No. 23-2545

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

LARS JENSEN, an individual,

*Plaintiff-Appellant*,

v.

NATALIE BROWN, in her individual and official capacities as
Administrative Officer at Truckee Meadows Community College;
JULIE ELLSWORTH, in her individual and official capacities as
Dean of Science at Truckee Meadows Community College; ANNE
FLESHER, in her individual and official capacities as Dean of Math
and Physical Sciences at Truckee Meadows Community College;
KARIN HILGERSOM, in her individual and official capacities as
President of Truckee Meadows Community College; MARIE
MURGOLO, in her individual and official capacities as Vice
President of Academic Affairs at Truckee Meadows Community
College; MELODY ROSE, in her individual and official capacities as
Chancellor of the Nevada System of Higher Education,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Nevada
Case No. 3:22-cv-00045-LRH-CLB
Hon. Larry R. Hicks

_____

## APPELLANT'S EXCERPTS OF RECORD

_____

[counsel of Plaintiff-Appellant listed on next page]

John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Rd.
Reno, Nevada 89523
[Telephone # of Counsel]
jmnolan84@gmail.com
*Attorney of Record for Plaintiff-Appellant*

Michael Langton, Esq. (NSBN 290)
801 Riverside Drive Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com
sean@markmausertlaw.com
*Attorneys for Plaintiff-Appellant*

**ORAL ARGUMENT REQUESTED**

# EXCERPTS OF RECORD

| DOCKET NO. | DOCUMENT | DATE | PAGE |
|---|---|---|---|
| 58 | Order | September 27, 2023 | ER6-ER25 |
| 33 | Plaintiff's Response in Opposition to Defendants' Motion to Dismiss the First Amended Verified Complaint | April 13, 2022 | ER26-ER72 |
| 21 | Defendants' Motion to Dismiss the First Amended Complaint | March 15, 2022 | ER73-ER120 |
| 34 | Reply in Support of Motion to Dismiss | May 4, 2022 | ER121-ER132 |
| 30 | Request for Judicial Notice in Support of Plaintiff's Response in Opposition to Defendants' Motion to Dismiss the First Amended Complaint | April 13, 2022 | ER133-ER179 |
| 31 | Declaration of David K. Demers | April 13, 2022 | ER180-ER188 |
| 32 | Declaration of Lars Jensen | April 13, 2022 | ER189-ER203 |
| 22 | Request for Judicial Notice | March 15, 2022 | ER204-ER205 |
| 8 | First Amended Verified Complaint for Civil Rights Violations under 42 U.S.C. § 1983 | January 28, 2022 | ER206-ER236 |
| 24 | First Motion to Stay Discovery | March 16, 2022 | ER237-ER244 |
| 27 | Response to Motion to Stay Discovery | March 30, 2022 | ER245-ER254 |
| 28 | Reply to Response to Motion to Stay Discovery | April 6, 2022 | ER255-ER263 |
| 44 | Motion to Amend | September 22, 2022 | ER264-ER275 |
| 45 | Response to Motion to Amend | October 6, 2022 | ER276-ER279 |

| 46 | Reply to Response to Motion to Amend | October 13, 2022 | ER280-ER283 |
|---|---|---|---|
| 60 | Notice of Appeal | October 2, 2023 | ER284-ER287 |
| | Court Docket | | ER288-ER298 |

DATED: February 19, 2024                    Respectfully submitted,

By:  */s/ John M. Nolan*
John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

*/s/ Michael Langton*
Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

*/s/ Mark Mausert*
Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff/Appellant*

## **CERTIFICATE OF SERVICE**

Pursuant to FRAP 25(d), I certify that on this 19th day of February 2024, I served a true and correct copy of the foregoing **APPELLANT'S EXCERPTS OF RECORD** via electronic means by operation of the Court's electronic filing system, upon each party in this case is registered as an electronic case filing user with the Clerk.


*/s/ John M. Nolan*
John M. Nolan

1

2

3

4

5

6                      UNITED STATES DISTRICT COURT

7                              DISTRICT OF NEVADA

8                                     * * *

9   LARS JENSEN, an individual,              Case No. 3:22-cv-00045-LRH-CLB

10                          Plaintiff,       ORDER

11        v.

12   NATALIE BROWN, in her individual and official
     capacities as Administrative Officer at Truckee
13   Meadows     Community      College;   JULIE
     ELLSWORTH, in her individual and official
14   capacities as Dean of Science at Truckee Meadows
     Community College; ANNE FLESHER, in her
15   individual and official capacities as Dean of Math
     and Physical Sciences at Truckee Meadows
16   Community College; KARIN HILGERSOM, in her
     individual and official capacities as President of
17   Truckee Meadows Community College; MARIE
     MURGOLO, in her individual and official capacities
18   as Vice President of Academic Affairs at Truckee
     Meadows Community College; MELODY ROSE, in
19   her individual and official capacities as Chancellor
     of the Nevada System of Higher Education,
20
                             Defendants.
21

22

23        Before the Court is Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin

24   Hilgersom, Marie Murgolo, and Melody Rose's (collectively, "the Administrators") Motion to

25   Dismiss Plaintiff Lars Jensen's ("Dr. Jensen") First Amended Complaint. ECF No. 21. Dr. Jensen

26   filed a response in opposition to the motion, in which he requested oral argument (ECF No. 33),

27   and the Administrators replied (ECF No. 34). Also before the Court is Dr. Jensen's Motion to

28   Amend Response in Opposition to the Administrators' motion to dismiss. ECF No. 44. The

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 7 of 298
Case 3:22-cv-00045-LRH-CLB   Document 58   Filed 09/27/23   Page 2 of 20

ER7

Administrators filed a response in opposition (ECF No. 45) and Dr. Jensen replied (ECF No. 46). In both his motion to amend and reply in support of the motion to amend, Dr. Jensen requested oral argument. *See* ECF Nos. 44, 46. The Court denies Dr. Jensen's requests for oral argument. For the reasons articulated below, the Court denies Dr. Jensen's motion to amend and grants the Administrators' motion to dismiss.

## I.     BACKGROUND

This matter primarily involves alleged violations of civil rights concerning higher education employment at Truckee Meadows Community College ("TMCC") and, by extension, the Nevada System of Higher Education ("NSHE"). Dr. Jensen is a Community College Professor in the Math and Physical Sciences Division of TMCC's Mathematics Department. ECF No. 1 at 4. Natalie Brown is the Executive Director of the Advisement and Transfer Center at TMCC ("Dr. Brown"); Julie Ellsworth was the Dean of Sciences at TMCC at all relevant times to this action ("Dr. Ellsworth"); Anne Flesher is the Dean of Math and Physical Sciences at TMCC ("Dean Flesher"); Karin Hilgerson is the President of TMCC ("President Hilgersom"); Marie Murgolo was the Vice President of Academic Affairs at TMCC at all relevant times to this action ("Dr. Murgolo"); and Melody Rose is the Chancellor of NSHE ("Chancellor Rose"). *Id*. at 4–6.

Generally, the First Amended Complaint alleges that the Administrators sought to discipline, retaliate, and punish Dr. Jensen after he voiced concerns about the lowering of curriculum standards and the deterioration of shared governance at TMCC. ECF *Id*. at 2–6. TMCC hired Dr. Jensen on January 16, 1996, and he tenured on July 1, 1999. *Id*. at 6. Dr. Jensen has taught varying levels of mathematic courses during this time which range from algebra to calculus to statistics to college physics. *Id*. Dr. Jensen contends that throughout his employment, TMCC has continually altered its standards to make it easier for students to complete math courses and ignored internal procedures relating to shared governance. *Id*. at 6, 7. Dr. Jesen admits he has consistently voiced his concerns to TMCC on these two issues in different ways which include various email communications and a handout he distributed at a function. *Id*. at 7–9.

In June of 2019, the NSHE Board of Regents passed the "Co-Requisite Policy" and on January 21, 2020, TMCC organized the "Math Summit" to discuss how the Co-Requisite Policy

would be implemented.[1] *Id.* at 7. During the Math Summit, Dr. Ellsworth hosted an audience question and answer session in which Dr. Jensen claims that Dr. Ellsworth allowed members of the audience to make general comments but twice-denied Dr. Jensen the opportunity to voice his concerns and instructed him to use the "parking lot" for his comments.[2] *Id.* at 7, 8. At that time, Dr. Jensen departed the Math Summit, went to his office, and typed and printed a handout entitled "On Math Pathways – Looking Under the Hood" which outlined his Co-Requisite Policy concerns. *Id.* at 8. Dr. Jensen returned to the Math Summit and distributed the handout to attendees in different rooms during a break. *Id.* at 9. According to Dr. Jensen, Dr. Ellsworth began to collect the distributed handouts, grew angry, and asked him to step outside for a private conversation in which she made disparaging remarks. *Id.* at 9, 10.

Shortly after, on January 30, 2020, Dr. Ellsworth sent Dr. Jensen a notice of reprimand, which included a proposed letter of reprimand, that characterized Dr. Jensen's behavior at the Math Summit as "insubordination." *Id* at 10. Dr. Jensen claims that Dr. Ellsworth improperly classified his behavior as "insubordination" as a form of retaliation against him. *Id.* On February 3, 2020, Dr. Jensen filed a grievance seeking vindication of his academic freedom and First Amendment right against Dr. Ellsworth. *Id.* On February 5, 2020, Dr. Jensen sent an email to TMCC's faculty listserv entitled "Lowering Standards is Criminal – Literally." *Id.* at 11. By February 11, 2020, Dr. Jensen claims that he felt forced and pressured by Dr. Ellsworth to offer his resignation as chair and as a member of the tenure committee. *Id.* On March 30, 2020, Dr. Ellsworth placed a letter of reprimand in Dr. Jensen's file. *Id.* Thereafter, Dr. Ellsworth also raised minor issues about Dr. Jensen's class syllabus policies, another retaliatory act according to Dr. Jensen. *Id.*

On May 19, 2020, Dr. Ellsworth allegedly ignored the department chair's rating recommendation of "Excellent 2" as to Dr. Jensen's annual performance evaluation and changed the rating to "Unsatisfactory," the lowest possible rating at TMCC. *Id.* Dr. Jensen filed additional

---

[1]  According to Dr. Jensen, the Co-Requisite Policy passed by the NSHE Board of Regents "put students into a college level math class, possibly with an additional 1-3 co-req credits to fill any holes they may have in Algebra 1-2 or Geometry." ECF No. 8-1 at 2.

[2]  The "parking lot" is a whiteboard in TMCC's faculty meeting room to which participants may affix written comments and concerns. ECF No. 21 at 2.

grievances in response to the incidents with Dr. Ellsworth, but on November 24, 2020, Chancellor Rose denied Dr. Jensen's grievances. *Id*. at 12.

Along similar lines, Dr. Jensen alleges that Dean Flesher cited minor issues as her justification for changing Dr. Jensen's annual performance review from a recommended "Excellent" to "Unsatisfactory." *Id*. at 12. Dr. Jensen also claims that Dean Flesher applied criteria to his annual performance review that was not equally applied to other annual performance reviews. *Id*. Dr. Jensen filed one grievance related to the incident with Dean Flesher and on July 27, 2021, Chancellor Rose denied the grievance. *Id*. at 12, 13.

On June 2, 2021, Dean Flesher wrote a letter to President Hilgersom notifying her that Dr. Jensen had received two consecutive "Unsatisfactory" annual performance evaluations. *Id*. at 13. Around June 16, 2021, President Hilgersom appointed Dr. Brown to investigate Dr. Jensen for a disciplinary hearing.[3] *Id*. at 13. Dr. Brown's investigation took place over the summer with faculty and included interviews with Dr. Ellsworth and Dean Flesher. *Id*. Dr. Jensen claims that the investigation was rushed, lasting only 21-days, and that his request to delay the proceedings until he was back in the country was ignored by Dr. Brown. *Id*. at 13, 14. According to Dr. Jensen, Dr. Brown used the investigation and charging letter to fabricate a basis to terminate his employment. *Id*. at 14.

On July 12, 2021, President Hilgerson appointed Mark Ghan as the Special Hearing Officer for Dr. Jensen's disciplinary hearing. *Id*. However, Ghan was later removed by President Hilgerson after Dr. Jensen raised a challenge for cause due to the existence of an ongoing contract between Ghan and NSHE. *Id*. Dr. Jensen alleges that President Hilgersom refused to order an allegedly biased committee member, Andy Hughes, to be removed from the faculty committee at the disciplinary hearing.[4] *Id*.

---

[3]   Dr. Jensen contests the validity of Dr. Brown's appointment to investigate because (1) no complaint was filed against him, and (2) under the NSHE Handbook, when a faculty member receives two consecutive unsatisfactory rankings the requirement is to hold a hearing only. ECF No. 8 at 13.

[4]   According to Dr. Jensen, Hughes had previously submitted a complaint of discrimination against Dr. Jensen that was investigated and dismissed by TMCC's Human Resources Department. ECF No. 1 at 14.

Dr. Jensen argues that the pattern of actions taken by the Administrators demonstrates a concerted effort to punish and retaliate against him for his handout distribution at the Math Summit, and his criticism of the deterioration of shared governance at TMCC. *Id*. at 15. Dr. Jensen further claims that the Administrators' actions caused a deprivation of his rights and proximately caused economic and emotional damages. *Id*. at 16. Dr. Jensen's First Amended Complaint alleges seven causes of action: (1) First Amendment Retaliation under 42 U.S.C. § 1983, against all the Administrators in their official capacities; (2) First Amendment Retaliation under 42 U.S.C. § 1983, against all the Administrators in their individual capacities; (3) Violation of the Nevada Constitution, Article I § 9, against all the Administrators; (4) Violation of Procedural Due Process Rights under 42 U.S.C. § 1983, against Dr. Brown, President Hilgersom, and Dean Flesher; (5) Violation of the Nevada Constitution, Article I § 8, against Dr. Brown, President Hilgersom, and Dean Flesher; (6) Violation of the Fourteenth Amendment Equal Protection Clause under 42 U.S.C. § 1983, against all the Administrators; and (7) Declaratory Relief under 28 U.S.C. §§ 2201, *et seq*., against all the Administrators. *Id*. at 19–24. The Administrators filed a motion to dismiss Dr. Jensen's First Amended Complaint. ECF No. 21. The motion is addressed below.

## II.   LEGAL STANDARD

A party may seek the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a legally cognizable cause of action. *See* Fed. R. Civ. P. 12(b)(6) (stating that a party may file a motion to dismiss for "failure to state a claim upon which relief can be granted[.]"). To survive a motion to dismiss for failure to state a claim, a complaint must satisfy the notice pleading standard of Federal Rule 8(a)(2). *See Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008). Under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8(a)(2) does not require detailed factual allegations; however, a pleading that offers only "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" is insufficient and fails to meet this broad pleading standard. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

///

To sufficiently allege a claim under Rule 8(a)(2), viewed within the context of a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference, based on the court's judicial experience and common sense, that the defendant is liable for the alleged misconduct. *See id.* at 678–79 (stating that "[t]he plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotations and citations omitted)). Further, in reviewing a motion to dismiss, the court accepts the factual allegations in the complaint as true. *Id.* However, bare assertions in a complaint amounting "to nothing more than a formulaic recitation of the elements of a . . . claim . . . are not entitled to an assumption of truth." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 698) (internal quotation marks omitted). The court discounts these allegations because "they do nothing more than state a legal conclusion—even if that conclusion is cast in the form of a factual allegation." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Id.*

"Although generally the scope of review on a motion to dismiss for failure to state a claim is limited to the [c]omplaint, a court may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels—Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotations and citations omitted).  The court may "treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).

///

## III.    DISCUSSION

### A.    Eleventh Amendment Immunity

The Eleventh Amendment "bars suits against the State or its agencies for all types of relief, absent unequivocal consent by the state." *Krainski v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*, 616 F.3d 963, 967 (9th Cir. 2010) (citations omitted). Such immunity extends to state officials, shielding them from suits alleged against them in their official capacities. *Id*. Here, the Administrators argue that all causes of action against them in their official capacities should be dismissed based on Eleventh Amendment immunity because they are NSHE employees. ECF No. 21 at 20, 21.

In the Ninth Circuit, Eleventh Amendment immunity extends to NSHE and its constituent entities as agencies of the State of Nevada. *See Johnson v. Univ. of Nevada*, 596 F. Supp. 175, 178 (D. Nev. 1984) (concluding that Nevada's university system operates as a branch of state government so that its entities are captured within the meaning of the Eleventh Amendment); *see also Krainski*, 616 F.3d at 968 (holding that the plaintiff may not bring an action against the University of Nevada, Las Vegas under the Eleventh Amendment); *see also Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 883 n. 17 (9th Cir. 2004) (noting NSHE's immunity from suit under the Eleventh Amendment). Here, there is no question that TMCC is an NSHE entity for purposes of Eleventh Amendment immunity.

The Ninth Circuit also recognizes that Eleventh Amendment immunity extends to NSHE employees in their official capacities. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (reasoning that actions against state officials in their official capacities are not suits against the official, but suits against the official's office under the Eleventh Amendment); *see also Krainski*, 616 F.3d at 967–68 (concluding that the district court did not err in dismissing plaintiff's claims against UNLV employees in their official capacities under the Eleventh Amendment). Thus, there is no question that the Eleventh Amendment immunity applies to the Administrators in their official capacities; they are all employees of TMCC or NSHE itself.

However, there is a narrow exception to Eleventh Amendment immunity "where the relief sought is prospective in nature and is based on an ongoing violation of the plaintiff's *federal*

1    constitutional or statutory rights." *Krainski*, 616 F.3d at 967–68 (citation omitted) (emphasis

2    original). Here, Dr. Jensen argues that the exception should apply because he seeks "prospective

3    relief" from the Administrators in their official capacities. ECF No. 33 at 23. The Administrators

4    question whether the "prospective relief" Dr. Jensen claims to seek is truly forward-looking

5    injunctive relief as to trigger the exception. ECF No. 34 at 10.

6          Whether relief sought is prospective or retrospective is based on *Ex parte Young*, 209 U.S.

7    123 (1908), and a litany of cases that followed.

8          *Young* has been focused on cases in which a violation of federal law by a state
            official is ongoing as opposed to cases in which federal law has been violated at
9          one time or over a period of time in the past, as well as on cases in which the relief
            against the state official directly ends the violation of federal law as opposed to
10         cases in which that relief is intended indirectly to encourage compliance with
            federal law through deterrence

11

12   *Papasan v. Allain*, 478 U.S. 265, 277–78 (1986). In deciding whether relief is prospective and

13   based on an ongoing violation of federal rights, courts "look to the substance rather than to the

14   form of the relief sought[.]" *Id*. at 279. An example of prospective relief that triggered the

15   immunity exception was observed in *Doe v. Lawrence Livermore Nat. Lab'y*, 131 F.3d 836 (9th

16   Cir. 1997). In that case, the Ninth Circuit reversed the district court's dismissal of a plaintiff's

17   § 1983 claim aimed at an official capacity defendant because plaintiff sought reinstatement as a

18   laboratory employee which constituted proper prospective injunctive relief. *Id*. at 837. The Ninth

19   Circuit reasoned that the plaintiff in *Doe* was "not attempting to recover lost wages or other accrued

20   benefits by arguing that their continued withholding is an ongoing violation" but simply sought

21   job reinstatement without any compensation. *Id*. at 840.

22         Conversely, relief that is not prospective for purposes of the immunity exception includes

23   relief "expressly denominated as damages" because it "serves to compensate a party injured in the

24   past by an action of a state official in his official capacity[.]" *Papasan*, 478 U.S. at 278 (citation

25   omitted). Relief that is referred to or styled as "prospective" but equates to "an award of damages

26   for a past violation of federal law" does not trigger the exception to Eleventh Amendment

27   immunity. *Id*.

28   ///

1    The only relief specifically labeled as "prospective" by Dr. Jensen in the First Amended

2    Complaint is some of the relief he seeks from the Administrators in their official capacities in

3    conjunction with his first cause of action. *See* ECF No. 8 at 19. Dr. Jensen describes this relief as

4    "relief from defendants for prospective compensation from the date of judgment for salary

5    adjustments he would have received had he not received the unlawful performance reviews" and

6    "prospective relief against the defendants acting in their official capacities for full expungement

7    of all negative personal files, return of his 2019-2020 annual performance evaluation to 'excellent',

8    and return of his 2020-2021 annual performance evaluation to 'excellent.'" ECF No. 8 at 19.

9    Although Dr. Jensen claims to seek "prospective relief" as to trigger the exception, the specifics

10   of his two requests reveal that he seeks retrospective relief to remedy a past violation of federal

11   law. Essentially, Dr. Jensen requests (1) monetary compensation for lost salary, and (2) retroactive

12   expungement and restoration of past performance reviews. Such requests more closely resemble

13   recovery of lost wages than true prospective relief addressing ongoing violations. Just because

14   relief is characterized as "prospective" does not render true. *See Ulaleo v. Paty*, 902 F.2d 1395,

15   1399 (9th Cir. 1990) ("[s]imply asking for injunctive relief and not damages does not clear the

16   path for a suit.").

17   Because the Ninth Circuit has expressly held that the Eleventh Amendment "bars suits

18   against state officials in their official capacities when the relief sought is retrospective or

19   compensatory in nature," *Han v. U.S. Dep't of Just.*, 45 F.3d 333, 338 (9th Cir. 1995), the Court

20   finds that the narrow exception to Eleventh Amendment immunity does not apply here. *See*

21   *Papasan*, 478 U.S. at 280 (concluding plaintiff's request for prospective relief was "essentially

22   equivalent" to a one-time restoration of lost trust corpus); *see also Edelman v. Jordan*, 415 U.S.

23   651, 665 (1974) (reasoning that a district court's award of retroactive benefits more closely

24   resembled a compensatory money damages award for past violations of federal law than it did an

25   award for prospective injunctive relief); *Green v. Mansour*, 474 U.S. 64, 68 (1985) (holding that

26   "compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh

27   Amendment." (citation omitted)).

28   ///

1    For these reasons, the Court finds that the Administrators are immune from suit in their

2    official capacities under the Eleventh Amendment. The Court also finds the narrow "prospective

3    injunctive relief exception" to Eleventh Amendment immunity does not apply. Accordingly, the

4    Court dismisses Dr. Jensen's constitutional claims against the Administrators in their official

5    capacities with prejudice.

6    However, to the extent that Dr. Jensen seeks declaratory and injunctive relief from the

7    Administrators in their official capacities, such claims are not barred by the Eleventh Amendment.[5]

8    *See The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989) (stating

9    that the Eleventh Amendment "does not bar actions for declaratory . . . relief." (citation omitted));

10   *see also Jackson v. Hayakawa*, 682 F.2d 1344, 1351 (9th Cir. 1982) ("[t]he Eleventh Amendment

11   does not bar actions for injunctive or declaratory relief against state officials sued under 42 U.S.C.

12   § 1983."). Dr. Jensen's sixth cause of action for declaratory relief is addressed herein in Sections

13   III.B.3 and III.D.

14   **B.    Qualified Immunity Defense**

15   The Administrators also claim qualified immunity with respect to Dr. Jensen's claim

16   against them in their individual capacities. ECF No. 21 at 21, 22. While Eleventh Amendment

17   immunity bars federal court action for damages and retroactive relief against state officials in their

18   official capacities, it does not bar such claims against the state officials in their personal capacities.

19   *Pena v. Gardner*, 976 F.2d 469, 472–73 (9th Cir. 1992), as amended (Oct. 9, 1992). At the same

20   time, however, an "official sued in his personal capacity, although deprived of [E]leventh

21   [A]mendment immunity, may assert a defense of qualified immunity." *Id.* at 473 (citation omitted).

22   As such, the Court addresses the Administrators' asserted qualified immunity defense with regard

23   to Dr. Jensen's claims alleged against them as individuals.

24   Generally, state officials sued in their individual capacities are entitled to qualified

25   immunity from suits for damages where "their conduct does not violate clearly established

26   statutory or constitutional rights of which a reasonable person would have known." *Krainski*, 616

27

28       [5]   This finding, of course, is subject to and does not incorporate Dr. Jensen's demands for
             "prospective relief" that the Court has found to be tantamount to retrospective awards for damages.
             That relief is clearly barred by the Eleventh Amendment as held in this Order.

F.3d at 968. More specifically, whether qualified immunity applies depends on two distinct inquiries: "(1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Id.* (citation omitted). "Courts may begin with either prong of the analysis." *Cates v. Stroud*, 976 F.3d 972, 978 (9th Cir. 2020). The Court finds that the defense of qualified immunity applies to the remaining constitutional claims against the Administrators in their individual capacities as outlined below.

> 1. The Court dismisses Dr. Jensen's second cause of action against the Administrators in their individual capacities based on qualified immunity because Dr. Jensen fails to clearly establish the right at issue in light of the specific context of this case.

Listed as the second cause of action in the First Amended Complaint, Dr. Jensen alleges that the Administrators, in their individual capacities, retaliated against him for his speech in violation of 42 U.S.C. § 1983. ECF No. 8 at 19, 20. As to the two qualified immunity defense inquiries, Dr. Jensen claims that the facts as alleged in the First Amended Complaint show the Administrators conduct violated a constitutional right, and that he clearly established the right at issue in this case because he clearly pled First Amendment retaliation, the Administrators knew they could not retaliate, he cited to *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014), and also established what protection professors receive under the First Amendment in the Ninth Circuit.[6] ECF No. 33 at 22, 23. The Administrators reiterate their argument that Dr. Jensen fails to show a clearly established right because he fails to identify on-point precedent and relies on broad assertions as to the First Amendment. ECF No. 34 at 11.

The Court begins its analysis with the second inquiry as it is dispositive here. It is the plaintiff's burden to prove that "the right allegedly violated was clearly established at the time of the alleged misconduct." *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021), cert. denied, 142 S. Ct. 898 (2022) (quotation omitted). "The contours of the right 'must be sufficiently clear that a

---

[6] Dr. Jensen's first citation to *Demers*, reads: *"Demers v. Austin*, 746 F.3d 1091 (9th Cir. 2014)." ECF No. 8 at 3. The correct citation for *Demers* is *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014). The Court continues its analysis with the understanding that Dr. Jensen meant to cite the actual Ninth Circuit *Demers* case found at 746 F.3d 402.

reasonable official would understand that what he is doing violates that right.'" *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1122–23 (9th Cir. 2023) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). While caselaw does not require the plaintiff to point to "a case directly on point for a right to be clearly established," it does require the plaintiff to point to "existing precedent" that "place[s] the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quotations and citations omitted).

Here, Dr. Jensen fails to show that the right allegedly violated was clearly established at the time of the alleged misconduct. Throughout the First Amended Complaint, Dr. Jensen consistently uses broad-stroke language and generalized terms to describe the right at issue in this case including "free speech rights;" "free expression;" "First Amendment rights;" "fully protected speech;" and "speech rights." *See generally* ECF No. 8. Such high-level language, paired with only three citations—*Demers*, 746 F.3d 402, the First Amendment, and 42 U.S.C. § 1983—do not clearly establish the specific right at issue in this particular case. Dr. Jensen's general characterization of his speech rights in the First Amended Complaint "is precisely the broad-based characterization that the Supreme Court has forbidden in the qualified immunity context." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 980 (9th Cir. 1998) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("[i]t should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense" so that "a reasonable official would understand that what he is doing violates that right.")). "[B]road rights must be particularized before they are subjected to the clearly established test." *Id.* at 977 (quoting *Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir.1995)).

The Court finds that the First Amended Complaint fails to clearly establish the right at issue here because Dr. Jensen does not particularize it to the specific context of this case.[7] *See*

---

[7] The Ninth Circuit has held that in some rare cases, a constitutional right at issue may be defined by a standard that is so obvious that no case on point is required to clearly establish the right. *Jessop v. City of Fresno*, 936 F.3d 937, 942 (9th Cir. 2019) (quotation and citation omitted). This is no such case. Moreover, courts in the Ninth Circuit are "hesitant" to find a clearly established right "without a body of relevant case law." *Sharp v. County of Orange*, 871 F.3d 901, 911–12 (9th Cir. 2017).

*Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 888 (9th Cir. 2022) (concluding that plaintiff failed to clearly establish the relevant constitutional right because it was described "at too high a level of generality" and, as such, "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." (citation omitted)).

Dr. Jensen "must point to prior case law that articulates a constitutional rule specific enough to alert" the officials alleged of misconduct "that their particular conduct was unlawful." *Hyde v. City of Willcox,* 23 F.4th 863, 869 (9th Cir. 2022) (quotation and citation omitted). The Court is unpersuaded by Dr. Jensen's argument that citing *Demers* clearly established the right at issue. In *Demers*, the Ninth Circuit applied the general rule established in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), to speech as academic teaching and writing for the first time.[8] *Demers*, 746 F.3d at 417. *Demers* concluded that a professor's academic teaching and writing may be an exception to *Garcetti* 's general rule, but ultimately held that the defendants were entitled to qualified immunity because the plaintiff had not shown that "the contours of the right" were so "sufficiently clear" that "every reasonable official would have understood" their conduct violated that right. *Id*. at 417–18. In other words, the only case Dr Jensen cites to clearly establish and particularize the alleged right at issue in the present case is a case in which the Ninth Circuit concluded that right was not clearly established. *Id*. Any argument Dr. Jensen poses that he included *Demers* to invoke the academic writing and teaching exception is unavailing. Not once does Dr. Jensen reference the exception in the First Amended Complaint. As pled, Dr. Jensen's First Amended Complaint fails to make the contours of the right sufficiently clear so that every reasonable official under these circumstances would understand their conduct violated the right.

For these reasons, the Court finds that Dr. Jensen has failed to clearly establish the alleged right at issue; he defines the right too generally and fails to provide case law that clearly establishes the contours of the specific right particularized to this case. *See D.C. v. Wesby*, 583 U.S. 48, 63 (2018) ("[i]t is not enough that the [right] is suggested by then-existing precedent."). The

---

[8]     The general rule from *Garcetti* is that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

1  Administrators, as individuals, are afforded qualified immunity as to Dr. Jensen's second cause of

2  action. Accordingly, the Court dismisses this cause of action.

3          2.      <u>The Court dismisses Dr. Jensen's fourth cause of action against Dr. Brown,
                   President Hilgersom, and Dean Flesher as individuals on the basis of
4                  qualified immunity because the alleged facts do not show their conduct
                   violated the Due Process Clause.</u>
5

6          Listed as the fourth cause of action in the First Amended Complaint, Dr. Jensen alleges

7  that Dr. Brown, President Hilgersom, and Dean Flesher violated his procedural due process rights

8  under 42 U.S.C. § 1983. ECF No. 8 at 16. In their motion to dismiss, Dr. Brown, President

9  Hilgersom, and Dean Flesher argue that this claim should be dismissed based on qualified

10 immunity because Dr. Jensen fails to provide facts that show their conduct violated a constitutional

11 right. ECF No. 21 at 21, 22. In response, Dr. Jensen argues that he adequately pled the

12 Administrators denied him procedural due process. ECF No. 33 at 17–19.

13         The parties agree that a "section 1983 claim based upon procedural due process ... has three

14 elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the

15 interest by the government; (3) lack of process." *Armstrong v. Reynolds*, 22 F.4th 1058, 1066 (9th

16 Cir. 2022) (quoting *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993)).

17 Combining the first two elements, the "procedural due process rights of the Fourteenth

18 Amendment apply only when there is a deprivation of a constitutionally protected liberty or

19 property interest." *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 373 (9th Cir. 1999) (citing *Bd. of

20 Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70 (1972)). Dr. Jensen expressly claims three

21 protected liberty interests were deprived in the First Amended Complaint: (1) avoiding

22 termination, including by a biased hearing panel; (2) Dr. Jensen's good name, reputation, honor,

23 and integrity; and (3) future employment opportunities. [9] ECF No. 8 at 21.

24

25 ─────────────────
        [9]    In his opposition response, Dr. Jensen attempts to allege additional "property interests" to his
26 procedural due process claim including "academic freedom, right to maintain standards of
   curriculum, right to have the processes for faculty terminations followed, and right to not be charges
27 with insubordination for distributing handouts." ECF No. 33 at 18. While Dr. Jensen points to
   instances in the First Amended Complaint in which such subjects are loosely referred, the Court
28 finds that none of them are expressly alleged as property interests as to his procedural due process
   claim. As such, they are disregarded for the analysis of this claim.

1    As to a protected liberty interest in avoiding termination, a government employee generally

2    has a constitutionally protected property interest in continued employment. *Portman*, 995 F.2d at

3    904. Here, the only inference that can be made from the facts alleged is that Dr. Jensen avoided

4    termination and that he was never dismissed by TMCC. In fact, Dr. Jensen admits he is still, and

5    was at all relevant times, employed as a professor by TMCC. ECF No. 8 at 4. There is no light in

6    which the Court may view the First Amended Complaint as plausibly alleging a deprivation of his

7    protected liberty interest in employment as a government employee because he remains a

8    government employee. Any argument that Dr. Brown, President Hilgersom, and Dean Flesher

9    deprived him of an employment related interest protected by the Due Process Clause is plainly

10   unsupported.

11   As to protected liberty interests in his good name, reputation, honor, and integrity, harm to

12   one's reputation alone is not considered a liberty or property interest guaranteed against state

13   deprivation without due process of law. *Paul v. Davis*, 424 U.S. 693, 712 (1976). In *Paul*, the

14   plaintiff claimed when officials disseminated flyers to merchants identifying him as an "active

15   shoplifter" with a photo, the police deprived him of protected interests in his reputation. *Id*. at 695–

16   97. The Supreme Court reversed the court of appeals and held that the plaintiff did not state a claim

17   for violation of his procedural due process rights because, without more, reputational damage does

18   not deprive a person of any liberty or property interests protected by the Due Process Clause. *Id*.

19   at 711–12. Again, Dr. Jensen was not terminated so there is nothing more here than reputational

20   damage. Without more, these are not damages that implicate the type of liberty or property interests

21   protected by the Due Process Clause.

22   As to a protected liberty interest in future employment opportunities, there is a protected

23   liberty interest that "encompasses an individual's freedom to work and earn a living." *Portman*,

24   995 F.2d at 907. "[W]hen the government dismisses an individual for reasons that might seriously

25   damage his standing in the community, he is entitled to notice and a hearing to clear his name."

26   *Id*. (quotation omitted). "To implicate constitutional liberty interests, however, the reasons for

27   dismissal must be sufficiently serious to 'stigmatize' or otherwise burden the individual so that he

28   is not able to take advantage of other employment opportunities." *Id*. (quoting *Bollow v. Federal*

1    *Reserve Bank of San Francisco*, 650 F.2d 1093, 1101 (9th Cir.1981), cert. denied, 455 U.S. 948

2    (1982). "Charges that carry the stigma of moral turpitude such as dishonesty or immorality may

3    implicate a liberty interest, but charges of incompetence or inability to get along with others do

4    not." *Portman*, 995 F.2d at 907.

5    The Court finds that the First Amended Complaint alleges no facts that make a deprivation

6    of "future employment opportunities" plausible. First, and of utmost importance in this case, the

7    charges underlying the disciplinary investigation and hearing did not result in a termination or

8    dismissal from employment. Second, even if the charges resulted in dismissal—something the

9    Court does not find—they are not the type of charges that carry the stigma of moral turpitude such

10   as dishonesty or immorality that implicate a protected liberty interest under the Due Process

11   Clause. Dr. Jensen alleges that "insubordination" formed the basis of his letter of reprimand and

12   eventual disciplinary investigation and hearing. The actual letter of reprimand describes Dr.

13   Jensen's "insubordination" as unprofessional, disrespectful, and disruptive conduct. ECF No. 21-

14   2 at 2. The Ninth Circuit has concluded that insubordination charges are not charges of moral

15   turpitude that deprive a person of their protected liberty. *See Gray v. Union Cnty. Intermediate*

16   *Educ. Dist.*, 520 F.2d 803, 805–06 (9th Cir. 1975) (holding that, amongst other things, a letter

17   charging the appellant with insubordination and hostility towards others did not deprive the

18   appellant of a protected liberty because such charges do not import serious character defects like

19   dishonesty or immorality). Moreover, any argument that Dr. Jensen's protected liberty interest in

20   "future employment opportunities" has been deprived here is harshly undermined by the fact that

21   (1) he provides no instances in which he was denied employment, and (2) he remains employed

22   by TMCC.

23   For these reasons, the Court finds that Dr. Brown, President Hilgersom, and Dean Flesher

24   are afforded qualified immunity because Dr. Jensen has failed to establish a constitutional violation

25   with regard to his claim for a procedural due process violation. Accordingly, the Court dismisses

26   this claim with prejudice.[10] *See Krainski*, 616 F.3d at 971 (affirming the district court's dismissal

27

28   _____
     [10] Dismissal of this claim is further supported by the fact that Dr. Jensen inadequately alleges lack of
     process. For example, as alleged in the First Amended Complaint, Dr. Jensen implies that the notice
     he received was not "reasonable," not that there was a lack of notice. Furthermore, the alleged facts

1  of student's procedural due process claim because allegations of a damaged reputation and

2  tarnished educational transcript, without more, did not amount to a deprivation of her

3  constitutionally protected liberties or property interests).

4          3.      The Court dismisses Dr. Jensen's sixth cause of action against the
                   Administrators as individuals on the basis of qualified immunity because
5                  the facts alleged do not show their conduct violated the Equal Protection
                   Clause.
6

7          Listed as the sixth cause of action in the First Amended Complaint, Dr. Jensen alleges that

8  the Administrators violated the Equal Protection Clause pursuant to 42 U.S.C. § 1983. ECF No. 8

9  at 23. In their motion, the Administrators argue that this claim should be dismissed because (1) no

10 facts alleged show their conduct violated constitutional equal protection rights, and (2) Dr. Jensen

11 fails to allege facts identifying the protected class at issue. ECF No. 21 at 22. Dr. Jensen claims

12 that he has adequately pled that the Administrators are personally liable for violating his

13 Fourteenth Amendment rights. ECF No. 33 at 21. In reply, the Administrators also point out that

14 Dr. Jensen may not bring a "class-of-one" claim in a public employment context. ECF No. 34 at

15 9.

16         The Fourteenth Amendment's Equal Protection Clause demands that that all persons

17 similarly situated should be treated alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S.

18 432, 439 (1985); *see also Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir.2008). "The central inquiry

19 in an Equal Protection Clause claim is whether a government action was motivated by a

20 discriminatory purpose." *Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022). To state a claim

21 "under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth

22 Amendment a plaintiff must show that the defendants acted with an intent or purpose to

23 discriminate against the plaintiff based upon membership in a protected class." *Furnace v.*

24 *Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (quoting *Barren v. Harrington*, 152 F.3d 1193, 1194

25 (9th Cir.1998)).

26

27 ─────────────────────

28          make clear that Dr. Jensen believes the disciplinary hearing was "biased," not that there was no
            hearing. Clearly then, Dr. Jensen received some notice and a hearing, both of which did not result
            in a loss of his employment.

1     The preliminary step in an equal protection analysis is for the plaintiff "to identify the

2 [defendant's asserted] classification of groups.'" *Thornton v. City of St. Helens*, 425 F.3d 1158,

3 1166–67 (9th Cir. 2005) (quoting and citing *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187

4 (9th Cir.1995) (citation omitted)). "An equal protection claim will not lie by conflating all persons

5 not injured into a preferred class receiving better treatment than the plaintiff." *Thornton*, 425 F.3d

6 at 1167 (quotation and citation omitted).

7     In the First Amended Complaint, Dr. Jensen makes no outright reference to the protected

8 class of which he purports to be a member. Instead, Dr. Jensen offers a scarce number of

9 conclusory statements that he was "treated differently than similarly situated Professors" and that

10 he was "evaluated differently from other faculty."[11] ECF No. 8 at 24, 12.  Two sweeping and

11 conclusory statements, even when viewed favorably, amount to nothing more than "conflating all

12 persons not injured into a preferred class receiving better treatment than the plaintiff." See

13 *Thornton*, 425 F.3d at 1167 (quotation and citation omitted).

14     For this reason, the Court finds that qualified immunity applies to the Administrators as

15 individuals here because Dr. Jensen has failed to allege a constitutional violation of the Equal

16 Protection Clause. Accordingly, the Court dismisses this claim. *See Bruns v. Nat'l Credit Union

17 Admin.*, 122 F.3d 1251, 1257 (9th Cir.1997) ("[A] liberal interpretation of a civil rights complaint

18 may not supply essential elements of the claim that were not initially pled." (citation and internal

19 quotation marks omitted)).

20     **C.     Dr. Jensen's Pendent State Law Claims**

21     Dr. Jensen brings supplemental Nevada Constitutional claims against the Administrators

22 in both their official and individual capacities. *See* ECF No. 8 at 18–24. The Administrators

23 provide a litany of reasons for dismissal of the state law claims. ECF No. 21 at 22, 23.

24

25     [11]    The Court does not believe Dr. Jensen purports to bring his Equal Protection Clause claim against
the individual Administrators under a "class-of-one" theory. To the extent that this may be true,

26     however, it is not persuasive. An equal protection claim based on class-of-one theory "presupposes
that like individuals should be treated alike, and that to treat them differently is to classify them in

27     a way that must survive at least rationality review." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591,
605 (2008). However, the Supreme Court has held that the class-of-one theory of equal protection

28     has "no application in the public employment context." *Id.* Thus, a class-of-one theory here is not
viable.

In *Pennhurst State Sch. & Hosp. v. Halderman* (*Pennhurst II*), the Supreme Court held that state law claims brought into federal court under pendent jurisdiction are subject to Eleventh Amendment immunity where the claims allege that state officials violated state law in carrying out their official responsibilities. 465 U.S. 89, 121 (1984). The Ninth Circuit echoes this finding. *See Ulaleo v. Paty*, 902 F.2d 1395, 1400 (9th Cir. 1990) (reasoning that plaintiff's pendent state law claims were rightfully dismissed because hearing them in federal court would "offend federalism and [would] not further the interests of federal law, the justification for the *Ex parte Young* exception to the eleventh amendment.").

In this Order, the Court has dismissed Dr. Jensen's constitutional claims on the basis of Eleventh Amendment immunity and the asserted defense of qualified immunity. Only, state law claims against the Administrators remain. The Court dismisses the pendent state law claims against the Administrators in their official capacities due to Eleventh Amendment immunity and those against the Administrators in their individual capacities on pendent jurisdiction grounds. Accordingly, the Court dismisses Dr. Jensen's pendent state law claims against the Administrators.

### D.      Dr. Jensen's Declaratory Relief Claim

In this Order, the Court has dismissed Dr. Jensen's constitutional claims against the Administrators in their official capacities on the basis of Eleventh Amendment immunity. *See* Eleventh Amendment Immunity discussion *supra* Section III.A. The Court has also dismissed Dr. Jensen's constitutional claims against the individual Administrators based on the asserted defense of qualified immunity. *See* Qualified Immunity Defense discussion *supra* Section III.B.1,2,3. And finally, the Court has dismissed Dr. Jensen's state law claims based on Eleventh Amendment immunity and pendent jurisdiction. *See* Dr. Jensen's Pendent State Law Claims discussion *supra* Section III.C.

Declaratory relief is not a standalone claim. *See* 28 U.S.C. §§ 2201, 2202; *see also Fiedler v. Clark*, 714 F.2d 77, 79 (9th Cir. 1983) ("The Declaratory Judgment Act does not provide an independent jurisdictional basis for suits in federal court" and "[i]t only permits the district court to adopt a specific remedy when jurisdiction exists."). When all of a plaintiff's "substantive claims have been dismissed, plaintiff's claim for declaratory relief will be dismissed as well." *Zappia v.*

*World Sav. F.S.B.*, Case No. 14-CV-1428-WQH-DHB, 2015 WL 9473641, at *10 (S.D. Cal. Dec. 28, 2015) (citing *Mayen v. Bank of Am., N.A.*, Case No. 14-CV-03757, 2015 WL 179541, at *5 (N.D. Cal. Jan. 14, 2015) ("The Court also agrees that, because Plaintiff's complaint will be dismissed in its entirety, no viable cause of action remains to support Plaintiff's request for declaratory relief. Plaintiff's declaratory relief claim must be dismissed.")). Because the Court dismisses all Dr. Jensen's substantive claims, the Court finds that no viable causes of action remain to support his declaratory relief requests. Accordingly, the Court dismisses this claim.

**IV.    CONCLUSION**

IT IS THEREFORE ORDERED that the Administrators' motion to dismiss is (ECF No. 21) is **GRANTED**. Dr. Jensen's constitutional claims against the Administrators in their official capacities are dismissed with prejudice based on Eleventh Amendment immunity. Dr. Jensen's constitutional claims against the Administrators in their individual capacities are dismissed based on the Administrators' asserted qualified immunity defense. Dr. Jensen's pendent state law claims against the Administrators, in both capacities, are dismissed without prejudice to Dr. Jensen's right to allege them in state court on Eleventh Amendment immunity and pendent jurisdiction grounds. While Eleventh Amendment immunity and qualified immunity do not bar Dr. Jensen's claims for declaratory and injunctive relief, the Court dismisses Dr. Jensen's claim for declaratory relief because all other substantive causes of action are dismissed.

IT IS FURTHER ORDERED that Dr. Jensen's motion to amend (ECF No. 44) is **DENIED as moo**t.

IT IS FURTHER ORDERED that the Clerk of the court shall enter judgment accordingly and close this case.

IT IS SO ORDERED.

DATED this 27th day of September, 2023.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff Lars Jensen*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LARS JENSEN, an individual,

     *Plaintiff,*

  v.

NATALIE BROWN, in her individual and
official capacities as Administrative Officer at
Truckee Meadows Community College; JULIE
ELLSWORTH, in her individual and official
capacities as Dean of Sciences at Truckee
Meadows Community College; ANNE
FLESHER, in her individual and official
capacities as Dean of Math and Physical
Sciences at Truckee Meadows Community
College; KARIN HILGERSOM, in her
individual and official capacities as President of
Truckee Meadows Community College;
MARIE MURGOLO, in her individual and
official capacities as Vice President of
Academic Affairs at Truckee Meadows
Community College; MELODY ROSE, in her

Case No. 3:22-cv-00045-ART-CLB

**PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE FIRST
AMENDED VERIFIED COMPLAINT**

**ORAL ARGUMENT REQUESTED**

individual and official capacities as Chancellor of the Nevada System of Higher Education,

*Defendants.*

Plaintiff Lars Jensen by and through his undersigned counsel herewith files his Response in Opposition to Defendants' Brown, et al., Motion to Dismiss the First Amended Complaint filed on March 15, 2022, (ECF No. 21)(the "MTD"). This Response in Opposition to the MTD is made and based upon following the Memorandum of Points and Authorities, the Verified Complaint (ECF No.1)(the "complaint") and exhibits thereto, the First Amended Verified Complaint (ECF No. 8)(the "FAC") and exhibits thereto, the Declaration of David Demers (ECF No. 31)("Demers Decl.") and exhibits thereto, the Declaration of Lars Jensen (ECF No. 32)("Jensen Decl.")and exhibits thereto, the exhibits and declarations filed in support of this Response in Opposition to the MTD, the pleadings and papers on file herein including documents attached to or incorporated into the pleadings, documents and information in the accompanying Request for Judicial Notice (ECF No. 30)(the "RJN"), and such other evidence and argument as the Court may allow.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

The U. S. Supreme Court has warned against any actions that "chill that free play of the spirit which all teachers ought especially to cultivate and practice" since it "makes for caution and timidity in their associations by potential teachers." *Wieman v. Updegraff*, 344 U.S. 183, 195 (1952). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and

die." *Sweezy v. N.H. ex rel Wyman*, 354 U.S. 234, 250 (1957).  A public institution of higher education in the State of Nevada should be a destination for intellectual diversity that meets the "marketplace of ideas" standard laid out by the U.S. Supreme Court's jurisprudence.  *See Keyishian V. Bd. Of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).  "[S]tate colleges and universities are not enclave immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972).  "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973).  "[T]he point of all speech protection, which is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).

Instead, of allowing these constitutional principles to flourish Defendants have taken actions that have had a chilling effect on speech to both Dr. Jensen and the larger community. Dr. Jensen's constitutional claims as alleged in the FAC are not brought lightly and are like a large number of cases recently decided or currently pending in the federal court system.  This District Court has previously held that, "[t]he fact that other federal courts are currently wrestling with constitutional issues similar to those presented by Plaintiffs in this case constitutes further indicia that Plaintiffs' claims under the U.S. Constitution are not frivolous." *Fair Maps Nevada v. Cegavske*, 463 F.Supp.3d 1123, 1137 (D. Nev. 2020 May 29, 2020)

///

///

## II.   <u>**SUMMARY OF CASE**</u>

In this case, Defendants retaliated against Dr. Jensen for questioning the expenditure of money and the appropriate level of standards for mathematics curriculum for higher education in the State of Nevada. Dr. Jensen spoke on matters of public concern as a private citizen through attempted public comment, emails, and distribution of a handout addressing his concerns regarding the impact of math standards on the community. *See* Jensen Decl., Ex. A, Ex. B, Ex. C; FAC ¶ 37. The distribution of the handout was at an event open to the greater Truckee Meadows Community College (hereinafter "TMCC") community and later through electronic distribution. FAC ¶ 26; Ex. C. The distribution of handouts critical of higher education administration by faculty has been protected in Nevada since the seminal case of *State ex rel. Richardson* in 1954 during the McCarthy era. *See State ex rel. Richardson v. Board of Regents*, 70 Nev. 347, 269 P.2d 265 (1954); *See* J. Dee Kille, Academic Freedom Imperiled: The McCarthy Era at the University of Nevada (2004).

Thereafter, Defendants, acting in their official and individual capacities, violated Dr. Lars Jensen's constitutional rights secured by the First and Fourteenth Amendments to the U. S. Constitution and rights secured by the Nevada Constitution by: (1) repeatedly retaliating against Dr. Jensen for his protected expression, (2) denying him procedural due process protections, and (3) treating him differently than other similarly situated professors. Dr. Jensen's FAC more than adequately alleges facts that give rise to an "inference" of liability for each of the seven causes of action. The constitutional rights that Dr. Jensen was repeatedly denied by Defendants have been clearly established by case law from the U.S. Supreme Court and the Ninth Circuit. In many cases for decades. Defendants filed a MTD that fails the dismissal standard in federal court since it raises arguments that fail to take factual inferences in Dr. Jensen's favor.

Finally, Defendants seem to concede in their MTD that constitutional violations occurred, but focus their arguments on the adequacy of pleading. They further assert that they are entitled to qualified immunity or Eleventh Amendment sovereign immunity and that all claims should be dismissed. MTD at 20-21. Defendants do not deserve either defense given the clearly established case law. Their MTD ignores multiple precedential cases with facts that are almost identical to the issues in this case. In asking this Court to dismiss these claims, Defendants ignore clearly established case law and facts they find inconvenient. Plaintiff Dr. Lars Jensen respectfully requests this honorable Court to deny the Defendants' MTD in its entirety for the reasons set forth herein.

## III.   STATEMENT OF FACTS

### A. Dr. Jensen – The Concerned Professor

According to the FAC, Dr. Jensen is a Community College Professor at TMCC in the Mathematics Department, which is a division of the Math and Physical Sciences Division. FAC ¶ 9. Dr. Jensen began professionally exercising his constitutional rights of free expression regarding the lowering of math standards and deterioration of shared governance since at least 2017. *Id.* ¶¶ 2, 22. As a faculty member, Dr. Jensen also has a obligation under the NSHE Handbook, Title 2, Chapter 2 § 2.1.3 to be "responsible for the maintenance of appropriate standards of scholarship and instruction." *Id.* ¶ 21 The NSHE Handbook also defines and protects academic freedom for faculty. *Id.* ¶ 1.

### B. TMCC and NSHE Lower Standards and Deteriorate Shared Governance

The FAC alleges that since Dr. Jensen was hired in 1996, he witnessed the deterioration of shared governance and the lowering of curriculum standards at TMCC. *Id.* ¶¶ 9,2, 20. In the FAC, Dr. Jensen's email from February 13, 2018, titled "On the issue of Confidentiality" is

listed as an example of Dr. Jensen raising concerns. *Id.* ¶ 23.  That email, which was

incorporated by reference, stated speculative concerns of Dr. Jensen regarding administration

decision making, reprimands being given for "made-up reasons," firings without due process,

administrators sexually assaulting faculty, and various other hypotheticals.  *See* Ex. A.

## C.  Math Standards Changed by NSHE Co-Requisite Policy

The Board of Regents for the NSHE passed a Co-Requisite Policy in June of 2019. FAC

¶ 24.  Following that announcement, Dr. Jensen developed concerns regarding the policy, which

were communicated to math department faculty on December 18, 2019.  That email which is

incorporated by reference stated specific concerns and examples regarding math standards and

the impact of the co-requisite policy. *See* Ex. B The email also stated that Dr. Jensen had given a

prior in person department presentation regarding these issues.  *Id.*

## D.  Dean Ellsworth's Math Summit

Dean Julie Ellsworth organized a Math Summit with the community to discuss how the

Board of Regents of the NSHE Co-Requisite policy would be implemented at TMCC.  FAC ¶

26.  The agenda for the event, which is incorporated by reference in the FAC, specifically states

that "members from the broader TMCC community" were invited to attend.  *See* Ex. C   Further,

the agenda specifically listed "Perspectives on Math Pathways at TMCC and the Co-Req

Adventure" as a topic for discussion. *Id.*   During the perspective sharing time, Dr. Lars Jensen

attempted to express his concerns regarding the implementation of the new co-requisite math

requirements that were in the process of being implemented by TMCC and was denied the

opportunity to speak by Dean Ellsworth. FAC ¶ 32.   All other attendees were allowed to speak if

desired by Dean Ellsworth except Dr. Jensen.  FAC ¶¶ 28-29.  Dr. Jensen then requested again to

be allowed to speak in the same manner as the other attendees and Dean Ellsworth then directed him to use the parking lot.  FAC ¶ 33.

### E.  "On the Math Pathways - Looking Under the Hood" Dr. Jensen's Handout

Dr. Jensen then left the Math Summit and typed out his comments in his faculty office at TMCC.  FAC ¶ 34.  The handout expressed concerns regarding the co-requisite policy.  FAC ¶¶ 35-37.  Some of the concerns had been previously communicated by Dr. Jensen in emails and presentations.  *See* Ex. B  In the handout, Dr. Jensen specifically mentions the impact of the co-requisite policy on the community.  FAC ¶ 37.  During break time at the Math Summit, Dr. Jensen distributed the handout in multiple rooms.  FAC ¶¶ 38, 42, 43.  During the NSHE special hearing, multiple witnesses confirmed under oath that Dr. Jensen was professional and was not disruptive.  FAC ¶ 39.  Julia Hammett, Jeff Olson, Damien Ennis, and Keith Hooper have all filed declarations in support of Plaintiff's Response in Opposition to the MTD, which are attached as exhibits herein, that Plaintiff was not disruptive during the Math Summit.  *See* Ex. D, Ex. E, Ex. F, Ex. G.

### F.  Dr. Jensen was retaliated against for his Constitutionally Protected Speech

Dean Ellsworth physically picked up the handouts and had other participants return their copies to her.  FAC ¶ 40.  Dean Ellsworth made disparaging remarks to Dr. Jensen and told him that he had "made an error by defying her." FAC ¶ 44.  On January 30, 2020, Dean Ellsworth sent Dr. Jensen a notice of reprimand for insubordination due to his "disruptive behavior" at the Math Summit. FAC ¶¶ 46-47.  The application of insubordination based on the holding from the Nevada Supreme Court in *State ex rel. Richardson v. Board of Regents*, 70 Nev. 347. 269, P.2d 265 (1954) was incorrectly applied to Dr. Jensen.  FAC ¶¶ 48-49.  Dr. Jensen filed a grievance on February 3, 2020, seeking vindication of his academic freedom and First Amendment rights,

but that was eventually denied by Chancellor Melody Rose. FAC ¶¶ 50, 58.  Dean Ellsworth

thereafter began retaliating against Dr. Jensen by raising minor bureaucratic issues and by giving

him unsatisfactory evaluations.  FAC ¶¶ 52, 54-60.  On March 30, 2020, Dean Ellsworth issued a

formal letter of reprimand to Dr. Jensen. FAC ¶ 53.  The following academic year, Dean Flesher

continued to take retaliatory employment actions against Dr. Jensen. FAC ¶¶61-67.  After giving

Dr. Jensen an unsatisfactory annual evaluation Dean Flesher sent a letter to President Hilgersom

notifying her that Dr. Jensen had received two consecutive unsatisfactory annual evaluations.

FAC ¶ 67.

**G.  Dr. Jensen was denied Procedural Due Process**

President Hilgersom appointed Dr. Natalie Brown to be an administrative officer and

investigate Dr. Jensen.  FAC ¶ 68.  The NSHE Handbook only allows a hearing when a faculty

member receives two consecutive unsatisfactory ratings. FAC ¶¶ 68, 70.  The investigation was

conducted over the summer when Dr. Jensen was off contract and only Dean Ellsworth and Dean

Flesher were interviewed by Dr. Brown.  FAC ¶¶ 71-72.  Dr. Jensen was out of the country

during the investigation and the investigation was rushed.  FAC ¶¶73-74.  Dr. Brown added

additional charges against Dr. Jensen, which she had no authority to add.  FAC ¶¶ 75-76.

President Hilgersom then appointed her colleague who had an ongoing contract with NSHE as

the Special Hearing Officer.  FAC ¶¶ 77-78.  President Hilgersom also refused to remove a

biased committee member from serving on the special hearing committee. FAC ¶¶ 80-82.  From

the appointment of Natalie Brown until the conclusion of the hearing Dr. Jensen was a victim of

multiple procedural due process violations. FAC ¶¶ 68-86.

///

///

IV.   **LEGAL STANDARD**

A 12(b)(6) motion to dismiss sets a high bar for the moving party to be successful and is "viewed with disfavor and is rarely granted." *Ernst & Haas Mgmt. Co. v. Hiscox, Inc,* 23 F.4th 1195, 1199 (9th Cir. 2022)(quoting *McDougal v. Cnty. of Imperial*, 942 F.2d 668, 676n.7 (9th Cir. 1991)).   Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.   Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   The Supreme Court has held that civil rights cases only require a "short and plain statement of the claim."   *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993).   When a court reviews a motion to dismiss "[a]ll material allegations in the complaint are to be taken as true and construed in the light most favorable to the non-moving party."   *Judd v. Weinstein*, 967 F.3d 952, 956 (9th Cir. 2020)(quoting *Puri v. Khalsa*, 844 F. 3d 1152, 1157 (9th Cir. 2017)).   This District Court has held that "…to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face.""   *Buran v. Riggs,* 5 F. Supp. 3d 1212, 1217 (D. Nev. March 11, 2014)(quoting *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 678 (2007)).

V.   **ARGUMENT**

Dr. Jensen's FAC sufficiently pleads his §1983 claims for First Amendment retaliation, procedural due process, and equal protection.   The FAC also has clearly plead claims for declaratory relief and the Nevada state constitutional equivalent of the free speech and due process claims.   Moreover, Defendants are not entitled to qualified immunity or sovereign immunity because reasonable government officials in Defendants' position would have known that a college cannot retaliate against Dr. Jensen for exercising his clearly established constitutional rights.

To survive the pending MTD, Dr. Jensen only needs to show that he has plead facts that show it is "plausible" that  Defendants violated the rights above.  Dr. Jensen has clearly met that standard.  Defendants have failed to meet their burden.  As explained below, the Court should not dismiss Dr. Jensen's FAC because Defendants have failed to meet their heavy burden for a Rule 12(b)(6) dismissal standard.

## A. Dr. Jensen has sufficiently pleaded that Defendants retaliated against him because of his speech

The FAC adequately demonstrates clear facts that Defendants violated Dr. Jensen's free speech rights under the First Amendment of the U.S. Constitution and the Nevada Constitution. FAC ¶¶ 1-5, 18-67, 95-102.  To successfully bring a First Amendment retaliation claim the Ninth Circuit has established a five factor inquiry that requires a public employee plaintiff show: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech. *Eng v. Cooley,* 552 F.3d 1062, 1070 (9th Cir. 2009).  If the plaintiff establishes the first three elements, then the burden shifts to the government to prove elements 4 and 5.  *Barone v. City of Springfield, Oregon*, 902 F.3d 1091, 1098 (9th Cir. 2018) (quoting *Eng*, 552 F.3d at 1070-72).

### i.    Dr. Jensen spoke on matters of public concern

Under *Eng's* first prong, Dr. Jensen spoke on a matter of public concern.  The scope of public concern is defined broadly by the Ninth Circuit "to permit the public to decide for itself

which issues and viewpoints merit its concern." *Ulrich v. City and County of San Francisco*, 308 F.3d 968 (9th Cir. 2002)(quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983). The test for determining whether a public employee's speech is a matter of public concern depends on whether it relates to "any matter of political, social or other concern to the community." *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick v. Myers*, 461 U.S. 138,146 (1983)); *Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 905 (9th Cir. 2021).   The Supreme Court in *Connick* also emphasized "the content, form, and context of a given statement, as revealed by the whole record."  *Connick,* 461 U.S.at 147.  The content of what was said by the employee matters most in making a determination of whether the speech is a matter of public concern and whether the information will "enable the public to make informed decisions about their government." *Gifford v. Hornbrook Fire Protection District*, 2021 WL 4168532, at 7 (E.D. Cal. Sept. 14, 2021)(quoting *Desrochers v. City of San Bernardino*, 572 F.3d 703 (9th Cir. 2009)).

First, the co-requisite policy involved major curriculum changes that would impact academic standards, grading, math curriculum, study programs, state funding, and the quality of graduates produced for the community. All of these are matters of public concern. *Johnson v. Lincoln University*, 776 F.2d 443, 451-52 (3d Cir. 1985); *Gibson v. Office of Atty. Gen., State of California*, 561 F.3d 920, 925 (9th Cir. 2009); *Ulrich*, 308 F.3d at 977-979; *Desrochers*, 572 F.3d at 709-714.

Second, in Dr. Jensen's handout that he distributed he clearly questions the use of public funds.  The Ninth Circuit and Supreme Court held that it is "clearly established that the misuse of public funds is a matter of public concern." *Grisen v. Hanken*, 925 F.3d 1097, 1111 (9th Cir. 2019)(quoting Johnson, 48 F.3d at 425).  In *Pickering* the court held that the question of whether

a school district needed additional funds was a matter of public concern. *Pickering v. Bd. Of Educ.,* 391 U.S. 563, 571 (1968).

Third, Dr. Jensen's handout raises issues related to whether "public officials are not discharging government responsibilities or are engaged in wrongdoing or breaches of public trust" and this qualifies as a matter of public concern. *Connick*, 461 U.S. at 146

Therefore, Dr. Jensen spoke on matters of public concern.

**ii.      Dr. Jensen's spoke at a public event as a private citizen**

The Ninth Circuit test for determining whether public employees speak pursuant to official duties is: (1) whether "the employee confined his communications to his chain of command"; (2) whether "the subject matter of the communication" fell within the plaintiff's regular job duties; and (3) whether the "employee sp[oke] in direct contravention to his supervisor's order[ ]." *Greisen* 925 F.3d at 1111(quoting *Dahlia v. Rodriquez*, 735 F.3d 1060, 1074-75 (9th Cir. 2019)(en banc).

Dr. Jensen is a community college professor, and his official responsibilities are to teach classes and perform service to the College. FAC ¶¶ 9, 19, 21.  The Math Summit on January 21, 2020, was an event that was opened to the "broader TMCC community." FAC ¶¶26; Ex. C.  The Math Summit was not required or part of Dr. Jensen's official responsibilities, he had no official duty to make the statements at issue, and he was not paid to perform any task at the event.  *See Eng*, 552 F.3d at 1071; *Garcetti v. Caballos*, 547 U.S. 410, 421 (2006).  Dr. Jensen attended on his own time and the distribution of the handout occurred during breaktime.

Further, in *Demers*, the 7-Step Plan was based on university committee service and the Court found that it was part of official duties. *Demers v. Austin,* 746 F.3d 402, 410 (9th Cir. 2014).  The

ER38

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 38 of 298
Case 3:22-cv-00045-ART-CLB   Document 33   Filed 04/13/22   Page 13 of 25

handout in this case was not part of any college committee or duty for Dr. Jensen.  Finally, Dr. Demers included his 7-Step Plan in his annual evaluation.  *Id.*

Based on the test above, Dr. Jensen's spoke as a private citizen.

### 1.  The *Demers* Exception

Even if this court would find that the event was related to his official duties, the handout was speech "related to teaching and scholarship" and would therefore qualify under the exception set forth by the Ninth Circuit in *Demers.  See Demers*, 746 F.3d at 417.  The Ninth Circuit held in *Demers* that academic employee speech is protected under the First Amendment by the *Pickering* analysis if it is a (1) matter of public concern, and (2) outweighs the interest of the state in promoting efficiency of service.  *Id.*

Defendants MTD incorrectly applies the holding from *Demers* as an "exception" based on speech that is "teaching and academic writing."   The MTD deliberately leaves out the words "***related to***."   The actual test that this Court must apply is whether the speech in question is "speech ***related to*** scholarship or teaching."  *Demers* 746 F.3d at 406, 411, 414-415 The MTD asserted that the speech be "…published, or publishable, work." MTD at 16  However, the Court in *Demers* made no such requirement.  The MTD further mischaracterizes Dr. Jensen's handout as "pet criticism on a hyper-specific issue." *Id.*  In reality, Dr. Jensen's handout was highly similar to Dr. Demer's "two-page pamphlet."  *See* RJN Ex. 1; *See* Demers Decl. Ex. A  Dr. Jensen's handout was commenting on an NSHE policy that applied to all institutions of higher education in the State of Nevada. FAC ¶ 24

Defendants also cannot make claims of workplace efficiency.  The Supreme Court clarified that "efficiency" concerns are based on the "…employers' reasonable predictions of disruption." *Waters v. Churchill*, 511 U.S. 661 (1994).  For Defendants to meet their burden for

their MTD they must show the need to maintain discipline or harmony among coworkers or that the faculty was disruptive. *Pred v. Board of Public Instruction of Dade County, Florida*, 415 F.2d 851(5th Cir. 1969); *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503 (1969). The University must show by clear and convincing evidence that the speech interfered with the operation of the college. *Smith v. Losee*, 485 F.2d 334 (10th Cir. 1973), cert. denied, 417 U.S. 908 (1974). Moreover, the Ninth Circuit has held that official university faculty senate meetings, which are more formal than the Math Summit in question in this matter, have been held to be places where "…expression of opinions should be most unfettered." *Mabey v. Reagan*, 537 F.2d 1036 (9th Cir. 1976). To succeed, TMCC had to show extreme conduct like "raucous catcalls," attempting to stop the governor's motorcade, or creating a danger of violence. *Adamian v. Lombardi*, 608 E2d 1224, 1227-28 (9th Cir. 1979), cert. denied, 446 U.S. 938 (1980).

Here, there is no evidence that Dr. Jensen was disruptive and the distribution of the handout occurred during a break in the summit and therefore had no impact on the efficiency of the meeting. Moreover, Dr. Jensen presented multiple witnesses at the NSHE special hearing that all testified that he was not disruptive at the Math Summit. FAC ¶ 39.  Therefore, Dr. Jensen's First Amendment interest in engaging in the protected speech outweighs TMCC's interest in prohibiting the speech to promote efficiency. This position has been supported by multiple national organizations.  FAC ¶ 4.;  *See* RJN Ex. C, Ex. D, and Ex. E

### iii.    Defendants reprimanded, negatively evaluated, and subjected Dr. Jensen to disciplinary hearings because they disliked the content of his speech

The third prong under *Eng*, requires that the plaintiff demonstrate that the state took an adverse employment action against the plaintiff and the speech was a substantial or motivating

factor in the adverse action.  *Eng*, 552 F.3d at 1071.  This is "purely a question of fact" and the Court "must assume the truth of the plaintiff's allegations." *Id.*   Further the Ninth Circuit held in *Coszalter* that "an adverse employment action is an act that is reasonably likely to deter employees from engaging in constitutionally protected speech" and that even adverse employment actions taken months later after the speech in question could still allow "a reasonable jury [to] infer that retaliation is a substantial or motivating factor." *Coszalter v. City of Salem*, 320 F.3d 968, 970 (9th Cir. 2003).

Dean Ellsworth stated to Dr. Jensen at the Math Summit that he had "made an error by defying her." FAC ¶ 44.  Thereafter, Dean Ellsworth sent Dr. Jensen a letter of notice of reprimand on January 30, 2020. FAC ¶ 46.  Dean Ellsworth issued a formal letter of reprimand to Dr. Jensen on March 30, 2020 based on the events of the Math Summit.   FAC ¶ 53.  Both Dean Ellsworth and Dean Flesher raised minor bureaucratic issues to Dr. Jensen after the Math Summit. FAC ¶¶ 54-55 63.  Dean Ellsworth and Dean Flesher negatively evaluated Dr. Jensen based on the events at the Math Summit.  FAC ¶¶ 56, 59, 62-64.  Chancellor Rose denied Dr. Jensen's grievance based upon on violation of his free expression and academic freedom on July 21, 2021.   FAC ¶ 66.  Dean Flesher retaliated against Dr. Jensen again by sending a letter to Dr. Hilgersom that he had received two unsatisfactory evaluations.  FAC ¶ 67.  President Hilgersom authorized Dr. Brown to investigate Dr. Jensen and hold a disciplinary hearing.  FAC ¶¶ 68-71.

Taking the above facts into consideration, the FAC more than adequately pleads that Dr. Jensen suffered multiple adverse employment actions and that his speech "was a substantial or motivating factor" for the repeated adverse employment actions.

*///*

iv.   **Defendants did not have an adequate justification for treating Dr. Jensen differently from other members of the general public**

Since Dr. Jensen has adequately plead the first three prongs under *Eng*, Defendants must show that they have an adequate justification for treating the employee differently from other members of the general public. *Eng,* 552 F.3d at 1070.  In the MTD, Defendants argue that they "had a legitimate interest in preventing the insubordinate conduct."  MTD at 12.  However, Dr. Jensen did not engage an insubordination.  Moreover, the events in question occurred during a break at the Math Summit – not during the Math Summit.  That is a critical distinction for this analysis.  Defendants had no authority to discipline Dr. Jensen for passing out pieces of paper at an event opened to the "broader TMCC community" during break time. *See* Ex. C  The Nevada Supreme Court in *State ex rel Richardson*, held that professors are not insubordinate for distributing articles on campus.  *See State ex rel. Richardson*, 70 Nev. at 366-368; Kille, *supra*.

Next, the MTD cited *Connick* for the proposition that "[w]hen a government employee personally confronts his immediate supervisor, the employing agency's institutional efficiency may be threatened[.]" MTD at 13 (quoting *Connick*, 461 U.S. at 153).  This fails to address facts as pleaded in the FAC.  First, Dean Ellsworth made disparaging remarks to Dr. Jensen and confronted him.  FAC ¶ 44.  Second, this occurred during a break in an event that was open to the broader TMCC community, which Dean Ellsworth had no authority. FAC ¶ 41.  Third, multiple witnesses at the hearing all testified under oath that Dr. Jensen was not disruptive at the event. FAC ¶ 39.     Finally, Defendants have not offered any evidence or support in the documents submitted to this Court or during the NSHE special hearing that there was a negative impact on efficiency or management of its personnel affairs.  Therefore, this argument fails.

Taking the above facts into consideration, the Defendants have not met their burden to show that they had an adequate justification for treating Dr. Jensen differently from other members of the public.

### v.     Defendants would not have taken the adverse employment action absent the protected speech

The fifth and final prong under *Eng*, shifts the burden to Defendants to show whether they would have taken the adverse employment action even absent the protected speech. *Eng,* 552 F.3d at 1070.  Under the Ninth Circuit case law Defendants essentially have to show that they "would have reached the same decision even in the absence of the [employee's] protected conduct."  *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004)(quoting *Ulrich*, 308 F.3d at 976-977).  Even Defendants admit in their MTD that Dr. Jensen had "long standing criticisms about how the new standards were to be implemented."  MTD at 2.  It can only be inferred that this is an admission that Dean Ellsworth's conduct at the Math Summit and after was based on her prior knowledge of Dr. Jensen's "long standing criticisms."  Further, the Reprimand provided as an exhibit to the MTD clearly states the adverse action was based solely on his constitutionally protected speech.  *Id.* Ex. 1.

Here, all of the adverse employment actions were based on the Dr. Jensen's protected expression.  Therefore, the Defendants fail under this prong.

### B.  Dr. Jensen adequately plead that Defendants violated his Fourteenth Amendment Rights by denying him procedural due process

The Due Process Clause of the Fourteenth Amendment commands "nor shall any State deprive any person of life, liberty, or property, without due process of law…."  U.S. Const. amend. XIV.  The U. S. Supreme Court has held that "[p]rocedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of

life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978).  The requirement of

procedural due process should "convey to the individual a feeling that the government has dealt

with him fairly…." *Id* at 262.  "A section 1983 claim based upon procedural due process… has

three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation

of the interest by the government; (3) lack of process." *Armstrong v. Reynolds*, 22 F.4th 1058,

1066 (9th Cir. 2022)(quoting *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir.

1993)).  The Supreme Court has held that "property interests—may take many forms" and that

Plaintiff needs to show "a legitimate claim of entitlement" based on "existing rules or

understandings that stem from an independent source such as state law." *Bd. of Regents of State

Colls. v. Roth*, 408 U.S. 564, 576-577 (1972).

Here, Dr. Jensen had a property interest in his right to academic freedom, right to maintain

standards of curriculum, right to have the processes for faculty terminations followed, and right

to not be charged with insubordination for distributing handouts. FAC ¶ 1, 21, 48-49, 51, 68-86,

97, 116.  Moreover, Dr. Jensen also had a liberty interest in his good name, reputation, and being

free from the stigma of being defined as insubordinate.  Defendants deprived Dr. Jensen of all of

these protected interests by their retaliatory actions.  Finally, there was a lack of process due to

the repeated failures to follow the NSHE Handbook.

Furthermore, the unconstitutionally vague definition of "insubordination" failed to give Dr.

Jensen adequate notice of what kind of conduct was prohibited by Defendants.

"Insubordination" is defined as "willful disregard of express or implied directions, or such

defiant attitude to be equivalent thereto."  *See* NSHE Handbook, Title 3, Chapter1, Section 3, j-

m; *State ex rel. Richardson*, 70 Nev. at 366-368.  Further, the case above specifically held that

distribution of articles on campus that were critical of the administration is NOT insubordination.

*Id.* The Defendants' subjective, arbitrary, and contrary to state law application of insubordination did not provide faculty like Dr. Jensen notice of what type of conduct or expression is prohibited by Defendants. The FAC adequately alleges that Defendants failed to give against Dr. Jensen adequate notice due to this vague policy. FAC ¶¶ 46-49.

Dr. Jensen was also denied an impartial tribunal by Defendants. The Ninth Circuit has held that there are two independent ways to show a Plaintiff has been denied a "right to fair hearing before an impartial tribunal" which are "actual bias" or an "appearance of impartiality." *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995). President Hilgersom allowed a biased committee member to remain on Dr. Jensen's hearing committee. FAC ¶ 80. The individual had previously filed an unsubstantiated complaint against Dr. Jensen. *Id.* A private attorney was forced to be involved. FAC ¶ 82. These actions were improper. These allegations easily state a plausible claim of actual bias.

Further, as alleged in the FAC Defendants repeatedly failed to follow their own NSHE Handbook for procedures related to the NSHE special hearing that was held to determine whether Dr. Jensen would be terminated. FAC ¶¶ 68-86. Dr. Jensen has a property right to ensure that policies are followed.

For these reasons, the FAC plead a valid cause of action against Defendants for violating Dr. Jensen's procedural due process rights.

## C. Dr. Jensen adequately plead that Defendants violated his Fourteenth Amendment Rights by violating his equal protection rights

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The U.S. Supreme Court has held that this means that "all persons similarly situated

should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 472 U.S. 432, 439 (1985).

Further, government actions or policies that infringe upon "personal rights protected by the

Constitution" are subject to strict scrutiny. *Plyler v. Doe*, 457 U.S. 202, 217-218 (1982). The

Supreme Court has held that a Plaintiff can be successful if they can demonstrate that they have

been "intentionally treated differently from others similarly situated and that there is no rational

basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

This standard applies in the public employment context "when the government makes class-

based decisions in the employment context, treating distinct groups of individuals categorically

differently." *Enquist v. Or. Dep't of Agric.*, 553 U.S. 591, 605 (2008).

   As alleged in the FAC, Defendants treated Dr. Jensen in a different manner than other

similarly situated professors at TMCC because of his comments on matters of public concern.

FAC. ¶¶29-33. Dr. Jensen's FAC describes at least seven different situations where Defendants

treated him in a different manner than other similarly situated professors at TMCC. First, Dr.

Jensen was denied the opportunity to speak during the Math Summit like other attendees. FAC ¶

29. Second, Dean Ellsworth only denied Dr. Jensen the opportunity to distribute handouts at the

Math Summit during break time. FAC ¶ 43. Third, Dean Ellsworth, applied syllabus polices to

Dr. Jensen that did not apply to other faculty. FAC ¶ 54. Fourth, Dean Ellsworth, incorrectly

applied the definition of insubordination only to Dr. Jensen when issuing him a letter of

reprimand on March 30, 2020. FAC ¶ 53. Fifth, Dean Flesher applied minor bureaucratic

matters to Dr. Jensen in a way that did not apply to all other faculty. FAC ¶ 63. Sixth,

Defendants only subjected Dr. Jensen to a NSHE special hearing for termination based on his

constitutionally protected speech. FAC ¶¶ 54-56, 61-64, 68-86. Finally, Defendants only

evaluated Dr. Jensen based on his constitutionally protected speech not on his yearly

performance.  FAC ¶¶ 54-56, 61-64.

In each instance above, Dr. Jensen was treated differently than other similarly situated

professors. Defendants have not shown any evidence or argument that they also retaliated or

initiated adverse employment actions for similarly situated professors that spoke in favor of the

NSHE policy.  In Dr. Jensen's FAC he clearly pleads that other individuals were able to make

comments at the Math Summit.  FAC ¶ 29.   Defendants cannot disfavor Dr. Jensen because of

the viewpoint of his constitutionally protected expression while favoring other professors with a

different viewpoint that they prefer.  *Carey v. Brown*, 447 U.S. 455, 463 (1980).

For these reasons, the FAC plead a valid cause of action against Defendants for violating

Dr. Jensen's equal protection rights.

### D.  Dr. Jensen has adequately plead that all Defendants are personally liable for violating Dr. Jensen's First and Fourteenth Amendment Rights

Each of the six listed Defendants were personally involved and liable for the harm they

caused to Dr. Jensen for depriving him of his constitutional rights.  The U.S. Supreme Court has

held that "to establish personal liability in a § 1983 action, it is enough to show that the official,

acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*,

473 U.S. 159, 166 (1985).  Dr. Jensen has clearly alleged the Defendants were aware of the

retaliation and participated in the unconstitutional conduct. FAC ¶¶ 12-17, 60, 87-94, 97-100.  At

the motion to dismiss stage, this Court must accept these allegations as true.  Further, these

allegations are specific enough to connect Defendants to the adverse employment decisions that

are the basis of all of Dr. Jensen's causes of action.

///

### i.    Dr. Jensen's FAC pleads that Defendants DO NOT deserve Qualified Immunity.

Defendants are not entitled to qualified immunity because Dr. Jensen has clearly plead his § 1983 allegations and there is a "case directly on point." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)   Further, the prior precedents, many of which have facts that are nearly identical to this case, gave Defendants "fair warning" that their conduct was in violation of law and unconstitutional.  *See Hope v. Pelzer*, 536 U.S. 730 (2002).  The qualified immunity inquiry involves two sequential questions: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the[official's] conduct violated a constitutional right?" and (2) "if a violation could be made out on a favorable view of the parties' submissions, ... [was] the right ... clearly established ... in light of the specific context of the case[?]" *Eng*, 552 F.3d at 1067(quoting *Saucier v. Katz*, 533 U.S. 194, 201(2001). The first prong of the qualified immunity analysis is met under the facts as plead in Dr. Jensen's FAC.

The second prong of the qualified immunity analysis requires a showing that the right "was clearly established" at the time of Defendant's misconduct.  *Capp v. County of San Diego*, 940 F.3d 1046 (9ᵗʰ Cir. 2019).  The Ninth Circuit has held that the "relevant inquiry is whether" the Defendants knew "the state of the law gave [] fair warning that their conduct was unconstitutional." *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9ᵗʰ Cir. 2013)(quoting *Hope v. Peltzer*, 536 U.S.  730, 741 (2002); *Nicholson v. City of Los Angeles*, 935 F.3d 685 (9ᵗʰ Cir. 2019)(quoting *Kisela v. Highes*, 584 U.S. -----, 138 S. Ct. 1148, 1152 (2018)(per curiam)).   It has been clearly established, in many cases for decades, by the U.S. Supreme Court and the Ninth Circuit that public employees cannot be punished for engaging in constitutionally protected speech. *Connick*, 461 U.S. at 142; *Rankin*, 483 U.S. at 383; *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Demers*, 746 F.3d 402, 417, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,

429 U.S. 274 (1977); *Perry v. Sindermann*, 408 U.S. 593 (1972).  Defendants argue that Dr. Jensen did not adequately allege a violation of a constitutional right that was "clearly established."  MTD at 22  However, this argument fails since Dr. Jensen clearly plead First Amendment retaliation and even cited to the *Demers* case multiple times in his FAC.  FAC ¶¶ 1, 21.  Defendants know they cannot retaliate because they disfavor constitutionally protected expression.  Further, the law regarding what protection professors receive under the First Amendment is clearly established in the Ninth Circuit. *Demers,* 746 F.3d 402, 417.

Dr. Jensen has clearly plead plausible causes of action of First Amendment retaliation, equal protection, and procedural due process that have been clearly established.  Therefore, Defendants are not entitled to qualified immunity for any claim.

### ii.      Dr. Jensen may recover damages against Defendants in their individual capacities and prospective relief in their official capacities

Dr. Jensen properly sued Defendants in their official and individual capacities.  The Eleventh Amendment to the U.S. Constitution does not stop Dr. Jensen from recovering damages against Defendants in their individual capacities. *Graham*, 473 U.S. 159.  The doctrine of sovereign immunity for the Eleventh Amendment does not apply to claims for prospective relief against Defendants in their official capacities. *Ex parte Young*, 209 U.S. 123 (1908).  Dr. Jensen has made multiple claims for valid prospective relief in his FAC.  Each of these claims are not compensatory but are designed to compel compliance with federal and constitutional law.  This is exactly the kind of equitable relief needed to end the continuing violations of federal law by Defendants.  Dr. Jensen's claims meet the standard set forth by the U.S. Supreme Court in *Ex Parte Young*.

Further, Dr. Jensen is entitled to declaratory and injunctive relief.  *Green v. Mansour*, 474 U.S. 64 (1985).   The FAC also alleges plausible causes of action under the Nevada constitution.

## VI.    CONCLUSION

Dr. Jensen clearly pleaded in his FAC that Defendants' retaliatory acts violated his constitutional rights.  These causes of action were not vague, conclusory, or contradictory.  Further, these rights were clearly established. Defendants' defenses of qualified immunity and Eleventh Amendment sovereign immunity both fail as a matter of law.  Even if this Court is so moved to grant any part of Defendants MTD, Plaintiff would request leave to amend his FAC.

For the foregoing reasons, Plaintiff Dr. Lars Jensen respectfully requests this Court to deny Defendants' MTD in its entirety.

DATED: April 13, 2022                    Respectfully submitted,

By:   /s/ John M. Nolan
John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

/s/ Michael Langton
Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

/s/ Mark Mausert
Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff Lars Jensen*

ER50

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 50 of 298
Case 3:22-cv-00045-ART-CLB Document 33 Filed 04/13/22 Page 25 of 25

## INDEX OF EXHIBITS

| Exhibit # | Description | Number of Pages |
|---|---|---|
| A | Lars Jensen Email titled on "On the issue of Confidentiality" dated February 13, 2018 | 1 |
| B | Lars Jensen email titled On the State of Academia at TMCC dated December 18, 2019 | 2 |
| C | Math Summit Agenda | 3 |
| D | Declaration of Keith Hooper | 2 |
| E | Declaration of Julia Hammett | 3 |
| F | Declaration of Damien Ennis | 2 |
| G | Declaration of Jeff Olsen | 2 |

# EXHIBIT A

**Lars Jensen Email titled on "On the issue of Confidentiality" dated February 13, 2018**

# EXHIBIT A

ER52

 **TMCC**

Lars Jensen <ljensen@tmcc.edu>

---

## On the issue of Confidentiality

---

**Lars** <ljensen@tmcc.edu>                                                                    Tue, Feb 13, 2018 at 7:28 AM
To: All TMCC Discussions <ALLDISCUSSIONS-L@listserv.tmcc.edu>
Bcc: Ana Douglass <ADouglass@tmcc.edu>

Dear Colleagues,

The issue of confidentiality and possible violations of it has been
brought up in recent emails to these lists. I consider this a little
bit of a distraction from the issues I was trying to discuss, namely
the disregard for shared government, and disrespect towards faculty
leadership. However since issue has been brought up, please consider
these hypothetical situations:

(1) A college administration regularly denies tenure to faculty
members based on random or made-up decision making.

(2) A college administration regularly gives written reprimands to
faculty based on made-up reasons.

(3) A dean regularly grabs the crutch of faculty members when visiting
the office.

(4) Chairs are fired without due process by a college administration.

(5) Black women is are sent to the back of the bus by the driver.

Whose interests are being served by maintaining confidentiality? There
is no code of confidentiality in these cases, unless an agreement of
confidentiality has been signed. In fact, I would claim that in all of
the cases above it is likely more unethical to maintain
confidentiality than not.

Consider case (1). Any faculty member should want to get this
discussed openly. One could claim that there is in fact a level of
responsibility to get this discussed in the open. You could be next!

In case (3) there might not be a Metoo movement if we all kept things
confidential.

Please note that I'm in no way advocating that everything should
always be discussed out in the open. I'm only trying to provide some
food for thought.

Lars.

# EXHIBIT B

**Lars Jensen email titled On the State of Academia at TMCC dated December 18, 2019**

# EXHIBIT B

ER54

 **TMCC**

Lars Jensen <ljensen@tmcc.edu>

---

## On the State of Academia at TMCC

**Lars** <ljensen@tmcc.edu>                                                Wed, Dec 18, 2019 at 10:58 AM
To: Anne Flesher <aflesher@tmcc.edu>, Bill Gallegos <bgallegos@tmcc.edu>, Bill Newhall <bnewhall@tmcc.edu>, Blisin
Hestiyas <bhestiyas@tmcc.edu>, Casey Machen <cmachen@tmcc.edu>, Damien Ennis <dennis@tmcc.edu>, Dan Hooper
<dhooper@tmcc.edu>, Gail Ferrell <gsmall@tmcc.edu>, Hieu Do <hdo@tmcc.edu>, Jeffrey Olsen <jolsen@tmcc.edu>, Jim
Cotter <jcotter@tmcc.edu>, Jim Winston <jwinston@tmcc.edu>, Jonathan Lam <jlam@tmcc.edu>, Kurt Ehlers
<kehlers@tmcc.edu>, Lars Jensen <ljensen@tmcc.edu>, Paula Farrenkopf <pfarrenkopf@tmcc.edu>, Rebecca McCleary
<rmccleary@tmcc.edu>, Rebecca Porter <rporter@tmcc.edu>, Shannon McCool <smccool@tmcc.edu>, Shehara Snow
<ssnow@tmcc.edu>, Theodore Lambert <tlambert@tmcc.edu>
Cc: Julie Ellsworth <jellsworth@tmcc.edu>, Scott Huber <shuber@tmcc.edu>

Dear Colleagues,

Hopefully you have had a chance to reflect on my presentation at the
last department meeting. The student work I showed you were that of
typical students, somewhere in the middle area of the bell curve. I
want to consider that these are students who came out of YOUR class,
students who passed YOUR class. Please think about this. The students
took next to nothing with them out of your class. They came into my
class with essentially no studying skills, essentially no reasoning
skills, little algebra skills, and poor arithmetic skills. They don't
bother memorizing definitions, which after all is the foundation of
mathematics.  Students make them up on the fly. If they don't how to
solve a problem, they just make up something. And these were students
with excellent attendance records....

Are these really the kind of students to whom we want to bestow degrees?

Yes, we are in a difficult situation with a dean like Julie Ellsworth
who, it appears, insists on exercising her control in any matter she
can. This applies to academic matters in the department as well as to
campus wide policies and guidelines. Dean Ellsworth's means seems to
serve the same main end, namely to get as many students through as
possible, at any cost. But even with a supervisor like this, you have
a choice. In the end, you are the gatekeeper of your classes, and
(most of) you have tenure. You can choose to support the dean's line,
and make yourself a willing participant in the destruction of
academia, your own profession, and of the field you love, mathematics.
You can also use your tenure protection to do the right thing, stop
passing your poor students on to your colleagues, and maintain
academic integrity first. I don't want students like those whose work
I showed you passed on into my classes. No thanks.

What Dean Ellsworth is pushing is counter to the whole idea of
academia. in academia, we bestow degrees on students who have filtered
to the top by acquiring a certain level of skill and knowledge. How
often do we hear the dean talk about this? It is pervasive also from
our co-req discussions that what really matters, and what comes down
from our leaders, is to find a way to get our students through
("student success," which is something everyone wants, is to be
translated as "high graduation rates"). Their skills and knowledge is
not a first priority - nobody tells us this. The effects of this view
is obvious - simply look at how we have dumbed down Math 120, a Math
class that counts for college credit. We have dumbed it down to the
extent that students who exit this class "is Math 95 ready," e.g.
ready for 8'th grade math. And now we're supposed to dumb down Math
124 to fit whatever plan it must fit. The community we're serving and

ER54

the employers out there don't want us to do this at all - they're telling us to do the exact opposite. The best proof of this, in the case of our own academic field, is the direct correlation between the number of math courses a student takes and their salary when they get a job. This correlation shows that the community and the corporations are putting their money where the math knowledge is. And it is a message to us that the right thing for us to do is to hold the standard and pass students who knows what they are doing.

Folks like Dean Ellsworth, and those who subscribe to her views should not be taking academic leadership positions. Academia is our livelihood, and we need leaders who put academics first and production numbers second. Our reputation depends on that. Dean Ellsworth would be serving the community better by returning to her department and keeping a low profile. Or even better by taking a job in industry.

Happy holidays, and best wishes for the New Year.

See you later this afternoon at the get-together.
Lars.

# EXHIBIT C

**Math Summit Agenda**

# EXHIBIT C

# Monday, January 20

## *Dr. Martin Luther King, Jr. Holiday*

# Tuesday, January 21

## 9 – 1:30 p.m.

### *TMCC Math Summit*

RDMT 255, 256

The TMCC Math Department has been hard at work in response to the BOR Co-Requisite policy adopted in June 2019 with full implementation due Fall 2021. This all-morning summit is a time for sharing planned course and curriculum changes across the Math Department and with members from the broader TMCC community interested in math curriculum, pathways, and student success. This workshop includes light breakfast snacks and lunch.

Please join us to learn about:

- *Policy timeline and implementation*
- *Pre-requisites and co-requisites*
- *Revamped Math 120 course curriculum*
- *New Math 124 course*
- *Math support co-requisites for Math 120 and Math 124*
- *Revised math pathways*

*Track: College Operations, Curriculum Design/Assessment*

**Dr. Julie Ellsworth, dean, sciences division; Kyle Sadanaga, coordinator, math skills center**

» Pre-register for the session on the January calendar prodev.tmcc.edu

## 11 a.m. – noon

### *Undergraduate Research at TMCC: Who, Me? Yes, You!*

RDMT 333

You will learn about the on-going undergraduate research at TMCC in the context of how similar projects could be conducted in both STEM and non-STEM disciplines. Topics we will cover will be potential sources of funding, leading the projects and, best of all, you will hear directly from successful TMCC undergrad research students about their experiences! Undergraduate research (UGR) has proven to be a worthwhile experience that teaches students skills applicable to further courses and future career opportunities. Studies have shown that students who have engaged in UGR programs are consistently more successful and prepared in their future endeavors. UGR programs are not limited to STEM fields, so come join the discussion and see how you can provide this kind of experience for your students.

*Track: Student Engagement, Teaching Strategies*

**P.J. Mitchell, instructor, chemistry; Dr. Meeghan Gray, professor, biology; Dr. Laura Briggs, chair, biology**

» Pre-register for the session on the January calendar prodev.tmcc.edu

### *ReadSpeaker Text to Speech*

SIER 101

Learn how faculty and students can use ReadSpeaker that has been integrated into Canvas to harness text to speech for student retention and comprehension. ReadSpeaker offers many different tools for students, such as text to speech reading of any Canvas page, as well as any documents added to the course such as Word, PowerPoint, and PDFs. Students can also use this tool to keep notes, highlight certain content, and enlarge text. ReadSpeaker offers both English and Spanish translations. Students can also download documents and listen offline.

*Track: Diversity & Inclusion, Supporting Students, Using Technology*

**Thomas Kearns, assistive technician, disability resource center; Brandy Scarnati, program director, WebCollege**

» Pre-register for the session on the January calendar prodev.tmcc.edu

ER58

1/20/2020

# Welcome to the Math Summit

Thank you for being here!

Please help yourself to refreshments and we will begin in a few minutes

January 21, 2020

1

## Math Summit Evolution

- Innovations grant proposal last year
- Was going to focus on developmental math
  – SKC, CTM, Math 95, and Math 96
- NSHE Co-Req policy adopted in June
  – No more SKC, CTM, Math 95, and Math 95
- So we re-purposed the summit ☺

2

1

ER59

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 59 of 298
Case 3:22-cv-00045-ART-CLB   Document 33-3   Filed 04/13/22   Page 4 of 4

1/20/2020

## Thank you!!

- Original proposal: Kyle Sadanaga, Eriko Sakamura, Ted Lambert
- Developmental math alignment: Paula Farrenkopf, Shannon McCool, Kyle Sadanaga, Eriko Sakamura
- Summit re-design: Kyle Sadanaga, Anne Flesher
- Food and logistics:  Cathy Brewster
- Set-up:  Facilities

3

## Agenda

- Ice breaker – get to know each other a little bit
- Perspectives on Math Pathways at TMCC and the Co-Req Adventure
- Short break
- Breakout Sessions (starting 10:30am)
  – Math 120 committee, and guests join at 11:30am
  – Math 124 committee
  – Rest of group gives feedback on Action Plan items
- Lunch (12:30pm)

4

2

# EXHIBIT D

**Declaration of Keith Hooper**

# EXHIBIT D

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 61 of 298
Case 3:22-cv-00045-ART-CLB Document 33-4 Filed 04/13/22 Page 2 of 3

ER61

John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff Lars Jensen*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LARS JENSEN, an individual,

        *Plaintiff,*

    v.

NATALIE BROWN, in her individual and
official capacities as Administrative Officer at
Truckee Meadows Community College; JULIE
ELLSWORTH, in her individual and official
capacities as Dean of Sciences at Truckee
Meadows Community College; ANNE
FLESHER, in her individual and official
capacities as Dean of Math and Physical
Sciences at Truckee Meadows Community
College; KARIN HILGERSOM, in her
individual and official capacities as President of
Truckee Meadows Community College;
MARIE MURGOLO, in her individual and
official capacities as Vice President of
Academic Affairs at Truckee Meadows
Community College; MELODY ROSE, in her

Case No. 3:22-cv-00045-MMD-CLB

## DECLARATION OF KEITH HOOPER

ER62

individual and official capacities as Chancellor
of the Nevada System of Higher Education,

   *Defendants.*

### DECLARATION OF KEITH HOOPER

I, Keith Hooper, declare:

1.     I attended the math summit on 1January 21, 2020, and was in the breakout session for math 120.

2. I did not find Dr. Jensen's passing out of the handout to be disruptive to the meeting.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: April 11, 2022

By: _____
      Keith Hooper

ER62

# EXHIBIT E

**Declaration of Julia Hammett**

# EXHIBIT E

ER64

John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff Lars Jensen*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LARS JENSEN, an individual,

          *Plaintiff,*

    v.

NATALIE BROWN, in her individual and
official capacities as Administrative Officer at
Truckee Meadows Community College; JULIE
ELLSWORTH, in her individual and official
capacities as Dean of Sciences at Truckee
Meadows Community College; ANNE
FLESHER, in her individual and official
capacities as Dean of Math and Physical
Sciences at Truckee Meadows Community
College; KARIN HILGERSOM, in her
individual and official capacities as President of
Truckee Meadows Community College;
MARIE MURGOLO, in her individual and
official capacities as Vice President of
Academic Affairs at Truckee Meadows
Community College; MELODY ROSE, in her

Case No. 3:22-cv-00045-MMD-CLB

**DECLARATION OF JULIA HAMMETT**

–1–
Declaration of Julia Hammett
3:22-cv-00045-MMD-CLB

ER64

individual and official capacities as Chancellor
of the Nevada System of Higher Education,

     *Defendants.*

## DECLARATION OF JULIA HAMMETT

I, Julia Hammett, declare:

1.     The TMCC Math Summit was promoted as a way for faculty to learn about how Math Department faculty were striving to meet new NSHE co-requisite goals.

2. Near the end of Dean Ellsworth's initial presentation, she answered several questions, including one from me.

3. She called on Dr. Jensen last, and just as he began to speak, Ellsworth interrupted him to say there was no more time.

5. We were only a very few minutes beyond the time scheduled for this program segment.

6. He asked for just one minute and she refused and told him to put his idea on a post it and place it on the common bulletin board.

7. The next segment was a break followed by breakout sessions.

8. After the breakout sessions Dr. Jensen circulated a one-page statement about his concerns related to the new Math Department strategies.

9. He approached me and handed me a copy, indicating what it was, and then moved on to distribute it to other people.

10. I did not observe Dr. Jensen to be disruptive in any way.

1    I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct.

3

4  DATED: April 13, 2022

5

6                                        By: _____

7                                            Julia Hammett

# EXHIBIT F

**Declaration of Damien Ennis**

# EXHIBIT F

John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff Lars Jensen*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LARS JENSEN, an individual,

   *Plaintiff,*

  v.

NATALIE BROWN, in her individual and
official capacities as Administrative Officer at
Truckee Meadows Community College; JULIE
ELLSWORTH, in her individual and official
capacities as Dean of Sciences at Truckee
Meadows Community College; ANNE
FLESHER, in her individual and official
capacities as Dean of Math and Physical
Sciences at Truckee Meadows Community
College; KARIN HILGERSOM, in her
individual and official capacities as President of
Truckee Meadows Community College;
MARIE MURGOLO, in her individual and
official capacities as Vice President of
Academic Affairs at Truckee Meadows
Community College; MELODY ROSE, in her

Case No 3:22-cv-00045-ART-CLB

**DECLARATION OF DAMIEN ENNIS**

ER69

Case 3:22-cv-00045-ART-CLB   Document 33-6   Filed 04/13/22   Page 3 of 3
Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 69 of 298

individual and official capacities as Chancellor
of the Nevada System of Higher Education,

> *Defendants.*

### DECLARATION OF DAMIEN ENNIS

I, Damien Ennis, declare:

1. I am a tenured Math Professor at TMCC and have previously served as department chair.

2. I was present at the Math Summit on 1/21/2020.

3. I witnessed Dr. Jensen getting cut off immediately when he wanted to discuss his concerns about a reduction in rigor being imposed on the math curriculum during the question-and-answer session.

4. I did not find his behavior during the question portion of the event disruptive. I was in the Math 120 breakout room (RDMT 253) immediately following this interaction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: 4/13/2022

By: _____
   Damien Ennis

# EXHIBIT G

**Declaration of Jeff Olsen**

# EXHIBIT G

ER71

John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff Lars Jensen*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LARS JENSEN, an individual,

        *Plaintiff,*

v.

NATALIE BROWN, in her individual and
official capacities as Administrative Officer at
Truckee Meadows Community College; JULIE
ELLSWORTH, in her individual and official
capacities as Dean of Sciences at Truckee
Meadows Community College; ANNE
FLESHER, in her individual and official
capacities as Dean of Math and Physical
Sciences at Truckee Meadows Community
College; KARIN HILGERSOM, in her
individual and official capacities as President of
Truckee Meadows Community College;
MARIE MURGOLO, in her individual and
official capacities as Vice President of
Academic Affairs at Truckee Meadows
Community College; MELODY ROSE, in her
individual and official capacities as Chancellor

Case No 3:22-cv-00045-ART-CLB

**DECLARATION OF JEFF OLSEN**

ER71

of the Nevada System of Higher Education,

       *Defendants.*

## **DECLARATION OF JEFF OLSEN**

I, Jeff Olsen, declare:

1.    I was present at the TMCC Math Summit on January 21, 2020.

2.    After other people were allowed to ask questions about proposed changes to our system of math courses, Lars stood up to ask his questions but was denied an opportunity to speak.

3.    Lars was not disruptive in the meeting when he tried to ask questions.

4.    We then took a break and met for breakout sessions on Math 120 and Math 126 in different rooms.

5.    I was in the Math 126 room.

6.    Lars entered our Math 126 room with a typewritten summary of his concerns and quietly handed out copies of his document to the meeting participants. In doing this, he did not disrupt our breakout session.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:  4/12/2022

By:       *Jeff Olsen*
          Jeff Olsen

John Albrecht, NV Bar No. 4505
General Counsel
Kiah D. Beverly-Graham, NV Bar No. 11916
Deputy General Counsel
Truckee Meadows Community College
2215 Raggio Parkway
Reno, Nevada 89512-1095
(775) 673-7396
(775) 673-7135 fax
john.albrecht@dri.edu
kiah.beverly@dri.edu

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| LARS JENSEN, | |
|        Plaintiff, | |
| v. | Case No. 3:22-cv-00045-MMD-CLB |
| NATALIE BROWN, et al. | |
|        Defendants. | |

## <u>DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT</u>

All Defendants, by and through their undersigned attorneys, hereby move pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's First Amended

Complaint (ECF No. 8) (the "FAC"). This Motion to Dismiss ("Motion") is based upon the

papers and pleadings on file herein, including documents attached to or incorporated into the

pleadings; the accompanying Declaration of Kiah Beverly-Graham ("Beverly-Graham Decl.");

documents and information of which the Court may take judicial notice, as identified on the

accompanying Request for Judicial Notice ("RJN"); the following Memorandum of Points and

Authorities; and any oral argument the Court may entertain.

///

///

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff Dr. Lars Jensen is a current tenured professor of mathematics at Truckee Meadows Community College ("TMCC"). He brings this action against several members of TMCC's administration and the Chancellor of the Nevada System of Higher Education ("NSHE"), of which TMCC is a part. In sum, Dr. Jensen alleges the Defendants (i) retaliated against him, through various disciplinary actions, for exercising his right to free speech and (ii) conducted a termination hearing – which did not actually result in termination or any other sanction – in violation of his procedural due process rights.

At its heart, this case is about the events that occurred at a TMCC "Math Summit" held in June 2020. As Dr. Jensen alleges it, the Math Summit was organized by his supervisor, Defendant Dr. Ellsworth; was to proceed on a specific agenda; and was called for the purpose of explaining how TMCC's math department was going to implement new curricular standards imposed by TMCC's governing body, the Board of Regents of NSHE (the "Board of Regents").

According to the FAC, shortly before a break at the Math Summit Dr. Jensen sought to be heard on his long-standing criticisms about how the new standards were to be implemented. His supervisor declined to let him air his criticisms in that context and instead directed him to post his thoughts in writing on the "parking lot", a whiteboard in the meeting room to which participants could affix written comments. Dr. Jensen left to obtain a typed version of his comments and then, in defiance of his supervisor's instruction to use the parking lot, passed it out to attendees. His supervisor indicated that he should stop, and he ignored her. She again indicated he should stop and, apparently in view of other attendees, he again disregarded her instructions and continued to pass out the document. Unsurprisingly, TMCC disciplined Dr.

Jensen for his publicly insubordinate conduct. He now alleges that discipline was in retaliation for his exercise of First Amendment rights.

The FAC alleges that the discipline was the result of TMCC's President, two deans, a fourth administrator, and the Chancellor of the entire NSHE system engaging in a "concerted effort to punish Dr. Jensen" for his speech and that all are "equally culpable" for this "pattern of actions[.]" *See*, FAC ¶¶ 84-85. The plain import of these allegations is that Dr. Jensen believes he is the victim of a conspiracy, reaching the highest levels of state-wide NSHE administration, designed to punish him for his comments. This conspiracy theory, which animates the entire FAC, is facially implausible and undermines the overall plausibility of the pleading.

Though various other claims are asserted, the First Amendment is what this action is really about. The claims thereunder fail for several reasons. Dr. Jensen's open disdain for the authority of his supervisor, as described in the FAC, plainly triggered TMCC's interest as a state employer to take disciplinary action for employee misconduct. TMCC has no legal obligation to sit back and allow insubordination just because the conduct is purportedly expressive. That government interest outweighs any supposed First Amendment rights. The FAC also fails to plausibly allege the speech at issue was of public concern or was made by Dr. Jensen in his capacity as a private citizen. These failings separately warrant dismissal as a matter of law.

For these reasons, as well as those discussed herein, the FAC should be dismissed.

## THE ALLEGATIONS IN THE FIRST AMENDED COMPLAINT

Dr. Jensen is a tenured math professor, presently employed at TMCC. FAC ¶¶ 18-19. He alleges TMCC engaged in the following wrongdoing over the course 2020 and 2021.

///

///

**I.   Alleged First Amendment Violations**

    **A.  The Speech At Issue**

Dr. Jensen alleges four specific instances of expressive conduct for which Defendants purportedly retaliated against him. Most of the speech at issue is Dr. Jensen's criticism of TMCC's implementation of a new policy (the "Co-requisite Policy") which was passed in June 2019 by the Board of Regents. The Co-requisite Policy mandated that NSHE institutions place students into college level courses while requiring them to simultaneously take, if needed, lower-level courses as "co-requisites" rather than taking them as "pre-requisites." *See* FAC, Ex. A.

Dr. Jensen criticized the implementation of the Co-requisite Policy on three occasions: (i) in a December 2019 email to TMCC's math department; (ii) at the January 2020 Math Summit; and (iii) in a February 2020 email to TMCC faculty. FAC ¶¶ 25, 35, 51.

Dr. Jensen also alleges that he sent an email in February 2018 to the TMCC faculty concerning "college policies and leadership" (together with the emails referred to in the foregoing paragraph, the "Emails"). FAC ¶ 23.

Defendants' supposed retaliation for Dr. Jensen's speech at the Math Summit is the crux of the FAC and is the only purported expressive conduct pled in any detail.

According to the FAC, Defendant Dr. Ellsworth, who was Dr. Jensen's direct supervisor, "organized a Math Summit at TMCC to discuss with the community how the [Co-requisite Policy] would be implemented . . ." *Id*. ¶ 26. As alleged, the Math Summit was to take place during a specific time and follow a specific agenda. *Id*. ¶¶ 26-27.

At some point before a lunch break, "Dr. Ellsworth took questions from the audience." *Id*. ¶ 28. According to Dr. Jensen, he raised his hand – not to ask a question but rather to a make an apparently critical comment regarding what a "look under the hood" of the Co-requisite

Policy implementation would reveal. *Id*. ¶¶ 28-31. According to the FAC, Dr. Ellsworth "cut off his comment and ended the question-and-answer session" in favor of taking a break, stating that "Dr. Jensen could not comment because the event was out of time[.]" *Id*. ¶¶ 31-32.

When "Dr. Jensen again requested to speak . . . Dr. Ellsworth refused to allow him to speak a second time and then directed Dr. Jensen to use the 'parking lot' for his comment." *Id.* ¶ 33. The FAC does not define the "parking lot", but it is described in the written reprimand (the "Reprimand") that is incorporated into the FAC as a basis for Dr. Jensen's claims. *See* FAC ¶ 60 (alleging Reprimand was in retaliation for protected speech). Thus the Court may consider the Reprimand for this Motion. *See, U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The "parking lot" was a whiteboard provided for Math Summit participants to post comments. *See* Beverly-Graham Decl., Ex.1 (Reprimand) at 1.

Dr. Jensen left the meeting and went to his office where he prepared a written version of the comments he wanted to make. *Id*. ¶ 34-35. That document is attached to the FAC as Exhibit A. Dr. Jensen alleges that he returned to the meeting and, in defiance of his supervisor's prior instructions to post his written comments on the "parking lot", began to hand out the document, including in different rooms that apparently were being used as breakout rooms by some Math Summit participants. *Id*. ¶¶ 38-43. Dr. Ellsworth indicated to Dr. Jensen that he should stop by physically picking up copies and motioning for those passed out to be returned. *Id*. ¶ 40. Dr. Jensen apparently disregarded the implied instruction. Dr. Ellsworth then again "denied" Dr. Jensen's efforts to pass out the document, and Dr. Jensen again disregarded her instructions. *Id*. ¶ 41. Dr. Ellsworth then took Dr. Jensen aside and criticized his conduct as "disruptive", "bully[ing]", and defiant of her role as the organizer of the workshop. *Id*. ¶ 44.

Though the FAC is vague about who attended the Math Summit, the Reprimand describes it as "a planned professional development workshop" with food provided. Ex. 1. It is clear from this description that the Math Summit was a non-public work event.

The FAC is vague about Dr. Ellsworth's professional relationship with Dr. Jensen. It does allege that she counseled him on his grading policies, authored a letter of discipline concerning his conduct, and evaluated him in his 2020 review. FAC ¶¶ 53-56. It is inferable from these allegations that Dr. Ellsworth was Dr. Jensen's direct supervisor at the time of the Math Summit.

### B.  Alleged Acts of Retaliation

Generally, the FAC is silent as to any nexus between the Emails and Defendants' purported retaliation. Rather, Dr. Jensen makes a series of vague and conclusory allegations that each of the Defendants "retaliate[d] against [him] for exercising his constitutionally protected rights to speak on matters of public concern." *E.g.*, FAC ¶¶ 60, 65, 84, 104, 109, 112.

The FAC details only one instance of speech against which Defendants supposedly retaliated – the conduct at the Math Summit. *See, e.g.*, FAC ¶¶ 84-85. According to Dr. Jensen, following the Math Summit Defendants purportedly retaliated against him for his conduct there as follows: (i) Dr. Ellsworth issued a letter of reprimand; (ii) Dr. Ellsworth rated him as "Unsatisfactory" on his 2020 annual evaluation; and (iii) after the receipt of a second consecutive "Unsatisfactory" on his 2021 annual evaluation, given by his subsequent supervisor Defendant Dean Flesher, TMCC commenced disciplinary proceedings against Dr. Jensen as required by NSHE regulations (the "Termination Proceedings"). FAC ¶¶ 46-47, 53, 56, 63, 68-70.

### II.   The Alleged Due Process Violations

Dr. Jensen alleges that in and around June 2021, TMCC commenced the Termination Proceedings because he received two consecutive unsatisfactory ratings in his annual reviews.

FAC ¶ 70. As alleged, this process was pursuant to NSHE Handbook, Title 2, Chapter 5 §

5.13.2(a)-(b). According to the FAC, Defendants' handling of the Termination Proceedings

violated Dr. Jensen's procedural due process rights. *See* FAC ¶¶ 68-94, 118-130. The allegations

in this regard are wide-ranging but in sum are as follows.

Dr. Brown allegedly violated Dr. Jensen's due process rights during her investigation of

his alleged misconduct because she (i) had no authority to investigate due to the purported

absence of a "complaint"; (ii) conducted her investigation over the summer when Dr. Jensen was

not teaching; (iii) interviewed only Dr. Ellsworth and Dean Flesher; (iv) declined to delay the

proceedings; (v) listed additional charges which she did not have authority to investigate in her

Charging Letter; and (vi) "fabricated" a basis to terminate Dr. Jensen. FAC ¶¶ 70-76.

President Hilgersom allegedly violated Dr. Jensen's due process rights by (i) appointing

her supposed "former colleague . . . as the Special Hearing Officer", then removing him once the

potential conflict was brought to her attention; (ii) "preventing", in some unexplained way, a

challenge to the very special hearing officer the FAC alleges President Hilgersom removed; and

(iii) refusing to order removal of a supposedly biased member of the faculty committee that was

also involved in the Termination Proceedings, notwithstanding the fact the proceedings did not

result in his loss of employment. FAC ¶¶ 77-81.

Unspecified Defendants "denied", in some unexplained fashion, Dr. Jensen a subpoena

for witnesses and documents. FAC ¶¶ 82-83.

The FAC alleges that Dr. Jensen was "entitled to reasonable notice and a meaningful

opportunity to be heard" (FAC ¶ 121), but it does not allege Dr. Jensen was denied those rights.

Rather, it alleges the Termination Proceedings were conducted pursuant to NSHE Handbook,

Title 2, Chapter 5 § 5.13.2. FAC ¶ 70. Among other things, this section of the Handbook (a set of

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 80 of 298
Case 3:22-cv-00045-MMD-CLB  Document 21  Filed 03/15/22  Page 8 of 25

ER80

NSHE regulations with force of law) requires that when an NSHE faculty member, such as Dr. Jensen, receives "unsatisfactory" ratings in two consecutive years, a hearing shall be held to determine if the faculty "should be retained in employment." *See* RJN Ex. 4 at p. 7, § 5.13.2(a). That hearing is to be conducted under Section 6.11 of the NSHE Handbook and all other provisions of Chapter 6 of the Handbook "should be followed to the extent applicable[.]" *Id*. § 5.13.2(b).

Section 6.11 contains numerous procedural safeguards in Dr. Jensen's favor including the right to (i) a neutral hearing officer, licensed to practice law, who finds facts (6.11.1(b), 6.11.2); (ii) challenge the officer for cause (6.11.1(c)); (iii) a "special hearing committee" of faculty members who hear evidence and make a recommendation to the president as to whether or not to dismiss the faculty member (6.11.4); (iv) challenge the special committee members for cause and peremptorily (6.11.6); (v) a hearing; and (vii) to appeal the hearing's outcome. Ex. 4 at 14-19.

Other provisions of Chapter 6 applicable to this hearing process include protections, such as (i) a minimum of ten calendar days' notice before the hearing, which notice must specify the misconduct charged (6.9.3); (ii) right to counsel (6.9.3(a)(4) and 6.9.6); (iii) the right to examine, at least five days' prior to the hearing, all documentary evidence to be presented (6.9.4); (iv) the faculty member's right to "present, challenge or rebut evidence and to question or cross-examine witnesses" (6.9.4); the right to have issued subpoenas for witnesses or documents (6.9.11); and a "preponderance of the evidence" standard of proof (6.9.14). Ex. 4 at 10-13.

The FAC fails to allege Dr. Jensen was denied the foregoing protections.

### III.   Summary of Other Allegations

The FAC also alleges (i) that Defendants violated Dr. Jensen's rights under the Equal Protection Clause; (ii) causes of action under provisions of the Nevada Constitution analogous to

federal First Amendment and procedural due process provisions ("Supplemental State Claims"); and (iii) entitlement to declaratory relief on a variety of issues arising from the foregoing.

## LEGAL STANDARD

A court may dismiss a plaintiff's complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In considering the Motion, the pleading's labels and conclusions or formulaic recitations of the elements of a cause of action are not entitled to an assumption of truth. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v Twombly*, 550 U.S. 544, 555 (2007)). Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

## ARGUMENT

### I.   **The Causes of Action Alleging First Amendment Violations Should Be Dismissed**

The FAC asserts two causes of actions against Defendants (one in their individual and one in their personal capacities) under 42 U.S.C. § 1983 for "First Amendment Retaliation." In sum, the FAC alleges that Dr. Jensen suffered retaliation in the form of various disciplinary actions after he "voiced his concerns regarding the lowering of math standards and deterioration of shared governance at TMCC since at least 2017." FAC ¶ 22. As alleged, these concerns were voiced in the three Emails and at the Math Summit. FAC ¶¶ 23-43, 51.

Regarding the Emails, the FAC fails to allege any plausible facts which, if true, would demonstrate they were a substantial motivating factor for the alleged disciplinary action. The Emails do not support the First Amendment claims and can be put aside for this analysis.

The FAC's allegations center on Dr. Jensen's speech at the Math Summit. In this regard the pleading fails to adequately allege that (i) Dr. Jensen's First Amendment interests outweigh

Defendants' interest in maintaining discipline and supervisory authority; (ii) Dr. Jensen spoke on

an issue of public concern; (iii) that Dr. Jensen spoke as a private citizen; or (iv) his speech

constitutes teaching or academic writing.

### A. __The Ninth Circuit's Framework for Evaluating Retaliation Claims__

The Ninth Circuit test for evaluating a government employee's First Amendment

retaliation claim considers the following five factors:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether
> the plaintiff spoke as a private citizen or public employee; (3) whether the
> plaintiff's protected speech was a substantial or motivating factor in the
> adverse employment action; (4) whether the state had an adequate
> justification for treating the employee differently from other members of
> the general public; and (5) whether the state would have taken the adverse
> employment action even absent the protected speech.

*Hettinger v. Fipps*, No. 13-cv-00364-MMD, 2014 WL 1783857, at *4 (D. Nev. May 5, 2014)

(Du, J.). (citing *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009)).

These are referred to as the *Eng* factors. Failure to meet any is fatal to the plaintiff's case.

*Coomes v. Sch. Dist.*, 816 F.3d 1255, 1260 (9th Cir. 2016) (citing *Dahlia v. Rodriguez*, 735 F.3d

1060, 1067 n. 4 (9th Cir. 2013) (en banc)). Because all five factors are independently necessary,

the Court is free to address a dispositive factor first rather than addressing each sequentially. *Id*.

A plaintiff may be excused from establishing the second *Eng* factor – i.e. the "private

citizen or public employee" prong – only where the speech at issue is adequately alleged to be

"teaching and academic writing that are performed pursuant to the official duties of a . . .

professor." *See Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014).

### B. __The FAC Fails to Allege the Emails Were a Substantial Motivating Factor in Any Discipline__

The FAC alleges the existence of three instances of expressive communication via

email. FAC ¶¶ 23, 25, 51. But it fails to allege facts which if proven would plausibly

ER83

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 83 of 298
Case 3:22-cv-00045-MMD-CLB   Document 21   Filed 03/15/22   Page 11 of 25

demonstrate that the Emails were a "substantial or motivating factor" in the discipline. *See Eng*, 552 F.3d at 1071; *see also Knickerbocker v. Stockton*, 81 F.3d 907, 911 (9th Cir. 1996) (protected activities are a substantial factor in discipline where the adverse actions would not have been taken "but for" the protected activities).

Notably, the FAC fails to describe the Emails with any meaningful detail or even attach them. The FAC also contains nothing more than conclusory allegations that would connect the disciplinary action to the Emails. Essentially, the pleading alleges Dr. Jensen wrote the Emails, then was later disciplined, without pleading any facts that connect the two events. This is the exact sort of case where courts conclude the expressive conduct was not a motivating factor for the adverse action. *See Demers*, 746 F.3d at 413-14; *Hettinger*, 2014 WL 1783857, at *5 (dismissing First Amendment claim where the pleading "simply alleges that the relevant speech occurred in the time between committing the offense and getting fired and that the speech was the cause of termination").

Accordingly, the Emails can be put aside and the analysis should focus on the true crux of the complaint – the events of the Math Summit.

## C. The FAC's Allegations Reveal That Defendants Had a Legitimate <u>Interest in Disciplining Dr. Jensen for His Insubordinate Conduct</u>

*Eng*'s fourth factor – whether the state had adequate justification for imposing the discipline – invokes the balancing test established by the Supreme Court in *Pickering v. Board of Ed*, 391 U.S. 563 (1968). *See Eng* 552 F.3d at 1071. Under this prong, the state actor bears the burden of showing its legitimate administrative interests outweigh the employee's First Amendment rights. *Id*. Based on the allegations in the FAC, Defendants meet that burden as a matter of law.

-11-

ER84

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 84 of 298
Case 3:22-cv-00045-MMD-CLB Document 21 Filed 03/15/22 Page 12 of 25

1
2
3
4
5
6
7
8
9
10
11

The particular state interest at issue here is ascertainable from the FAC, which alleges that at the Math Summit – an internal TMCC professional development event with a specific and limited agenda – Dr. Jensen repeatedly disregarded instructions from his direct supervisor, who was also running the event. FAC ¶¶ 32-43. These allegations put at issue well-recognized and legitimate administrative interests in maintaining employee discipline and supervisory authority. *See Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (state interest in avoiding expressive conduct which, among other things, "impairs discipline by superiors") (citing *Pickering*, 391 U.S. at 570-73); *Cochran v. Los Angeles*, 222 F.3d 1195, 1200-02 (9th Cir. 2000) (employer interest in preserving discipline outweighs employee interest in speech); *Pool v. VanRheen*, 297 F.3d 899, 909 (2002) (same).

12
13
14
15
16
17

The authorities clearly establish that Defendants had a legitimate interest in preventing the insubordinate conduct alleged in the FAC, including through the disciplinary measures taken in response. This is the type of circumstance in which the courts have recognized that a government employer "must have wide discretion and control over the management of its personnel and internal affairs." *See Connick v. Myers*, 461 U.S. 138, 151 (1983). The question is whether that interest outweighs Dr. Jensen's alleged First Amendment interests. It does.

18
19
20
21
22
23
24
25

The FAC suggests Dr. Jensen's First Amendment interest at the Math Summit was in being heard on his views about TMCC's implementation of the Co-requisite Policy. But the interest alleged is far more specific than that. As alleged, Dr. Jensen was given the opportunity to express his thoughts by posting them in written form on a board provided for that purpose. *See* FAC ¶ 33. He refused to do so as instructed by his supervisor. *Id*. ¶¶ 38-43. Instead, he insisted on handing the document out directly to participants. *Id*. The real interest Dr. Jensen asserts is in delivering his message in the exact manner that he wished.

26
27
28

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 85 of 298
Case 3:22-cv-00045-MMD-CLB   Document 21   Filed 03/15/22   Page 13 of 25

ER85

On balance, Defendant's interests outweigh Dr. Jensen's. This is for reasons like those embraced by the Supreme Court when it held in favor of the government employer in *Connick*. In that case, a state employee was disciplined for distributing a questionnaire at work which her employer found to be insubordinate conduct. 461 U.S. at 141. Rejecting her First Amendment retaliation claim, the Court agreed with the employer's view that the conduct at issue threatened the supervisor's ability to run the office. *Id*. at 153. Of particular relevance to this action is the Court's holding that that "[w]hen a government employee personally confronts his immediate supervisor, the employing agency's institutional efficiency may be threatened[.]" *Id*.

The FAC alleges such a confrontation. According to Dr. Jensen, he repeatedly defied his supervisor's authority in the middle of a meeting at which numerous other TMCC employees were present. Though couched in neutral language, these allegations describe a public challenge by an employee. That is the sort of confrontation which the Court in *Connick* noted would support a conclusion that the state's interest in institutional efficiency outweighs the employee's expressive interests. *Id*. (citing *Givhan v. Sch. Dist.,* 439 U.S. 410, 415 n. 4 (1979)).

The FAC alleges a set of facts which, even if true, will ultimately preclude relief under the fourth *Eng* factor, and the First Amendment Retaliation claims should be dismissed. *See Coomes*, 816 F.3d at 1260 (failure to adequately allege any of the five *Eng* prongs is fatal).

### D.  The First Amendment Claims Should Be Dismissed Because the FAC Fails to Plausibly Allege Speech of Public Concern

"[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest" the speech at issue is not protected by the First Amendment and cannot ground a cause of action for retaliation. *See Connick*, 461 U.S. at 147; *see also Eng*, 552 at 1070 (first *Eng* factor). This is a question of law, and the plaintiff has the burden of showing that the speech is of public concern. *Eng*, 552 F.3d

at 1070. In making this determination, the Court should consider the content, form and context of the speech at issue. *Demers*, 746 F. 3d at 415.

           i.     The Content of the Speech Alleged Does Not Plausibly Relate to a Matter of <u>Public Concern</u>

The content of speech is of public concern when it relates to some matter of political, social, or other concern to the community. *See Eng*, 552 F.3d at 1070.

Putting aside the Emails – which the FAC fails to plausibly allege were the motivating factor behind any retaliatory conduct as discussed above – the content at issue in this action is the handout that Dr. Jensen attempted to distribute at the Math Summit. *See* FAC ¶¶ 34-45; FAC Ex. A. The handout concerns the supposed lowering of standards in one particular TMCC class – Math 120 – purportedly caused by the manner in which TMCC implemented the Co-requisite Policy. According to Dr. Jensen, lowering the standards in this single class will have various follow-on adverse effects on the community and its employers. These statements are generally conclusory and without reference to any supporting evidence.

Thus, the "public concern" purportedly addressed by Dr. Jensen's speech is his speculation about the supposed impact on the community that will follow from TMCC's internal curricular decisions with respect to a single math class. *See* Ex. A. This is really a criticism of internal operational policy of the sort the courts have held to not be of public interest. *See Brooks v. Bd. of Regents*, 406 F.3d 476, 480 (7th Cir. 2005).

The references in Exhibit A to community impact do not change the analysis. The Ninth Circuit has "never held that a simple reference to government functioning automatically qualifies as speech on a matter of public concern." *Desrochers v. San Bernardino*, 572 F.3d 703, 711 (9th Cir. 2009); *see also Murray v. Williams*, 670 Fed.Appx. 608, 609 (9th Cir. 2016)

(statements which "marginally" relate to public concern and were made to co-workers were not entitled to First Amendment protection).

    ii.    The Context of the Speech At Issue – A Non-Public Work Event – Indicates The <u>Speech Was Not of Public Concern</u>

In determining whether speech is of public concern, the context of the speech should also be considered. If, as here, the employee expresses a grievance to a limited audience, such suggests a lack of public concern. *See Turner v. San Francisco*, 788 F. 3d 1208, 1210-1212 (9th Cir. 2015) (affirming dismissal of First Amendment retaliation claim where the speech at issue was voiced internally not publicly).

Though the FAC attempts to avoid pleading this detail, its allegations make clear that the speech occurred at a work meeting. *See* Ex. 1 (the Reprimand). Speech at such an event is inherently not of public concern and cannot ground a First Amendment claim. *See Turner*, 788 F.3d at 1211; *Murray*, 670 Fed.Appx. at 609.

    iii.    The Form of the Speech At Issue Gives Rise To a Clear Inference That Dr. Jensen's True Motivation In Speaking Was Defiance of His Supervisor Rather <u>Than Opining On an Issue of Public Concern</u>

The form of the speech is also considered in determining if it was of public interest. The speech here was in the form a written handout that Dr. Jensen wished to distribute directly to participants. This is significant because, as the FAC alleges it, there was an alternative form available to Dr. Jensen to engage in the exact same speech – he could have simply posted the document for any interested participant to see, as instructed by his supervisor. *See* FAC ¶ 33.

It is inferable from Dr. Jensen's insistence on communicating in the exact form desired that his true motivation was defiance of his supervisor. Such motive suggests the speech is not a matter of public concern. *See Turner*, 788 F.3d at 1210 (speech motivated by dissatisfaction with employer is not of public interest).

ER88

### E.   The FAC Does Not Adequately Allege That the Speech At Issue Related to Teaching or Academic Writing

*Eng's* second prong effectuates the Supreme Court's holding in *Garcetti* by establishing that "plaintiff bears the burden of showing the speech was spoken in the capacity of a private citizen and not a public employee." *Eng,* 552 F.3d at 1071. *Demers* creates an exception to that prong where the speech at issue is "teaching and academic writing." *Demers*, 746 F.3d at 412.

The FAC does not allege that the speech at issue was in the form of "teaching." It also fails to allege that the communication was "academic writing." In *Demers*, the writing at issue consisted of (i) an ultimately published book concerning the role and function of social science research in society and (ii) a "plan" authored by the plaintiff which was widely distributed and contained a detailed proposal concerning the fundamental reorganization of the university at which plaintiff taught. *Demers* at 406-07, 413-15.

The FAC contains no allegation that the speech at issue was published, or publishable, work. And a review of the handout contained at Exhibit A shows that it consists largely of a pet criticism on a hyper-specific issue. It is also clear this was a hastily written summary of oral remarks that Dr. Jensen intended to deliver live but reduced to writing instead. *See* FAC ¶ 34. This is not of the same character as the academic writing found to have existed in *Demers*.

Failing to adequately allege teaching or academic writing within *Demers*, the FAC must allege that Dr. Jensen spoke in his private capacity to state a claim. *See Eng*, 552 F.3d at 1071. The FAC does not. Dr. Jensen was clearly at the Math Summit by virtue of his role as a public employee, not as a private citizen afforded the full suite of First Amendment protections.

### II.   The Cause of Action For Procedural Due Process Violations Should Be Dismissed

Dr. Jensen's Fourth Cause of Action alleges that Defendants violated his procedural due process rights through the handling of the Termination Proceedings. To plead such a claim, Dr.

Jensen must plausibly allege (i) a property interest protected by the Constitution; (ii) deprivation of the interest; and (iii) lack of process. *See Portman v. Santa Clara,* 995 F.2d 898, 904 (9th Cir. 1988). The FAC fails to plausibly allege deprivation of a property interest or a lack of process.

### A. **Dr. Jensen Fails to Allege the Deprivation of a Protected Interest**

The FAC alleges three protected interests: (i) avoiding termination, including by a biased hearing panel; (ii) Dr. Jensen's good name, reputation, and related concepts; and (iii) future employment opportunities. FAC. ¶¶ 122-124. The FAC fails to plausibly allege the deprivation of any of these.

### i. The FAC Does Not Allege That Dr. Jensen Was Terminated

The FAC alleges that Dr. Jensen "still is[] a Community College Professor at TMCC." FAC. ¶ 9. He was not terminated and, accordingly, no deprivation of this interest is alleged. *See Gearhart v. Thorne*, 768 F.2d 1072, 1073 (9th Cir. 1985) (due process violation not adequately alleged where state employee retained employment). Because he was not actually terminated, Dr. Jensen also fails to plausibly allege any actionable bias in the hearing panel.

### ii. The FAC Does Not Adequately Allege The Existence or Deprivation of Dr. Jensen's Purported Interest In His Good Name

The FAC's allegations concerning Dr. Jensen's interest in his good name do not support a due process claim because they do not assert that he was subject to "[c]harges that carry the stigma of moral turpitude" such as dishonesty or immorality. *See Portman*, 995 F.2d at 907-08. The disciplinary actions for which Dr. Jensen sues assert insubordination and other managerial difficulties. *E.g.* Ex. 1 (Reprimand). These are like a charge of "inability to get along with others" which does not invoke a property interest in reputation. *See Portman*, 995 F.2d at 907.

And, the FAC fails to plausibly assert the deprivation of such an interest. It contains a vague allegation that "Plaintiff has been and will continue to be forced to tell other employers

about the disciplinary hearing, as well as family and friends . . ." FAC ¶ 125. But not a single, specific instance of this supposed harm is identified. Conclusory claims of reputational harm do not support due process claims. *See Zavareh v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*, 12-cv-02033-APG, 2013 WL 5781729, at *7 (D. Nev. Oct. 17, 2013) (dismissing due process claim).

<blockquote>
iii.    The FAC Does Not Adequately Allege Deprivation of Future Employment <u>Opportunities</u>
</blockquote>

Other than alleging this supposed property interest, the FAC fails to plead any facts that would support its deprivation. The FAC does not identify any "future employer" who did not hire Dr. Jensen because of Defendants. Thus the FAC fails to meet the minimal burden to aver some deprivation of the alleged property interest. *See Portman*, 995 F.2d at 904; *Phillips v. State Bar of Nevada*, No. 14-cv-2031-JCM, 2016 WL 829976, at *4 (D. Nev. Mar. 3, 2016).

<blockquote>
**B.  <u>The FAC Fails to Allege A Lack of Due Process As A Matter of Law</u>**
</blockquote>

<blockquote>
i.    <u>The FAC Fails to Allege a *Prima Facie* Element of a Due Process Claim</u>
</blockquote>

Among other things, a due process claim requires a plaintiff allege a lack of process. To do so, Dr. Jensen must plausibly allege the Termination Proceedings did not provide him (i) notice of the charges; (ii) an explanation of the supporting evidence; or (iii) an opportunity to present his side of the story. *See Bd. of Ed. v. Loudermill*, 470 U.S. 532, 546 (1985). The FAC fails to allege any such facts, warranting dismissal of this claim. *See id.*

<blockquote>
ii.    The FAC, Through Plain Inference, Actually Pleads Dr. Jensen's Termination <u>Proceedings Were Fully Consistent With Due Process</u>
</blockquote>

<u>First</u>, The FAC impliedly pleads Dr. Jensen received advance notice of the Termination Proceedings. Dr. Jensen alleges his termination hearing was pursuant to NSHE Handbook, Title 2, Chapter 5 § 5.13.2. FAC ¶ 70. That section incorporates the hearing procedures contained in Chapter 6 of the NSHE Handbook. *See* Ex. 4 at 7, § 5.13.2(b). Within Chapter 6 is Section 6.9.3,

which entitles Dr. Jensen to ten days' notice of the charges. *Id*. at 10-11. The FAC fails to allege Dr. Jensen did not receive this notice because he did. Where a plaintiff received notice of insubordination charges against him, due process is satisfied. *See Miller v. Sch. Dist.*, No. 02-cv-1641-JCM, 2008 WL 11385602, at *2 (D. Nev. Dec. 11, 2008).

Second, the FAC's allegations also reveal that Dr. Jensen received an explanation of the evidence against him in the Complaint and Charging Letter required by NSHE Handbook § 6.8.1 and 6.8.2(a). These are both placed at issue in the FAC. *See* FAC ¶¶ 67, 75-76; FAC p. 26, Prayer for Relief E(c) (seeking to expunge all materials related to Dr. Brown's investigation, which include the Complaint and Charging Letter). These documents may be considered on this Motion to Dismiss because they are incorporated by reference. *See Supra* at 5:8-12; Exs. 2 and 3. They provide a constitutionally sufficient "explanation" of the charges, meaning the FAC fails to adequately allege this prong. *See Brewster v. Bd. of Ed.*, 149 F.3d 971, 986 (9th Cir. 1998) (sufficient explanation of evidence provided in notice of the charges).

Third, under the NSHE Handbook provisions that the FAC alleges governed the Termination Proceedings, Dr. Jensen had the opportunity to present his side of the story through opening and closing statements, cross-examining TMCC's witnesses, calling his own witnesses, and introducing documents. *See supra* at 8:7-21 (summary of relevant provisions of the NSHE Code). The FAC does not allege any of these protections in the NSHE Code were denied.

    iii.    The Conduct Dr. Jensen Does Allege Does Not Support A Due Process Claim As A Matter of Law

Rather than plead the elements of a due process claim, the FAC points to supposedly wrongful conduct that is not relevant to such a claim.  For example, the FAC alleges that "Dr. Brown violated the Code for investigating Dr. Jensen when she had no authority to investigate

since she had not received a complaint." FAC ¶ 70. This is demonstrably incorrect: the "Complaint" is the document referenced in the FAC at ¶ 67 and attached as Exhibit 2.

Admittedly, the document does not have the word "Complaint" on it. But it plainly meets the NSHE Handbook § 6.8.1 definition of a complaint: it asserts that Dr. Jensen received two consecutive unsatisfactory ratings and references the relevant NSHE Code provisions which that conduct violated. Ex. 2. Several days later, Dr. Hilgersom appointed Dr. Brown as administrative officer, exactly as the NSHE Handbook contemplates she would do in response to a complaint. FAC ¶ 68; Ex.4 (NSHE Handbook) at 9, §§ 6.8.1 and 6.8.2(a). Ex. 2 is the Complaint.

Without explanation, the FAC also alleges that Dr. Ellsworth incorrectly applied the definition of "insubordination" to Dr. Jensen. FAC ¶ 48. The FAC cites to *State v. Bd. of Regents of Univ. of Nev.*, 70 Nev. 347, 366-67 (1954). In that case, the Supreme Court of Nevada held that "insubordination" means "willful disregard of express or implied directions, or such a defiant attitude as to be equivalent thereto." *Id.*

As alleged by Dr. Jensen, his conduct at the Math Summit fits this definition exactly. *See* FAC ¶¶ 30-43 (alleging repeated disregarded of express and implied directions from supervisor).

The FAC's other allegations about the various Defendants' violations of procedural due process rights are summarized *supra* at 7:5-21. Not a single one amounts to a plausible allegation that Dr. Jensen was denied notice and fair hearing as required by *Loudermill* or that the fulsome protections of the NSHE Code were not complied with.

**III.   Defendants In Their Official Capacities Have Eleventh Amendment Immunity**

Other than the Second Cause of Action, the claims in the FAC are pled against Defendants in both their official and unofficial capacities. State officials, including NSHE employees such as Defendants, are immune from suit in federal courts under the Eleventh Amendment. *See Johnson v. University of Nevada*, 596 F.Supp. 175, 176 (D. Nev. 1984)

-20-

1
2
3
4
5

(dismissing suit against NSHE entities because the Court "lacks jurisdiction because of the Eleventh Amendment"). And with respect to the Supplemental State Claims in particular, Defendants are immune from suit for injunctive relief in their official capacities. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 118-122, (1984). All causes of action against Defendants in their official capacities should be dismissed for these reasons.

6
7

The FAC attempts to evade this result with respect to the First Amendment retaliation claim by alleging this claim seeks "prospective relief." FAC ¶¶ 105-106.

8
9
10
11
12
13

However, claims for "prospective relief" create a "narrow exception" to Eleventh Amendment Immunity where the relief is prospective in nature and is based on ongoing violations of the plaintiff's federal constitutional or statutory rights. *Krainski v. Nev*, 616 F.3d 963, 967-68 (9th Cir. 2010). "Prospective relief" is forward-looking equitable relief that would compel future compliance, or forbid future non-compliance, with federal law. *See id*.

14
15
16
17

The FAC's allegations of "prospective relief" seek (i) an order expunging preexisting "negative personal files" and the retroactive adjustment of two years' of ratings in annual performance evaluations and (ii) monetary damages. FAC ¶¶ 105-106. This is not forward-looking equitable relief compelling Defendants to obey the law and thus is not "prospective".

18
19

**IV.   All Claims Against Defendants In Their Individual Capacity Should Be Dismissed On The Basis of Qualified Immunity**

20
21

Other than its First Cause of Action, the FAC's claims are also pled against Defendants in their individual capacities. These should be dismissed under the doctrine of qualified immunity.

22
23
24
25

Qualified immunity precludes suit against government officials such as Defendants where (i) the facts as alleged do not violate a constitutional right; or (ii) the right was not clearly established at the time of the alleged misconduct.  *See J.K.J v. San Diego*, 17 F.4th 1247, 1258-

26
27
28

ER94

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 94 of 298
Case 3:22-cv-00045-MMD-CLB   Document 21   Filed 03/15/22   Page 22 of 25

59 (9th Cir. 2021). Plaintiff bears the burden of proving that the right was clearly established. *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021).

As discussed throughout, the FAC fails to allege facts sufficient to support claims for First Amendment Retaliation or violation of due process or equal protection rights or the state equivalent of those claims. Thus, the FAC fails to adequately allege a violation of any of Dr. Jensen's constitutional rights and does not articulate any right that was "clearly established" at any relevant time. *See Brewster* 149 F.3d at 981-82, 986-87 (holding qualified immunity applied where First Amendment and due process rights alleged were not clearly established).

## V.    The FAC Fails To State An Equal Protection Claim

The FAC alleges violations of Dr. Jensen's rights under the Equal Protection Clause. The FAC must plausibly allege Defendants "acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013). The FAC contains no mention of the class at issue. *See* FAC ¶¶ 140-45.

Even if Dr. Jensen's intent is to allege that he is a class of one, the allegations in the FAC still do not state a claim for which relief can be granted. This is because such claims cannot be asserted in the public employment context – which is what is alleged here – as a matter of law. "[T]he class-of-one theory of equal protection has no application in the public employment context" because "government offices could not function if every employment decision became a constitutional matter." *Engquist v. Dept. of Ag.*, 553 U.S. 591, 607 (2008).

## VI.    The Claims Asserted Under the Nevada Constitution Should Be Dismissed

The FAC alleges violations of Article 1 § 9 of the Nevada Constitution, which is equivalent to the First Amendment. The facts are the same as those in the First Amendment

ER95

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 95 of 298
Case 3:22-cv-00045-MMD-CLB   Document 21   Filed 03/15/22   Page 23 of 25

1
2

Claims. FAC ¶¶ 110-117. The FAC alleges violation of Article 1 § 8 of the Nevada Constitution, restating Dr. Jensen's due process claim. FAC ¶¶ 131-39. These claims should be dismissed.

3
4
5
6

First, the Supplemental State Claims should be dismissed because the federal claims should also be dismissed as discussed herein. *See Burch v. NC Department of Public Safety,* 158 F. Supp. 3d 449, 465 (E.D. N.C. 2016) (district court may dismiss supplemental state claims if federal claims are dismissed).

7
8
9
10
11
12
13
14
15

Second, novel issues of law prevent the Court from exercising supplemental jurisdiction. *See* 28 USC § 1367(c)(1); *Linnemeier v. Indiana University,* 155 F. Supp. 2d 1044, 1056 (N.D. Ind. 2001). The Supplemental State Claims are asserted under the Nevada Constitution against state employees in their individual capacities.  The only case on whether a plaintiff may sue an individual capacity defendant under the state constitution holds that plaintiff may not bring such a suit. *S.O.C., Inc., v. Mirage Casino-Hotel,* 117 Nev. 403, 415-416 (2001).  A novel issue of law is whether a plaintiff may sue a state employee in her individual capacity under the due process clause of the Nevada Const. Art. 1, § 8.

16
17
18
19
20

Third, the Supplemental State Claims should be dismissed to the extent asserted against Defendants in their individual capacities because Nev. Const. Art. 1, §9 does not govern private conduct. *See S.O.C.,* 117 Nev. at 415-416. The reasoning of *S.O.C.* should be extended to a due process claim under Nev. Const. Art. 1, §8(2) against defendants in their individual capacities.

21
22
23
24
25
26

Fourth, the Supplemental State Claims should be dismissed for the same reasons articulated above with respect to the corresponding federal claims under the First Amendment and due process provisions. Art. 1 § 9 is coextensive to, but no greater than the First Amendment. *S.O.C.*, 117 Nev. at 415-16. The same reasoning should apply to the due process claims. If the federal claims fail, so too must the coextensive state law claims.

27
28

**VII.** <u>**Dr. Jensen Is Not Entitled to the Declaratory Relief Requested**</u>

The Seventh Cause of Action asks for declaratory relief raising the same issues as the First through Sixth Causes of Action.  "[W]here a plaintiff has alleged a substantive cause of action, a declaratory relief claim should not be used as a superfluous 'second cause of action for the determination of identical issues' subsumed within the first." *Jensen v. Quality Loan Service Corp.,* 702 F. Supp. 2d 1183 (E.D.Ca. 2010).

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants respectfully request that the Court grant the Motion to Dismiss and enter an order dismissing Dr. Jensen's First Amended Complaint in its entirety.

DATED March 15, 2022.

  */s/ John Albrecht*
John Albrecht, NV Bar No. 4505
General Counsel
Kiah D. Beverly-Graham, NV Bar No. 11916
Deputy General Counsel
Truckee Meadows Community College
2215 Raggio Parkway
Reno, Nevada 89512-1095
(775) 673-7396
(775) 673-7135 fax
john.albrecht@dri.edu
kiah.beverly@dri.edu

*Attorneys for Defendants*

ER97

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 97 of 298
Case 3:22-cv-00045-MMD-CLB   Document 21   Filed 03/15/22   Page 25 of 25

## INDEX OF EXHIBITS

| Exhibit No. | Description of Document | Page Numbers |
|---|---|---|
| Exhibit 1: | Letter of Reprimand | 001-002 |
| Exhibit 2: | Administrative Complaint | 003 |
| Exhibit 3: | Charging Letter (attachments omitted) | 004-006 |
| Exhibit 4: | Excerpts from Nevada System of Higher Education Handbook/Code | 007-019 |

# EXHIBIT 1

# LETTER OF REPRIMAND

# EXHIBIT 1

TO:    Lars Jensen

FROM:  Dean Julie Ellsworth

RE:  Written reprimand

On Tuesday January 21, 2020 you were a participant in a planned professional development workshop, called the Math Summit. The Math Summit was a pre-planned event that took place from 9am until 1:30pm, was designed around a 72-page packet of materials, included food provided by a TMCC Foundations grant, and there were approximately 45 participants. This was not a casual meeting of colleagues. Much time and effort from numerous people went into planning and executing the event.

The event planners knew there would be questions and comments from participants and limited time to address them during the event, due to the tightly planned schedule. Therefore, at the beginning of the meeting it was explained to the group how the Summit would collect and share input from participants without using valuable and limited meeting time. There was a white board marked "The Parking Lot" prominently situated in the main meeting room. Sticky notes and pens were provided at each table. Summit participants were encouraged to write their questions and comments and stick them on the board. The Math Summit organizers are in the process of compiling those questions and comments, they will address and answer questions when possible, and disseminate the collected information to participants. This process was explained at the beginning of the Math Summit.

The Math Summit schedule included a planned break at 10:15am. Near to that time you raised your hand to make a comment. I reminded you to please use the Parking Lot for comments and explained that we needed to stay on schedule. The group took a short break and then reconvened into three planned subgroups to continue the meeting. Near the end of the subgroup meeting time you returned to the main meeting room and began walking around the room and handing out copies of something to everyone in the room. I asked you to come out to the hallway with me, where I asked specifically that you not disrupt the meeting in this way. I did not read the page you were handing out. I did not have time as the meeting was in progress. If these were comments regarding the Math Summit, I reminded you that they could be posted on the "Parking Lot" board. I also said that you could place the copies on the table near the door and participants could take one if they chose as they left the meeting. You replied that you had a right to hand out what you wanted, and you went back into the meeting room and continued to hand out your copies to Math Summit participants.

Your behavior was unprofessional, disrespectful, disruptive, and insubordinate, thus in violation of Section 6.2.1 of the NSHE Code (d)-insubordination, and (n) -the intentional disruption or unauthorized interruption of functions of the System, including but not limited to classes, convocations, lectures, meetings, recruiting interviews and social events, on or off premises of the System.

In the anonymous evaluations collected at the end of the meeting one participant wrote your name as their response to "what was the worst part of the Math Summit?". Your behavior was

disruptive and distracted from the event. I offered you other avenues for you to express your opinion and comments, posting on the "Parking Lot" board and leaving your copies to be picked up at the end by participants. I expressly told you to stop distributing the copies during the event, and you continued to do so anyway.

# EXHIBIT 2

# ADMINISTRATIVE COMPLAINT

# EXHIBIT 2

ER102



**TMCC**
Truckee Meadows
Community College

June 3, 2021

Dr. Hilgersom,

I am writing to notify you that Dr. Lars Jensen received two consecutive Unsatisfactory ratings on his Annual Evaluations on May 16th, 2020 and again on May 17th, 2021.

This violates NSHE Code, Title 6, Sections 6.2.1 (a)-(d), (j), and (bb) (incorporating NSHE Code, Title 2, Chapter 5, Section 5.13.2(b)) and is cause for termination pursuant to NSHE Code, Title 2, Chapter 5, Sections 5.13.2(b) and NSHE Code, Title 2, Chapter 6, Section 6.2.6.

Regards,

Anne Flesher
Dean, Math and Physical Sciences

**ANNE FLESHER | MATH & PHYSICAL SCIENCES | 775-6737279 | RDMT 324**
Dandini Campus, 7000 Dandini Boulevard, Reno, Nevada 89512
775-673-7111 | www.tmcc.edu
Nevada System of Higher Education | Dedicated to Equal Opportunity

003                                                                          ER102

# EXHIBIT 3

# CHARGING LETTER

# EXHIBIT 3



**TMCC**
Truckee Meadows
Community College

June 30, 2021

Dear Dr. Hilgersom:

Pursuant to a letter dated June 9, 2021, and NSHE Code Title 2, Ch. 6, Sections 6.7.1 and 6.8.2(a), I was appointed as Administrative Officer to investigate a Complaint concerning Dr. Lars Jensen. The Complaint asserts that Dr. Jensen received two consecutive unsatisfactory ratings in his annual evaluations on May 16, 2020 and May 17, 2021. The purpose of my investigation was to clarify the facts and the positions taken by the parties and issue a charging letter if warranted. I have completed my investigation and have concluded that issuing this charging letter is warranted.

**Sources of Information**

In connection with my investigation, I reviewed the following documents:

- Dr. Jensen's 2019-2020 Annual Performance Evaluation and related documents, attached as Exhibit 1; and
- Dr. Jensen's 2020-2021 Annual Performance Evaluation and related documents, attached as Exhibit 2.

The following are persons who may have witnessed or otherwise have knowledge of the alleged prohibited conduct:

- Dean Anne Flesher;

Advising and Access Services | 775-674-7904 | RDMT 114
Dandini Campus, 7000 Dandini Blvd., Reno, Nevada 89512-3999
775-673-7111 | www.tmcc.edu
Nevada System of Higher Education | Dedicated to Equal Opportunity

004                                                                    ER104

- Dean Julie Ellsworth;
- Dr. Natalie Brown;
- Kim Studebaker; and
- Dr. Lars Jensen.

**Findings and Conclusions**

In order to achieve a satisfactory rating or higher, a faculty member must fulfill all criteria in the primary job responsibility section of the faculty evaluation.  Dr. Jensen's unsatisfactory ratings were due to not meeting all primary job responsibilities, in both the 2019-2020 and the 2020-2021 annual evaluations.

The 2019-2020 evaluation was rated as unsatisfactory by Dean Julie Ellsworth on May 16, 2020 due to Dr. Jensen exhibiting insubordination as documented in the Annual Evaluation.  The rating was subsequently upheld by:

- Dean Ellsworth in writing on September 24, 2020
- Annual Performance Rating Appeals Committee on October 13, 2020
- TMCC Vice President of Academic Affairs, Dr. Marie Murgolo on October 22, 2020

The 2020-2021 evaluation was the second consecutive unsatisfactory evaluation given to Dr. Jensen. This was given by Dean Anne Flesher on May 17, 2021.  The rating is based on Dr. Jensen not achieving item S3b on the evaluation and failing to satisfy the following items as outlined by the Faculty Support Committee's remedy plan:

- Dr. Jensen is to participate in TMCC Mathematics Department and other campus discussions at all times in a professional and respectful manner to colleagues and administration.
- Dr. Jensen is to show respect for the Dean's supervisory role by responding to requests in a timely manner per the Annual Plan

2

The evaluation outlines how each of these items were not achieved over the course of the 2020-2021 year.

Based on my review of the aforementioned documents and discussions with Dean Flesher and Dean Ellsworth, I find that it is more likely than not that Dr. Jensen received an unsatisfactory rating on two consecutive annual performance evaluations for the 2019-2020 and 2020-2021 academic years. If ultimately proven, this fact is cause for termination pursuant to NSHE Code, Title 2, Chapter 5, Sections 5.13.2(b).

I also find that it is more likely than not that the conduct which supports the unsatisfactory ratings in fact occurred. If ultimately proven, such conduct violates NSHE Code, Title 2, Ch. 6, Sections 6.2.1(a)-(d), (j), and (bb) (incorporating NSHE Code, Title 2, Chapter 5, Section 5.13.2(b)) and is additional cause for termination under NSHE Code Title 6, Sections 6.2.1 and 6.3.6.

A copy of this letter is being sent to Dr. Jensen, **and he has seven calendar days to provide a written response, but is not required to do so**. *See* NSHE Code, Title 2, Ch. 6, Section 6.8.2(b).

Sincerely,

Natalie J. Brown, PhD

Appointed Administrative Officer

Enclosure: 2019-2020 Annual Plan and Evaluation (Ex. 1); 2020-2021 Annual Plan and Evaluation (Ex. 2); Copy of NSHE Code, Title 2, Chapter 6 (Ex. 3).

3

# EXHIBIT 4

# EXCERPTS FROM NEVADA SYSTEM OF HIGHER EDUCATION HANDBOOK/CODE

# EXHIBIT 4

Evaluations of instructional faculty shall include an assessment incorporating teaching evaluations completed by their students.

5.12.3    **Review of Evaluations.** Each institution and the System Office shall adopt, in their respective bylaws, a procedure for review of a faculty member's adverse annual evaluation rating, as provided in Section 5.16 of the NSHE <u>Code</u>. Academic and administrative faculty who disagree with the supervisor's evaluation may submit a written rejoinder, as provided for in Title 4, Ch. 3, Sec. 4(5).

(B/R 10/08)


## Section 5.13    Annual Performance Evaluation of Tenured Faculty

5.13.1    **Declaration of Policy.**  It is the policy of this System to expect the continued commitment of its faculty to excellence after the granting of appointments with tenure.  Under this policy, tenured faculty will be encouraged to realize the academic community's expectations to such excellence in their future services and performances.  This policy shall be taken into consideration in the annual performance evaluation of tenured faculty, as provided in Section 5.12 of the NSHE <u>Code</u>.

5.13.2    **Evaluation Procedure.**

(a)    If the annual performance evaluations provided for in Section 5.12 of the NSHE <u>Code</u> result in a tenured faculty member receiving an overall unsatisfactory rating for two consecutive years, a hearing shall be held for the purpose of determining if the tenured faculty member should be retained in employment.

(b)    An overall "unsatisfactory" rating in two consecutive annual performance evaluations as provided in this Section shall be cause for termination of employment.   Hearings to consider terminations initiated by this Section shall be held by a special hearing officer and special hearing committee under Section 6.11 of the NSHE <u>Code</u>.  All other provisions of Chapter 6 of the NSHE <u>Code</u> should be followed to the extent applicable.

Notwithstanding the provisions of Subsections 6.11.4, 6.12.1 and 6.13.2 of the NSHE <u>Code</u>, the only option for recommendations or decisions upon the completion of the hearing or appeal process is the continuation or termination of employment of the tenured faculty member.  If, after the hearing or appeal process is completed, the decision is made to continue the tenured faculty member's employment, the annual performance evaluations which initiated the hearing shall be revised to eliminate the unsatisfactory ratings.  The burden of demonstrating that termination of employment should occur lies with the administrative authorities of the System institution.

(c)    The provisions of this Section shall not apply to administrators who hold tenure as academic faculty members at the universities as long as they continue as administrators.  Only the performance of such administrators of their assigned administrative duties shall be evaluated under Section 5.12 of the NSHE <u>Code</u>.  Commencing five years after such

Rev. 293 (12/20)
Title 2, Chapter 5, Page 36

administrators are discontinued as administrators, the provisions of this
Section shall be applied to them as tenured faculty members.

(d)     After the completion of the annual performance evaluations provided for
in Section 5.12 of the NSHE Code, the Presidents shall submit an annual
report to the Board of Regents detailing the process and outcomes of the
annual performance evaluations.

(B/R 6/16)

## Section 5.14   Oaths or Affirmations

No affirmation or oath shall be required of faculty, except that oath provided by
Article 11, Section 5 and Article 15, Section 2 of the Nevada Constitution.

## Section 5.15   Resignations/Leave

1.   Resignations.

a.   All resignations by a member of the academic or administrative faculty
should be in writing and should be submitted to the appointing authority at
least 30 calendar days in advance of its effective date.  The resignation
must be accepted in writing by the appointing authority (or designee).

b.   If a resignation is tendered verbally or is conveyed to an employee other
than the appointing authority, the resignation must still be accepted in
writing by the appointing authority (or designee).

c.    A resignation should indicate an effective date.  If the resignation does
not specify an effective date, the resignation shall be effective on the
fourth working day after acceptance and this date must be reflected in the
written acceptance.

d.   Once an employee's resignation is accepted by the appointing authority,
the employee shall have three working days after such acceptance to
revoke the resignation.  Thereafter, the employee may not revoke the
resignation, regardless of the effective date set forth in it.  A revocation of
a resignation must be in writing and must be delivered to the appointing
authority within the foregoing time period to be effective.

e.   The decision of an appointing authority not to accept a request to rescind
a resignation more than three working days after its written acceptance is
not subject to grievance or appeal processes.

2.   Leave

Leave may only be taken in accordance with the policies in Title 4, Chapter 3.
Unauthorized leave is charged as leave without pay pursuant to Title 4,
Chapter 3, Section 43, and may subject the employee to disciplinary action
under Title 2, Chapter 6.

(B/R 12/06)

## Section 6.8    Decision to Hold Hearings

**6.8.1**    **Complaints.**  Except as may be provided in Section 6.6 of the Nevada System of Higher Education <u>Code</u>, all complaints alleging conduct prohibited by Section 6.2 of the Nevada System of Higher Education <u>Code</u> or by applicable stated prohibitions, policies, procedures, rules, regulations or bylaws of the System institutions shall be filed with the administrative officer.  The complaint shall be in writing, shall be signed by the complainant and shall, to the extent reasonably possible, specify the date, time, place, person or persons involved and the circumstances of the alleged prohibited conduct, including the name or names of persons who may have witnessed the alleged prohibited conduct.

**6.8.2**    **Investigation, Informal Resolution or Recommendation for Hearing.**

(a)    The administrative officer shall investigate complaints with the purpose of clarifying the facts and the positions taken by the parties. The investigation shall be completed and a charging letter, if any, issued within sixty (60) calendar days after the receipt of the complaint. At a minimum, the charging letter shall contain the information specified in the <u>Code</u>, Subsection 6.8.1, and shall inform the person charged that, although there is no requirement or compulsion to do so, a written reply may be submitted.

(b)    The person charged may present a written answer within seven (7) calendar days after receipt of a charging letter.

(c)    If deemed appropriate to do so, the administrative officer, with the approval of the president, may informally resolve the complaint by conciliating with the parties, by permitting the complainant to voluntarily drop the complaint or by permitting the person charged to voluntarily accept disciplinary sanctions.

(d)    Within five (5) calendar days  after the administrative officer's receipt of the charged person's written answer to the charging letter, or if the charged person did not answer, then within five (5) calendar days of the date the answer was due, and if the complaint cannot be informally resolved, the administrative officer shall make a recommendation to the president as to whether or not the complaint should proceed to a hearing and, if a hearing is recommended, the administrative officer shall recommend the type of hearing which may be held, as specified in Subsection 6.8.3 of the Nevada System of Higher Education <u>Code</u>.

(e)    A hearing shall be held whenever the president accepts the administrative officer's recommendation to that effect or does not accept a contrary recommendation from the administrative officer.  The president shall decide the kind of hearing to be held, as authorized in Subsection 6.8.3 of the Nevada System of Higher Education <u>Code</u>.  The president shall make this decision within seven (7) calendar days after receipt of the administrative officer's recommendation.  Within the time period set forth in this paragraph, the president shall inform the administrative officer of the president's decision, and, if deciding to hold a hearing under Section 6.9 of the Nevada System of Higher Education <u>Code</u>, shall also inform the faculty senate chair of the decision.  If the hearing is to be held under Section 6.9 of the Nevada System of Higher Education <u>Code</u> on a charge or charges of sexual harassment under Subsection 6.2.2(p) of the Nevada System of Higher Education <u>Code</u>, the president shall also inform the president of the appropriate student government within the time

period set forth in this paragraph if a student or graduate student is involved in the charge as an alleged victim.

(f)    If it is determined by the president that the matter should not proceed to a hearing, then unless new evidence, sufficient in the opinion of the president to reopen the case, is subsequently discovered, the complaint shall be dismissed and the disciplinary procedure shall be considered closed.  All documents relating to the case shall be deposited with the president's office where they shall be retained for a period of one year, after which time they shall be released to the person charged, if requested by that person, or shall be destroyed unless destroyed sooner pursuant to regulations, policies or procedures established by the System institution.

6.8.3    **Types of Hearings.**  Except as mandated by Subsections 6.3.7(b) and 6.5.2 of the Nevada System of Higher Education <u>Code</u>, based upon the recommendation of the administrative officer and such other considerations as may be pertinent, the president shall decide whether a disciplinary hearing shall be held:

1.    By a general hearing officer, in an office hearing as provided in Section 6.10 of the Nevada System of Higher Education <u>Code</u>; or

2.    By a special hearing officer and special hearing committee, as provided in Section 6.11 of the Nevada System of Higher Education <u>Code</u>.

6.8.4    **Factors to be Considered.**  In making a recommendation or decision to hold a type of hearing, the administrative officer or the president, respectively, may consider as nonbinding factors the wishes of the person charged, the degree of apparent complexity of the facts or issues and the seriousness of the offense.

6.8.5    **Waiver of Hearing.**  The person charged may waive a hearing and accept a disciplinary sanction recommended by the administrative officer and approved by the president as provided in Subsection 6.8.2 of the Nevada System of Higher Education <u>Code</u>.

(B/R 9/15)


**Section 6.9    Provisions Applicable to Hearings**

6.9.1    **Applicable Provisions.**  The provisions of this section shall be applicable to hearings held pursuant to Sections 6.9 through 6.11 of the Nevada System of Higher Education <u>Code</u>.

6.9.2    **Hearing Arrangements.**  The administrative officer shall make physical and scheduling arrangements for hearings required by Sections 6.9 through 6.11 of the Nevada System of Higher Education <u>Code</u>.

6.9.3    **Notice.**

(a)    The person charged must receive, at least ten (10) calendar days before the hearing, written notice from the administrative officer containing:

1.    The date, time and place of the hearing;

ER112

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 112 of 298
Case 3:22-cv-00045-LRH-CLB   Document 22-1   Filed 03/15/22   Page 6 of 14

2.     Specification of the misconduct charged by citing the applicable provision of the Nevada System of Higher Education Code or the applicable stated policy, prohibition, procedure, rule, regulation or bylaw of a System institution which has been alleged to have been violated;

3.     Specification, to the extent reasonably possible, of the time, place, person or persons involved and the circumstances of the alleged prohibited conduct, including the name or names of persons who may have witnessed the alleged prohibited conduct;

4.     Notification that the person charged may be accompanied by an advisor of the charged person's choice, and of the time within which the person charged must inform the administrative officer of the name and address of the advisor, if any, and whether the advisor is an attorney, or else forfeit the right to have an advisor present, as provided in Subsection 6.9.6 of the Nevada System of Higher Education Code; and

5.     Such other information as the administrative officer may wish to include.

(b)     The administrative officer shall be responsible for preparing and delivering notices required by this section.  All notices or other documents shall be (1) served by 1st class mail, postage prepaid, and by email, if a current email address is available to the institution; or (2) hand delivered.  Notice delivered by mail shall be considered delivered when sent, provided that three (3) additional calendar days shall be added to the time period set forth for minimum notice.  A copy of the applicable disciplinary hearing procedures shall accompany each notice.

**6.9.4     Evidence.**
Evidence shall be considered if it possesses reasonably probative value, materiality and relevancy as determined by the hearing officer.  No evidence other than that received at the hearing shall be considered in the decision.  Upon request, the person charged, the person's advisor, if any, and the administrative officer shall have the right to examine, at least five (5) calendar days prior to the hearing during reasonable business hours, any documentary evidence to be presented at the hearing.  The parties shall also have the right to present, challenge or rebut evidence and to question or cross-examine witnesses.  The findings and recommendation of the Title IX coordinator pursuant to NSHE *Handbook*, Title 4, Chapter 8, Section 13 shall be considered.  Formal rules of evidence shall not apply, but irrelevant or unduly repetitious evidence shall be excluded.

**6.9.5     Administrative Officer's Duties.**
The administrative officer shall marshal and present the evidence against the person charged.

**6.9.6**     <u>Advisors, Attorneys.</u>

(a)     The person charged may be accompanied by one advisor of the person's choice, who may represent and advise the person and may present the evidence on the person's behalf. The person charged must give written notice of the name and address of the advisor, and whether the advisor is an attorney, to the administrative officer no later than seven (7) calendar days before the time set for the hearing. An advisor will not be permitted at the hearing without such notice.

(b)     Should a person charged advise that the person will be accompanied by an attorney as advisor, the administrative officer shall advise the vice chancellor for legal affairs so that an attorney will be present at the hearing to represent and advise the administrative officer and to present the evidence on behalf of the administrative officer.

**6.9.7**     <u>Technical Errors.</u> Technical departures from or errors in following the procedures established in the Nevada System of Higher Education <u>Code</u> or in any applicable stated prohibition, policy, procedure, rule, regulation or bylaw of a System institution under which disciplinary procedures are being invoked shall not be grounds to withhold disciplinary action unless, in the opinion of the president, the technical departures or errors were such as to have prevented a fair and just determination of the charges.

**6.9.8**     <u>Closed Hearings.</u> The hearing shall be closed unless the person charged requests an open hearing. Only the person charged and one advisor, the administrative officer and one advisor, the person or persons conducting the hearing, a person designated to record a hearing, as may be provided in this chapter, and witnesses while such witnesses are presenting evidence may be present for a closed hearing. When a hearing is held on a charge under Subsection 6.2.1 (w) or (x) of the Nevada System of Higher Education <u>Code</u>, the hearing shall be closed unless the complainant requests an open hearing. When a hearing is held on a charge made under Subsection 6.2.1 (w) or (x) of the Nevada System of Higher Education <u>Code</u>, the institution's affirmative action or Title IX coordinator may also be present for a closed hearing, and any person who alleges to be the victim of an act of sexual harassment may have a non-attorney supporter present for a closed hearing during the person's testimony only.

**6.9.9**     <u>Consolidated Hearings.</u>

(a)     When more than one person is charged with prohibited conduct arising out of a single occurrence, or out of multiple occurrences, a single hearing may be held for all of the persons so charged. Such persons may request that their cases be consolidated with others or separated from others. The administrative officer shall make determinations regarding consolidation. All such determinations shall be subject to revision by the general hearing officer, institutional hearing committee or special hearing officer, as the case may be. In the event of such revision, all cases affected shall be rescheduled for hearing.

(b)     The separation of one or more cases from a group of cases previously set for a consolidated hearing shall not be considered to affect the consolidation of the remaining cases in the group.

**6.9.10**   **Absence of the Person Charged.** If the person charged does not appear, either personally or through an advisor, at a hearing without satisfactory explanation for the absence having been made at the earliest opportunity, or should the person charged leave the hearing before its conclusion, the hearing shall proceed without the person charged and the general hearing officer, institutional hearing committee or the special hearing officer and special hearing committee, as the case may be, shall make findings of fact, recommendations or a report, as the case may be, on the available evidence. The fact that an administrative hearing or a civil or criminal trial for the person charged is pending shall not be considered a satisfactory explanation for absence unless the actual hearing or trial date conflicts with a date for a hearing held under this chapter, or unless it is physically impossible for the person charged, through no fault of that person, to attend a hearing held under this chapter.

**6.9.11**   **Subpoena.** The president shall issue subpoenas to compel the attendance of persons and the presentation of documents at all hearings established under this chapter upon the request of the person charged or of the administrative officer. Such subpoena authority shall be exercised under the authority conferred by NRS 396.323.

**6.9.12**   **Waiver or Extension of Time.**

    (a)   Matters preliminary to hearings shall be decided, hearings conducted and cases determined under these procedures as quickly as is reasonably feasible, consistent with reasonable notice.

    (b)   With the approval of the administrative officer only, a person charged may waive all time limits established in this chapter, except the time limits stated in Subsections 6.10.2 and 6.11.7 of the Nevada System of Higher Education Code.

    (c)   Extension of time for hearings shall be authorized by general hearing officers, institutional hearing committee chairs or special hearing officers only upon good and compelling reasons. The possibility or pendency of administrative, civil or criminal proceedings against the person charged is not such a good and compelling reason for extension of time unless the hearing or trial of such is scheduled for the same date as a hearing to be held under this chapter, or unless it is physically impossible for the person charged, through no fault of that person, to attend a hearing to be held under this chapter.

**6.9.13**   **Repetition of Hearing.** A hearing may not be held more than once on the basis of any specific complaint after a hearing process has been completed except as may be provided in this chapter.

**6.9.14**   **Standard of Proof.** The standard of proof is a preponderance of the evidence in all hearings and any appeals (i.e., the evidence establishes that it is more likely than not that the misconduct occurred).

(B/R 9/15)

Rev. 275 (06/17)
Title 2, Chapter 6, Page 19

## Section 6.10   General Hearing Officer

**6.10.1**   **Appointment.**  The president shall designate one or more general hearing officers who shall serve for terms as determined by the president.

**6.10.2**   **Office Hearings by a General Hearing Officer.**  Office hearings by a general hearing officer shall be informal in nature and subject to such procedures as the president may determine. A hearing shall be held and a recommendation made to the president as soon as is reasonably possible, but no later than one hundred eighty (180) calendar days after the filing of the complaint with the administrative officer.  Upon agreement of the administrative officer and the person charged, an additional ninety (90) calendar day extension shall be granted by the general hearing officer if the person charged has the right under the Older Workers Benefits Protection Act to a time period for consideration or cancellation of a proposed settlement agreement.  The sexual harassment complainant must also agree to such extension.

**6.10.3**   **Findings and Recommendations.**  Findings of fact and recommendations of the general hearing officer shall be made in writing to the president within a reasonable time after the close of the hearing with copies to the person charged and to the administrative officer.  The full range of sanctions established by Section 6.3 of the Nevada System of Higher Education Code is available, except as may be limited therein.

(B/R 9/15)

## Section 6.11   Special Hearing Officer and Special Hearing Committee

**6.11.1**   **Appointment of Special Hearing Officer.**

(a)   Within five (5) calendar days after making a decision to hold a hearing before a special hearing officer and a special hearing committee, the president shall select a special hearing officer and, within the time period set forth in this paragraph, shall inform the person charged and the administrative officer of the identity of the special hearing officer.

(b)   Special hearing officers shall be attorneys who have been members of the State Bar of Nevada for at least five years or who are otherwise qualified by professional experience in presiding at judicial or quasi-judicial adversary proceedings.  They will not hold any employment or other contractual relationship with any System institution during the period of their service.

(c)   A special hearing officer may be challenged for cause as set forth in Section 6.11.6, but no peremptory challenge shall be allowed.

**6.11.2**   **Duties of the Special Hearing Officer.**  The function of the special hearing officer shall be that of presiding officer of a special hearing committee during a hearing with the following authority:

(a)   To make all rulings on matters relating to the conduct of the hearing, including the consideration of evidence;

(b)   To maintain order, and the special hearing officer may exclude anyone who refuses to be orderly;

Rev. 275 (06/17)
Title 2, Chapter 6, Page 20

(c)     To recognize witnesses for the purpose of giving testimony during which the special hearing officer may also question witnesses;

(d)     To make such rulings on procedure deemed appropriate so long as not inconsistent with the applicable procedures established in this chapter;

(e)     To act as general advisor to the special hearing committee, but shall have no voting authority;

(f)     To prepare, at the conclusion of the hearing, a written report which shall contain, as to the person charged, the following:

1.  Findings of fact as determined by the special hearing officer together with a determination that the person charged did or did not commit the act or acts charged.

2.  A finding that the act or acts did or did not constitute one or more of the causes for discipline or suspension or termination for cause established in this Code or other applicable stated prohibition, policy, procedure, rule, regulation or bylaw of a System institution.

3.  Such further information as the special hearing officer may consider appropriate.

The special hearing officer's report shall be prepared and submitted to the president, with copies to each member of the special hearing committee, the person charged and the administrative officer, within a reasonable time after the conclusion of the hearing.

**6.11.3    Appointment of the Special Hearing Committee.**

(a)     A faculty-hearing panel, composed of at least 15 faculty members, shall be selected by the faculty senate of each System institution.  Both academic faculty and administrators shall be eligible to serve.  The members of the faculty-hearing panel shall serve one-year terms and upon agreeing to serve shall commit themselves in writing to serve on a special hearing committee when needed.  System institution administrators are obligated by the provisions of this subsection to grant special hearing committee members administrative leave or other assistance necessary to enable them to fulfill their responsibilities as members of special hearing committees.  This might require providing teaching assistance from classes or other administrative relief from assigned duties.

(b)     Except as provided in subparagraph (c) below, within five (5) calendar days after receipt from the president of notice of the president's decision to hold a hearing under Section 6.11 of the Nevada System of Higher Education Code, the faculty senate chair shall select the names of nine persons from among the faculty hearing panel, the selection to be made by lot, to serve on a special hearing committee and the faculty senate chair, within the time period set forth in this paragraph, shall inform the person charged and the administrative officer of the names of the persons selected.

(c)    If a hearing is to be held on a charge or charges of sexual harassment under Subsection 6.2.2(p) of the Nevada System of Higher Education <u>Code</u> and if a student or graduate student is involved in the charge as an alleged victim, within five (5) calendar days after receipt of notice of the president's decision to hold a hearing under Section 6.8.3 of the Nevada System of Higher Education <u>Code</u>, the faculty senate chair shall select the names of eight persons from among the faculty hearing panel, the selection to be made by lot, and the appropriate student government president shall nominate three students, to serve on a special hearing committee and the faculty senate chair and the appropriate student government president, within the time period set forth in this paragraph, shall inform the person charged and the administrative officer of the names of the persons selected or nominated.

**6.11.4**    <u>**Duties of the Special Hearing Committee.**</u>  The function of the special hearing committee shall be:

(a)    Together with the special hearing officer, to hear evidence presented at a hearing held under this chapter during which the committee members may also question witnesses; and

(b)    To make recommendations, after reviewing the report of the special hearing officer, to the president at the conclusion of a hearing for dismissal of charges or imposition of a sanction or sanctions.  Such recommendations shall be in writing and shall be made by the committee within a reasonable time after reviewing the special hearing officer's report with copies sent to the person charged and the administrative officer.  The full range of sanctions established by Section 6.3 of the Nevada System of Higher Education <u>Code</u> is available.

**6.11.5**    <u>**Hearings to be Recorded.**</u>  A tape recording will be made of the hearing and kept in the president's office for at least one year before being destroyed, unless the matter is brought before the courts during which time the recording will be kept until the matter is decided in the courts.  Except as provided herein or for purposes of appeal, a tape recording of a closed hearing shall be confidential. The person charged, on request of and at the charged person's expense may have or, under supervision may make, a copy of such recording.  No tape recording by the person charged or by other persons at the hearing will be permitted. The person charged may, at the charged person's expense, provide for a certified court reporter. A copy of the court reporter's transcript shall also be made available to the president upon the president's request and at the System institution's expense.

**6.11.6    Challenges.**

(a)    Within seven (7) calendar days after the faculty senate chair, and the appropriate student government president under Subsection 6.11.3(c) of the Nevada System of Higher Education Code, has informed the person charged and the administrative officer of the identities of the persons selected from the faculty hearing panel or nominated by the student government president, the administrative officer and the person charged or the adviser of the person charged shall meet in person or by telephone to exercise, in alternate order, the peremptory challenges provided in subparagraph (c) of this subsection. The person charged or the adviser shall exercise the first peremptory challenge. Peremptory challenges not exercised at this time shall be waived. At this time, the person charged or the adviser shall also submit written challenges for cause, as provided in subparagraph (b) of this subsection. No challenge for cause may be exercised after this date.

(b)    The person charged may challenge the special hearing officer or the members of the special hearing committee for cause for the following reasons:

   1.   The person challenged was a participant in the event out of which the alleged prohibited conduct arose; or

   2.   The person challenged bears a relationship to some party to the proceedings which may prejudice the charged person's ability to obtain a fair and impartial hearing and decision.

Within the time period set forth in paragraph (a) of this section, the person charged shall submit a written statement setting forth the allegations underlying the challenge to the administrative officer. The administrative officer shall send the written challenge to the president the same day it is received, with a copy to the person challenged. Within seven (7) calendar days after receipt of the written challenge, the president or the president's designee shall determine whether the facts present grounds for disqualification. The decision of the president shall be final. A hearing shall not be held until the challenge is decided by the president. The special hearing officer or special hearing committee members may be disqualified on their own motions.

(c)    The administrative officer and the person charged each shall have the right to challenge:

   1.   In the case of a hearing to be held to hear a charge of sexual harassment under Subsection 6.2.2(p) of the Nevada System of Higher Education Code in which a student or graduate student is an alleged victim, no more than two members of the faculty hearing panel selected by lot and no more than one student government nominee without cause;

   2.   In all other cases, no more than two members of the faculty hearing panel selected by lot without cause.

(d)    In cases of consolidated hearings, the persons charged shall be limited to a total of the number of challenges without cause appropriate under either subparagraph (c)(1) or (c)(2) above.

(e)     Replacements for disqualified special hearing officers shall be made by the president within five (5) calendar days after the president's decision on a challenge for cause.  Replacements for disqualified special hearing committee members shall be made by lot from the faculty hearing panel or shall be nominated by the appropriate student government president as the case may be within five (5) calendar days after the president's decision on a challenge for cause.  No further challenges for cause of either a special hearing officer or members of a special hearing committee shall be permitted.

(f)     The special hearing committee shall consist of five members.  In the event a member is unable to serve due to unavoidable reasons, the administrative officer may choose to have the vacancy filled by the procedure stated in subparagraph (e) of this subsection or proceed to a hearing with the remainder of the special hearing committee, provided that the special hearing committee shall consist of no fewer than three members.

**6.11.7**   **Hearing and Recommendation.**  A hearing shall be held and a recommendation made to the president no later than one hundred eighty (180) calendar days after the filing of the complaint with the administrative officer.  Upon agreement of the administrative officer and the person charged, an additional ninety (90) calendar day extension shall be granted by the special hearing officer if the person charged has the right under the Older Workers Benefits Protection Act to a time period for consideration of or cancellation of a proposed settlement agreement. The complainant of sexual harassment must also agree to such extension.

For the sake of convenience, the time limits for procedures specified throughout this section are summarized as follows:

(a)     The complaint is filed.

(b)     Within sixty (60) calendar days after receipt of the complaint, the administrative officer completes the investigation (see Section 6.8.2(a)). During that time period, the administrative officer shall issue a charging letter to the person charged who then has seven (7) calendar days after receipt of the charging letter to respond to it, if desired (see Section 6.8.2(b)).

(c)     Within five (5) calendar days  after  receipt of any written response from the person charged or within five (5) calendar days after completion of the investigation, the administrative officer makes a recommendation to the president on whether to hold a hearing or not (see Section 6.8.2(d)).

(d)     Within seven (7) calendar days after receipt of the administrative officer's recommendation, the president makes a decision on whether to hold a hearing or not and informs the administrative officer and faculty senate chair of the decision (see Section 6.8.2(e)).

(e)     Within five (5) calendar days after notification of the president's decision, the president shall choose a special hearing officer and the faculty senate chair shall choose nine names from the faculty hearing panel and each shall forward the names to the person charged and the administrative officer (see Section 6.11.1(a)).

(f)     Within seven (7) calendar days after the president and the faculty senate chair have forwarded the name of the special hearing officer and the names chosen from the faculty hearing panel, the administrative officer and the person charged or the adviser of the person charged meet to exercise peremptory challenges and to transmit challenges for cause (see Section 6.11.6(a)).

(g)     The same day that challenges for cause are received by the administrative hearing officer, the administrative hearing officer shall send such challenges to the president (see Section 6.11.6(b)).

(h)     Within seven (7) calendar days after receipt of challenges with cause, the president shall make a decision on the challenges (see Section 6.11.6(b)).

(i)     Within three (3) calendar days after the president's decision on challenges for cause, vacancies in the appointments of special hearing officer or members of a special hearing committee shall be filled (see Section 6.11.6(e)).

(j)     Within one hundred eighty (180) calendar days after the filing of the complaint with the administrative officer, the hearing shall be held and a recommendation made to the president for action. Upon agreement of the administrative officer and the person charged, an additional ninety (90) calendar day extension shall be granted by the special hearing officer if the person charged has the right under the Older Workers Benefits Protection Act to a time period for consideration or cancellation of a proposed settlement agreement.  The complainant of sexual harassment must also agree to such extension (see Section 6.11.7).

(B/R 9/15)


## Section 6.12  President's Decision

**6.12.1**     **Options Available.**  The president shall review the findings of fact and recommendations of the general hearing officer or the institutional hearing committee or, in cases heard before a special hearing officer and special hearing committee, the report of the special hearing officer and the recommendations of the special hearing committee.  The president may:

(a)     Dismiss the charge;

(b)     Affirm the recommended sanction;

(c)     Impose a lesser sanction than recommended;

(d)     Impose a greater sanction than recommended; or

(e)     Order a new hearing.

ER121

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 121 of 298
Case 3:22-cv-00045-ART-CLB   Document 34   Filed 05/04/22   Page 1 of 12

1  John Albrecht, NV Bar No. 4505
   General Counsel
2  Kiah D. Beverly-Graham, NV Bar No. 11916
   Deputy General Counsel
3  Truckee Meadows Community College
   2215 Raggio Parkway
4  Reno, Nevada 89512-1095
   (775) 673-7396
5  (775) 673-7135 fax
   john.albrecht@dri.edu
6  kiah.beverly@dri.edu

7  *Attorneys for Defendants*

8                    **UNITED STATES DISTRICT COURT**
                         **DISTRICT OF NEVADA**
9

10  LARS JENSEN,

11            Plaintiff,

12     v.                                   Case No. 3:22-cv-00045-ART-CLB

13  NATALIE BROWN, et al.

14            Defendants.

15       **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

16         All Defendants submit this reply in support of their Motion to Dismiss (ECF No. 21, the

17  "Motion" or "MTD") the First Amended Complaint ("FAC").[1]

18                              **ARGUMENT**

19  I.    **THE FIRST AMENDMENT CLAIMS SHOULD BE DISMISSED**

20         A.  **The Relevant Legal Framework**

21         The parties agree the Ninth Circuit's decision in *Eng v. Cooley*, 552 F.3d 1062 (2009), is

22  the framework for analyzing Dr. Jensen's claims for First Amendment retaliation. *Compare*

23  MTD 10:5-13 *with* Opp. 10:12-19. Though Defendants do not concede the ultimate viability of

24  the FAC's allegations regarding any of the *Eng* factors, the present dispute centers on the

25

26  ───────────────
    [1] Defined terms herein are given the same meaning as in the Motion.
27

28                                    -1-

application of three of them – whether Defendants' interests outweigh Dr. Jensen's; whether the speech at issue was of public concern; and whether it was made in a private or public capacity.

The Motion's analysis of the First Amendment claims focuses on the events of the Math Summit because the FAC does not plausibly allege that the three Emails identified were a substantial motivating factor in any discipline. *See* MTD 10:24-11:16. The Opposition fails to respond to this point, which is effectively a concession. Opp. 14:25-15:25; *Pers. Elec. Transports, Inc. v. U.S. Trustee.*, 313 F. App'x 51, 52 (9th Cir. 2009) (unpublished) (argument not made in opposition to motion to dismiss is waived).

### B.  The Balance of Interests Favors Defendants

*Eng*'s fourth factor considers "whether the state had an adequate justification for treating the employee differently from other members of the general public[.]" *Eng*, 552 F.3d at 1070. That question is answered by applying the "balancing test" established by the Supreme Court in *Pickering v. Board of Ed. See id.* at 1071-72. Defendants bear the burden "to show that the balance of interests justified their adverse employment decision[.]" *See Eng* 552 F.3d at 1074. If Defendants can demonstrate they will prevail on this element as a matter of law, the FAC's First Amendment causes of action must fail. *See Coomes v. Sch. Dist.*, 816 F.3d 1255, 1260 (failure to meet any *Eng* factor is fatal, and the Court may review the factors in any order).

In their moving papers, Defendants addressed the balancing test. *See* MTD 11:19-13:19. In sum, Defendants argued that Dr. Jensen's conduct at the Math Summit, *as it is alleged in the FAC*, constituted insubordination and that imposing discipline to avoid such conduct is within a state employers' legitimate interests. Dr. Jensen's alleged interest is in the ability to express himself in the exact manner he desired, rather than through the alternative means his supervisor instructed him to use because the question-and-answer session was out of time. This very

specific interest, which is not supported by citation to any authority, does not outweigh

Defendants' interests.

The Opposition argues that Dr. Jensen's conduct at the Math Summit was "not disruptive

and the distribution of the handout occurred during a break in the summit and therefore had no

impact on the efficiency of the meeting." Opp. 14:15-23. As a result, the Opposition argues, "Dr.

Jensen's First Amendment interest in engaging in the protected speech outweighs TMCC's

interest in prohibiting the speech to promote efficiency." Id. 14:19-23. This argument does not

alter the conclusion that the Motion should be granted.

> i.    <u>Defendants Have A Legitimate Interest In Maintaining Employee Discipline</u>

The Opposition suggests the state's interest is in generic efficiency, but it is more

particular than that. The state interest at play here is in a supervisor's ability to discipline the

employees that report to him or her when appropriate. This interest is recognized by numerous

decisions issued by the Supreme Court and the Ninth Circuit. *See* MTD at 12:1-12:18 (citing

numerous authorities). It also accords with common sense.

> ii.   <u>Defendants' Interest Was Triggered By Dr. Jensen's Conduct</u>

The Opposition contests whether Defendants' interest was triggered by Dr. Jensen's

conduct. Defendants' position is that it was because Dr. Jensen's conduct was insubordinate and

clearly appropriate for disciplinary action.

The parties agree that insubordination means "willful disregard of express or implied

directions, or such a defiant attitude as to be equivalent thereto." *Compare* MTD at 20:10-14

(citing *Richardson v. Bd. of Regents*, 70 Nev. 347, 366-67 (1954), for definition of

insubordination) *with* Opp. at 18:23-26. (same). The conduct alleged in the FAC meets that

definition.

ER124

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 124 of 298
Case 3:22-cv-00045-ART-CLB   Document 34   Filed 05/04/22   Page 4 of 12

As alleged, at a TMCC event, Dr. Jensen's direct supervisor declined to allow him to speak in a question-and-answer session which had run out of time. FAC ¶¶ 28-32. She instructed him to put his comments, in writing, on a white board provided for that purpose. FAC ¶ 33. Instead, Dr. Jensen attempted to hand his document out to participants directly. *Id*. ¶ 38. The supervisor then impliedly indicated that Dr. Jensen should stop by picking up copies of the document or motioning that they should be returned to her. *Id*. ¶ 40. The FAC is vague but alleges that the supervisor indicated again, in some form, that she was "den[ying] Dr. Jensen the opportunity to distribute his handout." *Id*. ¶ 41. These allegations describe three separate instances in which Dr. Jensen willfully disregarded his supervisor's instructions at work.

This fits within the definition of insubordination. *See Richardson*, 70 Nev. at 366-67. Avoiding insubordination is inherently part of the state's legitimate disciplinary interests.

Contrary to the Opposition's argument, *Richardson* does not hold that a professor *per se* cannot be insubordinate for distributing an article. It held only that a professor was not insubordinate because, unlike here, there was no direction or instruction that was disregarded. *See id*. at 366 (noting there was no order, etc., that was violated). The termination there was expressly based on the "attack" against the administration. *Id*. at 360-365 (evidence largely was of an "attack" on the president). And the *Richardson* court expressly disavowed the type of sweeping holding the Opposition would attribute to it. *Id.* at 349 ("The extent to which the regents may limit, curtail or eliminate entirely faculty participation in matters of the curriculum, entrance requirements, or other academic policies is *not* involved in this proceeding").

Finally, Dr. Ellsworth's instructions to Dr. Jensen were appropriate. It is well-settled that the First Amendment is not offended when speech is channeled into an alternative means, as happened here. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

ER125

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 125 of 298
Case 3:22-cv-00045-ART-CLB   Document 34   Filed 05/04/22   Page 5 of 12

iii.    Whether or Not Dr. Jensen's Conduct Was Disruptive Is Not Relevant

The Opposition would avoid the conclusion that the conduct was insubordinate by arguing that it was not disruptive. But the definition of insubordination does not reference disruption. *See Richardson*, 70 Nev. at 366-67. One may be calm and polite when ignoring a supervisor's instructions. And the Supreme Court foreclosed the supposed need to evidence disruption when it held that "we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *See Connick v. Meyers*, 461 U.S. 138, 152 (1983).

The Opposition cites to inapposite cases in support of its argument on this point. Opp. at 14:5-14. The Opposition cites *Smith v. Losee*, 485 F.2d 334 (10th Cir. 1973), for the proposition that Defendants must show by clear and convincing evidence that the speech interfered with TMCC's operations. *Eng*, decided in this Circuit more recently than *Losee*, does not hold that. *Smith* is also inconsistent with the Supreme Court's later holding that the employer need not allow the events that would generate such "evidence" to unfold. *See Connick* 461 U.S. at 152.

The Opposition also incorrectly suggests extreme conduct, such as that at issue in *Adamian v. Lombardi*, 608 F.2d 1224, 1228 (9th Cir. 1979), is required to defeat a retaliation claim. This wrongly assumes that there is no state interest in preventing any conduct which falls short of that in *Adamian*. Nothing in that case suggests such an expansive holding.

The Opposition's reliance on *Mabey v. Reagan*, 537 F.2d 1036 (9th Cir. 1976), is even further afield. That case held that "the academic senate is one place where expression of opinions should be most unfettered." *Id*. at 1048. The Opposition argues that because the Math Summit was less formal than a faculty senate, it must be a forum in which expression is even less fettered. Opp. 14:6-10. But the assumption that the level of formality controls is unsupported. It

-5-

ER126

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 126 of 298
Case 3:22-cv-00045-ART-CLB   Document 34   Filed 05/04/22   Page 6 of 12

is self-evident that in a representative body, like a faculty senate, the First Amendment interests are far greater than in a work meeting like the Math Summit at issue here.

    iv.    <u>Whether the Conduct Alleged Occurred At a Break Is Not Relevant</u>

The Opposition also argues Dr. Jensen's conduct cannot constitute insubordination because it allegedly occurred during a break. Opp. at 16:7-14. Essentially this argument is that a supervisor's authority ceases during breaks, even if the employee is still on employer property and in the physical location of an event overseen by the supervisor. No case is cited for this proposition. If true, it would mean every state employee has *carte blanche* to behave however they want at work, so long as the employee is on a break. This cannot possibly be the law.

    **B.    The Speech At Issue Was Not of Public Concern and Was Not Made In Dr. Jensen's Private Capacity**

In their Motion, Defendants established that the speech at issue was not of public concern and was not made in Dr. Jensen's capacity as a private citizen or in connection with his public duties related to teaching or academic writing. *See* MTD 13:21-16:23. Generally, Defendants stand on these prior arguments, though a few specific points in the Opposition warrant response.

<u>First</u>, the Opposition attempts to align Dr. Jensen's handout (the speech at issue) with case law that describes the type of speech generally held to be in the public interest. Opp. 11:16-12:7. The content of the handout (FAC Ex. A), is not of the same character. The first two points contain a vanilla description of a new statewide policy. The balance focus on (i) Dr. Jensen's concerns over the supposed impact – on a single math class – of TMCC's internal implementation of that policy and (ii) speculative consequences that may follow. This document is not within the public interest for at least two reasons. It expresses an internal policy grievance of the type generally not of public interest. *See* MTD at 14:21-15:2 (citing relevant cases). And speculation about public effects alone do not elevate speech to that of public importance. *Id*.

-6-

ER127

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 127 of 298
Case 3:22-cv-00045-ART-CLB   Document 34   Filed 05/04/22   Page 7 of 12

<u>Second</u>, the Opposition argues the FAC satisfies *Eng's* second prong because Dr. Jensen spoke as a private citizen. Opp. 12:9-13:3. This is belied by the allegations that this type of speech is part of his job. *See* FAC ¶¶ 21, 51; Opp. at 5:19-20. Taking this allegation to be true, the speech at issue was Dr. Jensen's job responsibility, meaning he could have been not speaking in his private capacity as is required for this claim to survive. *See Eng*, 552 F.3d at 1071.

<u>Third</u>, assuming Dr. Jensen was speaking in his public capacity, the speech does not qualify for the *Demers* exception described in the Motion. MTD 10:18-22. The handout at issue in *Demers*, which is attached as RJN Ex. A (ECF No. 30-1), is facially very different than the document at issue here. On this point, the documents speak for themselves.

### C.   The Math Summit Was A TMCC Work Event

According to the FAC and the Opposition, the Math Summit was open to the "broader TMCC community." Opp. 12:17-19. But the FAC does not explain who constitutes this community. This ambiguity allows the FAC to raise the specter, without directly alleging it, that the event was an open public forum. A close read of the event's agenda, which the parties agree is incorporated by reference into the FAC as part of Opp. Exhibit C (*see* Opp. 6:17-19, ECF No. 33-3), reveals it was not. The agenda states that the event included an ice breaker, breakout sessions, and a lunch. This description, paired with the FAC's failure to allege the event was open to the public at large, gives rise to a clear inference that this was a work event.

### II.   THE DUE PROCESS CLAIMS SHOULD BE DISMISSED

In their moving papers, Defendants established that the FAC fails to plausibly allege the elements of a Section 1983 due process claim. MTD 16:24-20:21. The parties agree that those elements are as follows: (i) a property interest protected by the Constitution; (ii) deprivation of that interest; and (iii) lack of process. *Compare id*. at 17:1-3 *with* Opp. 18:3-5.

**A.    The FAC Fails to Plausibly Allege The Existence or Deprivation of a
<u>Constitutionally Protected Property Interest</u>**

The Motion pointed out that Dr. Jensen was not terminated, which defeats a due process

claim premised on the interest alleged in the FAC in retaining employment. MTD 17:10-15. The

Opposition does not respond to this point, which is effectively conceded.

Regarding the alleged reputational interest, the Motion established the FAC fails to

adequately plead such because there is no allegation that Dr. Jensen was charged with

misconduct involving dishonesty or immorality. This is required to plead a due process claim

based on reputation. MTD 17:17-18:5. The Opposition concedes this point by not addressing it.

The Opposition also improperly attempts to amend the pleading by adding a host of

unpled purported rights: "right to academic freedom, right to maintain standards of curriculum,

right to have the processes for faculty terminations followed, and right to not be charged with

insubordination for distributing handouts." Opp. 18:13-15. The Opposition points to no authority

that these are constitutionally protected property interests. In any event, the Court should

disregard these assertions because they are not alleged in the FAC. *See infra* at 12:4-8.

**B.    <u>The FAC Fails to Allege a Lack of Process</u>**

The Motion pointed out that the FAC does not plausibly allege the absence of notice or a

fair hearing, as required to meet the lack of process prong on a due process claim. MTD 18:15-

20. Rather, the FAC alleges the Termination Proceedings were conducted under provisions of the

NSHE Handbook that ensure notice and a fair right to be heard. *Id*. 18:22-19:20.

The Opposition does not contest that the provisions regarding notice and the right to

defend oneself through counsel, cross, and the ability to call witnesses were afforded. Instead, it

argues (i) the wrong definition of "insubordination" was applied; (ii) the Termination

-8-

ER129

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 129 of 298
Case 3:22-cv-00045-ART-CLB   Document 34   Filed 05/04/22   Page 9 of 12

Proceedings were affected by bias; and (iii) the NSHE Handbook was not followed with respect to certain provisions not relevant to due process.

Regarding the definition of insubordination, the Opposition makes conclusory assertions of wrongdoing, but fails to identify the supposed incorrect definition; explain why it is "unconstitutionally vague"; or point to authority that this is relevant to the lack of process prong.

On the bias argument, the Opposition relies on *Stivers v. Pierce*, 71 F.3d 732 (9th Cir. 1995). That case supports Defendants. The plaintiff there lost at the administrative hearing and was not granted a professional license. *Id*. at 738-39. In contrast, Dr. Jensen did not lose. He was not terminated and does not allege any sanction was imposed at the hearing. *See* FAC ¶ 9.

Moreover, *Stivers* rejected an argument, much like the Opposition's, that a past grudge showed bias absent evidence the bias persisted at the hearing. *Id*. at 744. The FAC fails to allege any facts that would support a conclusion that any bias persisted at hearing. The fact, inferable from the FAC, that the hearing panel member at issue apparently voted in favor of Dr. Jensen strongly suggests no such evidence exists. And to the extent *Stivers* found actionable bias, it was based on extensive facts, the type of which are not alleged in the FAC. *Id*. at 742, 745-46.

Regarding the NSHE Handbook, the Motion established that the Handbook rights Dr. Jensen claims were not afforded are not relevant to the lack of process analysis because they do not bear on his right to fair notice and a chance to be heard. See MTD 7:5-21 (summarizing alleged Handbook violations); 19:22-20:21 (addressing alleged Handbook violations).

## III.    THE EQUAL PROTECTION CLAIM SHOULD BE DISMISSED

The Motion established that the FAC does not plead a plausible equal protection claim because (i) it fails to plead the protected class to which Dr. Jensen belongs and (ii) a plaintiff may not bring a "class-of-one" claim in the public employment context. Motion 22:10-21.

The Opposition does not contest these points. Instead, it lists a series of situations in which Dr. Jensen was allegedly treated differently than other TMCC employees. This does not remedy the failure to identify a protected class to which he belongs. *See Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (plaintiff must show membership in a protected class). Merely pointing out, as the Opposition does (Opp. at 20:11-21:2), that various "similarly situated" people were allegedly treated better than Dr. Jensen is not sufficient. *See id.* at 1031 ("An equal protection claim will not lie by conflating all persons not injured into a preferred class receiving better treatment than the plaintiff") (internal citations and citing ref's omitted); *see also Cochran v. City of Atlanta,* 150 F. Supp. 3d 1305, 1320-1321 (N.D. Ga. 2015) (plaintiff's general allegations that there were numerous City employees similarly situated to plaintiff were not sufficient to survive a motion to dismiss).

## IV.     IMMUNITY PRECLUDES ALL CAUSES OF ACTION IN THE FAC

### A.     Eleventh Amendment Sovereign Immunity Bars the Claims Against Defendants in their Official Capacities

The Motion established that all claims against Defendants in their official capacities are barred by the Eleventh Amendment. MTD at 20:23-21:18. The Opposition's sole argument that Defendants are not afforded Eleventh Amendment Immunity in their official capacities is that the FAC seeks prospective injunctive relief. Opp. 23:17-20. With respect to the official capacity Defendants, the FAC alleges an entitlement to "prospective relief" only in connection with the First Cause of Action for First Amendment Retaliation. Thus, the Opposition appears to concede that Eleventh Amendment immunity bars all claims against official capacity defendants but for the First Cause of Action to the extent it seeks "prospective relief."

As discussed in the MTD, the FAC's allegations of "prospective relief" are either not truly injunctive or not forward-looking as is required for this doctrine to apply. MTD at 21:6-18.

-10-

Finally, the Opposition appears to suggests that the pendency of state law claims also bars application of Eleventh Amendment immunity. However, the law is that claims against state officials based upon state law, whether retroactive or prospective, are barred by the Eleventh Amendment. *See Pennhurst State School & Hosp.* v. *Halderman*, 465 U.S. 89, 105 (1984).

     **B.**    **Qualified Immunity Bars All Claims Against Defendants In Their <u>Individual Capacities</u>**

Defendants argued that qualified immunity bars all claims against them in their individual capacities because the right alleged to be violated was not clearly established at the time of the alleged violation. *See* MTD at 22:2-9. The Opposition does not identify on-point precedent, relying upon broad assertions about the importance of the First Amendment. Opp. at 22:22-23:1.

A clearly established right requires that "existing precedent . . . placed the statutory or constitutional question beyond debate." *White v. Pauly,* 580 U.S. 73, 137 S. Ct. 548, 551 (2017) (internal quotations and citing ref's omitted). The Plaintiff has the burden of establishing the right was clearly established. *Moran v. State of Wash.,* 147 F.3d 839, 844 (9th Cir. 1998).

Plaintiff cites no case where the right to distribute a statement criticizing the rigor of one course by handing it to individuals at a college meeting, rather than posting it, is held to be a clearly established right. Absent such specific guidance, it cannot be said that "the contours of the right in this circuit were 'sufficiently clear that every reasonable official would have understood that this conduct violated that right.'" *See Demers v. Austin*, 746 F.3d 402, 417 (9th Cir. 2014) (holding defendants entitled to qualified immunity).

**<u>OBJECTION TO RJN AND INCORPORATION OF DOCUMENTS</u>**

The Opposition is accompanied by (i) a Request for Judicial Notice ("P. RJN") (ECF No. 30) and (ii) several exhibits attached directly or through declarations. These would add several documents – containing many unpled alleged facts – to the record. Defendants object as follows.

Defendants object to P. RJN Exhibits B-E (ECF Nos. 30-2 – 30-5) because the Opposition attempts to use them to expand the facts beyond what is in the pleading. *See* Opp. 14:19-23 (purpose of the exhibits is to demonstrate various national organizations' support for plaintiff). This is procedurally impermissible. *See Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (disregarding "new" allegations in opposition to motion to dismiss because a court may not take into account additional facts asserted through briefing). Put differently, a party cannot amend pleadings through briefing. *Ponomarenko v. Shapiro*, 287 F. Supp. 3d 816, 826 (N.D. Cal. 2018). There is a procedure for amendment a plaintiff must follow.

Defendants also object to almost all the new documents the Opposition seeks to introduce as attachments or through declarations. The objectionable documents are: (i) Opp. Exs. D-G (ECF Nos. 33-4 – 33-7); (ii) Demers Decl. (ECF No. 31); (iii) Jensen Decl. and attached Exhibits (ECF Nos. 32 – 32-3). Generally, these exhibits attempt to add unpled facts, which is not permissible as discussed above. Most of Opp. Exhibit C (ECF No. 33-3) is also objectionable for the same reasons. However, the last page of that document contains an agenda which is referenced in the FAC and is appropriately put before the Court. With that exception, the foregoing should all be disregarded for purposes of resolving this Motion.[2]

## **CONCLUSION**

For the reasons stated herein, and in the Motion, Defendants respectfully request the Court grant their Motion and enter an order dismissing the FAC in its entirety.

DATED May 4, 2022

 */s/ John Albrecht*
John Albrecht, NV Bar No. 4505
*Attorneys for Defendants*

---

[2] For clarity, Defendants have no objection to RJN Ex. A (ECF No. 30-1) or Opp. Exs. A-B (ECF Nos. 33-1 – 33-2) or the Agenda on the last page of Opp. Ex. C (ECF No. 33-3). These documents are either judicially noticeable or incorporated into the FAC.

-12-

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 133 of 298
Case 3:22-cv-00045-ART-CLB   Document 30   Filed 04/13/22   Page 1 of 5

ER133

John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff Lars Jensen*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LARS JENSEN, an individual,<br><br>*Plaintiff,*<br><br>v.<br><br>NATALIE BROWN, in her individual and official capacities as Administrative Officer at Truckee Meadows Community College; JULIE ELLSWORTH, in her individual and official capacities as Dean of Sciences at Truckee Meadows Community College; ANNE FLESHER, in her individual and official capacities as Dean of Math and Physical Sciences at Truckee Meadows Community College; KARIN HILGERSOM, in her individual and official capacities as President of Truckee Meadows Community College; MARIE MURGOLO, in her individual and official capacities as Vice President of Academic Affairs at Truckee Meadows Community College; MELODY ROSE, in her | Case No. 3:22-cv-00045-ART-CLB<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

–1–
Request for Judicial Notice in Support of Plaintiff's Response in Opposition to Motion to Dismiss
3:22-cv-00045-ART-CLB

ER133

individual and official capacities as Chancellor of the Nevada System of Higher Education,

*Defendants.*

Plaintiff, LARS JENSEN, by and through his undersigned counsel, hereby request, pursuant to Rule 201 of the Federal Rules of Evidence, that this Court take judicial notice of the following items in connection with Plaintiff's Response in Opposition to Defendants' Motion to Dismiss the First Amended Complaint:

1. Exhibit A: Plaintiff David Demers, Complaint Exhibit A, *Demers v. Austin, et al.,* Case No. 2:09-cv-00334-RHW (E.D. Wash.)(hereinafter "*Demers v. Austin*") ECF No. 1-2.

2. Exhibit B: Arthur E. Bester, *Aimlessness in Education,* The Scientific Monthly, Vol. 75, No.2 (Aug. 1952), pp. 109-116.  Published By: American Association for the Advancement of Science.

3. Exhibit C: Letter to Plaintiff Lars Jensen from Mark Criley, Senior Program Officer at the American Association of University Professors on October 21, 2021. (attachments included).

4. Exhibit D: Letter to President Hilgersom from Joshua Bleisch, Faculty Legal Defense Fund Fellow, at the Foundation for Individual Rights in Education (hereinafter "FIRE") on October 1, 2021.

5. Exhibit E: Letter to President Hilgersom from Keith Whittington, Chair of the Academic Committee at the Academic Freedom Alliance on October 22, 2021.

–2–
Request for Judicial Notice in Support of Plaintiff's Response in Opposition to Motion to Dismiss
3:22-cv-00045-ART-CLB

ER134

This Court may take judicial notice of a fact if it is "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned, so that the fact is not subject to reasonable dispute." Fed. R. Evid. 201.  Further this Court may also take judicial notice of documents that are incorporated by reference in the plaintiff's complaint, although not attached, to a complaint if: (1) the complaint refers to the document, (2) it is central to the plaintiff's claims, and (3) the authenticity of the document is not disputed.  *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011).

Exhibit A is a court record from *Demers v. Austin*, which is an undisputed public record since it was filed in federal court.  Exhibit B is a published academic paper that was the subject of the litigation in *State ex rel. Richardson v. Board of Regents*, 70 Nev. 144 (1954). Exhibits C through E are documents incorporated by reference in Plaintiff's First Amended Complaint (ECF No. 8) and they are generally known within the territorial jurisdiction of this Court since they were either published by, quoted in, or linked to in the following: (1) *ThisisReno,* (2) *Nevada Independent*, (3) *Academe,* or (4) the FIRE website.  Further, this Court may take judicial notice of information contained in news stories "as an indication of what is in the public realm." *Von Saher v. Norton Simon Museum of Art of Pasadena,* 592 F.3d 954, 960 (9th Cir. 2010); *Heliotrope Gen., Inc. v. Ford Motor Co.,* 189 F.3d 971,981 (9th Cir. 1999).

Links to each of the above can be found in full below:

https://www.thefire.org/fire-letter-to-truckee-meadows-community-college-october-1-2021/

https://thenevadaindependent.com/article/math-curriculum-fight-spotlights-college-faculty-discipline-disputes

–3–
Request for Judicial Notice in Support of Plaintiff's Response in Opposition to Motion to Dismiss
3:22-cv-00045-ART-CLB

ER135

https://thisisreno.com/2021/10/higher-ed-faculty-interested-tmcc-alleged-academic-freedom-violations/

https://academeblog.org/2021/11/03/in-defense-of-lars-jensen-part-1/

In sum, the above items meet the requirements of Rule 201 of the Federal Rules of Evidence, and therefore, the Court must take judicial notice of them pursuant to Rule 201(c)(2).

DATED: April 13, 2022

Respectfully submitted,

By:   /s/ John M. Nolan
John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

/s/ Michael Langton
Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

/s/ Mark Mausert
Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff*

−4−
Request for Judicial Notice in Support of Plaintiff's Response in Opposition to Motion to Dismiss
3:22-cv-00045-ART-CLB

ER136

## INDEX OF EXHIBITS

| Exhibit # | Description | Number of Pages |
|-----------|-------------|-----------------|
| A | 7-Step Plan from *Demers v. Austin* | 5 |
| B | Article titled "*Aimlessness in Education*" | 9 |
| C | Letter to Lars Jensen from Mark Criley | 16 |
| D | Letter to President Hilgersom from Joshua Bleisch | 6 |
| E | Letter to President Hilgersom from Keith Whittington | 2 |

–5–
Request for Judicial Notice in Support of Plaintiff's Response in Opposition to Motion to Dismiss
3:22-cv-00045-ART-CLB

ER137

# EXHIBIT A

**7 Step Plan from *Demers v. Austin***

# EXHIBIT A

Case 2:22-cv-00306-SAB ECF No. 1 filed 10/28/22 PageID.2 Page 2 of 5

**Exhibit B**

ER140

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 140 of 298
Case 2:22-cv-00314... Document 10... Filed 02/28/... Page 26 of 5



# A 7-STEP PLAN FOR IMPROVING THE QUALITY OF THE EDWARD R. MURROW SCHOOL OF COMMUNICATION AND MAKING IT FINANCIALLY INDEPENDENT

AND A $100,000 DONATION TO KICK OFF A FUND-RAISING CAMPAIGN

PREPARED BY
MARQUETTE BOOKS LLC
SPOKANE, WASHINGTON

ER141

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 141 of 298
Case 09:22-cv-03036-SHR... Document ... Filed 04/28/... Page ... Page 36 of 5

March 29, 2007

Dr. Elson Floyd, President
422 French Administration
Washington State University
Pullman, Washington 99164-1048

Dear Dr. Floyd:

The purpose of this plan is to show how Washington State University can turn the Edward R. Murrow School of Communication into a revenue-generating center for the university and, at the same, improve the quality of the program itself.

To initiate a fund-raising campaign to achieve this goal, my company and I would like to donate $100,000 in unrestricted funds to the university.*

This proposal does NOT require that the School be transformed into a college at WSU or become independent of the College of Liberal Arts. Its purpose is to show why the School, unlike other mass communication programs, has failed to generate significant support and donations from mass media professionals and businesses (i.e., those associated with the production of television and radio programming, newspaper content, and public relations and advertising messages) **AND** how this problem can be corrected.

The university has encouraged faculty and administrators to develop partnerships with private business and industry. This plan seeks to implement that goal. However, even if all aspects of the plan do not fit well into university goals, some elements may be useful, and I encourage university administrators to consider them.

Thank you for considering this proposal.

Respectfully yours,

*David Demers*

Dr. David Demers, Publisher**
Marquette Books LLC
3107 East 62nd Avenue
Spokane, Washington 99223
509-443-7057
www.MarquetteBooks.com
demers@marquettebooks.com

*This plan was sent to Provost Robert Bates on January 16, 2007. He never responded. College of Liberal Arts Dean Erich Lear looked at the plan and turned it over to Murrow School interim director Erica Austin several weeks ago. She has not responded.
**Demers also is associate professor of communication at Washington State University. Marquette Books LLC is a book/journal publishing company that he operates in his spare time. It has no ties with nor does it use any of the resources at Washington State University.

# BRIEF BACKGROUND

The relationship between mass communication programs (e.g., journalism, broadcasting, public relations, advertising) and the academy in general has always been a rocky one. The first print journalism programs emerged in the early 1900s, mostly at Midwestern universities and colleges, and were staffed largely with teachers who had professional backgrounds (former journalists and editors). As the years passed, increasing pressure was placed on journalism and other related programs (broadcasting, public relations, advertising) to "scholarize" their faculty — that is, to hire faculty who had earned Ph.D. degrees in the social sciences and conduct research. At the same time, the programs began hiring fewer teachers with professional experience.

As the number of Ph.D.s increased, so did the tension within these departments. Some historians have referred to this as the era of the "green eyeshades" versus the "chi-squares." Not unexpectedly, at larger research-oriented universities, the Ph.D.s won the battle and today most of the faculty teaching in mass communication programs at research-oriented universities have the Ph.D.

Needless to say, this turn of events alienated many professionals and media-related businesses. Students were required to take more theory and conceptual courses and fewer skills-based courses, such as writing and reporting. Professionals complained more and more that the writing skills of university graduates were declining. The close relationship universities once had with the professional community was disappearing. The Ph.D. professor had become the enemy rather than the ally of the professional community. In fact, in 1997, when one newly hired Ph.D. journalism professor at WSU asked a newspaper publisher in Washington state why other publishers in the Pacific Northwest Newspaper Publishers Association were unwilling to forge closer ties with the Edward R. Murrow School of Communication, the publisher replied: "Don't you know? You have a Ph.D."

The relationship between the professional community and mass communication programs deteriorated even further at some universities when, as a cost-cutting move, they merged communication studies departments with mass communication programs during the 1980s and 1990s. The former were staffed almost exclusively with Ph.D.s and had a more humanist, critical orientation than the empirically based mass communication Ph.D.s. At The Ohio State University and other schools, the mergers even led to elimination or diminution of some professional programs.

Of course, not all research-oriented universities have gutted their professional programs. The University of Illinois at Champaign-Urbana has one of the strongest professional programs in the country. Most of the faculty there have professional backgrounds. Even the Dean is a former professional whose highest earned degree is a bachelor's. (Most of the Ph.D.s are in a separate unit called the Institute of Communications Research. This separation, by the way, helps reduce conflict between the groups.)

About five years ago, the University of Minnesota, in an effort to bolster donations from the professional community, also "professionalized" its journalism and mass communication program. The University of Oregon also has many faculty with professional backgrounds. The journalism program recently received a gift of $4 million to create an endowed chair in writing and reporting; has three other endowed chairs in public relations, advertising and administration; and has a $2 million journalism endowment fund.

WSU receives many generous scholarships from mass media organizations in the Pacific Northwest, but it has no endowed chairs or funds and the total amount of donations generated at WSU pales in comparison with the giving at Oregon and other places. In fact, some scholars have even speculated that the School of Communication at WSU generates less foundation money per graduating student than any other professional program in the country.

There is little question that lack of trust one of the most important reasons media businesses have been reluctant to provide more support for WSU. The 7-step plan outlined in this report is offered to help correct that situation and improve the quality of education at the School.

1. **Separate the mass communication program from the communication studies program at WSU — i.e., create two separate units.** This will send a very strong message to the professional/business community that WSU is committed to enhancing its undergraduate program in mass communication. Communication studies should retain the current graduate program (M.A. and Ph.D.), which does not contain a professional component. The "new" mass communication program should continue to use the "Edward R. Murrow" name and should develop its own master's and Ph.D. programs in mass communication.

2. **Hire a director of the Edward R. Murrow School of Communication who has a strong professional background.** She or he should be someone who draws respect from the professional/business community. Ideally, the candidate also would possess a Ph.D., but professional experience is more important for the School to improve its relations with the professional community. The professional community should be allowed to play an active role in the hiring process.

3. **Create an Edward R. Murrow Center for Media Research that conducts joint research projects with the professional community.** Among other things, the Center could conduct on-going public opinion polls at election time (creates visibility) and offer low-cost research services to media organizations (e.g., omnibus surveys). The activities of the center could be tied to courses that focus on research at the undergraduate and graduate level. Research-oriented faculty should play a key role in developing and staffing the Center. The Center also should develop non-accredited educational programs with the help of the professional community that enhance the careers of media professionals.

4. **Give professionals an active (rather than the current passive) role in the development of the curriculum in the School.** The current Advisory Board could be used for this purpose. On several occasions in the past, some faculty have expressed opposition to this idea, and the ideas of professionals rarely have much impact on the curriculum. Separating the units (see No. 1 above) should enhance the role of professionals.

5. **Give professional faculty a more active role in the development of the undergraduate curriculum for mass communication students.** Currently, Ph.D. faculty dominate discussions at faculty meetings, and the focus is often on the graduate program. Some professional faculty are sometimes afraid to speak because they do not have tenure. Separating the units and hiring a professionally oriented director will solve this problem.

6. **Seek national accreditation for the "new" mass communication programs.** The University of Oregon boasts that it is the only program in the West to have six nationally accredited programs in mass communication. National accreditation would enhance the quality and visibility of the School at WSU.

7. **Hire more professional faculty with substantial work experience.** Only several faculty currently in the School of Communication have 10 or more years experience in media-related industries. More depth of experience would enhance the quality of the undergraduate program.



ER144

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 144 of 298
Case 3:22-cv-00045-ART-CLB   Document 30-2   Filed 04/13/22   Page 1 of 9

# EXHIBIT B

**Article titled "Aimlessness in Education"**

# EXHIBIT B

ER145

# Aimlessness in Education

ARTHUR E. BESTOR, JR.

*Dr. Bestor (Ph.D., Yale, 1938) speaks, in the article below, from long experience. Beginning at Yale as an instructor in history in 1931, he has taught and lectured widely ever since. He was at Columbia and Teachers College in 1936, at Stanford from 1942 to 1946, a Newberry fellow at Chicago's famous Newberry Library in 1946, and at the University of Wisconsin in 1947. He has been in the Department of History of the University of Illinois since then. He was made a member of the Committee on American Civilization of the American Council of Learned Societies in 1950.*

"IF A nation expects to be ignorant and free," said Jefferson, ". . . it expects what never was and never will be." Americans have taken this dictum to heart. No belief is more firmly held in the United States than belief in education. But belief is not enough. We must understand education as well as believe in it. The thing that counts, after all, is not the number of schoolrooms we have, but what goes on in them. And if we really believe that education is vital to our safety, then we need to know exactly what kind of schooling constitutes genuine education, and what kind is merely a gaudy show.

Education, first of all, is the opposite of ignorance. Jefferson makes this clear. The phrases he uses elsewhere as synonyms of education indicate the positive meaning he attaches to the concept. The kind of schooling that is vital to a democratic society is the kind that results in the "spread of information" and the "diffusion of knowledge;" the kind that regards "science . . . [as] more important in a republican than in any other government;" the kind that recognizes that "the general mind must be strengthened by education;" the kind that aims to make the people "enlightened" and to "inform their discretion."[1] These are the ends that the schools must serve if a free people are to remain free. These, be it noted, are intellectual ends. Genuine education, in short, is intellectual training.

The nation depends upon its schools and colleges to furnish this intellectual training to its citizenry as a whole. Society has no other institution upon which it can rely in the matter. If schools and colleges do not emphasize rigorous intellectual training, there will be none. This is not true of the other services that educational institutions may incidentally render. It is well for the schools to pay attention to public health, for example, but if they are unable to do so, the health of our citizens will not go uncared for. The medical profession and the existing welfare agencies remain unimpaired. But if the schools neglect their central purpose of intellectual training, the loss to society is an irreparable one.

The loss is catastrophic whether or not the students concerned go on into college; in point of fact, the situation is more dangerously irreparable if they do not. College preparation, in other words, is not the matter at issue. A command of written English, mathematics, science, history, and the other disciplines in which we find high school graduates so often deficient, is vital for many things besides advanced study. Throughout history these intellectual disciplines have been rightly considered fundamental to education for practical life and for citizenship. Every vocation has grown more complicated in the modern world. The artisan of an earlier century might make his way in the world even though he were illiterate and all but unlearned in elementary arithmetic. Today even the simplest trades require more than this. The responsibilities of citizenship, too, are more complex than ever before. Intelligent citizenship does not mean merely a simple faith in American democracy. It calls for a thorough knowledge of political principles and institutions, of history, and of economics. It demands a clear understanding of the various sciences, for the intelligent citizen must help decide public policy on such complex matters as atomic energy. Above all, intelligent citizenship requires an ability to read, to understand, and to test the logic of arguments far more complicated than any that have hitherto been addressed to the public at large.

The economic and political life of a democratic state depends upon how successfully its educational system keeps pace with the increasingly heavy intellectual demands of modern life. Our civilization requires of every man and woman a variety of complex skills which rest upon the power to read, write, and calculate, and upon sound knowledge of

ER145

science, history, economics, and other fundamental disciplines.

The concept of education that I have just stated is *not* guiding the American public schools today. It is a concept which professors of education have repudiated, and which they caricature at every opportunity. According to a recent article by a professor of education, the scientists and scholars on university faculties

. . . visualize the mind as a sort of cold storage warehouse, which is empty at birth. The process of learning consists in hanging on the walls of the warehouse chunks of fact and information. . . . The chunks hang there in the same condition in which they were first stored until some day the student needs one or more of them; then he can go into the warehouse, unhook the right chunk, and use it for some mature purpose which he could not have conceived in the immature condition of his mind when he first acquired the material. . . . The conception that new learnings become part of the learner through their digestion and assimilation into other previously acquired material is quite foreign to this idea of learning.[2]

I assume that incompetents can be found who perform thus. I doubt if anyone can be found who believes thus, and I am certain that I have never met anyone who would defend, nor read a single sentence that seriously propounded, such a doctrine.

The caricature in itself is unimportant. What is important is the fact that American educators are deliberately and consciously cutting the public schools loose from the disciplines of science and scholarship, because they think that what they are repudiating is the theory described in this quotation. Unfortunately, what they are casting away is something utterly different from this. The liberal disciplines are not chunks of frozen fact. They are not facts at all. They are the powerful tools and engines by which a man discovers and handles facts. Without the scientific and scholarly disciplines he is helpless in the presence of facts. With them he can command facts and make them serve his varied purposes. With them he can even transcend facts and deal as a rational man with the great questions of purpose and meaning.

Consider how the disciplines of science and learning came into being. The world is first known to us—and was to mankind—as a great tangle of confused perceptions. Before man can deal with it at all, he must differentiate one experience from another and he must discover relationships among them: similarity and diversity, cause and effect, and the like. Gradually he discovers that one kind of relationship can best be investigated in one way (by controlled experiment, it may be), and another in another way (by the critical study of written records or of fossil remains, perhaps). Thus the

separate disciplines were born, not out of arbitrary invention but out of evolving experience. Trial and error, prolonged over centuries, has resulted in the perfecting of these tools of investigation. The methods can be systematized and taught, hence the intellectual power that mankind has accumulated throughout its entire history can be passed on to successive generations. Thereby each generation is enabled to master the new environment and the new conditions of life that surround it. This ability to solve new problems by using the accumulated intellectual power of the race is mankind's most precious possession. To transmit this power of disciplined thinking is the primary and inescapable responsibility of an educational system.

That present-day professional educators are seeking to evade this primary responsibility is the grave charge that members of the learned professions are making. The evidence is to be found in the educators' own widely publicized statements of educational aim. One carefully analyzed example is better than a score of quotations at random. Let us therefore look carefully at the curricular revision that is going on in the high schools of Illinois, remembering that similar movements are afoot in practically every one of the forty-eight states.

The Illinois Secondary School Curriculum Program is sponsored by the state superintendent of public instruction and has as its director the associate dean of the College of Education of the University of Illinois. Over the past five years it has conducted a series of studies, one of which—a so-called Follow-Up Study—will concern us here. This study makes use of a group of widely circulated questionnaires, all based upon a central document entitled *Problems of High School Youth,* prepared by a professor of education. Fifty-five problems are listed,[3] and the questions are essentially rephrasings of these items. The answers, it is said, will "afford a measure, at the level of informed opinion, of the performance of the school." And these, in turn, "will be helpful in 'engineering' an improved, broadly based consensus regarding what the local high school should be doing for its students."[4]

The first thing that strikes one on reading the list is the grotesque disproportion between the different problems presented. Trivia are elaborated beyond all reason, and substantial matters are lumped together in a very small number of separate items, thus reducing them to relative insignificance in the whole. Among the fifty-five points are these: "the problem of improving one's personal appearance," "the problem of selecting a

ER147

'family dentist' and acquiring the habit of visiting him systematically," "the problem of developing one or more 'making things,' 'making it go,' or 'tinkering' hobbies," and "the problem of developing and maintaining wholesome boy-girl relationships." Not a whit more weight or emphasis is placed upon the following, each of which constitutes but a single point among the fifty-five: "the problem of acquiring the ability to distinguish right from wrong and to guide one's actions accordingly," "the problem of acquiring the ability to study and help solve economic, social, and political problems," and "the problem of making one's self a well-informed and sensitive 'citizen of the world.' "

Needless to say, the scholarly and scientific disciplines have no place among these "real-life problems." Arithmetic has sometimes been considered of practical importance, but, although "athletic games," "camping," "collecting art objects, etc.," and "doing parlor stunts" are mentioned by name, each in a separate item of the list of fifty-five, not one of the branches of mathematics is even hinted at. The word "science" occurs nowhere in the list, nor any term synonymous with it or descriptive of its various branches. That history and foreign languages are absent, even by remotest implication, goes without saying. The final item on the list is "the problem of securing adequate preparation for successful college work. . . ." One can imagine that this will prove the most difficult problem of all.

The intermingling of the trivial and the important in these lists and questionnaires is not an accident but a symptom. It is not enough to say that "neither the order in which needs are given nor the amount of space devoted to each need is indicative of the relative significance of the different needs."[5] The arrangement of items in a list like this, and the attention devoted to each, do have a meaning—a very profound meaning. The order and emphasis of a man's writing are just as truly a part of what he says to his reader as any of his particular assertions. And what the list of *Problems of High School Youth* says to the reader is that order, balance, discrimination, and a sense of values are matters of no consequence whatever to the pedagogues who are remaking the curricula of our public schools.

Men who cannot compile a simple list without revealing their mental limitations do not inspire confidence that they will know how to accomplish even the saner of their objectives. Take, for example, "the problem of acquiring the ability to study and help solve economic, social, and political problems." The question for the educator is not

*whether* the school should do anything in the matter, but *how.* The traditional curriculum offered a clear-cut answer: through careful and systematic study of history, political science, philosophy, economics, sociology, and the other relevant disciplines. The aim was to cultivate sound judgment based upon critical thinking and thorough knowledge. To the new pedagogical medicine man, however, all this is sheer pedantry, just as bacteriology is so much learned nonsense to the happy faith healer.

Political, economic, and social problems that have taxed the intelligence of the best-educated men from antiquity to the present are to be solved, so the educator blithely assures us, through a "common learnings course" in the high school, wherein "materials from science, literature, history, mathematics, industrial education, homemaking, business education, art, music, and all other areas of the curriculum would be included."[6] And from the *Problems of High School Youth* we are acquainted with the exquisite sense of order and proportion that a professional educator brings to the task of organizing a set of problems rationally and effectively. We must not detain him to ask for proof that his short cut to wisdom will actually produce it. After all, he has fifty-four other problems to wrestle with, and he must hasten on to the next— "the problem of acquiring the ability to select and enjoy good motion pictures," perhaps, or "the problem of acquiring the social skills of dancing, playing party games, doing parlor stunts, etc."

If men and women prefer the latter things to intellectual training, the educator will argue, should they not have them? The question is really irrelevant, for the questionnaires do not provide, and cannot provide, one iota of evidence that the public is making any such choice. The most damning part of the whole study is that the questionnaires it uses are patently dishonest. They purport to ask parents, citizens, teachers, and pupils what they "think is the job of the secondary school."[7] But the persons questioned are not permitted to give the slightest indication that they believe the job of the secondary school is to give intellectual training. In the entire battery of questionnaires there is not a single blank that one can check in order to express the view that the public schools should offer sound training in mathematics, in natural science, in grammar and composition, in foreign languages, or in history. The citizen may respond in the negative to every question implying the substitution of frivolous aims, but he cannot indicate in any manner whatever the kind of positive program he would favor. The questionnaires are so

ER147

rigged that the results are predetermined from the beginning. However overwhelming the public sentiment in favor of disciplined intellectual training may be, the professor of education who constructed the questionnaires has taken care that this sentiment shall not appear anywhere in the answers.

The Follow-Up Study is not an attempt to ascertain public opinion; it is a cynical effort to manipulate public opinion. It is obviously designed to manufacture the appearance of public support for curricular changes that the professional educators have determined upon in advance. This purpose comes out stark and clear in the official statements explaining the questionnaires: "Given the American tradition of the local lay-control of public education, it is both necessary and desirable that a community (patrons, pupils, teachers) consensus be engineered in understanding support of the necessary changes before they are made."[8] I find difficulty in following some of the involved syntax of this sentence, but I have no difficulty whatever in grasping the significance of a "consensus" that is to be "engineered." We approach here the real meaning of what educators euphemistically describe as "democracy in education." It is the democracy of the "engineered" consensus.

The lighthearted prospectus of these curriculum engineers contains this exhortation: "There are many ways of getting under way in a program of curriculum revision. The important thing is that we need to pry ourselves loose from the present situation. Maybe one lever will do the prying loose; perhaps, it may require several. . . . Pick your lever(s) and let's get started."[9] (The metaphor is apt. The kind of lever that one uses for prying things loose is sold in hardware stores under the name of wrecking-bar.)

Pry loose from what? The answer is implicit in the entire program. The secondary school curriculum must be pried loose from the established disciplines of science and scholarship. The public school must be pried loose from its relationship to institutions of higher learning. College entrance requirements are a thorn in the side of the public school directorate, for they give some support, feeble though it may be, to intellectual training in the secondary schools. The Illinois Curriculum Program is ready to deal with this menace to "real-life" education. It recommends "that the colleges adopt admission policies which do not specify the courses the students are to take in high school." College entrance requirements in the basic intellectual disciplines of "English, foreign language, mathematics, science, and social studies"

are "particularly limiting for smaller schools." These, alas, cannot afford to offer both the fundamental courses that scientists, scholars, and citizens believe in, and also the gilded fripperies after which the new pedagogues hanker. The lever for prying the schools loose from all intellectual requirements has at last been found. It is the new guiding principle that the Curriculum Program advances: "Since the high school carries the responsibility for educating all youth, it, and not the college or university, has the responsibility of specifying the content of the high school curriculum."[10]

Uncontrolled discretion will at last be vested in up-to-date school administrators like the author of the following remarks, which were addressed to the National Association of Secondary-School Principals and published in its official proceedings:

Through the years we've built a sort of halo around reading, writing, and arithmetic. We've said they were for everybody . . . rich and poor, brilliant and not-so-mentally endowed, ones who liked them and those who failed to go for them. Teacher has said that these were something "everyone should learn." The principal has remarked, "All educated people know how to write, spell, and read." When some child declared a dislike for a sacred subject, he was warned that, if he failed to master it, he would grow up to be a so-and-so.

The Three R's for All Children, and All Children for the Three R's! That was it.

We've made some progress in getting rid of that slogan. But every now and then some mother with a Phi Beta Kappa award or some employer who has hired a girl who can't spell stirs up a fuss about the schools . . . and ground is lost. . . .

When we come to the realization that not every child has to read, figure, write and spell . . . that many of them either cannot or will not master these chores . . . then we shall be on the road to improving the junior high curriculum.

Between this day and that a lot of selling must take place. But it's coming. We shall some day accept the thought that it is just as illogical to assume that every boy must be able to read as it is that each one must be able to perform on a violin, that it is no more reasonable to require that each girl shall spell well than it is that each one shall bake a good cherry pie. . . .

When adults finally realize that fact, everyone will be happier . . . and schools will be nicer places in which to live. . . .

If and when we are able to convince a few folks that mastery of reading, writing, and arithmetic is not the one road leading to happy, successful living, the next step is to cut down the amount of time and attention devoted to these areas in general junior high-school courses. . . .

One junior high in the East has, after long and careful study, accepted the fact that some twenty per cent of their students will not be up to standard in reading . . . and they are doing other things for these boys and girls. That's straight thinking. Contrast that with the junior high which says, "Every student must know the multiplication tables before graduation."

ER149

Such a requirement attaches more importance to those tables than I'm willing to accord them.[11]

There are even more pernicious strongholds of intellectualism than the junior high schools. But the professional educators, undaunted, are preparing to reduce them. Colleges and universities still resist, but blueprints have at least been made of future institutions of higher learning after the educators shall have purged them. There has been at least one dress rehearsal in Michigan, described in a volume entitled *A College Curriculum Based on Functional Needs of Students.* Here is an enthusiastic report of the work in college mathematics:

Originally there was no time set aside for instruction in mathematics except a small amount for remedial work on the simple, everyday uses of addition, subtraction, division, multiplication, and other fundamental operations. With the development of other fields of instruction certain abilities became necessary: ability to interpret and make graphs, profiles, charts, and tables; ability to interpret test scores; understanding of certain statistical terms; ability to use the other skills necessary to the general curriculum. . . . This has led to the setting-aside of two hours each week throughout the Freshman year when the student can go to the mathematics laboratory to work, under the supervision of an instructor, on his own inadequacies in the field.[12]

This program was doubtless adequate to accomplish the ends of higher education as these educators conceived them, for in their comprehensive list of the "functional needs" that a college education should serve appears the following high objective: "Ability to read long numbers and to 'round them off.' "[13]

Professional educators are fond of talking about the complexity of modern problems. They speak oracularly of "education for the atomic age." And *this* is how they propose to train citizens to cope with the vast technical questions that are posed by science, by an intricate industrial system, and by international anarchy. After nine full years of formal schooling a student need not be expected to read his native language or to know the multiplication table. And in college he is doing well if he can "read long numbers and . . . 'round them off.' "

Where did these preposterous ideas come from? Who originated them, and who is propagating them? They are obviously not the ideas of scientists, scholars, and professional men. The evidence that the public supports them is manufactured evidence. Under compulsion from their administrative superiors a few public school teachers have given approval, but a number of able and courageous classroom teachers are expressing the sense of outrage that vast numbers of their intimidated colleagues undoubtedly feel. None of these groups can be held responsible for the anti-intellectualism that is wrecking our public schools.

There is no mystery about the source of these proposals. By checking the list of authors and studying the rosters of sponsoring committees, one can fix responsibility, clearly and unequivocally, upon three closely connected professional groups. First of all, there are professors of education, so-called, in universities, colleges, teachers' colleges, and normal schools. Second, there are school superintendents, principals, and other local public school administrators and supervisors. Third, there are state and federal officials and bureaucrats. These three groups constitute an interlocking public school directorate. Collectively, they glory in the title of "professional educators."

The existence of a vast educational bureaucracy is unavoidable, given the size and complexity of the American public school system. But that such a bureaucracy should have usurped the power of making educational policy, as well as administering it, is a catastrophe for which scholars are partly to blame. They have failed to exercise constant vigilance over developments in the public schools, and to bring their views on the subject forcefully to public attention. They have allowed college entrance requirements to be relaxed. They have permitted professors of education to seize control over the college programs of students preparing to teach. They have failed to provide continuous, organized intellectual leadership—completely independent of the pedagogues—in the process of developing and strengthening the secondary school curriculum.

Into the breach have rushed the "experts" from state departments and colleges of education, the curriculum doctors, the integrators, the indoctrinators—the specialists in know-how rather than knowledge. Out of their overflowing minds they have offered to furnish ready-made a philosophy to guide the entire educational system. They are glad to point out to the teachers—those unimaginative dullards—the relationships that exist among the great fields of knowledge. They are happy to draw the really vital generalizations from the data which grubbers in laboratories and libraries have so obligingly collected. All that teachers need do is teach what they are told to teach. All that scientists and scholars need do is supply little facts to fill up the blanks in the great schemata which the educators have devised. "We have decided to teach a unit on industrialism," they say to the scholars. "Will you as a historian assist us by telling us who invented the power loom? And will you as a

scientist show us how to connect up a buzzer?"

Consider for a moment the training and qualifications of the men who have seized this stranglehold upon American intellectual life. The professional educator does not ordinarily hold an advanced degree in one of the established scholarly disciplines, but merely in the teaching of them, or in the supervising and administering of school systems. His advanced degree (and often his undergraduate one) is granted by a department of education or a teachers' college. If a doctorate, it may be an Ed.D.—a doctor's degree with the teeth pulled. Although he may consider himself a specialist in the teaching of some particular field, he is apt to define the field itself in vague terms: not history or economics, but "social studies;" not physics or botany, but "general science;" not English or German, but "language arts." His training in the various parts of his omnibus field has been kept to a bare minimum in order that he may take full advantage of the rich variety of courses which the professors of education offer: "Supervision in Home Economics Education," "Public School Business Management," "Elementary School Core Programs."[14]

Throughout his entire career the professional educator can have only the most fleeting glimpse of the great world of science and learning. At worst he may have no contact with it at all. His first twelve years of schooling are in a system run by the educators. His undergraduate work may be done in a normal school or teachers' college, dominated again by the educators. If he is fortunate enough to receive his undergraduate training in a college of liberal arts, teacher certification requirements may reach out to thwart him, diverting his effort to pedagogical trivialities at the very moment when he is ready to buckle down to serious advanced work in one of the disciplines. The graduate work of the future educationist is directed by professors of education, and most of it must be taken in courses labeled "Education." His professional life is apt to be lived in close association with the educational bureaucracy and in an isolation, largely self-imposed, from the realms of scientific and scholarly research and higher learning.

Across the educational world today stretches the iron curtain that the professional educators have fashioned. Behind it, in slave-labor camps, are the classroom teachers, whose only hope of rescue is from without. On the hither side lies the free world of science and learning, menaced but not yet conquered. This division is the great reality that every citizen must recognize and understand. The subversion of American intellectual life is possible because the first twelve years of formal schooling (from the elementary grades through the high school) have fallen under the policy-making control of educators who have no real place in—who do not respect, and who are not respected by—the world of science, of scholarship, and of the learned professions.

The fifth column that engineered this betrayal was composed of professors of education. When they were given university status, they were expected to assume the role of mediators. As members of an academic community they were supposed to grasp the growing complexity of intellectual life and to see its implications for secondary education. As teachers of teachers they were expected to translate these developments in science and scholarship into the language of the classroom. Through their close connections with school administrators they were expected to develop curricula more thorough and rigorous than those of the slipshod past. Their great responsibility was to stimulate and encourage rising standards of disciplined training throughout the school system, using the prestige of their university position to advance the ideals of liberal education to which the university is dedicated.

Professors of education have failed—nay, have refused—to do any of these things. There are honorable exceptions, of course. But, by and large, professors of education have never undertaken to transmit to the public school bureaucracy the considered educational views of their scholarly and scientific colleagues. Instead they have arrogated to themselves the sole right to speak, in the name of the university, on matters of public school policy. They have used the prestige of the university not to advance but to undermine science and learning in the schools. And they subject to personal vituperation any colleague in the liberal arts who ventures to protest.[15] In their eyes a lifetime of teaching cannot make a scholar or scientist anything but a meddlesome amateur when public educational policy is up for discussion.

Professors of education as a group have made their choice, and their rewards have been tangible ones. They have sold their position in the learned world for a partnership in the public school directorate. They serve their partners faithfully, laboring assiduously to enhance the power of the educational bureaucracy and to free it from the last vestige of responsibility to the world of science and learning. In return, the public school directorate renders valuable assistance to departments and colleges of education in building up their empires

within the universities. Teacher certification requirements, fixed by the state educational bureaucracy, insure a steady flow of students through the courses given by professors of education. Experienced teachers who return to the university for advanced work are all but compelled by their administrative superiors to take that work, not in the subjects they are teaching, but in endless courses in pedagogy. The inflation of departments of education that results from this ingenious protective tariff is illustrated by the situation at the University of Illinois. There a graduate faculty of twenty-eight full professors of education offer no less than seventy-five courses at the highest graduate level, whereas eighteen full professors of chemistry offering less than half as many courses of equal rank (thirty-four to be exact) suffice to make the Department of Chemistry and Chemical Engineering one of the great centers of research and advanced scientific training in the United States.[16]

If the workings of the great public school directorate are called in question at any point, an educational survey can be initiated, and the educators then cheerfully investigate each other, like a treasurer auditing his own books.

Can we afford to entrust to men who think and act like this the power to direct the first twelve years of American schooling? Can we build a skyscraper by commissioning architects and engineers to erect the superstructure, while leaving the foundations to be planned by a crew of bricklayers who do not believe in buildings more than three stories high? The years from six to eighteen are the years in which young men and women must learn to think clearly and accurately if they are to learn to think at all. Command of written English, foreign languages, and mathematics—to say nothing of the abstract processes of analyzing, generalizing, and criticizing—cannot be acquired in a year or two when a student or a citizen suddenly finds himself in desperate need of them. The seed must be planted at the beginning and cultivated continuously if the crop is to be ready when it is required. And these intellectual abilities *are* required, not merely as a prerequisite for advanced study, but also and especially for intelligent participation in the private and public affairs of a world where decisions must be made on the basis of informed and accurate thinking about science, about economics, about history and politics.

The disciplined mind is what education at every level should strive to produce. It is important for the individual. It is even more important for society. It is most important of all for a democratic society. In that terrifying novel by George Orwell,

*1984,* the Party of Big Brother developed the ultimate in ruthless dictatorship precisely because it devised the means of enslaving men's minds. It began by undermining the discipline of history, setting all men adrift in a world where past experience became meaningless. It continued by undermining the discipline of language, debasing speech until it could no longer be the vehicle of independent thought. And the crowning triumph of its torture chambers was the undermining of the disciplines of logic and mathematics, by which it finally brought its victims not only to assert, but actually to believe, that two plus two equals five.

Fortunately it is as yet only through fantasy that we can see what the destruction of the scholarly and scientific disciplines would mean to mankind. From history we can learn what their existence has meant. The sheer power of disciplined thought is revealed in practically all the great intellectual and technological advances which the human race has made. The ability of the man of disciplined mind to direct this power effectively upon problems for which he was not specifically trained is proved by examples without number. The real evidence for the value of liberal education lies, where educational testers and questionnaire-makers refuse to seek it, in history and in the biographies of men who have met the valid criteria of greatness. These support overwhelmingly the claim of liberal education that it can equip a man with fundamental powers of decision and action, applicable not only to boy-girl relationships, to tinkering hobbies, or to choosing the family dentist, but to all the great and varied concerns of human life—not least, those that are unforeseen.

When Americans, a century or so ago, committed themselves to the ideal of universal democratic education, they were not thinking in terms of the trivia that fascinate present-day educators. They did not intend, by making education universal, to debase and destroy it. They were not seeking to water down the great tradition of disciplined and liberal study. They were undertaking the heroic task of raising an entire nation to the highest attainable level of intellectual competence. Liberal education, they believed, was not and should not be the exclusive prerogative of the aristocratic few. Even the humblest man, whatever his trade, was capable of a liberal education. In a democracy he was entitled to it. His intellectual horizon should not be limited, as it had been for the lower classes in times gone by, to his occupation and to the routine details of his everyday life. He should receive training for his occupation, true. But far more important than that, he should be

given an opportunity to develop his mind to the fullest extent possible. He should be given command of the intellectual resources that had once been the badge—and one of the principal bulwarks—of aristocracy. His mind furnished with the knowledge and disciplined to the strength that had made the old ruling classes great and powerful, the American freeman would be in a position to rule himself. And the civilization he built would be a humane and magnificent civilization because it offered to every man not only equality before the law, not only the right to vote and to work, but, most precious of all, the opportunity to develop through liberal education his own highest qualities of manhood.

Let us never be satisfied with less.

## Bibliography and Notes

1. PADOVER, S. K., Ed. *Thomas Jefferson on Democracy.* New York: Penguin Books, 89, 149, 87, 90, 118, 90 (1946).
2. REEDER, E. H. The Quarrel between Professors of Academic Subjects and Professors of Education: An Analysis. *Am. Assoc. Univ. Professors Bull.* **37**, 514 (Autumn 1951).
3. ILLINOIS SECONDARY SCHOOL CURRICULUM PROGRAM. Bull. No. 11, *How to Conduct the Follow-Up Study,* 30 (Aug. 1950). The printed text lists only 55 problems, but all the accompanying statements speak of "56 real-life problems" (*ibid.,* 11). The unexpressed 56th problem—insoluble, perhaps—is doubtless that of summing up correctly the following figures: $6 + 10 + 5 + 3 + 12 + 7 + 4 + 8$.
4. ———. Bull. No. 13, 15, 14.
5. ———. Bull. No. 1, 10.
6. *Ibid.,* 35.
7. ———. Bull. No. 11, 33.
8. *Ibid.,* 10 (italics omitted). Note also the following statements: "The central purpose underlying the use of this questionnaire is precisely that of securing factual evidence which can be used to persuade a larger proportion of the pupils, teachers, and school patrons of the necessity of thus functionalizing the high school curriculum" (p. 13); repeated almost verbatim on p. 27: "If, on the other hand, such a consensus [in favor of a "real-life" curriculum] does not exist [in the answers to a given questionnaire], it is apparent that the data afforded by the other questionnaires . . . will afford the basis for engendering the requisite consensus" (p. 28).
9. ———. Bull. No. 1, 25.
10. ———. Bull. No. 9, 14, 5, 13.
11. LAUCHNER, A. H. How Can the Junior High School Curriculum Be Improved? *Bull. Natl. Assoc. Secondary-School Principals,* **35**, (177), 299 (Mar. 1951). In reprinting this passage I have made and indicated a few omissions at the end of paragraphs. The three dots that occasionally occur in the middle of sentences, however, are not marks of ellipsis but are the author's substitutes for traditional punctuation. Mr. Lauchner, at the time of reading this paper, was principal of the Thornburn Junior High School in Urbana, seat of the University of Illinois. Although his remarks were fully reported in the local newspapers, and have subsequently been cited several times, no member of the faculty of the College of Education of the university has publicly expressed an adverse opinion of them.
12. HEATON, K. L., and KOOPMAN, G. R. *A College Curriculum Based on Functional Needs of Students.* Chicago: Univ. Chicago Press, 64 (1936). This volume reports an actual experiment involving the Central State Teachers College at Mount Pleasant, Mich.
13. *Ibid.,* 148.
14. These are three of the courses currently offered *at the highest graduate level* by the College of Education at the University of Illinois.
15. In reply to the article entitled "The Emperor's New Clothes" (*Sci. Monthly,* **72**, 32 [1951]), by Harry J. Fuller, Ph.D., professor of botany in the University of Illinois, a public address was given by Willard B. Spalding, Ed.D., LL.D., dean of the College of Education in the same university. It was entitled "The Bewildered Botanist," and in it Professor Fuller was described as "a peripatetic hatchet man," "a demagogue rather than a scholar," "a master of the pointed phrase rather than the finished thought," a writer whose article was completed with "a satisfied leer," and a man who "reveals either an almost unbelievable ignorance of sociology, or an indifference to social well being that is beyond . . . comprehension" *Champaign-Urbana Courier* (Jan. 9, 1952).
16. *Univ. Illinois Bull.,* **48**, (16), (Oct. 1950), *Graduate College, 1950–1952,* 73, 106.



# EXHIBIT C

**Letter to Lars Jensen from Mark Criley**

# EXHIBIT C

ER154



AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

1133 19th Street, NW, Suite 200, Washington, DC 20036
PHONE: 202.737.5900 • FAX: 202.737.5526 • www.aaup.org

October 21, 2021

VIA ELECTRONIC MAIL

Professor Lars Jensen
Truckee Meadows Community College
7000 Dandini Boulevard
Reno, Nevada  89512

Dear Professor Jensen:

You have requested the advice of the staff in the national office of the American
Association of University Professors concerning two elements of academic freedom that
bear on the ongoing dismissal proceedings against you at Truckee Meadows Community
College: (a) the assignment of student grades and (b) speech addressing matters of
institutional policy and governance. You also have asked about the AAUP's position on
the suitability of insubordination as a basis for dismissal.

Our Association has enunciated its understanding of academic freedom in the enclosed
1940 *Statement of Principles on Academic Freedom and Tenure*, formulated in
cooperation with the Association of American Colleges and Universities and endorsed by
more than 250 scholarly and educational organizations. We are pleased to note that
chapter 2 ("Academic Freedom and Responsibility") of the Nevada System of Higher
Education Code, which governs TMCC, incorporates nearly verbatim the language of the
1940 *Statement* on academic freedom.

**Assignment of Student Grades**

You report that the administration has alleged that you were insubordinate in declining or
deferring a dean's "request" that you revoke a policy that disqualified failing students
from taking the final exam in one of your courses. The AAUP has long held that
academic freedom protects instructors' right to set course policies and assign grades
according their own professional judgment, provided they are consistent with institutional
regulations and professional ethics. As the enclosed statement *Freedom to Teach*
declares,

> [t]he freedom to teach includes the right of the faculty to select the materials,
> determine the approach to the subject, make the assignments, and assess student
> academic performance in teaching activities for which faculty members are
> individually responsible, *without having their decisions subject to the veto of a
> department chair, dean, or other administrative officer*. (Emphasis added.)

ER154

ER155

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 155 of 298
Case 3:22-cv-00045-ART-CLB Document 30-3 Filed 04/13/22 Page 3 of 17

Professor Jenkins
October 21, 2021
Page 2

Of course, department chairs, deans, or other administrative officers do not violate a faculty member's academic freedom when they question the pedagogical wisdom of a faculty member's grading policy, nor when they recommend or request that a faculty member change it. However, a faculty member's professional judgment in these areas is not subordinate to that of their chair, dean, or other administrative officer. It would therefore be preposterous to regard a faculty member as insubordinate for declining such a request.

**Speech Addressing Matters of Institutional Policy and Governance**

You report that the administration alleges that your speech concerning institutional and departmental policies has been insubordinate, disrespectful, or disruptive. The AAUP has also long held that academic freedom protects a faculty member's right to criticize institutional policies. The enclosed statement *On the Relationship of Faculty Governance to Academic Freedom* notes that

> the academic freedom of faculty members includes the freedom to express their views … on matters having to do with their institution and its policies, and to do so even if their views are in conflict with one or another received wisdom.

The statement further observes that faculty members' freedom to participate candidly in the college and university governance of their institutions is essential because the "grounds for thinking an institutional policy desirable or undesirable must be heard and assessed if the community is to have confidence that its policies are appropriate."[1]

Such criticism might be unpleasant and unwelcome to those who hear it, even as it contributes to the health of the institution. The enclosed statement *On Collegiality as a Criterion for Faculty Evaluation* observes that

> [g]adflies, critics of institutional practices or collegial norms, even the occasional malcontent, have all been known to play an invaluable and constructive role in the life of academic departments and institutions. Certainly a college or university replete with genial Babbitts is not the place to which society is likely to look for leadership. It is sometimes exceedingly difficulty to distinguish the constructive engagement that characterizes true collegiality from an obstructiveness or truculence that inhibits collegiality. Yet the failure to do so may invite the suppression of dissent.

---

[1] In the same vein, section 2.1.2 of the NSHE Code provides that

> [i]n order to ensure the freedom to seek and profess truth and knowledge, as stated in Section 2.3 of the Nevada System of Higher Education Code, the faculty member … *shall not be subjected to censorship or discipline* by the Nevada System of Higher Education on grounds that the faculty member has expressed opinions or views which are controversial, unpopular *or contrary to the attitudes of the Nevada System of Higher Education* or the community. (Emphases added.)

ER156

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 156 of 298
Case 3:22-cv-00045-ART-CLB   Document 30-3   Filed 04/13/22   Page 4 of 17

Professor Jenkins
October 21, 2021
Page 3

And it is precisely to avoid such suppression that Association-supported standards insist that an institution may sanction faculty members only for speech that bears on their fitness for their positions. The threshold is unambiguously set in *On the Relationship of Faculty Governance to Academic Freedom*:

> Protecting academic freedom on campus requires ensuring that a particular instance of faculty speech will be subject to discipline only where that speech violates some central principle of academic morality, as, for example, where it is found to be fraudulent (academic freedom does not protect plagiarism and deceit). Protecting academic freedom also requires ensuring that faculty status [e.g., dismissal] turns on a faculty member's views only where the holding of those views clearly supports a judgment of competence or incompetence.

**Insubordination**

For the reasons canvassed in the previous two sections, the AAUP has long challenged the appropriateness of insubordination as a ground for dismissal. When Association investigating committees have (all too frequently) encountered it, their members have questioned how a general requirement of subordination to authority can be reconciled with the faculty's responsibility, under principles of academic freedom, to pursue truth wherever it may lead and to express views regarding educational policy institutional governance that may diverge from those of the administration and governing board.

*     *     *     *     *

I hope that this letter and the accompanying documents are useful to you. Please feel free to contact me with any further questions, concerns, or updates. Given the apparent centrality of the academic freedom issues in this case, the national AAUP will be keenly interested in the results of your dismissal proceedings.

Sincerely,

Mark Criley
Senior Program Officer
Department of Academic Freedom, Tenure, and Governance

Enclosures by email attachment

Cc:   Professor Cheryl Cardoza, President, AAUP Chapter
      Professor Kent Ervin, President, Nevada Faculty Alliance/AAUP State Conference

# 1940 Statement of Principles on Academic Freedom and Tenure

## with 1970 Interpretive Comments

In 1915 the Committee on Academic Freedom and Academic Tenure of the American Association of University Professors formulated a statement of principles on academic freedom and academic tenure known as the 1915 *Declaration of Principles*, which was officially endorsed by the Association at its Second Annual Meeting held in Washington, D.C., December 31, 1915, and January 1, 1916.

In 1925 the American Council on Education called a conference of representatives of a number of its constituent members, among them the American Association of University Professors, for the purpose of formulating a shorter statement of principles on academic freedom and tenure. The statement formulated at this conference, known as the 1925 *Conference Statement on Academic Freedom and Tenure*, was endorsed by the Association of American Colleges (now the Association of American Colleges and Universities) in 1925 and by the American Association of University Professors in 1926.

In 1940, following a series of joint conferences begun in 1934, representatives of the American Association of University Professors and of the Association of American Colleges agreed on a restatement of the principles that had been set forth in the 1925 *Conference Statement on Academic Freedom and Tenure*. This restatement is known to the profession as the 1940 *Statement of Principles on Academic Freedom and Tenure*.

Following extensive discussions on the 1940 *Statement of Principles on Academic Freedom and Tenure* with leading educational associations and with individual faculty members and administrators, a joint committee of the AAUP and the Association of American Colleges met during 1969 to reevaluate this key policy statement. On the basis of the comments received, and the discussions that ensued, the joint committee felt the preferable approach was to formulate interpretations of the 1940 *Statement* from the experience gained in implementing and applying it for over thirty years and of adapting it to current needs.

The committee submitted to the two associations for their consideration *Interpretive Comments* that are included below as footnotes to the 1940 *Statement*.[1] These interpretations were adopted by the Council of the American Association of University Professors in April 1970 and endorsed by the Fifty-Sixth Annual Meeting as Association policy.

---

1. The Introduction to the Interpretive Comments notes: In the thirty years since their promulgation, the principles of the 1940 "Statement of Principles on Academic Freedom and Tenure" have undergone a substantial amount of refinement. This has evolved through a variety of processes, including customary acceptance, understandings mutually arrived at between institutions and professors or their representatives, investigations and reports by the American Association of University Professors, and formulations of statements by that association either alone or in conjunction with the Association of American

13

The purpose of this statement is to promote public understanding and support of academic freedom and tenure and agreement upon procedures to ensure them in colleges and universities. Institutions of higher education are conducted for the common good and not to further the interest of either the individual teacher or the institution as a whole.[2] The common good depends upon the free search for truth and its free exposition.

Academic freedom is essential to these purposes and applies to both teaching and research. Freedom in research is fundamental to the advancement of truth. Academic freedom in its teaching aspect is fundamental for the protection of the rights of the teacher in teaching and of the student to freedom in learning. It carries with it duties correlative with rights.[3]

Tenure is a means to certain ends; specifically: (1) freedom of teaching and research and of extramural activities, and (2) a sufficient degree of economic security to make the profession

attractive to men and women of ability. Freedom and economic security, hence, tenure, are indispensable to the success of an institution in fulfilling its obligations to its students and to society.

## Academic Freedom

1. Teachers are entitled to full freedom in research and in the publication of the results, subject to the adequate performance of their other academic duties; but research for pecuniary return should be based upon an understanding with the authorities of the institution.

2. Teachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching controversial matter which has no relation to their subject.[4] Limitations of academic freedom because of religious or other aims of the institution should be clearly stated in writing at the time of the appointment.[5]

3. College and university teachers are citizens, members of a learned profession, and officers of an educational institution. When they speak or write as citizens, they should be free from institutional censorship or discipline, but their special position in the community imposes special obligations. As scholars and educational officers, they should remember that the public may judge their profession and their institution by their utterances. Hence they should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that they are not speaking for the institution.[6]

Colleges. These comments represent the attempt of the two associations, as the original sponsors of the 1940 "Statement," to formulate the most important of these refinements. Their incorporation here as Interpretive Comments is based upon the premise that the 1940 "Statement" is not a static code but a fundamental document designed to set a framework of norms to guide adaptations to changing times and circumstances.

Also, there have been relevant developments in the law itself reflecting a growing insistence by the courts on due process within the academic community which parallels the essential concepts of the 1940 "Statement"; particularly relevant is the identification by the Supreme Court of academic freedom as a right protected by the First Amendment. As the Supreme Court said in *Keyishian v. Board of Regents*, 385 US 589 (1967), "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."

2. The word "teacher" as used in this document is understood to include the investigator who is attached to an academic institution without teaching duties.

3. First 1970 comment: The Association of American Colleges and the American Association of University Professors have long recognized that membership in the academic profession carries with it special responsibilities. Both associations either separately or jointly have consistently affirmed these responsibilities in major policy statements, providing guidance to professors in their utterances as citizens, in the exercise of their responsibilities to the institution and to students, and in their conduct when resigning from their institution or when undertaking government-sponsored research. Of particular relevance is the "Statement on Professional Ethics" adopted in 1966 as Association policy (AAUP, *Policy Documents and Reports*, 11th ed. [Baltimore: Johns Hopkins University Press, 2015], 145–46).

4. Second 1970 comment: The intent of this statement is not to discourage what is "controversial." Controversy is at the heart of the free academic inquiry which the entire statement is designed to foster. The passage serves to underscore the need for teachers to avoid persistently intruding material which has no relation to their subject.

5. Third 1970 comment: Most church-related institutions no longer need or desire the departure from the principle of academic freedom implied in the 1940 "Statement," and we do not now endorse such a departure.

6. Fourth 1970 comment: This paragraph is the subject of an interpretation adopted by the sponsors of the 1940 "Statement" immediately following its endorsement:

If the administration of a college or university feels that a teacher has not observed the admonitions of paragraph 3 of the section on Academic Freedom and believes that the extramural utterances of the teacher have been such as to raise grave doubts concerning the teacher's fitness for his or her position, it may proceed to file charges under paragraph 4 of the section on Academic Tenure. In pressing such charges, the administration should remember that teachers are citizens and should be

## Academic Tenure

After the expiration of a probationary period, teachers or investigators should have permanent or continuous tenure, and their service should be terminated only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of financial exigencies.

In the interpretation of this principle it is understood that the following represents acceptable academic practice:

1.  The precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated.
2.  Beginning with appointment to the rank of full-time instructor or a higher rank,[7] the probationary period should not exceed seven years, including within this period full-time service in all institutions of higher education; but subject to the proviso that when, after a term of probationary service of more than three years in one or more institutions, a teacher is called to another institution, it may be agreed in writing that the new appointment is for a probationary period of not more than four years, even though thereby the person's total probationary period in the academic profession is extended beyond the normal maximum of seven years.[8] Notice should be given at least one year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period.[9]

---

accorded the freedom of citizens. In such cases the administration must assume full responsibility, and the American Association of University Professors and the Association of American Colleges are free to make an investigation.

Paragraph 3 of the section on Academic Freedom in the 1940 "Statement" should also be interpreted in keeping with the 1964 "Committee A Statement on Extramural Utterances," *Policy Documents and Reports*, 31, which states inter alia: "The controlling principle is that a faculty member's expression of opinion as a citizen cannot constitute grounds for dismissal unless it clearly demonstrates the faculty member's unfitness for his or her position. Extramural utterances rarely bear upon the faculty member's fitness for the position. Moreover, a final decision should take into account the faculty member's entire record as a teacher and scholar."

Paragraph 5 of the "Statement on Professional Ethics," *Policy Documents and Reports*, 146, also addresses the nature of the "special obligations" of the teacher:

> As members of their community, professors have the rights and obligations of other citizens. Professors measure the urgency of these obligations in the light of their responsibilities to their subject, to their students, to their profession, and to their institution. When they speak or act as private persons, they avoid creating the impression of speaking or acting for their college or university. As citizens engaged in a profession that depends upon freedom for its health and integrity, professors have a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom.

Both the protection of academic freedom and the requirements of academic responsibility apply not only to the full-time probationary and the tenured teacher, but also to all others, such as part-time faculty and teaching assistants, who exercise teaching responsibilities.

7. Fifth 1970 comment: The concept of "rank of full-time instructor or a higher rank" is intended to include any person who teaches a full-time load regardless of the teacher's specific title. [For a discussion of this question, see the "Report of the Special Committee on Academic Personnel Ineligible for Tenure," *AAUP Bulletin* 52 (September 1966): 280–82.]

8. Sixth 1970 comment: In calling for an agreement "in writing" on the amount of credit given for a faculty member's prior service at other institutions, the "Statement" furthers the general policy of full understanding by the professor of the terms and conditions of the appointment. It does not necessarily follow that a professor's tenure rights have been violated because of the absence of a written agreement on this matter. Nonetheless, especially because of the variation in permissible institutional practices, a written understanding concerning these matters at the time of appointment is particularly appropriate and advantageous to both the individual and the institution. [For a more detailed statement on this question, see "On Crediting Prior Service Elsewhere as Part of the Probationary Period," *Policy Documents and Reports*, 167–68.]

9. Seventh 1970 comment: The effect of this subparagraph is that a decision on tenure, favorable or unfavorable, must be made at least twelve months prior to the completion of the probationary period. If the decision is negative, the appointment for the following year becomes a terminal one. If the decision is affirmative, the provisions in the 1940 "Statement" with respect to the termination of service of teachers or investigators after the expiration of a probationary period should apply from the date when the favorable decision is made.

The general principle of notice contained in this paragraph is developed with greater specificity in the "Standards for Notice of Nonreappointment," endorsed by the Fiftieth Annual Meeting of the American Association of University Professors (1964) (*Policy Documents and Reports*, 99). These standards are:

> Notice of nonreappointment, or of intention not to recommend reappointment to the governing board, should be given in writing in accordance with the following standards:
>
> 1.  *Not later than March 1 of the first academic year of service*, if the appointment expires at the end of that year; or, if a one-year appointment terminates during an academic year, at least three months in advance of its termination.

15

3. During the probationary period a teacher should have the academic freedom that all other members of the faculty have.[10]

4. Termination for cause of a continuous appointment, or the dismissal for cause of a teacher previous to the expiration of a term appointment, should, if possible, be considered by both a faculty committee and the governing board of the institution. In all cases where the facts are in dispute, the accused teacher should be informed before the hearing in writing of the charges and should have the opportunity to be heard in his or her own defense by all bodies that pass judgment upon the case. The teacher should be permitted to be accompanied by an advisor of his or her own choosing who may act as counsel. There should be a full stenographic record of the hearing available to the parties concerned. In the hearing of charges of incompetence the testimony should include that of teachers and other scholars, either from the teacher's own or from other institutions. Teachers on continuous appointment who are dismissed for reasons not involving moral turpitude should receive their salaries for at least a year from the date of notification of dismissal whether or not they are continued in their duties at the institution.[11]

---

2. *Not later than December 15 of the second academic year of service,* if the appointment expires at the end of that year; or, if an initial two-year appointment terminates during an academic year, at least six months in advance of its termination.

3. At least twelve months before the expiration of an appointment after two or more years in the institution.

Other obligations, both of institutions and of individuals, are described in the "Statement on Recruitment and Resignation of Faculty Members," *Policy Documents and Reports,* 153–54, as endorsed by the Association of American Colleges and the American Association of University Professors in 1961.

10. Eighth 1970 comment: The freedom of probationary teachers is enhanced by the establishment of a regular procedure for the periodic evaluation and assessment of the teacher's academic performance during probationary status. Provision should be made for regularized procedures for the consideration of complaints by probationary teachers that their academic freedom has been violated. One suggested procedure to serve these purposes is contained in the "Recommended Institutional Regulations on Academic Freedom and Tenure," *Policy Documents and Reports,* 79–90, prepared by the American Association of University Professors.

11. Ninth 1970 comment: A further specification of the academic due process to which the teacher is entitled under this paragraph is contained in the "Statement on Procedural Standards in Faculty Dismissal Proceedings," *Policy Documents and Reports,* 91–93, jointly approved by the

5. Termination of a continuous appointment because of financial exigency should be demonstrably bona fide.

## Endorsers

Note: Groups that changed names subsequent to endorsing the statement are listed under their current names.

Association of American Colleges and Universities....................................................1941
American Association of University Professors.......................................................1941
American Library Association (adapted for librarians).....................................................1946
Association of American Law Schools.............1946
American Political Science Association ...........1947
American Association for Higher Education and Accreditation........................1950
American Association of Colleges for Teacher Education.........................................1950
Eastern Psychological Association ...................1950
Southern Society for Philosophy and Psychology....................................................1953
American Psychological Association ...............1961
American Historical Association......................1961
Modern Language Association.........................1962
American Economic Association ......................1962
Agricultural and Applied Economic Association....................................................1962
Midwest Sociological Society ...........................1963
Organization of American Historians.............1963
Society for Classical Studies.............................1963
American Council of Learned Societies...........1963
American Sociological Association ..................1963

---

American Association of University Professors and the Association of American Colleges in 1958. This interpretive document deals with the issue of suspension, about which the 1940 "Statement" is silent.

The "Statement on Procedural Standards in Faculty Dismissal Proceedings" provides: "Suspension of the faculty member during the proceedings is justified only if immediate harm to the faculty member or others is threatened by the faculty member's continuance. Unless legal considerations forbid, any such suspension should be with pay." A suspension which is not followed by either reinstatement or the opportunity for a hearing is in effect a summary dismissal in violation of academic due process.

The concept of "moral turpitude" identifies the exceptional case in which the professor may be denied a year's teaching or pay in whole or in part. The statement applies to that kind of behavior which goes beyond simply warranting discharge and is so utterly blameworthy as to make it inappropriate to require the offering of a year's teaching or pay. The standard is not that the moral sensibilities of persons in the particular community have been affronted. The standard is behavior that would evoke condemnation by the academic community generally.

Southern Historical Association .......................1963
American Studies Association............................1963
Association of American Geographers ............1963
Southern Economic Association.......................1963
Classical Association of the Middle West
    and South ...........................................................1964
Southwestern Social Science Association........1964
Archaeological Institute of America ................1964
Southern Management Association.................1964
American Theatre Association
    (now dissolved) ...............................................1964
South Central Modern Language
    Association..........................................................1964
Southwestern Philosophical Society................1964
Council of Independent Colleges......................1965
Mathematical Association of America.............1965
Arizona-Nevada Academy of Science..............1965
American Risk and Insurance Association......1965
Academy of Management...................................1965
American Catholic Historical Association.......1966
American Catholic Philosophical
    Association...................................................... 1966
Association for Education in Journalism
    and Mass Communication............................1966
Western History Association ............................1966
Mountain-Plains Philosophical Conference....1966
Society of American Archivists ........................1966
Southeastern Psychological Association..........1966
Southern States Communication
    Association..........................................................1966
American Mathematical Society......................1967
Association for Slavic, East European,
    and Eurasian Studies.....................................1967
College Theology Society ..................................1967
Council on Social Work Education...................1967
American Association of Colleges of
    Pharmacy ..........................................................1967
American Academy of Religion ........................1967
Association for the Sociology of Religion .......1967
American Society of Journalism School
    Administrators (now merged with the
    Association of Schools of Journalism
    and Mass Communication)...........................1967
John Dewey Society ...........................................1967
South Atlantic Modern Language
    Association..........................................................1967
American Finance Association ..........................1967
Association for Social Economics.....................1967
Phi Beta Kappa Society .....................................1968
Society of Christian Ethics ...............................1968
American Association of Teachers
    of French ...........................................................1968
Eastern Finance Association .............................1968
American Association for Chinese Studies .....1968
American Society of Plant Biologists...............1968
University Film and Video Association ...........1968
American Dialect Society ..................................1968

American Speech-Language-Hearing
    Association.........................................................1968
Association of Social and Behavioral
    Scientists ...........................................................1968
College English Association...............................1968
National College Physical Education
    Association for Men.......................................1969
American Real Estate and Urban Economics
    Association.........................................................1969
Council for Philosophical Studies ...................1969
History of Education Society............................1969
American Musicological Society......................1969
American Association of Teachers of
    Spanish and Portuguese................................1969
Texas Community College Teachers
    Association.........................................................1970
College Art Association of America................1970
Society of Professors of Education ..................1970
American Anthropological Association...........1970
Association of Theological Schools .................1970
Association of Schools of Journalism and
    Mass Communication ...................................1971
Academy of Legal Studies in Business.............1971
Americans for the Arts .....................................1972
New York State Mathematics Association
    of Two-Year Colleges....................................1972
College Language Association...........................1973
Pennsylvania Historical Association................1973
American Philosophical Association................ 1974
American Classical League ...............................1974
American Comparative Literature
    Association........................................................ 1974
Rocky Mountain Modern Language
    Association........................................................ 1974
Society of Architectural Historians.................1975
American Statistical Association......................1975
American Folklore Society ................................1975
Association for Asian Studies...........................1975
Linguistic Society of America ..........................1975
African Studies Association ..............................1975
American Institute of Biological Sciences .......1975
North American Conference on British
    Studies...............................................................1975
Sixteenth-Century Society and Conference ...1975
Texas Association of College Teachers.............1976
Association for Jewish Studies .........................1976
Association for Spanish and Portuguese
    Historical Studies ...........................................1976
Western States Communication Association.....1976
Texas Association of Colleges for Teacher
    Education...........................................................1977
Metaphysical Society of America....................1977
American Chemical Society ..............................1977
Texas Library Association.................................1977
American Society for Legal History................1977
Iowa Higher Education Association .................1977
American Physical Therapy Association .........1979

North Central Sociological Association...........1980
Dante Society of America..................................1980
Association for Communication
    Administration.............................................1981
National Communication Association.............1981
American Association of Physics Teachers......1982
Middle East Studies Association ......................1982
National Education Association........................1985
American Institute of Chemists.......................1985
American Association of Teachers
    of German....................................................1985
American Association of Teachers of Italian...1985
American Association for Applied
    Linguistics....................................................1986
American Association for Cancer Education...1986
American Society of Church History..............1986
Oral History Association..................................1987
Society for French Historical Studies ..............1987
History of Science Society................................1987
American Association of Pharmaceutical
    Scientists.......................................................1988
American Association for Clinical
    Chemistry.....................................................1988
Council for Chemical Research .......................1988
Association for the Study of Higher
    Education.......................................................1988
American Psychological Association ...............1989
Association for Psychological Science..............1989
University and College Labor Education
    Association.....................................................1989
Society for Neuroscience ..................................1989
Renaissance Society of America.......................1989
Society of Biblical Literature............................1989
National Science Teachers Association ............1989
Medieval Academy of America ........................1990
American Society of Agronomy ......................1990
Crop Science Society of America .....................1990
Soil Science Society of America.......................1990
International Society of Protistologists...........1990
Society for Ethnomusicology ...........................1990
American Association of Physicists
    in Medicine...................................................1990
Animal Behavior Society..................................1990
Illinois Community College Faculty
    Association.....................................................1990
American Society for Theatre Research..........1990
National Council of Teachers of English..........1991
Latin American Studies Association................1992
Society for Cinema and Media Studies............1992
American Society for Eighteenth-Century
    Studies...........................................................1992
Council of Colleges of Arts and Sciences.........1992
American Society for Aesthetics......................1992
Association for the Advancement
    of Baltic Studies............................................1994
American Council of Teachers of Russian.......1994

Council of Teachers of Southeast
    Asian Languages ..........................................1994
American Association of Teachers of Arabic...1994
American Association of Teachers of
    Japanese........................................................1994
Academic Senate for California
    Community Colleges....................................1996
National Council for the Social Studies...........1996
Council of Academic Programs in
    Communication Sciences and Disorders ....1996
Association for Women in Mathematics .........1997
Philosophy of Time Society..............................1998
World Communication Association ................1999
The Historical Society......................................1999
Association for Theatre in Higher Education..1999
National Association for Ethnic Studies..........1999
Association of Ancient Historians ...................1999
American Culture Association .........................1999
American Conference for Irish Studies ...........1999
Society for Philosophy in the
    Contemporary World...................................1999
Eastern Communication Association...............1999
Association for Canadian Studies
    in the United States......................................1999
American Association for the History of
    Medicine....................................................... 2000
Missouri Association of Faculty Senates........ 2000
Association for Symbolic Logic ....................... 2000
American Society of Criminology...................2001
American Jewish Historical Society ................2001
New England Historical Association ...............2001
Society for the Scientific Study of Religion ....2001
Society for German-American Studies ...........2001
Society for Historians of the Gilded Age
    and Progressive Era......................................2001
Eastern Sociological Society ............................2001
Chinese Historians in the United States..........2001
Community College Humanities
    Association....................................................2002
Immigration and Ethnic History Society........2002
Society for Early Modern Catholic Studies.....2002
Academic Senate of the California State
    University .................................................... 2004
Agricultural History Society .......................... 2004
National Council for Accreditation
    of Teacher Education ................................... 2005
American Council on the Teaching
    of Foreign Languages.................................. 2005
Society for the Study of Social Biology.......... 2005
Society for the Study of Social Problems ....... 2005
Association of Black Sociologists.................... 2005
Dictionary Society of North America ........... 2005
Society for Buddhist-Christian Studies.......... 2005
Society for Armenian Studies......................... 2006
Society for the Advancement of
    Scandinavian Study .................................... 2006

American Physiological Society ...................... 2006
National Women's Studies Association .......... 2006
National Coalition for History ....................... 2006
Society for Military History ........................... 2006
Society for Industrial and Applied
    Mathematics ............................................... 2006
Association for Research on Ethnicity and
    Nationalism in the Americas .................... 2006
Society of Dance History Scholars.................. 2006
Association of Literary Scholars, Critics,
    and Writers ................................................. 2006
National Council on Public History ............... 2006
College Forum of the National Council of
    Teachers of English..................................... 2006
Society for Music Theory ............................... 2006
Society for Historians of American
    Foreign Relations........................................ 2006
Law and Society Association ........................... 2006
Society for Applied Anthropology.................. 2006
American Society of Plant Taxonomists......... 2006
Society for the History of Technology ........... 2006
German Studies Association............................ 2006
Association of College and Research
    Libraries ......................................................2007
Czechoslovak Studies Association...................2007
American Educational Studies Association .....2007
Southeastern Women's Studies Association .. 2009
American Academy for Jewish Research.........2014
American Association for Ukrainian
    Studies..........................................................2014
American Association of Italian Studies .........2014
American Theatre and Drama Society ............2014
Central European History Society...................2014
Central States Communication Association....2014

Chinese Language Teachers Association .........2014
Coordinating Council for Women
    in History......................................................2014
Ecological Society of America .........................2014
Institute for American Religious and
    Philosophical Thought.................................2014
Italian American Studies Association..............2014
Midwestern Psychological Association............2014
Modern Greek Studies Association..................2014
National Association of Professors
    of Hebrew.....................................................2014
National Council of Less Commonly
    Taught Languages ........................................2014
Population Association of America ..................2014
Society for Italian Historical Studies..............2014
Society for Psychophysiological Research.......2014
Society for Romanian Studies..........................2014
Society for Textual Scholarship.......................2014
Society for the History of Children and
    Youth............................................................2014
Society for the Psychological Study
    of Social Issues.............................................2014
Society for the Study of the Multi-Ethnic
    Literature of the United States....................2014
Society of Civil War Historians.......................2014
Society of Mathematical Psychology...............2014
Sociologists for Women in Society ..................2014
Urban History Association ...............................2014
World History Association ...............................2014
American Educational Research
    Association....................................................2014
Labor and Working-Class History
    Association....................................................2014
Paleontological Society ....................................2014

# The Freedom to Teach

The following statement was approved by Committee A on Academic Freedom and Tenure in November 2013.

The freedom to teach includes the right of the faculty to select the materials, determine the approach to the subject, make the assignments, and assess student academic performance in teaching activities for which faculty members are individually responsible, without having their decisions subject to the veto of a department chair, dean, or other administrative officer. Teaching duties that are commonly shared among a number of faculty members require a significant amount of coordination and the imposition of a certain degree of structure, often involving a need for agreement on such matters as general course content, syllabi, and examinations.[1]

In a multisection course taught by several faculty members, responsibility is often shared among the instructors for identifying the texts to be assigned to students. Common course syllabi and examinations are also typical but should not be imposed by departmental or administrative fiat. The shared responsibility bespeaks a shared freedom, which trumps the freedom of an individual faculty member to assign a textbook that he or she alone considers satisfactory. The individual's freedom in other respects, however, remains undiluted. Individuals should be able to assign supplementary materials to deal with subjects that they believe are inadequately treated in the required textbook. Instructors also have the right to discuss in the classroom what they see as deficiencies in the textbook; doing so could turn out to be as effective in engaging the students as requiring them to use an alternate textbook. These principles apply equally to faculty in the tenure system and those with contingent appointments. Although, under these circumstances, the decisions of the group may prevail over the dissenting position of a particular individual, the deliberations leading to such decisions ought to involve substantial reflection and discussion by all those who teach the courses. The department should have a process for periodically reviewing curricular decisions and altering them based on a consensus of the appropriate teaching faculty, subject to review at other levels of governance.

**Note**

1. Substantially the same paragraph appears in "Academic Freedom in the Medical School" (AAUP, *Policy Documents and Reports*, 11th ed. [Baltimore: Johns Hopkins University Press, 2015], 71–72).

28

# On Collegiality as a Criterion for Faculty Evaluation

## (2016 REVISION)

*The statement that follows was approved by the Association's Committee A on Academic Freedom and Tenure and adopted by the Association's Council in November 1999. Committee A revised the statement in 2016.*

In evaluating faculty members for promotion, renewal, tenure, and other purposes, American colleges and universities have customarily examined faculty performance in the three areas of teaching, scholarship, and service, with service sometimes divided further into public service and service to the college or university. While the weight given to each of these three areas varies according to the mission and evolution of the institution, the terms are themselves generally understood to describe the key functions performed by faculty members.

In recent years, Committee A has become aware of an increasing tendency on the part not only of administrations and governing boards but also of faculty members serving in such roles as department chairs or as members of promotion and tenure committees to add a fourth criterion in faculty evaluation: "collegiality." For the reasons set forth in this statement, we view this development as highly unfortunate, and we believe that it should be discouraged.

Few, if any, responsible faculty members would deny that collegiality, in the sense of collaboration and constructive cooperation, identifies important aspects of a faculty member's overall performance. A faculty member may legitimately be called upon to participate in the development of curricula and standards for the evaluation of teaching, as well as in peer review of the teaching of colleagues. Much research, depending on the nature of the particular discipline, is by its nature collaborative and requires teamwork as well as the ability to engage in independent investigation. And committee service

of a more general description, relating to the life of the institution as a whole, is a logical outgrowth of the Association's view that a faculty member is an "officer" of the college or university in which he or she fulfills professional duties.[1]

Understood in this way, collegiality is not a distinct capacity to be assessed independently of the traditional triumvirate of teaching, scholarship, and service. Evaluation in these three areas will encompass the contributions that the virtue of collegiality may pertinently add to a faculty member's career. The current tendency to isolate collegiality as a distinct dimension of evaluation, however, poses several dangers. Historically, "collegiality" has not infrequently been associated with ensuring homogeneity and hence with practices that exclude persons on the basis of their difference from a perceived norm. The invocation of "collegiality" may also threaten academic freedom. In the heat of important decisions regarding promotion or tenure, as well as other matters involving such traditional areas of faculty responsibility as curriculum or academic hiring, collegiality may be confused with the expectation that a faculty member display "enthusiasm" or "dedication," evince "a constructive attitude" that will "foster harmony," or display an excessive

---

1. The locus classicus for this term is the 1940 *Statement of Principles on Academic Freedom and Tenure:* "College and university teachers are citizens, members of a learned profession, and officers of an educational institution."

© 2016 AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS

*On Collegiality as a Criterion for Faculty Evaluation*

deference to administrative or faculty decisions where these may require reasoned discussion. Such expectations are flatly contrary to elementary principles of academic freedom, which protect a faculty member's right to dissent from the judgments of colleagues and administrators.

A distinct criterion of collegiality also holds the potential of chilling faculty debate and discussion. Criticism and opposition do not necessarily conflict with collegiality. Gadflies, critics of institutional practices or collegial norms, even the occasional malcontent, have all been known to play an invaluable and constructive role in the life of academic departments and institutions. They have sometimes proved collegial in the deepest and truest sense. Certainly a college or university replete with genial Babbitts is not the place to which society is likely to look for leadership. It is sometimes exceedingly difficult to distinguish the constructive engagement that characterizes true collegiality from an obstructiveness or truculence that inhibits collegiality. Yet the failure to do so may invite the suppression of dissent. The very real potential for a distinct criterion of "collegiality" to cast a pall of stale uniformity places it in direct tension with the value of faculty diversity in all its contemporary manifestations.

Nothing is to be gained by establishing collegiality as a separate criterion of assessment. A fundamental absence of collegiality will no doubt manifest itself in the dimensions of teaching, scholarship, or, most probably, service, though here we would add that we all know colleagues whose distinctive contribution to their institution or their profession may not lie so much in service as in teaching and research. Professional misconduct or malfeasance should constitute an independently relevant matter for faculty evaluation. So, too, should efforts to obstruct the ability of colleagues to carry out their normal functions, to engage in personal attacks, or to violate ethical standards. The elevation of collegiality into a separate and discrete standard is not only inconsistent with the long-term vigor and health of academic institutions and dangerous to academic freedom; it is unnecessary.

Committee A accordingly believes that the separate category of "collegiality" should not be added to the traditional three areas of faculty performance. Institutions of higher education should instead focus on developing clear definitions of teaching, scholarship, and service, in which the virtues of

collegiality are reflected.[2] Certainly an absence of collegiality ought never, by itself, to constitute a basis for nonreappointment, denial of tenure, or dismissal for cause. ∎

---

2. Even when collegiality is not employed as a separate criterion in conducting faculty evaluations, if the term is improperly used to denote civility or congeniality, it should play no role in evaluating a faculty member's performance.

# On the Relationship of Faculty Governance to Academic Freedom

This statement was approved in May 1994 by the Association's Committee on College and University Governance (Committee T). In June 1994 it was approved by Committee A on Academic Freedom and Tenure and adopted by the Association's Council.

---

Since its founding in 1915, the AAUP has been actively engaged in developing standards for sound academic practice and in working for their acceptance throughout the community of higher education. Two aspects of an institution's academic practice have been of particular concern to the Association ever since: the rights and freedoms of individual faculty members and the role of the faculty in institutional governance. The fundamental principles describing the rights and freedoms that an institution should accord to its individual faculty members are set forth in the 1940 *Statement of Principles on Academic Freedom and Tenure;* those principles have been further developed in more recent Association statements and reports that bring the principles to bear on specific issues having to do with faculty status. The fundamental principles describing the proper role of faculty members in institutional governance are set forth in the *Statement on Government of Colleges and Universities;* those principles, too, have been further developed in more recent Association statements and reports.

Although the Association established Committee A in 1915, its initial year, to attend to issues of academic freedom and tenure, and created Committee T the following year to address issues of institutional "government," the AAUP has not spoken explicitly to the links between its principles in these two basic areas. Thus, the 1940 *Statement of Principles* describes faculty members as "officers of an educational institution," but it is silent about the governance role they should carry out in light of their being officers of the institution. The *Statement on Government* describes the role in institutional government that faculty should be accorded, but it does not speak to the bearing of that role on the rights and freedoms of individual faculty members.[1]

Historical and contemporary links can be clearly seen, however. This statement will suggest that a sound system of institutional governance is a necessary condition for the protection of faculty rights and thereby for the most productive exercise of essential faculty freedoms. Correspondingly, the protection of the academic freedom of faculty members in addressing issues of institutional governance is a prerequisite for the practice of governance unhampered by fear of retribution.[2]

An institution's system of governance is the structure according to which authority and responsibilities are allocated to the various offices and divisions within the institution. How should that authority be allocated? Conducting the academic enterprise requires carrying out a complex array of tasks by the various components of the institution. The *Statement on Government* singles out three major institutional components—the governing board, the administration, and the faculty—and describes their respective responsibilities, that is, the tasks for which each is primarily responsible. Being responsible for carrying out a task is one thing, however, and having authority over the way in which the task is carried out is quite another. The *Statement on Government* connects them in the following general principle, enunciated at the outset: "differences in the weight of each voice, from one point to the next, should be determined by reference to the responsibility of each component for the particular matter at hand. . . ." Thus degrees of authority should track directness of responsibility.

For example, since the faculty has primary responsibility for the teaching and research done in the institution, the faculty's voice on matters having to do with teaching and research should be given the greatest weight. From that idea flow more specific principles regarding the faculty's role, as expressed in the *Statement on Government.* Since such decisions as those involving choice of method of instruction, subject matter to be taught, policies for admitting students, standards of student competence in a discipline, the maintenance of a suitable environment for learning, and standards of faculty competence

123

bear directly on the teaching and research conducted in the institution, the faculty should have primary authority over decisions about such matters—that is, the administration should "concur with the faculty judgment except in rare instances and for compelling reasons which should be stated in detail." Other decisions bear less directly on the teaching and research conducted in the institution; these include, for instance, decisions about the institution's long-range objectives, its physical and fiscal resources, the distribution of its funds among its various divisions, and the selection of its president. But these decisions plainly can have a powerful impact on the institution's teaching and research, and the *Statement on Government,* therefore, declares that the decision-making process must include the faculty, and that its voice on these matters must be accorded great respect.

In short, the *Statement on Government* derives the weight of the faculty's voice on an issue—that is, the degree to which the faculty's voice should be authoritative on the issue—from the relative directness with which the issue bears on the faculty's exercise of its various institutional responsibilities.

There are at least three reasons why the faculty's voice should be authoritative across the entire range of decision making that bears, whether directly or indirectly, on its responsibilities. For each of these reasons it is also essential that faculty members have the academic freedom to express their professional opinions without fear of reprisal.

In the first place, this allocation of authority is the most efficient means to the accomplishment of the institution's objectives. For example, as the *Statement on Government* maintains, "the educational effectiveness of the institution" is the greater the more firmly the institution is able to protect this allocation of authority against pressures from outside the institution. Moreover, scholars in a discipline are acquainted with the discipline from within; their views on what students should learn in it, and on which faculty members should be appointed and promoted, are therefore more likely to produce better teaching and research in the discipline than are the views of trustees or administrators. More generally, experienced faculty committees—whether constituted to address curricular, personnel, or other matters—must be free to bring to bear on the issues at hand not merely their disciplinary competencies, but also their first-hand understanding of what constitutes good teaching and research generally, and of the climate in which those endeavors can best be conducted.

The second reason issues from the centrality of teaching and research within the array of tasks carried out by an academic institution: teaching and research are the very purpose of an academic institution and the reason why the public values and supports it. This means that the faculty, who are responsible for carrying out those central tasks, should be viewed as having a special status within the institution. The Association has taken this view from its earliest days. Its first statement, the 1915 *Declaration of Principles,*[3] declares that members of a faculty "are the appointees, but not in any proper sense the employees," of the trustees; they are partners with the trustees, and, as the 1915 *Declaration* states, the office of faculty member should be—indeed, it is in the public interest that the office of faculty member should be—"one both of dignity and of independence." Allocation of authority to the faculty in the areas of its responsibility is a necessary condition for the faculty's possessing that dignity and exercising that independence.

The third reason is the most important in the present context: allocation of authority to the faculty in the areas of its responsibility is a necessary condition for the protection of academic freedom within the institution. The protection of free expression takes many forms, but the issue emerges most clearly in the case of authority over faculty status.

The academic freedom of faculty members includes the freedom to express their views (1) on academic matters in the classroom and in the conduct of research, (2) on matters having to do with their institution and its policies, and (3) on issues of public interest generally, and to do so even if their views are in conflict with one or another received wisdom. Association policy documents over the years before and since the adoption of the 1940 *Statement of Principles* have described the reasons why this freedom should be accorded and rights to it protected. In the case (1) of academic matters, good teaching requires developing critical ability in one's students and an understanding of the methods for resolving disputes within the discipline; good research requires permitting the expression of contrary views in order that the evidence for and against a hypothesis can be weighed responsibly. In the case (2) of institutional matters, grounds for thinking an institutional policy desirable or undesirable must be heard and assessed if the community is to have confidence that its policies are appropriate. In the case (3) of issues of public interest generally, the faculty member must be free to exercise the rights accorded to all citizens.[4]

Protecting academic freedom on campus requires ensuring that a particular instance of faculty speech will be subject to discipline only where that speech violates some central principle of academic morality, as, for example, where it is found to be fraudulent (academic freedom does not protect plagiarism and deceit). Protecting academic freedom also requires ensuring that faculty status turns on a faculty member's views only where the holding of those views clearly supports a judgment of competence or incompetence.

It is in light of these requirements that the allocation to the faculty—through appropriate governance processes and structures—of authority over faculty status and other basic academic matters can be seen to be necessary for the protection of academic freedom. It is the faculty—not trustees or administrators—who have the experience needed for assessing whether an instance of faculty speech constitutes a breach of a central principle of academic morality, and who have the expertise to form judgments of faculty competence or incompetence. As AAUP case reports have shown, to the extent that decisions on such matters are not in the hands of the faculty, there is a potential for, and at times the actuality of, administrative imposition of penalties on improper grounds.

A good governance system is no guarantee that academic freedom will flourish. A governance system is merely a structure that allocates authority, and authority needs to be exercised if even the most appropriate allocation of it is to have its intended effects. Faculty members must be willing to participate in the decision-making processes over which a sound governance system gives them authority. As the Association's *Statement on Professional Ethics* says, faculty members must "accept their share of faculty responsibilities for the governance of their institution." If they do not, authority will drift away from them, since someone must exercise it, and if members of the faculty do not, others will.

The second possible source of concern is more subtle. Even with a sound governance system in place and with a faculty active in self-government and operating under rules and regulations protective of academic freedom, dysfunctions that undermine academic freedom may still occur: subtle (or not so subtle) bullying on the part of

the faculty itself, a covertly enforced isolation, a disinclination to respect the views of the offbeat and cranky among its members. That is to say, given appropriate formal protections, such incivilities may not issue in clear-cut violations of academic freedom, but a faculty member's academic freedom may nevertheless be chilled.[5]

In sum, sound governance practice and the exercise of academic freedom are closely connected, arguably inextricably linked. While no governance system can serve to guarantee that academic freedom will always prevail, an inadequate governance system—one in which the faculty is not accorded primacy in academic matters—compromises the conditions in which academic freedom is likely to thrive. Similarly, although academic freedom is not a sufficient condition, it is an essential one for effective governance. Thus, the earliest principles formulated by the Association, those of 1915 and 1916, are most likely to thrive when they are understood to reinforce one another. Under those conditions, institutions of higher education will be best served and will in turn best serve society at large.

## Notes

1. The "Statement on Government" does, however, quote from the 1940 "Statement of Principles" (AAUP, *Policy Documents and Reports*, 11th ed. [Baltimore: Johns Hopkins University Press, 2015], 122, n. 2).

2. Also relevant are the Association's "Statement on Professional Ethics," ibid., 145–46, and "A Statement of the Association's Council: Freedom and Responsibility," *AAUP Bulletin* 56 (December 1970): 375–76.

3. 1915 "Declaration of Principles on Academic Freedom and Academic Tenure," *Policy Documents and Reports*, 3–12.

4. In this connection, several policy statements have particular relevance, including the "Committee A Statement on Extramural Utterances," ibid., 31, and the "Statement on Professors and Political Activity," ibid., 39.

5. According to "A Statement of the Association's Council: Freedom and Responsibility," "Membership in the academic community imposes on students, faculty members, administrators, and trustees an obligation to respect the dignity of others, to acknowledge their right to express differing opinions, and to foster and defend intellectual honesty, freedom of inquiry and instruction, and free expression on and off the campus" (375).

ER170

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 170 of 298
Case 3:22-cv-00045-ART-CLB Document 30-4 Filed 04/13/22 Page 1 of 7

# EXHIBIT D

**Letter to President Hilgersom from Joshua Bleisch**

# EXHIBIT D



**FIRE**
Foundation for Individual
Rights in Education

October 1, 2021

Karin Hilgersom
President's Office
Truckee Meadows Community College
7000 Dandini Boulevard, RDMT 200
Reno, NV 89512

<u>**URGENT**</u>

<u>*Sent via Facsimile (775-673-7297) and Electronic Mail (khilgersom@tmcc.edu)*</u>

Dear President Hilgersom:

The Foundation for Individual Rights in Education (FIRE) is a nonpartisan, nonprofit organization dedicated to defending liberty, freedom of speech, due process, academic freedom, legal equality, and freedom of conscience on America's college campuses.

FIRE is concerned by Truckee Meadows Community College's (TMCC) recent charges against Professor Lars Jensen for "insubordination" based in part on his distribution of handouts criticizing academic standards at TMCC. While critical of TMCC, Jensen's handouts and other statements are protected by the First Amendment, which bars TMCC from investigating or punishing protected expression.

## I.    Jensen's Potential Termination Follows Criticism of TMCC

The following is our understanding of the pertinent facts. We appreciate that you may have additional information to offer and invite you to share it with us. To these ends, please find enclosed an executed privacy waiver authorizing you to share information about this matter.

Lars Jensen is a professor in the Math Department at TMCC. During a comment period at the end of a session of the Math Summit at TMCC's Professional Development Days during the 2019-20 academic year, Jensen attempted to make a verbal comment about academic standards at TMCC. Jensen was prevented from making his full comments, however, because the schedule called for a break period to begin.[1] In lieu of verbally delivering his comments, Jensen went back to his office, typed and printed out his comments, and distributed the handouts to his colleagues during the break between programming.

---

[1] Letter from Dean Julie Ellsworth to Lars Jensen, Sept. 24, 2020 (on file with author).

The handout accused TMCC of lowering its standards in order to boost completion rates. In relevant part excerpted here, Jensen wrote:

> • Regents Mandate: Put students into a college level math class, possibly with an additional 1-3 co-req credits to fill any holes they may have in Algebra 1-2 or Geometry.
> • Math Department Response to the Mandate: The department has decided that the mandate cannot be carried out without a drop in completion rates if we maintain the current academic level of Math 120. Therefore the department has decided to lower the academic level of Math 120 so students will be able to complete the course at current rates. (The department has allowed completion rates to dictate the academic level of an exit math course.)
> • What is the Level of the New Math 120? In the words of the Math 120 co-req committee, "...a student completing Math 120 may be ready for Math 95." Paraphrasing, this means that "a student graduating from college may be ready for middle school math." (This is an absurd statement. The department has decided to comply with the Regent's mandate by lowering the academic level of its classes. This is in clear violation of the intent of the mandate.)
> • Impact on Our Degree- and Certificate Programs: The lower academic skills of Math 120 completers will directly impact 31% of our degree- and certificate programs by lowering the math- and technical skills of graduates in these programs.
> • Impact on the Community: Employers in the community pays our salaries, and subsidizes students' education, through their taxes. What do they expect in return? Answer: Qualified graduates. It is well known that employers, including all the high-tech companies coming into our area, value math skills because the more math classes a student has taken, the higher salary an employer will pay. Well, employers will soon get much less than they have been paying for. TMCC is planning to do the exact opposite of what the community wants: We are going to lower the level of our exit classes and the math skills of our graduates, in the name of preserving completion rates.[2]

Julie Ellsworth, Dean of the Life Sciences, Allied Health and Public Safety Division, asked Jensen not to pass out his flyers directly to other Math Summit participants and to instead place one copy on the event's "parking lot" board.[3] Jensen continued to distribute his handouts directly to colleagues, but he did not interrupt the summit or prevent it from proceeding.

---

[2] Lars Jensen, *On the Math Pathways – Looking Under the Hood* (handout distributed to TMCC colleagues) (as written) (on file with author).

[3] Letter from Dean Julie Ellsworth to Lars Jensen, Sept. 24, 2020 (on file with author).

Beyond distributing his handout during the Math Summit, Jensen has been an outspoken critic of the TMCC administration. In February 2018, the TMCC Chapter of the Nevada Faculty Alliance, for which Jensen served as Treasurer, shared a list of faculty concerns including violations of the First Amendment rights of other faculty members and an erosion of shared governance at TMCC.[4] Jensen also spoke at a meeting of the Board of Regents in June 2019 at which he alleged that TMCC had been using its phase-in retirement policy as a retaliatory tool against certain faculty members.[5]

After the Math Summit, Jensen received his first unsatisfactory annual review.[6] Despite Jensen's department chair agreeing that Jensen's performance had been excellent, Dean Ellsworth overrode that rating. She cited insubordination by Jensen due to his distribution of handouts at the Math Summit, as well as a dispute over a requested change to his course syllabus.

Jensen received his second unsatisfactory annual review on April 1, 2021. Again, Jensen's department chair rated Jensen's performance as excellent, but Flesher rated his performance as unsatisfactory.[7] Flesher cited Jensen's "persistent and continual defiance to the dean's supervisory role." Flesher attached a report elaborating on how Jensen's purported insubordination stemmed from disputes about his annual plan, his syllabus, and his failure to complete Canvas training on time. Critically, because this was his *second* unsatisfactory review, there were grounds for Jensen's termination, as Nevada System of Higher Education (NSHE) Code creates grounds for termination for faculty who receive two such reviews in consecutive years.[8]

On June 30, 2021 Jensen received a charging letter and notice of hearing, notifying him that he was being considered for termination due to two consecutive unsatisfactory annual reviews, as well as violations of another policy prohibiting insubordination and other general catch-all provisions.[9]

## II.  The First Amendment Bars TMCC from Punishing Jensen for the Flyers

Jensen's distribution of flyers at the board meeting was protected by his First Amendment right to comment as a citizen on matters of public concern, and TMCC cannot use it as grounds for termination.

---

[4] Nevada Faculty Alliance – TMCC Chapter, *TMCC-NFA List of Faculty Concerns* (Feb. 20, 2018) (on file with author).

[5] Lars Jensen, Phased In Retirement Plan Abused at TMCC (June 9, 2019) (on file with author).

[6] Annual Performance Evaluation for Academic Faculty, Lars Jensen (May 19, 2020) (on file with author).

[7] Annual Performance Evaluation for Academic Faculty, Lars Jensen (April 1, 2021) (on file with author).

[8] NSHE Code Title 2, section 5.13.2(b).

[9] Notice of Hearing in the Matter of Discipline of Dr. Lars Jensen (June 30, 2021) (on file with author).

### A.    Jensen's public criticism of TMCC is protected expression.

It has long been settled law that the First Amendment is binding on public colleges like TMCC.[10] Accordingly, the decisions and actions of a public college or university—including the pursuit of disciplinary sanctions in response to faculty members' protected speech—must be consistent with the First Amendment.

Faculty members at public colleges do not "relinquish First Amendment rights to comment on matters of public interest by virtue of government employment,"[11] but instead retain a right to speak as private citizens on matters of public concern. This includes the well-established right to distribute pamphlets, one of the "most effective instruments in the dissemination of opinion."[12]

In distributing his handouts, it was clear that Jensen was speaking as himself, not on behalf of TMCC. The "critical question" in determining whether the speech was that of an employee or private citizen is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."[13] Ordinarily, faculty are employed by institutions of higher education to teach students, produce scholarship, and provide service to the institution. Colleges typically do not employ their faculty to speak at community college board meetings about the details of its retirement policies or comment on the value of the education a community is receiving.

Similarly, Jensen's handouts address matters of public concern. The discussion of TMCC standards was framed around the fact that taxpayers within the community expect their money to go toward producing qualified graduates, and that employers place a premium on graduates with a great degree of aptitude in mathematics.

### B.    TMCC Presented No Facts Showing that Jensen's Speech was Actually Disruptive.

To determine whether a public employee's speech as a private citizen on a matter of public concern is protected by the First Amendment, courts must "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[14] The public employer must demonstrate that the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes

---

[10] *Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'") (internal citation omitted).

[11] *Connick v. Myers*, 461 U.S. 138, 140 (1983).

[12] *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. Of Stratton*, 536 U.S. 150, 162 (2002) (quoting *Schneider v. New Jersey*, 308 U.S. 147, 164 (1939)).

[13] *Lane v. Franks*, 573 U.S. 228, 240 (2014).

[14] *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

the performance of the speaker's duties or interferes with the regular operation of the enterprise."[15] Moreover, the "desire to maintain a sedate academic environment does not justify limitations on a teacher's freedom to express [himself] on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms."[16]

After distributing his handout, Jensen continued teaching for the remainder of the school year without disruption among his colleagues. While it is possible that Jensen's handout may have stirred some disagreement among his colleagues, there is no evidence that the handouts created an actual disruption during or after their distribution. The allegations against Jensen stem entirely from his rejection of the request that he post his comments to one specific location. The details of the charges against him did not say that he took speaking time from anyone else or that he prevented others from proceeding with their professional development at the Math Summit. Ellsworth's argument that, by distributing his handouts after he was asked not to, Jensen created a disruption *per se* is unsubstantiated by the facts.[17] Indeed, Ellsworth herself acknowledged that participants at the Math Summit had "numerous loose-leaf handouts."[18] One more to add to the stack could not have created a disruption, and concerns about confusion over the sources of various papers are unfounded because each faculty member would have taken the handout from Jensen himself. This *de minimis* burden on the institution is insufficient to overcome a public employee's strong free speech interests in "handing literature to one willing to receive it."[19] Therefore, Jensen's handouts are protected by the First Amendment.

It is also important to note that Jensen's own department chair rated his performance as satisfactory for both the 2019-20 and 2020-21 academic years. According to those who work most closely with him, Jensen was able to professionally execute his duties as a teacher and colleague, and none cited an inability of his colleagues to do the same based on anything relating to Jensen. It was only after he began criticizing TMCC's administration through his handout, public comments at a board meeting, and union activities that Dean Ellsworth and Dean Flesher stepped in and overrode the assessment of Jensen's department chair with an unsatisfactory review.

### C.   *Jensen's termination cannot be premised on a retaliatory purpose.*

While a public college might lawfully decline to renew a contract for no reason at all, it cannot decline to renew a faculty member's contract for a retaliatory purpose, including for speech protected by the First Amendment.[20]

Here, the charges against Jensen arose in the context of his public criticism. The charges are based on his receiving two consecutive unsatisfactory annual reviews. However, the first of

---

[15] *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); *see also Nichols v. Dancer*, 657 F.3d 929, 933 (9th Cir. 2011).

[16] *Rodriguez v. Maricopa Cnty. Comm. Coll. Dist.*, 605 F.3d 703, 708–09 (9th Cir. 2009).

[17] Letter from Dean Julie Ellsworth to Lars Jensen, Sept. 24, 2020 (on file with author).

[18] *Id.*

[19] *Schneider v. New Jersey*, 308 U.S. 147, 162 (1939).

[20] *Perry v. Sindermann*, 408 U.S. 593, 598 (1972) ("[T]he nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights") (internal citations omitted).

ER176

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 176 of 298
Case 3:22-cv-00045-ART-CLB   Document 30-4   Filed 04/13/22   Page 7 of 7

6

those two unsatisfactory reviews rested entirely upon Jensen's constitutionally protected distribution of handouts at the Math Summit. If he had not received that first unsatisfactory review, there would be no grounds for his termination, regardless of the reasons for the other unsatisfactory review (the merits of which are not conceded here).[21] Accordingly, TMCC's decision to charge Jensen and proceed to a disciplinary hearing necessarily arises from his protected expression, and TMCC bears the "burden of proof . . . to demonstrate that it would have reached the same decision even if the [professor] had not engaged in the protected" expression.[22] Because the college cited no other reasons for Jensen's first unsatisfactory review, and because two negative reviews are required to trigger termination, it has not met that burden.

## III.  <u>Conclusion</u>

TMCC is proceeding with a termination hearing against Jensen because he received two consecutive unsatisfactory annual reviews, but one of those reviews rests on Jensen's distribution of handouts commenting on matters of public concern. The speech that generated that unsatisfactory review is clearly protected. Accordingly, Jensen's termination, based on receiving consecutive unsatisfactory annual reviews, would violate his First Amendment rights.

Given the urgent nature of this matter, we request receipt of a response to this letter no later than the close of business on October 15, 2021, confirming that TMCC will not pursue disciplinary sanctions in this matter.

Sincerely,

Joshua Bleisch
Faculty Legal Defense Fund Fellow

Cc:     Julie Ellsworth, Dean, Life Sciences, Allied Health and Public Safety Division
        Anne Flesher, Dean, Math and Physical Sciences Division
        Estella Gutierrez, Vice President of Student Services and Diversity
        Jeffrey Alexander, Vice President of Academic Affairs

Encl.

---

[21] *See* NSHE Code Title 2, section 5.13.2(b).

[22] *Lindsey v. Bd. of Regents of Univ. Sys. of Ga.*, 607 F.2d 672, 676 (5th Cir. 1979).

# EXHIBIT E

**Letter to President Hilgersom from Keith Whittington**

# EXHIBIT E



October 22, 2021

Dear President Hilgersom,

The Academic Freedom Alliance (AFA) is a coalition of faculty members from across the country and across the ideological spectrum who are committed to upholding the principles of academic freedom and professorial free speech.

We are concerned about Truckee Meadows Community College's handling of a dispute with Professor Lars Jensen. On January 21, 2020, Professor Jensen participated in the Math Summit that was part of the college's professional development activities. Professor Jensen had felt a growing concern about changes in the math curriculum and the maintenance of academic standards, and he attempted to express those concerns at the summit. His remarks were cut off in order to adhere to the event's tight schedule, and he subsequently attempted to distribute a handout with his core points to the participants during a break period. He was asked not to distribute the flyers by hand by Dean Julie Ellsworth but was instead instructed to leave one copy of his handout at "The Parking Lot," where participants could write questions and comments on sticky notes. Since Professor Jensen had hoped to convey his remarks not only to the administration but to the assembled participants, he continued to distribute his flyer during the break. Professor Jensen has spoken out on other occasions as well to express his discontent with the administration of the college. Professor Jensen subsequently received a letter of reprimand from Dean Ellsworth for "insubordination" and "intentional disruption" of an event. Dean Ellsworth then overrode his department chair's excellent rating on Professor Jensen's annual performance review, giving him instead an unsatisfactory rating because of his insubordination. The dean likewise cited Professor Jensen's "persistent and continual defiance to the dean's supervisory role" in overruling the chair to give an unsatisfactory rating in a second annual review in 2021. Because two consecutive unsatisfactory reviews create grounds for termination, he is now being subjected to proceedings to reach that result.

I write on behalf of the Academic Freedom Alliance to express our concern with the college's present course of action. The unsatisfactory performance reviews that provide the legal basis for his possible termination were explicitly grounded in part on Professor Jensen's constitutionally protected speech. As a consequence, the disciplinary hearings raise grave concerns that Professor Jensen is being retaliated against for his constitutionally protected criticism of the college's administration and efforts to communicate his concerns about the academic functioning of the college to his colleague and to other interested parties.

It is well established that state universities like Truckee Meadows Community College are constrained by the First Amendment of the U.S. Constitution. Professors at state universities enjoy certain First Amendment protections relative to their university employer, and state



universities cannot discipline or sanction members of their faculty for constitutionally protected speech. In particular, the U.S. Supreme Court observed in *Connick v. Myers*, 461 U.S. 138, 140 (1983) that "a public employee does not relinquish rights to comment on matters of public interest by virtue of government employment." As the Court said in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 509 (1969), mere "apprehension of disturbance is not enough to overcome the right to freedom of expression" and "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" cannot be the grounds for suppressing speech in an educational environment. For a university professor, those rights to comment include the right to criticize university administrators and university policies. As federal courts have noted, the "desire to maintain a sedate academic environment" is insufficient "to justify limitations on a teacher's freedom to express himself on political issues" or to engage in "political agitation as a citizen – even on the campus itself." *Adamian v. Board of Regents*, 523 F.2d 929, 934 (9th Cir. 1975).

The Supreme Court has sharply limited the circumstances in which a government employee can be disciplined for his constitutionally protected speech. When speaking as a private citizen on a matter of public concern, as Professor Jensen has done, the employee should be free from sanction by his government employer unless it can be demonstrated that the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operations of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). The Court has long been particularly solicitous of the peaceful distribution of leaflets as a core First Amendment activity. *Lovell v. City of Griffin*, 303 U.S. 444 (1938). There appears to be no serious evidence that Professor Jensen's expressive activities disrupted the Math Summit or otherwise impeded the performance of his or his colleagues' duties at the college.

For Professor Jensen to face the possible termination of his employment in part on the basis of and in retaliation for his constitutionally protected speech would violate his First Amendment rights. Under the circumstances, we call on the college to end its proceedings against him.

Sincerely,

Keith Whittington
Chair, Academic Committee, Academic Freedom Alliance
William Nelson Cromwell Professor of Politics, Princeton University

ER180

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 180 of 298
Case 3:22-cv-00045-ART-CLB   Document 31   Filed 04/13/22   Page 1 of 4

John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff Lars Jensen*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LARS JENSEN, an individual,

      *Plaintiff,*

  v.

NATALIE BROWN, in her individual and official capacities as Administrative Officer at Truckee Meadows Community College; JULIE ELLSWORTH, in her individual and official capacities as Dean of Sciences at Truckee Meadows Community College; ANNE FLESHER, in her individual and official capacities as Dean of Math and Physical Sciences at Truckee Meadows Community College; KARIN HILGERSOM, in her individual and official capacities as President of Truckee Meadows Community College; MARIE MURGOLO, in her individual and official capacities as Vice President of Academic Affairs at Truckee Meadows Community College; MELODY ROSE, in her individual and official capacities

Case No. 3:22-cv-00045-MMD-CLB

**DECLARATION OF DAVID K. DEMERS**

as Chancellor of the Nevada System of Higher
Education,

           *Defendants.*

## DECLARATION OF DAVID K. DEMERS

I, David K. Demers, declare:

1.     I taught full-time in the Edward R. Murrow College (formerly a School) of

Communication at Washington State University from August 1996 to December 2012. I was

tenured and promoted to associate professor of communication in 1999.

2.     In 2009, I filed a federal free speech lawsuit against four WSU administrators.

The Ninth Circuit Court of Appeals issued its final opinion in the case on January 29, 2014

[*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014)].

3.     The Ninth Circuit ruled that a controversial 7-Step Plan I had created in 2007 to

improve the quality of my School (now a College) was protected speech under the First

Amendment. The 7-Step Plan contained seven recommendations and was four 5.5-by-8.5-inch

pages long.

4.     In 2007, I printed the 7-Step Plan flier on my laser jet printer and personally

distributed it via postal mail, e-mail or in person to news media in Washington state, faculty,

administrators, newspaper publishers, and the public. The 7-Step Plan was never published in an

academic journal or book or any other scholarly outlet before the Ninth Circuit Court ruling.

///

///

///

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:  *April 6, 2022*

By:  _____
David K. Demers

## INDEX OF EXHIBITS

| Exhibit # | Description | Number of Pages |
|-----------|-------------|-----------------|
| A | 7-Step Plan | 1 |

# EXHIBIT A

**7-Step Plan**

# EXHIBIT A

# A 7-Step Plan for improving the quality of the Edward R. Murrow School of Communication and making it Financially Independent

### And a $100,000 donation to Kick off a Fund-Raising Campaign



Prepared by
Marquette Books LLC
Spokane, Washington

ase 3:23-2545, 02/19/2024, DktEntry: 12.1, Page 186 of 298
Case 3:22-cv-00045-ART-CLB Document 31-1 Filed 04/13/22 Page 3 of
ER186

Dr. Elson Floyd, President
422 French Administration
Washington State University
Pullman, Washington 99164-1048

Dear Dr. Floyd:

The purpose of this plan is to show how Washington State University can turn the Edward R. Murrow School of Communication into a revenue-generating center for the university and, at the same, improve the quality of the program itself.

To initiate a fund-raising campaign to achieve this goal, my company and I would like to donate $100,000 in unrestricted funds to the university.*

This proposal does NOT require that the School be transformed into a college at WSU or become independent of the College of Liberal Arts. Its purpose is to show why the School, unlike other mass communication programs, has failed to generate significant support and donations from mass media professionals and businesses (i.e., those associated with the production of television and radio programming, newspaper content, and public relations and advertising messages) **AND** how this problem can be corrected.

The university has encouraged faculty and administrators to develop partnerships with private business and industry. This plan seeks to implement that goal. However, even if all aspects of the plan do not fit well into university goals, some elements may be useful, and I encourage university administrators to consider them.

Thank you for considering this proposal.

Respectfully yours,

Dr. David Demers, Publisher**
Marquette Books LLC
3107 East 62nd Avenue
Spokane, Washington 99223
509-443-7057
www.MarquetteBooks.com
demers@marquettebooks.com

*This plan was sent to Provost Robert Bates on January 16, 2007. He never responded. College of Liberal Arts Dean Erich Lear looked at the plan and turned it over to Murrow School interim director Erica Austin several weeks ago. She has not responded.

**Demers also is associate professor of communication at Washington State University. Marquette Books LLC is a book/journal publishing company that he operates in his spare time. It has no ties with nor does it use any of the resources at Washington State University.

## Brief Background

The relationship between mass communication programs (e.g., journalism, broadcasting, public relations, advertising) and the academy in general has always been a rocky one. The first print journalism programs emerged in the early 1900s, mostly at Midwestern universities and colleges, and were staffed largely with teachers who had professional backgrounds (former journalists and editors). As the years passed, increasing pressure was placed on journalism and other related programs (broadcasting, public relations, advertising) to "scholarize" their faculty — that is, to hire faculty who had earned Ph.D. degrees in the social sciences and conduct research. At the same time, the programs began hiring fewer teachers with professional experience.

As the number of Ph.D.s increased, so did the tension within these departments. Some historians have referred to this as the era of the "green eyeshades" versus the "chi-squares." Not unexpectedly, at larger research-oriented universities, the Ph.D.s won the battle and today most of the faculty teaching in mass communication programs at research-oriented universities have the Ph.D.

Needless to say, this turn of events alienated many professionals and media-related businesses. Students were required to take more theory and conceptual courses and fewer skills-based courses, such as writing and reporting. Professionals complained more and more that the writing skills of university graduates were declining. The close relationship universities once had with the professional community was disappearing. The Ph.D. professor had become the enemy rather than the ally of the professional community. In fact, in 1997, when one newly hired Ph.D. journalism professor at WSU asked a newspaper publisher in Washington state why other publishers in the Pacific Northwest Newspaper Publishers Association were unwilling to forge closer ties with the Edward R. Murrow School of Communication, the publisher replied: "Don't you know? You have a Ph.D."

The relationship between the professional community and mass communication programs deteriorated even further at some universities when, as a cost-cutting move, they merged communication studies departments with mass communication programs during the 1980s and 1990s. The former were staffed almost exclusively with Ph.D.s and had a more humanist, critical orientation than the empirically based mass communication Ph.D.s. At The Ohio State University and other schools, the mergers even led to elimination or diminution of some professional programs.

Of course, not all research-oriented universities have gutted their professional programs. The University of Illinois at Champaign-Urbana has one of the strongest professional programs in the country. Most of the faculty there have professional backgrounds. Even the Dean is a former professional whose highest earned degree is a bachelor's. (Most of the Ph.D.s are in a separate unit called the Institute of Communications Research. This separation, by the way, helps reduce conflict between the groups.)

About five years ago, the University of Minnesota, in an effort to bolster donations from the professional community, also "professionalized" its journalism and mass communication program. The University of Oregon also has many faculty with professional backgrounds. The journalism program recently received a gift of $4 million to create an endowed chair in writing and reporting; has three other endowed chairs in public relations, advertising and administration; and has a $2 million journalism endowment fund.

WSU receives many generous scholarships from mass media organizations in the Pacific Northwest, but it has no endowed chairs or funds and the total amount of donations generated at WSU pales in comparison with the giving at Oregon and other places. In fact, some scholars have even speculated that the School of Communication at WSU generates less foundation money per graduating student than any other professional program in the country.

There is little question that lack of trust one of the most important reasons media businesses have been reluctant to provide more support for WSU. The 7-step plan outlined in this report is offered to help correct that situation and improve the quality of education at the School.

# The Seven-Step Plan

1. **Separate the mass communication program from the communication studies program at WSU — i.e., create two separate units.** This will send a very strong message to the professional/business community that WSU is committed to enhancing its undergraduate program in mass communication. Communication studies should retain the current graduate program (M.A. and Ph.D.), which does not contain a professional component. The "new" mass communication program should continue to use the "Edward R. Murrow" name and should develop its own master's and Ph.D. programs in mass communication.

2. **Hire a director of the Edward R. Murrow School of Communication who has a strong professional background.** She or he should be someone who draws respect from the professional/ business community. Ideally, the candidate also would possess a Ph.D., but professional experience is more important for the School to improve its relations with the professional community. The professional community should be allowed to play an active role in the hiring process.

3. **Create an Edward R. Murrow Center for Media Research that conducts joint research projects with the professional community.** Among other things, the Center could conduct on-going public opinion polls at election time (creates visibility) and offer low-cost research services to media organizations (e.g., omnibus surveys). The activities of the center could be tied to courses that focus on research at the undergraduate and graduate level. Research-oriented faculty should play a key role in developing and staffing the Center. The Center also should develop non-accredited educational programs with the help of the professional community that enhance the careers of media professionals.

4. **Give professionals an active (rather than the current passive) role in the development of the curriculum in the School.** The current Advisory Board could be used for this purpose. On several occasions in the past, some faculty have expressed opposition to this idea, and the ideas of professionals rarely have much impact on the curriculum. Separating the

units (see No. 1 above) should enhance the role of professionals.

5. **Give professional faculty a more active role in the development of the undergraduate curriculum for mass communication students.** Currently, Ph.D. faculty dominate discussions at faculty meetings, and the focus is often on the graduate program. Some professional faculty are sometimes afraid to speak because they do not have tenure. Separating the units and hiring a professionally oriented director will solve this problem.

6. **Seek national accreditation for the "new" mass communication programs.** The University of Oregon boasts that it is the only program in the West to have six nationally accredited programs in mass communication. National accreditation would enhance the quality and visibility of the School at WSU.

7. **Hire more professional faculty with substantial work experience.** Only several faculty currently in the School of Communication have 10 or more years experience in media-related industries. More depth of experience would enhance the quality of the undergraduate program.



ER188

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 189 of 298
Case 3:22-cv-00045-ART-CLB   Document 32   Filed 04/13/22   Page 1 of 4

ER189

John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff Lars Jensen*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LARS JENSEN, an individual, <br><br>         *Plaintiff,* <br>    v. <br><br> NATALIE BROWN, in her individual and official capacities as Administrative Officer at Truckee Meadows Community College; JULIE ELLSWORTH, in her individual and official capacities as Dean of Sciences at Truckee Meadows Community College; ANNE FLESHER, in her individual and official capacities as Dean of Math and Physical Sciences at Truckee Meadows Community College; KARIN HILGERSOM, in her individual and official capacities as President of Truckee Meadows Community College; MARIE MURGOLO, in her individual and official capacities as Vice President of Academic Affairs at Truckee Meadows Community College; MELODY ROSE, in her individual and official capacities as Chancellor | Case No. 3:22-cv-00045-ART-CLB <br><br> **DECLARATION OF LARS JENSEN** |

of the Nevada System of Higher Education,

   *Defendants.*

## DECLARATION OF LARS JENSEN

I, Lars Jensen, declare:

1.      On January 21, 2020, the same day of the TMCC Math Summit where I was prevented from voicing my concerns about TMCC's implementation of the Regent's corequisite mandate (Title 4, Ch. 16, Section 1 of the NSHE Handbook), I sent my concerns in an email to the TMCC All Discussions listserv which is sent to as many as 1500 TMCC email addresses. See Exhibit A

2. On January 23, 2020, two days after the TMCC Math Summit where I was prevented from voicing my concerns about TMCC's implementation of the Regent's corequisite mandate (Title 4, Ch. 16, Section 1 of the NSHE Handbook), I sent my concerns in an email to the TMCC All Professional listserv which is read by 347 TMCC Faculty and Administrators. See Exhibit B

3. Later on January 23, 2020, I sent my concerns in an email to all regents and to the Chancellor. The email included a copy of the handout I distributed at the Math Summit.  A copy of the same email was sent the same day to Reno Gazette Journal reporter Siobhan McAndrew, Las Vegas Review Journal reporter Alexandra Appleton, Las Vegas Sun reporter Miranda Wilson, and This Is Reno reporter Bob Conrad. See Exhibit C

///

///

///

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

DATED:   4/10/22

By: _____
Lars Jensen

## INDEX OF EXHIBITS

| Exhibit # | Description | Number of Pages |
|---|---|---|
| A | Lars Jensen email to TMCC All Discussions listserv on January 21, 2020 | 1 |
| B | Lars Jensen email to TMCC All Professional listserv on January 23, 2020, with response from Brian Wells on January 26, 2020 | 3 |
| C | Lars Jensen emails to all regents, Chancellor Rose, reporter Siobhan McAndrew, reporter Aleksandra Appleton, reporter Miranda Wilson, and reporter Bob Conrad on January 23, 2020 | 4 |

# EXHIBIT A

**Lars Jensen email to TMCC All Discussions listserv on Jan. 21, 2020**

# EXHIBIT A

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 194 of 298

ER194



Lars Jensen <ljensen@tmcc.edu>

---

## On the Math Co-requisite Pathways - What Everyone Needs to Know

**Lars Jensen** <ljensen@tmcc.edu>                                         Tue, Jan 21, 2020 at 8:25 PM
To: "[ALLDISCUSSIONS-G]" <alldiscussions-g@tmcc.edu>

## Dear Colleagues

Please find below a summary of how the Math Department has decided to carry out the Regents' mandate on the co-requisite pathways (Title 4, Ch. 16, Section 1 of the NSHE Handbook). The summary was distributed to participants at today's professional development Math Summit, but it should be known to everyone in our local community, particularly to faculty at TMCC and in NSHE, local employers, students and parents: If the implementation of the policy proposed by the TMCC Math Department is put in effect, we will see an irreversible change in the academic skill level of our graduates which will negatively impact 31% of our certificate- and degree programs. Everyone n the local community, especially faculty in charge of these programs, as well as local employers who hire our graduates, ought to be properly informed about the proposed changes and given a chance to comment. Unfortunately I'm not aware of any initiatives taken to make this happen. Hence the reason for this post. Comments are welcome.

Sincerely,
Lars Jensen
TMCC Math Department

## On the Math Pathways – Looking Under the Hood

### Summary

- **Graduating High School from Washoe County School District** requires students to pass Algebra 1, Geometry, and Algebra 2. (Algebra 1 is the same as Math 95, Algebra 2 is the same as Math 96).

- **The Regents Mandate:** Put all students into a college level math class, possibly with an additional 1-3 co-requisite credits to fill any holes students may have in Algebra 1-2 or Geometry.

- **Math Department Response to the Mandate:** The department has decided that the mandate cannot be carried out without a drop in completion rates if we maintain the current academic level of Math 120. Therefore the department has decided to lower the academic level of Math 120 so students will be able to complete the course at current rates. (The department has allowed completion rates to dictate the academic level of an exit math course.)

- **What is the Level of the New Math 120?** In the words of the departmental Math 120 co-requisite committee, "*...a student completing Math 120 may be ready for Math 95.*" Paraphrasing, this means that "*a student graduating from college may be ready for middle school math.*" (This is an absurd statement. The department has decided to comply with the Regent's mandate by lowering the academic level of its classes. This is in clear violation of the intent of the Regents' mandate.)

- **Impact on Our Degree- and Certificate Programs:** The lower academic skills of Math 120 completers will directly impact 31% of our degree- and certificate programs by lowering the math- and technical skills of graduates in these programs.

- **Impact on the Community:** Employers in the community pays our salaries, and subsidizes students' education, through their taxes. *What do they expect in return*? Answer: *Qualified graduates.* It is well known that employers, including all the high-tech companies coming into our area, value math skills because the more math classes a student has taken, the higher salary an employer will pay. Well, employers will soon get much less than they have been paying for. TMCC is planning to do the exact opposite of what the community wants: We are going to lower the level of our exit classes and the math skills of our graduates, in the name of preserving completion rates.

--
**Public Records Notice:** In accordance with Nevada Revised Statutes (NRS) Chapter 239, this email and responses, unless otherwise made confidential by law, may be subject to the Nevada Public Records laws and may be disclosed to the public upon request.

ER194

# EXHIBIT B

**Lars Jensen email to TMCC All Professional listserv on Jan. 23, 2020, with response from Brian Wells on Jan. 26, 2020**

# EXHIBIT B

Case: 23-2545  02/19/2024  DktEntry: 12.1  Page 196 of 298
Case 3:22-cv-00045-ART-CLB  Document 32-2  Filed 04/13/22  Page 2 of 4

ER196



**TMCC**

Lars Jensen <ljensen@tmcc.edu>

## Re: [ALLPROFESSIONAL-L] Lowering of academic Standards and "Confusion about our Roles"

1 message

**Brian Wells** <bwells@tmcc.edu>                                    Sun, Jan 26, 2020 at 1:19 PM
To: Lars <ljensen@tmcc.edu>
Cc: All Professional Employees <ALLPROFESSIONAL-L@listserv.tmcc.edu>

A note about a comment Lars made about Faculty "being confused about their roles".

We are required to be  "subject matter experts", but we have found ourselves requiring the skills of stand-up comedians and motivational speakers. These open enrollment students seem to need those skills from us or they "check-out" with their electronics or stop attending college altogether. Education at TMCC does't seem to bring students up to academic and professional standards anymore... academic and professional standards are being lowered to meet them. Think about that for a minute...let it soak in (to use a topical phrase).

As if that weren't enough, now utilizing expensive software packages like "Starfish", we're being requested (tacitly) to perform the role of "social workers" to assess whether a student is homeless or food deprived as well as other "markers" or "tracks". We are being asked to do things we are not qualified to do, even IF they are supposed to be our duties, which they are not.  Heck, because of all this, I am going to add the line "customer service representative" on my CV.

Two separate TMCC faculty members, in addition to Lars' mention of faculty roles, have pointed out to me that our responsibilities and roles seem to be ever increasing, yet none of those roles are recognized by institutional or system leadership, or recognized as being listed as official duties of our positions. These additional duties are not compensated for whatsoever, yet we are both overtly and tacitly "encouraged" (ahem) that they are requirements in order to maintain enrollment and requirements of our jobs. In fact, our purchasing power has decreased over the 12 years because we have not received any raises except equity adjustments and cola since 2007! (It should be noted that a 2% COLA per annum is a 1% decrease in relative purchasing power over the same time period because the cost of living increases by 3% each year on average.

While 30,000 new people have moved to the region this last year alone, the only increases in enrollment are reportedly found in offering special scholarships such as the Promise Scholarship, and others. Since few new attendees except those scholarship recipients are enrolling, the only way this "listing" ship stays afloat is by keeping the students we have via the many "rates" we are tasked to track, support and address, such as persistence, attendance, attrition, graduation and others. Bean count in = bean count out. I still don't know why TMCC can't sell to the general public our transferable classes which cost 30% of UNR's costs, especially when the national discussion about post-secondary education is about cost.

Meanwhile morale has plummeted (I wonder why?), senior and experienced faculty and staff are leaving TMCC, paddling their lifeboats through choppy waters, hoping for calm and security on distant shores. (I know, I know... it ain't easy being cheesy).

By decreasing our academic standards, it seems like the system, that already apparently thinks of us as an "advanced high school for dummies" is now mandating that we prove it to them by removing remedial education classes and lowering standards in Math and English.

I think I made my points and offered enough examples to support the assertions, and I hope I wasn't too "liberal" with my metaphors (or similes) and other slightly hyperbolic, nautical rhetoric.

----------------------------
**Brian Wells, MFA.**
Professor, Graphic Arts & Media Technology
Visual and Performing Arts Department
Truckee Meadows Community College
7000 Dandini Blvd. Reno, NV. 89512
Ph. (775) 673-8223

FAX (775) 674-4854

https://chroniclevitae.com/people/5798-brian-wells/profile

http://www.mindfulwhim.com

"We have, at the outset, the ability to live an infinite number of types of lives, but in the end, we live only one."

-Author Unknown

"The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persona or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer."

On Thu, Jan 23, 2020 at 9:42 AM Lars <ljensen@tmcc.edu> wrote:

# Dear Colleagues

Please find below a summary of how the Math Department has decided to carry out the Regents' mandate on the co-requisite pathways (Title 4, Ch. 16, Section 1 of the NSHE Handbook). The summary should be known to everyone in our local community, particularly to faculty at TMCC and in the NSHE, local employers, students and parents: If the implementation of the mandate proposed by the TMCC Math Department is put in effect, we will see an irreversible change in the academic skill level of our graduates which will negatively impact 31% of our certificate- and degree programs. All stakeholders including those mentioned above, ought to be properly informed about the proposed changes and given an opportunity to comment. Unfortunately I'm not aware of any initiative taken to make this happen.

# On the Math Pathways at TMCC – A Look Under the Hood

## Summary

- **Graduating from Washoe County School District** requires students to pass Algebra 1, Geometry, and Algebra 2. ( Algebra 1 is the same as Math 95, Algebra 2 is the same as Math 96).

- **Regents' Mandate:** Put all students into a college level math class, possibly with 1-3 co-requisite credits added on to fill any holes they may have in Algebra 1-2 or Geometry. (Title 4, Chapter 16, Section 1 of the NSHE Handbook.)

- **The TMCC Math Department Response to the Mandate:** The department has determined that the mandate will result in a drop in completion rates if we maintain the current academic level of Math 120. Therefore the it has decided to soften the course and lower the academic level and rigor of Math 120 so that students will be able to complete the course at current rates. (In other words, the department has allowed completion rates to dictate the academic level of an exit math course. This a clear violation of the intent of the mandate.)

- **What is the Level of the New Math 120?** In the words of the departmental Math 120 co-requisite committee, "...*a student completing Math 120 may be ready for Math 95.*" Paraphrasing, this means that "*a student graduating from college may be ready for middle school math.*" (This is an absurd statement – it essentially says that students will exit college with less skills that they were supposed to enter with. It is a clear violation of the intent of the mandate.)

- **Impact on Our Degree- and Certificate Programs:** The lower academic skills of Math 120 completers will directly impact 31% of our degree- and certificate programs by lowering the math- and technical skills of graduates in these programs.

- **Impact on the Community:** Employers in the community pays our salaries, and subsidizes students' education, through their taxes. *What do they expect in return*? Answer: *Qualified graduates*. It is well known that employers, including the high-tech companies coming into our area, value math skills because statistics has shown that the more math classes a student has taken, the higher salary an employer will pay. Employers will soon get much less than they have been paying for. TMCC is planning to do the exact opposite of what the community wants: We are going to lower the level of our exit classes and the math skills of our graduates, in the name of preserving completion rates.

Why is this happening at TMCC? If you ask me, I have little doubt that it is due to the poisonous chemistry that results when the state funding formula for NSHE institution is combined with a lack of presidential leadership over the years

which has filtered down through the levels of the institution and helped create an atmosphere of fear at the college. This poisonous mixture has not been good for academic standards.


Sincerely,
Lars Jensen
TMCC Math Department



--
**Public Records Notice:** In accordance with Nevada Revised Statutes (NRS) Chapter 239, this email and responses, unless otherwise made confidential by law, may be subject to the Nevada Public Records laws and may be disclosed to the public upon request.

--

**Public Records Notice:** In accordance with Nevada Revised Statutes (NRS) Chapter 239, this email and responses, unless otherwise made confidential by law, may be subject to the Nevada Public Records laws and may be disclosed to the public upon request.

ER199

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 199 of 298
Case 3:22-cv-00045-ART-CLB   Document 32-3   Filed 04/13/22   Page 1 of 5

# EXHIBIT C

**Lars Jensen emails to all regents, Chancellor Rose, reporter Siobhan McAndrew, reporter Aleksandra Appleton, reporter Miranda Wilson, and reporter Bob Conrad on January 23, 2020**

# EXHIBIT C



Lars Jensen <ljensen@tmcc.edu>

---

## Co-requisite Pathways and the Lowering of Standards -- What Everyone Needs to Know
5 messages

---

**Lars** <ljensen@tmcc.edu>                                                                   Thu, Jan 23, 2020 at 10:13 AM
To: jgeddes@nshe.nevada.edu, mdoubrava@nshe.nevada.edu, pcarter@nshe.nevada.edu, acarvalho@nshe.nevada.edu, cdelcarlo@nshe.nevada.edu, thayes@nshe.nevada.edu, slieberman@nshe.nevada.edu, cmcadoo@nshe.nevada.edu, dmcmichael@nshe.nevada.edu, jmoran@nshe.nevada.edu, kpage@nshe.nevada.edu, lperkins@nshe.nevada.edu, rtrachok@nshe.nevada.edu
Cc: chancellor@nevada.edu, cabba@nshe.nevada.edu, tmeek@nshe.nevada.edu
Bcc: Julia Hammett <JHammett@tmcc.edu>, Scott Huber <shuber@tmcc.edu>

## Dear Regents

Please find below a summary of how the TMCC Math Department has decided to carry out the Regents' mandate on the co-requisite pathways (Title 4, Ch. 16, Section 1 of the NSHE Handbook). The summary should be known to everyone in our local community, particularly to faculty at TMCC and in the NSHE, local employers, students and parents: If the implementation of the mandate proposed by the TMCC Math Department is put in effect, we will see an irreversible change in the academic skill level of our graduates which will negatively impact 31% of our certificate- and degree programs. All stakeholders including those mentioned above, ought to be properly informed about the proposed changes and given an opportunity to comment. Unfortunately I'm not aware of any initiative taken to make this happen.

# On the Math Pathways at TMCC – A Look Under the Hood

## Summary

- **Graduating from Washoe County School District** requires students to pass Algebra 1, Geometry, and Algebra 2. ( Algebra 1 is the same as Math 95, Algebra 2 is the same as Math 96).

- **Regents' Mandate:** Put all students into a college level math class, possibly with 1-3 co-requisite credits added on to fill any holes they may have in Algebra 1-2 or Geometry. (Title 4, Chapter 16, Section 1 of the NSHE Handbook.)

- **The TMCC Math Department Response to the Mandate:** The department has determined that the mandate will result in a drop in completion rates if we maintain the current academic level of Math 120. Therefore the department has decided to soften the course and lower the academic level and rigor of Math 120 so that students will be able to complete the course at current rates. (In other words, the department has allowed completion rates to dictate the academic level of an exit math course. This a clear violation of the intent of the mandate.)

- **What is the Level of the New Math 120?** In the words of the departmental Math 120 co-requisite committee, "...*a student completing Math 120 may be ready for Math 95.*" Paraphrasing, this means that "*a student graduating from college may be ready for middle school math.*" (This is an absurd statement – it essentially says that students will exit college with less skills that they were supposed to enter with. This is in clear violation of the intent of the mandate.)

- **Impact on Our Degree- and Certificate Programs:** The lower academic skills of Math 120 completers will directly impact 31% of our degree- and certificate programs by lowering the math- and technical skills of graduates in these programs.

- **Impact on the Community:** Employers in the community pays our salaries, and subsidizes students' education, through their taxes. What do they expect in return? Answer: Qualified graduates. It is well known that employers, including the high-tech companies coming into our area, value math skills in particular because statistics has shown that the more math classes a student has taken, the higher salary an employer will pay. Employers will soon get much less than they have been paying for. TMCC is planning to do the exact opposite of what the community wants: We are going to lower the level of our exit classes and the math skills of our graduates, in the name of preserving completion rates.

ER201

Sincerely,
Lars Jensen
TMCC Math Department

---

**Lars** <ljensen@tmcc.edu>                                    Thu, Jan 23, 2020 at 10:26 AM
To: smcandrew@rgj.com
Bcc: Scott Huber <shuber@tmcc.edu>, Julia Hammett <JHammett@tmcc.edu>

## Dear Ms McAndrew,

Please find below a summary of how the TMCC Math Department has decided to carry out the Regents' mandate on the co-requisite pathways (Title 4, Ch. 16, Section 1 of the NSHE Handbook). The summary should be known to everyone in our local community, particularly to faculty at TMCC and in the NSHE, local employers, students and parents: If the implementation of the mandate proposed by the TMCC Math Department is put in effect, we will see an irreversible change in the academic skill level of our graduates which will negatively impact 31% of our certificate- and degree programs. All stakeholders including those mentioned above, ought to be properly informed about the proposed changes and given an opportunity to comment. Unfortunately I'm not aware of any initiative taken to make this happen.

## On the Math Pathways at TMCC – A Look Under the Hood

### Summary

- **Graduating from Washoe County School District** requires students to pass Algebra 1, Geometry, and Algebra 2. ( Algebra 1 is the same as Math 95, Algebra 2 is the same as Math 96).

- **Regents' Mandate:** Put all students into a college level math class, possibly with 1-3 co-requisite credits added on to fill any holes they may have in Algebra 1-2 or Geometry. (Title 4, Chapter 16, Section 1 of the NSHE Handbook.)

- **The TMCC Math Department Response to the Mandate:** The department has determined that the mandate will result in a drop in completion rates if we maintain the current academic level of Math 120. Therefore the department has decided to soften the course and lower the academic level and rigor of Math 120 so that students will be able to complete the course at current rates. (In other words, the department has allowed completion rates to dictate the academic level of an exit math course. This a clear violation of the intent of the mandate.)

- **What is the Level of the New Math 120?** In the words of the departmental Math 120 co-requisite committee, "*...a student completing Math 120 may be ready for Math 95.*" Paraphrasing, this means that "*a student graduating from college may be ready for middle school math.*" (This is an absurd statement – it essentially says that students will exit college with less skills that they were supposed to enter with. This is in clear violation of the intent of the mandate.)

- **Impact on Our Degree- and Certificate Programs:** The lower academic skills of Math 120 completers will directly impact 31% of our degree- and certificate programs by lowering the math- and technical skills of graduates in these programs.

- **Impact on the Community:** Employers in the community pays our salaries, and subsidizes students' education, through their taxes. What do they expect in return? Answer: Qualified graduates. It is well known that employers, including the high-tech companies coming into our area, value math skills in particular because statistics has shown that the more math classes a student has taken, the higher salary an employer will pay. Employers will soon get much less than they have been paying for. TMCC is planning to do the exact opposite of what the community wants: We are going to lower the level of our exit classes and the math skills of our graduates, in the name of preserving completion rates.

Why is this happening at TMCC? If you ask me, I have little doubt that it is due to the poisonous chemistry that results when the state funding formula for NSHE institution is combined with a lack of presidential leadership which over the years has filtered down through the levels of the institution and contributed to an atmosphere of fear at the college. This poisonous mixture has not been good for academic standards.

There are a lot changes going on in the NSHE institutions at the moment related to the implementation of the Regents' mandate, and some of these changes that are happening in the quiet, may not end up being in the public interest.

ER202

Sincerely,
Lars Jensen, Professor
TMCC Math Department

---

**Lars** <ljensen@tmcc.edu>                                                     Thu, Jan 23, 2020 at 10:29 AM
To: aappleton@reviewjournal.com

## Dear Ms Appleton,

Please find below a summary of how the TMCC Math Department has decided to carry out the Regents' mandate on the co-requisite pathways (Title 4, Ch. 16, Section 1 of the NSHE Handbook). The summary should be known to everyone in our local community, particularly to faculty at TMCC and in the NSHE, local employers, students and parents: If the implementation of the mandate proposed by the TMCC Math Department is put in effect, we will see an irreversible change in the academic skill level of our graduates which will negatively impact 31% of our certificate- and degree programs. All stakeholders including those mentioned above, ought to be properly informed about the proposed changes and given an opportunity to comment. Unfortunately I'm not aware of any initiative taken to make this happen.

# On the Math Pathways at TMCC – A Look Under the Hood

## Summary

- **Graduating from Washoe County School District** requires students to pass Algebra 1, Geometry, and Algebra 2. ( Algebra 1 is the same as Math 95, Algebra 2 is the same as Math 96).

- **Regents' Mandate:** Put all students into a college level math class, possibly with 1-3 co-requisite credits added on to fill any holes they may have in Algebra 1-2 or Geometry. (Title 4, Chapter 16, Section 1 of the NSHE Handbook.)

- **The TMCC Math Department Response to the Mandate:** The department has determined that the mandate will result in a drop in completion rates if we maintain the current academic level of Math 120. Therefore the department has decided to soften the course and lower the academic level and rigor of Math 120 so that students will be able to complete the course at current rates. (In other words, the department has allowed completion rates to dictate the academic level of an exit math course. This a clear violation of the intent of the mandate.)

- **What is the Level of the New Math 120?** In the words of the departmental Math 120 co-requisite committee, "...*a student completing Math 120 may be ready for Math 95.*" Paraphrasing, this means that "*a student graduating from college may be ready for middle school math.*" (This is an absurd statement – it essentially says that students will exit college with less skills that they were supposed to enter with. This is in clear violation of the intent of the mandate.)

- **Impact on Our Degree- and Certificate Programs:** The lower academic skills of Math 120 completers will directly impact 31% of our degree- and certificate programs by lowering the math- and technical skills of graduates in these programs.

- **Impact on the Community:** Employers in the community pays our salaries, and subsidizes students' education, through their taxes. What do they expect in return? Answer: Qualified graduates. It is well known that employers, including the high-tech companies coming into our area, value math skills in particular because statistics has shown that the more math classes a student has taken, the higher salary an employer will pay. Employers will soon get much less than they have been paying for. TMCC is planning to do the exact opposite of what the community wants: We are going to lower the level of our exit classes and the math skills of our graduates, in the name of preserving completion rates.

Why is this happening at TMCC? If you ask me, I have little doubt that it is due to the poisonous chemistry that results when the state funding formula for NSHE institution is combined with a lack of presidential leadership which over the years has filtered down through the levels of the institution and contributed to an atmosphere of fear at the college. This poisonous mixture has not been good for academic standards.

There are a lot changes going on in the NSHE institutions at the moment related to the implementation of the Regents' mandate, and some of these changes that are generally happening in the quiet, may not end up being in the public interest.

Sincerely,

ER202

[Quoted text hidden]

---

**Lars** <ljensen@tmcc.edu>                                                    Thu, Jan 23, 2020 at 10:42 AM
To: miranda.willson@gmgvegas.com
Bcc: Scott Huber <shuber@tmcc.edu>, Julia Hammett <JHammett@tmcc.edu>

### Dear Ms Willson,

[Quoted text hidden]

---

**Lars** <ljensen@tmcc.edu>                                                    Thu, Jan 23, 2020 at 10:43 AM
To: bob@thisisreno.com
Bcc: Scott Huber <shuber@tmcc.edu>, Julia Hammett <JHammett@tmcc.edu>

### Dear Bob,

[Quoted text hidden]

ER204

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 204 of 298
Case 3:22-cv-00045-MMD-CLB  Document 22  Filed 03/15/22  Page 1 of 2

1  John Albrecht, NV Bar No. 4505
   General Counsel
2  Kiah D. Beverly-Graham, NV Bar No. 11916
   Deputy General Counsel
3  Truckee Meadows Community College
   2215 Raggio Parkway
4  Reno, Nevada 89512-1095
   (775) 673-7396
5  (775) 673-7135 fax
   john.albrecht@dri.edu
6  kiah.beverly@dri.edu

7  *Attorneys for Defendants*

                    **UNITED STATES DISTRICT COURT**
8                    **DISTRICT OF NEVADA**

9
10 LARS JENSEN,

              Plaintiff,
11
12     v.                                   Case No. 3:22-cv-00045-MMD-CLB

13 NATALIE BROWN, et al.

              Defendants.
14

15                    **REQUEST FOR JUDICIAL NOTICE**

16        All defendants in the above-captioned action request that the Court take judicial notice

17 of certain excerpts of the Nevada System of Higher Education ("NSHE") Handbook (also

18 referred to as the "NSHE Code"). True and correct copies of the relevant excerpts of the NSHE

19 Handbook are attached hereto as **Exhibit 4.** As stated in the accompanying Motion to Dismiss,

20 the NSHE Handbook is relevant to the disposition of the Motion.

21        The NSHE Handbook is appropriate for the Court's consideration on a Motion to

22 Dismiss because it is a matter of public record. *See Brandt v. Medtronic, Inc*., 179 F. Supp. 3d

23 963, 965 n. 1 (D. Nev. 2016) (Du, J.) (allowing public record documents to be considered on

24 motion to dismiss). The NSHE Handbook is accessible in full here:

25 https://nshe.nevada.edu/leadership-policy/board-of-regents/handbook/board-of-regents-

   handbook-subchapters/.
26

27

28                              -1-

ER205

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 205 of 298
Case 3:22-cv-00045-MMD-CLB  Document 22  Filed 03/15/22  Page 2 of 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The District of Nevada has previously recognized that the NSHE Handbook is appropriate for judicial notice in connection with a motion to dismiss. *See Narayanan v. Nevada*, No. 3:11-CV-00744-LRH, 2012 WL 4076163, at *1, n. 2 (D. Nev. Sept. 10, 2012) ("[t]he Nevada System of Higher Education Code has the 'force and effect of statute' . . . making it a matter of public record") (citing *State ex rel. Richardson v. Board of Regents*, 70 Nev. 144, 150 (1981)).

For these reasons Defendants respectfully request that the Court take judicial notice of the sections of the NSHE Handbook, attached hereto as Exhibit 4, for the purposes of resolving their Motion to Dismiss filed contemporaneously herewith.

DATED March 15, 2022

  */s/ John Albrecht*
John Albrecht, NV Bar No. 4505
General Counsel
Kiah D. Beverly-Graham, NV Bar No. 11916
Deputy General Counsel
Truckee Meadows Community College
2215 Raggio Parkway
Reno, Nevada 89512-1095
(775) 673-7396
(775) 673-7135 fax
john.albrecht@dri.edu
kiah.beverly@dri.edu

*Attorneys for Defendants*

John M. Nolan, NV Bar # 15790
Michael Langton, NV Bar # 290
Mark Mausert, NV Bar # 2398
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
jmnolan84@gmail.com
mlangton@sbcglobal.net
mark@markmausertlaw.com
*Attorneys for Plaintiff Lars Jensen*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LARS JENSEN, an individual, | |
| *Plaintiff,* | Case Number: 3:22-cv-00045-MMD-CLB |
| v. | **FIRST AMENDED VERIFIED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C § 1983** |
| NATALIE BROWN, in her individual and official capacities as Administrative Officer at Truckee Meadows Community College; JULIE ELLSWORTH, in her individual and official capacities as Dean of Sciences at Truckee Meadows Community College; ANNE FLESHER, in her individual and official capacities as Dean of Math and Physical Sciences at Truckee Meadows Community College; KARIN HILGERSOM, in her individual and official capacities as President of Truckee Meadows Community College; MARIE MURGOLO, in her individual and official capacities as Vice President of Academic Affairs at Truckee Meadows Community College; MELODY ROSE, in her individual and official capacities as Chancellor of the Nevada System of Higher Education, | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

**COMES NOW** Plaintiff, LARS JENSEN, by and through counsel, and files this

Complaint for declaratory relief, monetary damages, costs, attorneys' fees, and any other relief to

which he is entitled as a victim of civil rights violations against Defendants Natalie Brown, Julie

Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, and Melody Rose.  This is an action under 42 U.S.C. § 1983 to address Defendants violations of Plaintiff's First Amendment rights and procedural due process rights under the United States Constitution and Nevada Constitution. Plaintiff does hereby state and allege as follows:

## INTRODUCTION

1.     Two of the core principles of higher education are the protection of academic freedom and shared governance.  Academic freedom grants faculty the right and responsibility to search for truth, no matter how controversial, in regard to their teaching and research responsibilities.  Protection of academic freedom benefits society by advancing knowledge and allowing faculty to speak on matters of public concern without fear of retaliation or punishment. The Nevada System of Higher Education (hereinafter "NSHE") handbook defines and protects academic freedom. See Nevada System of Higher Education Handbook, Title 2, Chapter 2, §§ 2.1-2.3.5.

2.     Truckee Meadows Community College (hereinafter "TMCC") is one of the eight (8) institutions comprising the NSHE system.  Dr. Jensen has witnessed the deterioration of shared governance and lowering of curriculum standards at TMCC over a multiyear period and felt obligated to exercise his First Amendment rights on multiple occasions to professionally communicate his concerns.  However, rather than respect his academic freedom and right to speak on matters of public concern, TMCC sought to silence Dr. Jensen and punish him.

3.     When attempts to silence Dr. Jensen were unsuccessful, Defendants engaged in willful retaliation and attempts to publicly humiliate him with letters of reprimand, negative annual performance evaluations, and investigations.  All of these actions were directed at Dr. Jensen to harass him for exercising his First Amendment rights.

4.      TMCC's unlawful discipline of Dr. Jensen and other faculty exercising their First Amendment rights has resulted in litigation, media attention, and controversy.  The American Association of University Professors, the Foundation for Individual Rights in Education, the Academic Freedom Alliance, and the Nevada Faculty Alliance have all sent letters condemning the actions of Defendants.

5.      Defendants have unlawfully violated Dr. Jensen's First Amendment right to speak on matters of public concern and his procedural due process rights.  See *Demers v. Austin*, 746 F.3d 1091 (9th Cir. 2014).  These repeated violations have forced Dr. Jensen to seek vindication of the First Amendment protections repeatedly violated by Defendants and to litigate due to the long-term effects of the letter of reprimand, negative evaluations, stress, and psychological trauma he has suffered.

## JURISDICTION AND VENUE

6.      This court has original jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this is an action to redress the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States.  Plaintiff seeks remedies under 42 U.S.C. 1983 and 1988.

7.      This Court has jurisdiction to issue injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. § 1983.

8.      Venue is proper in the United States District Court for the District of Nevada, and in the Northern Division of the court, pursuant to 28 U.S.C. § 1391(b).  All events or omissions giving rise to Plaintiff's claims occurred in the District of Nevada, Washoe County.  All Defendants reside or are found, or have agents, and transact business in this judicial district and

their acts in violation of the laws of the United States and the U.S. Constitution have arisen in this judicial district.

## **PARTIES**

**Plaintiff**

9.     The Plaintiff, Dr. Lars Jensen, at all times relevant to this Complaint was, and still is, a Community College Professor at TMCC.  Dr. Jensen is in the Mathematics Department in the Math and Physical Sciences Division. Dr. Jensen teaches math classes at TMCC.  He began his employment at TMCC in 1996 and obtained tenure in 1999.

10.     Dr. Jensen received his Master of Science from the University of Copenhagen, Denmark in 1979 and Ph.D., from the University of Pennsylvania in 1984.

11.     Dr. Jensen is a U.S. citizen and at all times relevant to this Complaint was a resident of Washoe County, Nevada.

**Defendants**

12.     Defendant Dr. Natalie Brown is the Executive Director of the Advisement and Transfer Center at TMCC.  She was appointed by President Hilgersom to act as the administrative officer during the investigation and disciplinary hearing of Dr. Jensen.  See Nevada System of Higher Education Handbook, Title 2, Chapter 6 § 6.7.1.  Dr. Brown was responsible for violating Dr. Jensen's constitutionally protected due process rights by not following the NSHE Code during the investigation of Dr. Jensen.  She participated in and condoned the continuing retaliation against Dr. Jensen for the exercise of his free speech rights.  At all times relevant to this case, Dr. Brown was acting in an official capacity as an agent and employee of TMCC and was acting within the scope of her employment and under color of the laws of the State of Nevada.   She is sued in her individual and official capacities.

13.     Defendant Dr. Julie Ellsworth was the Dean of Sciences at TMCC from 2017-2020.   Dr. Ellsworth was the administrator who violated Dr. Jensen's first amendment rights two times during the Math Summit on January 21, 2020.  She also instigated two adverse employment actions against Dr. Jensen that are the subject of this complaint.  These adverse employment actions were retaliation against Dr. Jensen for the exercise of his free speech rights at the Math Summit on January 21, 2020.  At all times relevant to this case, Dr. Ellsworth was acting in an official capacity as an agent and employee of TMCC and was acting within the scope of her employment and under color of the laws of the State of Nevada.  She is sued in her individual and official capacities.

14.     Defendant Anne Flesher is the Dean of Math and Physical Sciences at TMCC. Defendant Flesher instigated adverse employment actions against Dr. Jensen that were in retaliation against Dr. Jensen for the exercise of his free speech rights at the Math Summit on January 21, 2020.  She participated in and condoned the continuing retaliation against Dr. Jensen for the exercise of his free speech rights.  At all times relevant to this case, Defendant Flesher was acting in an official capacity as an agent and employee of TMCC and was acting within the scope of her employment and under color of the laws of the State of Nevada.   She is sued in her individual and official capacities.

15.     Defendant Dr. Karin Hilgersom is the President of TMCC.  In that capacity, Dr. Hilgersom had oversight responsibility for the administration of the College.  She participated in and condoned the continuing retaliation against Dr. Jensen for the exercise of his free speech rights.  Dr. Hilgersom violated Dr. Jensen's due process rights by authorizing an invalid investigation and authorizing a biased committee member at Dr. Jensen's disciplinary hearing.  At all times relevant to this case, Dr. Hilgersom was acting in an official capacity as an agent

ER211

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 211 of 298
Case 3:22-cv-00045-MMD-CLB   Document 8   Filed 01/28/22   Page 6 of 29

and employee of TMCC and was acting within the scope of her employment and under color of the laws of the State of Nevada.  She is sued in her individual and official capacities.

16.     Defendant Dr. Marie Murgolo was the Vice President of Academic Affairs at TMCC.  She participated in and condoned the continuing retaliation against Dr. Jensen for the exercise of his free speech rights.  At all times relevant to this case, Dr. Murgolo was acting in an official capacity as an agent and employee of TMCC and was acting within the scope of her employment and under color of the laws of the State of Nevada.   She is sued in her individual and official capacities.

17.     Defendant Dr. Melody Rose is the Chancellor of the Nevada System of Higher Education.  She participated in and condoned the continuing retaliation against Dr. Jensen for the exercise of his free speech rights.  At all times relevant to this case, Dr. Rose was acting in an official capacity as an agent and employee of TMCC and was acting within the scope of her employment and under color of the laws of the State of Nevada.  She is sued in her individual and official capacities.

## **FACTUAL ALLEGATIONS**

***Dr. Jensen Has Spoken on Matters of Pubic Concern.***

18.     Dr. Jensen was hired by TMCC on January 16, 1996 and became tenured on July 1, 1999.

19.     During his service to TMCC, Dr. Jensen has primarily taught pre-calculus, algebra, calculus, differential equations, statistics, physics for scientists and engineers, and college physics courses.

20.     During his time at TMCC math standards have been continually altered to make it easier for students to complete courses and internal procedures relating to shared governance

have been increasingly ignored.  These changes have created disagreements and tension among faculty, administrators, and the greater community.

21.     As an academic faculty member Dr. Jensen is required to be "…responsible for the maintenance of appropriate standards of scholarship and instruction."  See Nevada System of Higher Education Handbook, Title 2, Chapter 2 § 2.1.3.

22.     Dr. Jensen has consistently voiced his concerns regarding the lowering of math standards and deterioration of shared governance at TMCC since at least 2017.

23.     For example, Dr. Jensen sent to the TMCC faculty listserv on February 13, 2018, an email titled "On the issue of Confidentiality" where he expressed concerns about college policies and leadership.

24.     In June of 2019 the Board of Regents for the NSHE passed the Co-Requisite Policy.

25.     On December 18, 2019, Dr. Jensen sent an email to the math department faculty where he expressed specific concerns regarding math standards at TMCC.

26.     On January 21, 2020, Dr. Ellsworth organized a Math Summit at TMCC to discuss with the community how the Board of Regents of the NSHE Co-Requisite policy would be implemented from 9:30 a.m. until 1:30 p.m.

27.     The agenda for the meeting listed updates regarding: (1) policy timeline and implementation, (2) pre-requisites and co-requisites, (3) revamped Math 120 course curriculum, new Math 124 course, (5) Math support co-requisites for Math 120 and Math 124, and (6) revised math pathways.

28.     Following the conclusion of the morning presentation of the Math Summit on January 21, 2020, Dr. Ellsworth took questions from the audience.

29.     Dr. Ellsworth allowed all participants to comment at the Math summit except Dr. Jensen.

30.     Dr. Jensen raised his hand and stated that he wanted to make a comment to benefit individuals present who were not from the math department.

31.     Dr. Jensen then stated that he wanted, "…to point out a couple of things a look under the hood would reveal."  Dean Ellsworth then abruptly cut off his comment and ended the question-and-answer session.

32.     Dr. Ellsworth stated Dr. Jensen could not comment because the event was out of time even though there was a fifteen-minute break following the presentation.  Further, Dr. Ellsworth allowed any other participant who wished to comment or question to do so during the entire presentation without any censorship.

33.     Dr. Jensen again requested to speak and Dr. Ellsworth refused to allow him to speak a second time and then directed Dr. Jensen to use the "parking lot" for his comment.

34.     Dr. Jensen then left the Math Summit and went to his office where he typed out his comments in a handout titled "On the Math Pathways – Looking Under the Hood." A copy of the handout is included as Exhibit A.

35.     In the handout Dr. Jensen stated that the Math Department's response to the Co-Req policy would be, "…to lower the academic level of Math 120 so students will be able to complete the course at current rates. (The department has allowed completion rates to dictate the academic level of an exit math course.)."  See Exhibit A.

36.     Dr. Jensen's handout went on to describe the impact on the policy on degree and certificate programs by stating it, "…will directly impact 31% of our degree- and certificate

programs by lowering the math- and technical skills of graduates in these programs." See Exhibit A.

37.    The handout concluded by discussing the impact on the community, "Employers in the community pays our salaries, and subsidizes students' education, through their taxes. What do they expect in return? Answer: Qualified graduates.  It is well known that employers, including all the high-tech companies coming into our area, value math skills because the more math classes a student has taken, the higher the salary an employer will pay.  Well, employers will soon get much less than they have been paying for.  TMCC is planning to do the exact opposite of what the community wants: We are going to lower the level of our exit classes and the math skills of our graduates, in the name of preserving completion rates." See Exhibit A.

38.    Dr. Jensen then returned to the Math Summit during a break and went room to room to distribute the handout.

39.    Dr. Jensen was not disruptive and multiple witnesses confirmed under oath during his disciplinary hearing that he was professional while distributing the handout.

40.    Dr. Ellsworth then began to physically pick up copies that were distributed and motioned for the participants to return their copies to her.

41.    Dr. Jensen then communicated to Dr. Ellsworth that it was break time and he was not being disruptive or disturbing anyone.  Dr. Ellsworth again denied Dr. Jensen the opportunity to distribute his handout.

42.    Dr. Jensen then left room RDMT 256 and went into RDMT rooms 252 and 253 and began to distribute his handout.

43.    Dr. Jensen then returned to RDMT room 256 and began distributing the handout again.  The continued distribution of the handout in RDMT 256 angered Dr. Ellsworth who then

directed him to immediately stop distributing the handouts and asked him to step outside for a private talk.

44.     In the hallway Dr. Ellsworth stated to Dr. Jensen that this was "her workshop" and he was not allowed to distribute anything.  Dr. Ellsworth then made disparaging remarks to Dr. Jensen.  She accused him of being a "bully," "disobeying her," and being "disruptive." Then Dr. Ellsworth stated to Dr. Jensen that he had "made an error by defying her."

45.     The handout distributed at the Math Summit jeopardized defendants' plans for implementation of the Co-Requisite Policy at TMCC.

**Multiple Adverse Employment Actions have been taken by Dr. Ellsworth against Dr. Jensen for Engaging in Fully Protected Speech.**

46.     Following the Math Summit on January 21, 2020, Dr. Ellsworth sent Dr. Jensen a letter of notice of reprimand on January 30, 2020, which contained the proposed letter of reprimand.

47.     In the letter Dr. Ellsworth stated that Dr. Jensen's behavior at the Math Summit constituted "insubordination" and disrupted the event.

48.     Dr. Ellsworth incorrectly applied the definition of "insubordination" to Dr. Jensen.  See Nevada System of Higher Education Handbook, Title 3, Section 3(k); *State ex rel. Richardson v. Board of Regents*, 70 Nev. 347. 269, P.2d 265 (1954).

49.     The incorrect application of insubordination to Dr. Jensen can only be viewed as retaliation for the exercise of his First Amendment right to comment on matters of public concern.  See *Demers*, 746 F.3d at 402

50.     On February 3, 2020, Dr. Jensen filed a grievance seeking vindication of his academic freedom and First Amendment rights against Dr. Ellsworth.

51.     On February 5, 2020, Dr. Jensen sent an email titled "Lowering Standards is Criminal – Literally" to faculty listserv at TMCC.  In the email, Dr. Jensen cited the NSHE Handbook Title 2, Chapter 2 § 2.1.1 and Title 2, Chapter 2 § 2.1.3 as examples that faculty are required to maintain standards of instructions and that faculty work for the common good.

52.     After pressure from Dr. Ellsworth, Dr. Jensen felt forced to offer his resignation as chair and as a member of Dr. Jonathan Lam's tenure committee on February 11, 2020.

53.     On March 30, 2020, Dr. Ellsworth gave Dr. Jensen a letter of reprimand that was placed in his personnel file.

54.     Dr. Ellsworth then began to raise minor issues such as syllabus policies to Dr. Jensen in an attempt to further retaliate against him for exercising his First Amendment rights.

55.     On March 6 and April 9, 2020, Dr. Ellsworth sent emails to Dr. Jensen accusing him of having "punitive" course policies.  The policies in question were used extensively by math faculty for a long period of time and Dr. Ellsworth made no attempt to contact other math faculty.  These acts by Dr. Ellsworth can only be viewed as continuing retaliation for exercising his First Amendment rights.

56.     On May 19, 2020, Dr. Ellsworth ignored the department chair's recommendation of "Excellent 2" and changed Dr. Jensen's annual performance evaluation to "Unsatisfactory." This is the lowest possible rating at TMCC.   In her written comments, Dr. Ellsworth stated:

> "Professor Jensen exhibited insubordination in two instances, one which is documented in relationship to the Math Summit and is on record in HR, and the other one in regard to the requested alteration of a course syllabus."

57.     Dr. Jensen filed four grievances related to the adverse employment actions taken against him by Dean Ellsworth for exercising his First Amendment rights and all were not seriously considered or reviewed by Defendants.

58.     On November 24, 2020, Chancellor Melody Rose denied Dr. Jensen's grievance that was submitted for the violations of his free expression and academic freedom.

59.     Dr. Ellsworth's incorrect annual performance evaluations of Dr. Jensen for the 2019-2020 academic year negatively impacted his academic reputation and future merit pay.

60.     The notice of reprimand, the letter of reprimand, and the adverse annual performance evaluation issued by Dr. Ellsworth can only be explained by her motive to retaliate against Dr. Jensen for exercising his constitutionally protected rights to speak on matters of public concern.

***Dean Flesher Retaliated against Dr. Jensen.***

61.     Dean Flesher attended the Math Summit on January 21, 2020, as a participant and criticized Dr. Jensen at the event.

62.     During the 2020-2021 academic year Dean Flesher took additional adverse employment actions against Dr. Jensen that can only explained by retaliation for his constitutionally protected speech at the Math Summit on January 21, 2020.

63.     Dean Flesher cited minor issues as justification for disregarding Dr. Jensen's chair recommendation of "excellent" to the lowest ranking of "unsatisfactory" in his annual performance evaluation.

64.     Dean Flesher's justification for the ranking was based on criteria that was not equally applied to other faculty.  During the disciplinary hearing multiple witnesses confirmed that Dr. Jensen was evaluated differently from other faculty by Dean Flesher.

65.     Dr. Jensen filed one grievance related to the adverse employment actions taken against him by Dean Flesher for exercising his First Amendment rights.  The grievance was not seriously considered by Defendants.

66.     On July 27, 2021, Chancellor Melody Rose denied Dr. Jensen's grievance based on violation of his free expression and academic freedom.

67.     On June 2, 2021, Dean Flesher wrote a letter to Dr. Hilgersom notifying her that Dr. Jensen had received two consecutive unsatisfactory annual performance evaluations.

***Dr. Brown and Dr. Hilgersom Retaliated against Dr. Jensen and Violated his Procedural Due Process Rights.***

68.     On or around June 16, 2021, President Hilgersom appointed Dr. Natalie Brown to be an Administrative Officer to investigate Dr. Jensen in violation of the NSHE Handbook. See NSHE Handbook Title 2, Chapter 6 § 6.7.1

69.     This was the first disciplinary hearing that had taken place at TMCC for an extremely long period of time.

70.     Dr. Brown violated the Code for investigating Dr. Jensen when she had no authority to investigate since she had not received a complaint.  Under NSHE handbook when a faculty member receives two consecutive unsatisfactory rankings the requirement is hold a hearing only.  See NSHE Handbook, Title 2, Chapter 5 § 5.13.2(a)-(b)

71.     Dr. Brown's investigation was conducted over the summer when faculty were off contract and was completed within approximately 21 days.

72.     For the investigation itself Dr. Brown only interviewed Dr. Ellsworth and Dean Flesher both who had taken adverse employment actions against Dr. Jensen.

73.     Since Natalie Brown's investigation was completed in a rushed manner over the summer it limited Dr. Jensen's ability to respond and made collection of evidence and witnesses difficult.

74.     Dr. Jensen requested the proceedings be delayed since he was out of the country until faculty are back on contract and Natalie Brown ignored the request.

75.     In Dr. Brown's charging letter that followed her improper investigation she violated the Code again by listing out additional charges against Dr. Jensen which she had no authority to investigate.  This can only be viewed as retaliation.

76.     Dr. Brown used the investigation and charging letter to fabricate a basis to terminate Dr. Jensen from employment at TMCC.

77.     On July 12, 2021, President Hilgersom, in what can only be viewed as an attempt to influence the disciplinary hearing, appointed her former colleague Mark Ghan who had previously served as President and General Counsel of Western Nevada College as the Special Hearing Officer.

78.     Mr. Ghan was removed by President Hilgersom by letter on August 4, 2021, after a challenge for cause was raised by Dr. Jensen due to the existence of an ongoing contract between Mr. Ghan and NSHE.  This contractual relationship violated the NHSE Handbook Title 2, Chapter 6 § 6.11.1(b).

79.     The process for challenging the special hearing officer in the NSHE Code violated Dr. Jensen's procedural due process rights by preventing a challenge for cause or preemptory challenge for the replacement special hearing officer.  See NSHE Handbook Title 2, Chapter 6 §§ 6.11.6(a)-(f).

80.     President Hilgersom also refused to order a biased committee member to be removed from the faculty committee at the special hearing.  Mr. Andy Hughes had previously submitted an unsubstantiated complaint of discrimination against Dr. Jensen.  This complaint was investigated by the HR department at TMCC and dismissed.

81.     After the complaint was dismissed President Hilgersom had sent Dr. Jensen a list of stipulations that was retaliatory and resulted in attorney Tom Donaldson sending a letter to President Hilgersom threatening legal action.  The only explanation for this decision from President Hilgersom was to retaliate against Dr. Jensen and bias the hearing committee against Dr. Jensen in violation of the NSHE Handbook.  See NSHE Handbook Title 2, Chapter 6 § 6.11.6(b)(1).

82.     Dr. Jensen was denied a subpoena to have Mr. Andy Hughes appear as a witness at the hearing, which violated his due process rights.

83.     Dr. Jensen was denied a subpoena to have relevant records produced at the hearing that would have helped his defense.  Producing the documents would not have created an administrative burden for the university since they had already been requested by Dr. Jensen.

84.     Dr. Ellsworth, Dean Flesher, Dr. Brown, Dr. Hilgersom, Dr. Murgolo, and Dr. Rose are equally culpable as all of their actions were tainted by the same retaliatory intent.  Each administrator had full knowledge of the nature of the protected speech at the Math Summit on January 21, 2020, and allowed the retaliatory adverse employment actions to proceed.  Each was charged with the responsibility pursuant to state law to ensure that Dr. Jensen was not punished for exercising his first amendment rights.

85.     The pattern of actions taken by the defendants demonstrates a concerted effort to punish Dr. Jensen for his handout at the Math Summit and criticism of a deterioration of shared governance at TMCC.

86.     Stifling Dr. Jensen's speech regarding his distribution of the handout and criticism of the deterioration of shared governance at TMCC promoted no state interest, such as

ER221

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 221 of 298
Case 3:22-cv-00045-MMD-CLB  Document 8  Filed 01/28/22  Page 16 of 29

workplace efficiency or avoiding workplace disruption.  Dr. Jensen's distribution of the handout was during a break, and he had received no lawful written order prohibiting his distribution.

***Defendants' Actions Have Caused a Deprivation of Rights, and Economic and Emotional Damage to Dr. Jensen.***

87.     As a direct and proximate cause of Defendants' acts, Plaintiff has suffered irreparable injury, including being deprived of his constitutional rights to free expression and due process.

88.     Defendants' conduct has caused Plaintiff irreparable harm by violating his First Amendment rights to free expression and precluding him from engaging in First Amendment protected expression in connection with teaching at TMCC.

89.     Defendants' conduct has caused Plaintiff irreparable harm by violating his due process rights by subjecting him to an invalid investigation and biased disciplinary hearing.

90.     Dr. Jensen suffered adverse employment actions due to Defendants' issuing him a letter of reprimand, unsatisfactory annual performance evaluations for academic years 2019-2020 and 2020-2021, disciplinary investigations, and disciplinary hearings.

91.     Due to these adverse employment actions, Dr. Jensen has been prevented from receiving employment benefits and other opportunities at TMCC.

92.     Defendants acted recklessly and with callous disregard for Dr. Jensen's First Amendment rights by retaliating against him for speaking on matters of public concern.

93.     Defendants acted recklessly and with callous disregard for Dr. Jensen's due process rights by subjecting him to an improper investigation, denying him reasonable notice, and subjecting him to a biased hearing panel.

94.     Additionally, Dr. Jensen has experienced significant emotional distress, including physical manifestations of stress and anxiety.

## APPLICABLE STATUTES

### The Defendants Violated the First Amendment Rights of Dr. Jensen.

95.     The First Amendment to the United States Constitution states:

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."
> The First Amendment is made applicable to state officials through the Fourteenth Amendment.

96.     Dr. Jensen has a clearly established federal right under the First Amendment of the United States Constitution to speak freely on a matter of public concern as a private citizen and as a professor at TMCC.  His speech at the Math Summit and handout are matters of public concern since they deal with academic standards, quality of education, enrollment, funding, and community expectations for higher education in Nevada.  Further, Dr. Jensen's speech that criticized the deterioration of shared governance at TMCC also involves a clear matter of public concern.

97.     All defendants were aware of Dr. Jensen's clearly established First Amendment rights at all times.  The NSHE Handbook, Title 2, Chapter 2, § 2.1.2 prohibits "censorship or discipline" for faculty exercising their academic freedom rights.

98.     The defendants violated Dr. Jensen's clearly established federal right by taking adverse action against him for distribution of his handout at the Math Summit on January 21,

2020.  Dr. Jensen's speech was a substantial motivating factor for the adverse action that he suffered.  These adverse actions, or retaliation, included, but are not limited to:

    a.   Condoning faculty shunning and humiliation of Dr. Jensen;

    b.   Providing annual reviews of his performance inconsistent with previous reviews that unfairly ranked Dr. Jensen's performance at the lowest level;

    c.   Producing annual performance evaluations that contain false statements and inconsistent evaluation criteria;

    d.   Failing to correct the annual reviews when confronted by Dr. Jensen with evidence and other explanations;

    e.   Subjecting Dr. Jensen to an unlawful investigation in violation of the NSHE Code that violated his Constitutionally protected due process rights;

    f.   Requesting and condoning an investigation that rendered false conclusions about Dr. Jensen that went beyond the scope of the matter;

99.    The actions that harmed Dr. Jensen were taken by defendants acting in their official capacities.

100.    Each defendant is liable for the damage sustained by Dr. Jensen.  There is a causal link between the defendants actions and the injuries sustained by Dr. Jensen as a result of the violations committed by Defendants.

**Dr. Jensen May Sue Under 42 U.S.C. § 1983 for Violation of his First Amendment Rights.**

101.    42 U.S.C. § 1983 provides in part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

102.    The defendants are liable to Dr. Jensen for the deprivation of his First Amendment rights as a result of their official actions, pursuant to 42 U.S.C. § 1983.

**FIRST CAUSE OF ACTION**
**First Amendment Retaliation under 42 U.S.C. § 1983**
**(Against All Official Capacity Defendants)**

103.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

104.    The actions of defendants acting in their official capacity in adopting, endorsing and carrying out a policy of retaliation for the exercise of the free speech rights of Dr. Jensen violate the First Amendment of the United States Constitution on its face and applied.

105.    Dr. Jensen seeks prospective relief against the defendants acting in their official capacities for full expungement of all negative personal files, return of his 2019-2020 annual performance evaluation to "excellent", and return of his 2020-2021 annual performance evaluation to "excellent."

106.    Dr. Jensen is also entitled to relief from defendants for prospective compensation from the date of judgment for salary adjustments he would have received had he not received the unlawful performance reviews.

107.    Defendants are liable for the requested relief pursuant to 42 U.S.C. § 1983.

**SECOND CAUSE OF ACTION**
**First Amendment Retaliation under 42 U.S.C. § 1983**
**(Against All Individual Capacity Defendants)**

108.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

109.    Each defendant is liable in a personal capacity for action taken in an official

capacity.  Each violated Dr. Jensen's clearly established right to exercise free speech on a matter

of public concern.  The defendants are liable in their personal capacities for their actions in

adopting, endorsing and carrying out a policy of retaliation for the exercise of the free speech

rights of Dr. Jensen, which violate the First Amendment of the United States Constitution on its

face and applied.  Pursuant to 42 U.S.C. § 1983, the defendants are therefore liable for the

damages of Dr. Jensen, which proximately resulted therefrom.

### THIRD CAUSE OF ACTION
### Violation of Nevada Const., Art. 1 § 9
### (All Defendants)

110.    Plaintiff repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

111.    The Nevada Constitution grants Dr. Jensen speech rights under Art. 1, § 9 and

Defendants cannot take action against Dr. Jensen for exercising those rights.

112.    Defendants retaliated against Dr. Jensen for the exercise of his free speech and

took other adverse employment actions against him.

113.    Dr. Jensen's comments were on matters of public concern.

114.    Any purported interest of Defendants in promoting the efficiency of public

services did not outweigh Dr. Jensen's free speech rights as related to the statements at issue.

115.    Defendants' actions against Dr. Jensen were arbitrary and capricious.

116.    Defendants' conduct violated Dr. Jensen's rights under Art. 1, § 9 of the Nevada

Constitution by punishing him for exercising his free speech rights.  Defendants' actions have

chilled future speech by sending a message to Dr. Jensen and other employees of TMCC that

they will face similar retaliation and civil rights violations for making statements that are not approved by Defendants.

117.    Dr. Jensen suffered injury due to these constitutional violations and is entitled to relief.

## FOURTH CAUSE OF ACTION
### Violation Procedural Due Process Rights under 42 U.S.C. § 1983
### (Against Defendants Brown, Hilgersom, and Flesher)

118.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

119.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law."

120.    Fourteenth Amendment due process protections are required in higher education disciplinary proceedings at public institutions.

121.    Plaintiff was entitled to reasonable notice and a meaningful opportunity to be heard.

122.    Plaintiff has a protected liberty interest in his good name, reputation, honor, and integrity which he cannot be deprived of by the state absent due process.

123.    Plaintiff also has a protected liberty interest in his future employment opportunities which the state cannot deprive him of absent due process.

124.    Plaintiff has a significant interest in avoiding termination for cause or being subjected to a biased hearing panel.

125.    Plaintiff has been and will continue to be forced to tell other employers about the disciplinary hearing, as well as family and friends.

126.     TMCC provided an appeals process that was inherently biased and lacking fair standards and composition.

127.     Providing a fair and impartial panel does not impose a great administrative burden on a university.

128.     Defendants' denied Dr. Jensen two subpoenas that were critical in his defense at the hearing.  The denial was fundamentally unfair to Dr. Jensen.

129.     Defendants' actions and inactions as set forth above were fundamentally unfair to Plaintiff.

130.     As a direct and proximate result of Defendants' unlawful actions, Plaintiff has and will suffer irreparable harm, injury and damages, including, but not limited to false permanent findings and discipline on his record, damage to his standing in the community, damage to his personal and professional reputation, denial of future employment opportunities and earning capacity, mental and emotional distress, and humiliation and embarrassment.

### FIFTH CAUSE OF ACTION
### Violation of Nevada Const., Art. 1 § 8
### (Against Defendants Brown, Hilgersom, and Flesher)

131.     Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

132.     Plaintiff was entitled to reasonable notice and a meaningful opportunity to be heard.

133.     Plaintiff has a protected liberty interest in his good name, reputation, honor, and integrity which he cannot be deprived of by the state absent due process.

134.     Plaintiff has a significant interest in avoiding termination or being subjected to a biased hearing panel.

135.     Plaintiff has been and will continue to be forced to tell other employers about the disciplinary hearing, as well as family and friends.

136.     TMCC provided an appeals process that was inherently biased and lacking fair standards and composition.

137.     Providing a fair and impartial panel does not impose a great administrative burden on a university.

138.     Defendants' actions and inactions as set forth above were fundamentally unfair to Plaintiff.

139.     As a direct and proximate result of Defendants' unlawful actions, Plaintiff has and will suffer irreparable harm, injury and damages, including, but not limited to false permanent findings and discipline on his record, damage to his standing in the community, damage to his personal and professional reputation, denial of future employment opportunities and earning capacity, mental and emotional distress, and humiliation and embarrassment.

## SIXTH CAUSE OF ACTION
### Violation of Fourteenth Amendment
### Equal Protection Clause Pursuant under 42 U.S.C. § 1983
### (Against All Defendants)

140.     Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

141.     The Equal Protection Clause prohibits classifications that treats individuals in similar situations differently.

142.     By subjecting Dr. Jensen to numerous adverse employment actions, retaliation, harassing investigations, and asking him to terminate his First Amendment activities, Defendants by policy and practice have treated Dr. Jensen differently than similarly-situated

Professors and deprived him of his ability to freely express his ideas on issues of public concern at TMCC.

143.    Defendants, acting under color of state law, and by policy and practice, have explicitly and implicitly discriminated against Dr. Jensen and deprived him of his clearly established right to equal protection of the law secured by the Fourteenth Amendment to the United States Constitution.

144.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm.  He, therefore, is entitled to an award of monetary damages, including punitive damages, and equitable relief.

145.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including his attorneys' fees.

### SEVENTH CAUSE OF ACTION
### Declaratory Relief Under 28 U.S.C. §§ 2201, *et.seq.*
### (Against All Defendants)

146.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

147.    An actual controversy has arisen and now exists between Dr. Jensen and Defendants concerning whether Defendants' adverse employment actions against Dr. Jensen and Defendants' custom or practice of retaliating against professors who speak out on matters of public concern violates the Constitution.

148.    Plaintiff demands declaratory judgment that Defendants' adverse employment actions against Dr. Jensen, and Defendants' custom or practice of retaliating against and terminating professors for speaking on matters of public concern, are unconstitutional

abridgments of the freedom of speech. Such a declaratory judgment will clarify and settle the legal relations in issue and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to this proceeding.

149.   Plaintiff demands declaratory judgment that Defendants' interpretation of "insubordination" as applied to Dr. Jensen and Defendants' custom and practice of incorrectly charging faculty with insubordination violates the NSHE handbook and Nevada Supreme Court holding in *ex rel Richardson*.

150.   Plaintiff demands declaratory judgment that Defendants' violations of procedural due process as applied to Dr. Jensen, and Defendants' custom or practice of ignoring due process rights of faculty in disciplinary hearings are unconstitutional and violate due process rights guaranteed in the Constitution.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff expressly reserves the right to amend his Complaint at or before the time of trial of the action herein to include all terms of damages not yet ascertained, and respectfully requests that this Court enter judgment against the Defendants and issue the following forms of relief:

A.   A declaratory judgment that Defendants' custom and practice of retaliating against faculty who speak on matters of public concern, including Dr. Jensen, violate the First Amendment to the U.S. Constitution as requested in paragraph 148;

B.   A declaratory judgment stating that Defendants' custom and practice of violating procedural due process against faculty in disciplinary hearings, including Dr. Jensen, are unconstitutional and violate the NSHE handbook as requested in paragraph 150;

C.  A declaratory judgment stating that Defendants' custom and practice of charging faculty, including Dr. Jensen, with insubordination violated the NSHE Code and the Nevada Supreme Court Holding in *ex rel Richardson* as requested in paragraph 149;

D.  Enjoining Defendants to rescind their unconstitutional adverse employment actions against Dr. Jensen and to end their custom and practice of taking adverse employment actions against faculty who speak on matters of public concern;

E.  An order directing TMCC to fully expunge the following from Dr. Jensen's record and employment files:

    a.  March 30, 2020 letter of reprimand from Dean Julie Ellsworth;

    b.  letter from Dean Ellsworth dated January 30, 2020;

    c.  all materials related to Dr. Natalie Brown's investigation as administrative officer;

    d.  all negative comments entered by Dean Julie Ellsworth for the 2019-2020 evaluation;

    e.  all negative comments entered by Dean Anne Flesher for the 2020-2021 evaluation;

    f.  letter from Dr. Jeffrey Alexander Re: Unsatisfactory Annual Evaluation, Academic Year 2020-2021 dated September 27, 2021;

    g.  Letter from APRAC Committee to Dr. Jeffrey Alexander dated September 24, 2021;

    h.  Letter from Dean Anne Flesher Re: Article 13, part 2 dated September 1, 2021;

      i.   Letter from Vice President Murgolo RE: Advisory decision regarding 3 grievances filed by TMCC Lars Jensen dated April 30, 2020;

      j.   President Hilgersom letter dated December 21, 2020;

      k.   Chancellor Rose letter Re: Lars Jensen Grievance Appeal dated November 24, 2020;

      l.   Letter from Dean Ellsworth Re: Article 14 Grievances dated September 3, 2020;

      m.   Chancellor Rose letter Re: Grievance Appeal to Chancellor dated July 27, 2021; and

F.  An order directing TMCC to return the 2019-2020 evaluation rating to "excellent;" and return of the 2020-2021 evaluation rating to "excellent;"

G.  Compensation from the date of judgment based upon increases or adjustments Dr. Jensen would receive had he not been subject to the unlawful ratings and actions.

Dr. Jensen also prays for the following relief against defendants in their personal capacities:

H.  An award of compensatory damages against all defendants for Dr. Jensen in an amount to be proven at trial;

I.  Punitive damages against defendants in an amount to be proven at trial;

J.  An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

K.  For such other additional relief as the Court may deem just and proper.

///

///

///

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all causes of action.

DATED: January 26, 2022

Respectfully submitted,

By: /s/ John M. Nolan
John M. Nolan
Nevada Bar No. 15790
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

/s/ Mark Mausert
Mark Mausert
Nevada Bar No. 2398
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

/s/ Michael Langton
Michael Langton
Nevada Bar No. 290
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

*Attorneys for Plaintiff*

## VERIFICATION OF COMPLAINT

I, Lars Jensen, a citizen of the United States and resident of the State of Nevada, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. That I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

2. Any allegations which are not subject to being stated with certainty were made upon information and belief.

3. I believe the allegations that I do not have personal knowledge of to be true based on specified information, documents, or both.

Executed this 28th day of January, 2022, at Reno, Nevada.

_____
Dr. Lars Jensen
Community College Professor
Truckee Meadows Community College

# EXHIBIT A

# EXHIBIT A

# On the Math Pathways – Looking Under the Hood

## Summary

- **Graduating from WCSD** requires students to pass Algebra 1, Geometry, and Algebra 2. ( Algebra 1 is the same as Math 95, Algebra 2 is the same as Math 96).

- **Regents Mandate:** Put students into a college level math class, possibly with an additional 1-3 co-req credits to fill any holes they may have in Algebra 1-2 or Geometry.

- **Math Department Response to the Mandate:** The department has decided that the mandate cannot be carried out without a drop in completion rates if we maintain the current academic level of Math 120. Therefore the department has decided to lower the academic level of Math 120 so students will be able to complete the course at current rates. (The department has allowed completion rates to dictate the academic level of an exit math course.)

- **What is the Level of the New Math 120?** In the words of the Math 120 co-req committee, "...*a student completing Math 120 may be ready for Math 95.*" Paraphrasing, this means that "*a student graduating from college may be ready for middle school math.*" (This is an absurd statement. The department has decided to comply with the Regent's mandate by lowering the academic level of its classes. This is in clear violation of the intent of the mandate.)

- **Impact on Our Degree- and Certificate Programs:** The lower academic skills of Math 120 completers will directly impact 31% of our degree- and certificate programs by lowering the math- and technical skills of graduates in these programs.

- **Impact on the Community:** Employers in the community pays our salaries, and subsidizes students' education, through their taxes. *What do they expect in return*? Answer: *Qualified graduates*. It is well known that employers, including all the high-tech companies coming into our area, value math skills because the more math classes a student has taken, the higher salary an employer will pay. Well, employers will soon get much less than they have been paying for. TMCC is planning to do the exact opposite of what the community wants: We are going to lower the level of our exit classes and the math skills of our graduates, in the name of preserving completion rates.

1  John Albrecht, NV Bar No. 4505
   General Counsel
2  Kiah D. Beverly-Graham, NV Bar No. 11916
   Deputy General Counsel
3  Truckee Meadows Community College
   2215 Raggio Parkway
4  Reno, Nevada 89512-1095
   (775) 673-7396
5  (775) 673-7135 fax
   john.albrecht@dri.edu
6  kiah.beverly@dri.edu

7  *Attorneys for Defendants*

8              **UNITED STATES DISTRICT COURT**
                  **DISTRICT OF NEVADA**
9

10 LARS JENSEN,

11              Plaintiff,

12     v.                                    Case No. 3:22-cv-00045-MMD-CLB

13 NATALIE BROWN, et al.

14              Defendants.

15         **DEFENDANTS' MOTION TO STAY DISCOVERY**

16         All Defendants, by and through their undersigned attorneys, hereby move to temporarily

17 stay discovery until after the Court has disposed of Defendant's pending Motion to Dismiss

18 (ECF No. 21) (the "MTD") and any subsequent motion to dismiss filed with respect to any

19 amended pleading the Court gives Plaintiff leave to file upon disposition of the MTD. The

20 requested stay would lift upon Defendants' filing of an Answer.

21         The instant Motion to Stay ("Motion") is based upon the papers and pleadings on file

22 herein; the following Memorandum of Points and Authorities; and any oral argument the Court

23 may entertain.

24 ///

25 ///

26 ///

27

28                              -1-

## MEMORANDUM OF POINTS AND AUTHORITIES

### Allegations of the First Amended Complaint

The operative pleading is the First Amended Complaint (ECF No. 8) (the "FAC"). For a detailed summary of the FAC's relevant allegations, Defendants respectfully refer the Court to their MTD at 4-8. The relevant allegations are essentially as follows.

Plaintiff is a current member of TMCC's math faculty. This matter arises from an incident at a TMCC workshop for faculty and administrators. Plaintiff insisted upon distributing a handout at the workshop by walking around and personally handing it to each participant. His supervising dean instructed him not to do so and instructed him to affix it to a whiteboard available at the workshop for that exact purpose. The Plaintiff refused to follow the dean's instruction and was reprimanded. Eventually, the Plaintiff received unsatisfactory ratings on two consecutive annual performance evaluations, the first of which was in part because of the insubordination at the workshop. A hearing was held regarding the two consecutive performance evaluations which could have resulted in Plaintiff's dismissal from his job. The Plaintiff was retained in his job as a math faculty member and remains in that position to date.

The FAC alleges seven causes of action. The first two causes of action allege free speech retaliation claims, asserting that the six defendants – Truckee Meadows Community College administrators and the Chancellor of the Nevada System of Higher Education – in their official and individual capacities retaliated against the Plaintiff when they disciplined him for failing to follow his supervisor's instruction on how he should distribute a handout at a college workshop. The Fourth Cause of Action alleges due process violations against three of the administrators, in their individual and official capacities, arising from a disciplinary proceeding that did not result in the Plaintiff's dismissal from his job. The Sixth Cause of Action alleges a class-of-one equal

ER239

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 239 of 298
Case 3:22-cv-00045-MMD-CLB   Document 24   Filed 03/16/22   Page 3 of 6

protection claim. The Third and Fifth Causes of Action allege supplemental state claims based upon the state constitution's free speech and due process clauses. The Seventh Cause of Action is for declaratory relief based on the first six causes of action.

**Relevant Procedural Background**

On March 15, 2022, Defendants filed their MTD, seeking dismissal of the FAC in its entirety. Per an agreement-in-principle that Defendants expect will be memorialized shortly in a stipulation, Plaintiff's Opposition will be due on April 12, 2022 and Defendants' Reply due May 3, 2022.

Approximately two weeks prior to filing this Motion, Defendants' counsel met and conferred with Plaintiff's counsel by telephone regarding the requested stay of discovery. Plaintiff's counsel stated that the Plaintiff was willing to stay depositions but no other discovery. Defendants have made a good faith effort to resolve the issues raised herein without motion practice, but that effort was not successful. The foregoing facts are set forth in the accompany Declaration of John Albrecht.

This matter is in the earliest stages. As of the date of the instant Motion, discovery has not yet commenced and no discovery demands have been served by either side.

**Argument**

I.  **Defendants' MTD raises the issues of qualified immunity and Eleventh Amendment immunity, which are likely to dispose of the entire action. Defendants have also asserted multiple other grounds for which the FAC fails to state a claim, which collectively warrant dismissal of the FAC in its entirety. Given these viable arguments for wholesale dismissal, discovery should be stayed until the MTD is decided.**

The standard for deciding a motion to stay discovery pending the outcome of a dispositive motion is (1) whether the motion to dismiss is potentially dispositive of the entire case; and (2) whether the motion to dismiss may be decided without additional discovery.

*Tradebay, LLC, v. eBay, Inc.,* 278 F.R.D. 597, 602 (D. Nev. 2011). The Defendants meet this standard for a temporary stay of discovery.

Qualified immunity is raised as a defense to all causes of action except the First, which is the only claim pled solely against official capacity defendants. Eleventh Amendment immunity is raised as a defense to all causes of action except the second, which is the only one pled solely against individual capacity defendants. Thus, all causes of action are subject to potential dismissal on an immunity theory. *See* MTD at 20:22-22:9.

The Supreme Court has held, **"**Until this threshold [qualified] immunity question is resolved, discovery should not be allowed." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Crawford-El, v. Britton,* 523 U.S. 574, 598 (1998). The Ninth Circuit has affirmed that a stay of discovery is appropriate when qualified immunity is raised as a defense. *Little v. City of Seattle,* 863 F. 2d 681, 685 (9th Cir. 1988); *see also Ministerio Roca Solida v. U.S. Dept. of Fish and Wildlife,* 288 F.R.D. 500, 506-07 (D. Nev. 2013) (immunity questions should be decided before the parties engage in discovery). Because Defendants' immunity defenses are likely to result in dismissal of the entire FAC, discovery should be stayed pending disposition of the MTD.

The MTD raises several other arguments likely to result in dismissal of the entire FAC. To assist in determining whether these arguments are potentially dispositive of the entire case, the Court may take a "preliminary peek" at the MTD's merits. See *Tradebay*, 278 F.R.D. at 602.

The First and Second Cause of Action are for purported retaliation for plaintiff's exercise of his free speech rights. This is a dispute between the Plaintiff and his supervising dean over how Plaintiff's written hand out should be distributed at a college workshop. The dean simply instructed the Plaintiff how to distribute his written handout in a manner not to disrupt the

workshop.  The Plaintiff refused to follow that instruction and was later disciplined.  This is not a viable free speech retaliation claim. *See* MTD at 9:13-16:23

In the Fourth Cause of Action the Plaintiff alleges various due process violations in connection with his termination hearing and the process preceding that hearing. But he fails to plausibly allege the *prima facie* elements of such a claim and fails to explain why the robust procedures he was afforded were not constitutionally sufficient. They were. He received advance notice of the charges against him and a full opportunity to defend himself. *See* MTD 16:24-21:18.

The Sixth Cause of Action is for violating the Plaintiff's equal protection rights. Plaintiff fails to allege membership in any protected class. And the U.S. Supreme Court held that an equal protection claims under a class-of-one theory is not cognizable in public employment.  *Engquist v. Oregon Dept. of Agr.,* 553 U S 591, 607 (2008). *See* MTD at 22:11-21.

The Third and Fifth Causes of Action are supplemental state claims over which the Court should decline jurisdiction if the federal claims are dismissed. There are several other arguments supporting dismissal of these claims. *See* MTD at 22:23-23.

The Seventh Cause of Action is for declaratory relief based upon the first six causes of action. This claim cannot survive if the underlying substantive causes of action fail.

Finally, the aforementioned bases for dismissal are legal arguments that generally accept the truth of the facts alleged. In some instances, these arguments refer to clear inferences from the alleged facts or documents incorporated by reference into the FAC or subject to judicial notice. Most importantly, the immunity arguments which are likely to dispose of the entire action are purely legal. There is no dispute that all defendants are state employees. Accordingly, no

ER242

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 242 of 298
Case 3:22-cv-00045-MMD-CLB   Document 24   Filed 03/16/22   Page 6 of 6

discovery is necessary for resolution of the pending MTD, further warranting a stay of discovery.

*See Tradebay*, 278 F.R.D. at 608.

### <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant this Motion and enter a protective order staying all discovery in this action until the date, if ever, on which Defendants file an Answer.


DATED March 16, 2022.

      */s/ John Albrecht*
John Albrecht, NV Bar No. 4505
General Counsel
Kiah D. Beverly-Graham, NV Bar No. 11916
Deputy General Counsel
Truckee Meadows Community College
2215 Raggio Parkway
Reno, Nevada 89512-1095
(775) 673-7396
(775) 673-7135 fax
john.albrecht@dri.edu
kiah.beverly@dri.edu

*Attorneys for Defendants*

ER243

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 243 of 298
Case 3:22-cv-00045-MMD-CLB   Document 24-1   Filed 03/16/22   Page 1 of 2

John Albrecht, NV Bar No. 4505
General Counsel
Kiah D. Beverly-Graham, NV Bar No. 11916
Deputy General Counsel
Truckee Meadows Community College
2215 Raggio Parkway
Reno, Nevada 89512-1095
(775) 673-7396
(775) 673-7135 fax
john.albrecht@dri.edu
kiah.beverly@dri.edu

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LARS JENSEN,

          Plaintiff,

     v.

NATALIE BROWN, et al.

          Defendants.

Case No. 3:22-cv-00045-MMD-CLB

## <u>DECLARATION</u>

I, John Albrecht, declare under penalty of perjury as follows:

1.   I am General Counsel for Truckee Meadows Community College and counsel for all Defendants in this action.

2.   This Declaration is in support of Defendant's Motion to Stay Discovery pending disposition of their Motion to Dismiss. The Motion to Stay is filed contemporaneously herewith.

3.   In connection with my duties as General Counsel, and specifically in connection with my representation of Defendants in this action, I have obtained personal knowledge of the facts stated herein.

///

///

-1-

4.   Approximately two to three weeks before March 16, 2022, I telephoned the law office of Michael Langton, one of the attorneys for the Plaintiff.  I left a voice mail message in which I said that the Defendants wanted to discuss whether the Plaintiff would stipulate to stay discovery because the Defendants would be raising immunities in a motion to dismiss. Mr. Langton did not return my phone call, and a few days after leaving that message I telephoned Mr. Langton again and spoke to him in person.

5.   Mr. Langton told me that the Plaintiff would agree to stay depositions but not to stay all discovery.  I replied that the Defendants would not agree to only stay depositions and would make a motion to stay all discovery.

6.   The parties have attempted to resolve the issues raised in this motion without judicial intervention, but those efforts were unsuccessful.

DATED March 16, 2022

  _/s/ John Albrecht_
John Albrecht

-2-

1   John M. Nolan, Esq. (NSBN 15790)
    2750 Peavine Creek Road
2   Reno, Nevada 89523
    jmnolan84@gmail.com
3

4   Michael Langton, Esq. (NSBN 290)
    801 Riverside Drive
5   Reno, NV 89503
    Telephone: (775) 329-3612
6   mlangton@sbcglobal.net

7   Mark Mausert, Esq. (NSBN 2398)
    Sean McDowell, Esq. (NSBN 15962)
8   729 Evans Avenue
    Reno, Nevada 89512
9   Telephone: (775) 786-5477
    mark@markmausertlaw.com
10

11   *Attorneys for Plaintiff Lars Jensen*

12

13              **UNITED STATES DISTRICT COURT**
                **DISTRICT OF NEVADA**

14

15   LARS JENSEN, an individual,

16              *Plaintiff,*

17      v.

18   NATALIE BROWN, in her individual and
    official capacities as Administrative Officer at
19   Truckee Meadows Community College; JULIE
    ELLSWORTH, in her individual and official
20   capacities as Dean of Sciences at Truckee
    Meadows Community College; ANNE
21   FLESHER, in her individual and official
    capacities as Dean of Math and Physical
22   Sciences at Truckee Meadows Community
    College; KARIN HILGERSOM, in her
23   individual and official capacities as President of
    Truckee Meadows Community College;
24   MARIE MURGOLO, in her individual and
    official capacities as Vice President of
25   Academic Affairs at Truckee Meadows
    Community College; MELODY ROSE, in her

Case No. 3:22-cv-00045-MMD-CLB

**PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANTS'
MOTION TO STAY DISCOVERY**

**ORAL ARGUMENT REQUESTED**

26

27

28

individual and official capacities as Chancellor of the Nevada System of Higher Education,

    *Defendants.*

Plaintiff, LARS JENSEN, by and through his undersigned counsel, hereby files his Opposition to Defendants' Brown, et al., Motion to Stay Discovery (ECF No. 24)(the "MSD") and respectfully move this Court to deny Defendants' pending MSD.  This Opposition is made based upon the papers and pleadings on file herein, the following Memorandum of Points and Authorities, the First Amended Verified Complaint (ECF No. 8)(the "FAC") including exhibits thereto, and such other evidence and argument as the Court may allow.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This is a 42 U.S.C. § 1983 lawsuit for civil rights violations of Dr. Lars Jensen by Defendants.  As this Court is aware, Defendants' have filed a MSD asking this Court to grant a total stay of discovery until an Answer is filed.  (MSD at 1.)  In making this MSD, Defendants mischaracterize the details of Plaintiff's FAC and premise their MSD on the defenses of qualified immunity and Eleventh Amendment sovereign immunity being successful.  However, both defenses are questions of law and fail.  The overly broad MSD is little more than a thinly veiled effort to delay adjudication of this case on the merits.  Further, Plaintiff in good faith agreed to a partial stay of discovery by agreeing to stay depositions, which are typically the most expensive discovery method and difficult to schedule. (ECF No. 24-1 at 5.)  Defendants in their official capacities are all employees of either Truckee Meadows Community College ("TMCC") or the Nevada System of Higher Education ("NSHE").  (FAC at 12-17.)   Both are already

subject to the Nevada Public Records Act (N.R.S. 239 et seq.) and the NSHE Handbook, Title 4, Chapter 1, Section 31, which require disclosure of public records.  Under current state law, much of the production of documents that are needed in this litigation are already required to be produced if requested at little to no cost. *See, e.g.,* N.R.S. 239 et seq.  Plaintiff on his own has filed multiple public records requests with TMCC and to date only a very small amount have been produced.  Plaintiff's earliest public records request is from September 16, 2021, and only 37 pages of a reported 5,500 emails have been produced.  The continued delay to produce documents required by state law has caused severe harm to Plaintiff by limiting his ability to defend himself before the NSHE Special Hearing that preceded this litigation and now before this Court.  Defendants are now requesting this Court to further grant them the ability to delay production of needed discovery.  Plaintiff respectfully requests this Court to deny the MSD.

## II.   <u>BACKGROUND</u>

Prior to this pending litigation, Plaintiff has been subject to multiple administrative processes at TMCC in relationship to the matters herein.  (FAC at 50, 65, and 89.)   On January 26, 2022, Plaintiff filed his Verified Complaint (ECF No. 1)(the "Complaint") against Defendants, alleging various civil rights violations under 42 U.S.C. § 1983.  On January 28, 2022, Plaintiff filed his FAC.  On March 15, 2022, Defendants filed their Motion to Dismiss (ECF No. 21)(the "MTD") Plaintiff's FAC.  The following day, March 16, 2022, Defendants filed their MSD.

## III.   <u>LEGAL STANDARD</u>

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Virginian R. Co. v. United States*, 272 U.S. 658, 672 (1926).  The Federal Rules of Civil Procedure state that the Rules "…should be construed to secure the just, speedy, and inexpensive

determination of every action." Fed. R. Civ. P. 1.  "[I]f there is even a fair possibility that the stay . . . will work damage to someone else, the stay may be inappropriate absent a showing by the moving party of hardship or inequity." *Dependable Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007).  Courts have broad discretionary power to control discovery. *See, e.g., Little v. City of Seattle,* 863 F.2d 681, 685 (9th Cir.1988). "An alleged constitutional infringement will often alone constitute irreparable harm." *Goldie's Bookstore, Inc. v. Superior Court of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).  "The Federal Rules of Civil Procedure do not provide for automatic or blanket stays of discovery when a potentially dispositive motion is pending." *Tradebay, LLC v. eBay, Inc.,* 278 F.R.D. 597, 601 (D.Nev.2011). Instead, a party seeking to stay discovery carries the heavy burden of making a strong showing why discovery should be denied. *See, e.g., Turner Broadcasting Sys., Inc. v. Tracinda Corp.,* 175 F.R.D. 554, 556 (D.Nev.1997).

Courts in this District have formulated three requirements in determining whether to stay discovery pending resolution of a potentially dispositive motion.  *Kor Media Group, LLC v. Green*, 294 F.R.D. 579 (D. Nevada 2013).  Motions to stay discovery may be granted when: (1) the pending motion is potentially dispositive; (2) the potentially dispositive motion can be decided without additional discovery; and (3) the Court has taken a "preliminary peek" at the merits of the potentially dispositive motion and is convinced that the plaintiff will be unable to state a claim for relief.  *Id* at 581.

IV.   **ARGUMENT**

As articulated below, Defendants have failed to meet their burden with respect to these factors and therefore the MSD should be denied.

///

**A. The Pending MTD is not potentially dispositive.**

Defendants have failed to make a strong showing that they are likely to succeed on the merits of their MTD.   Their MTD will not be dispositive on the entire case since the state law issues and declaratory relief will remain even if their defenses are granted by this Court.

The main arguments that Defendants assert to support their MSD is qualified immunity or Eleventh Amendment sovereign immunity.  These arguments both fail as a matter of law. First, the Eleventh Amendment does not prevent Dr. Jensen from obtaining damages from Defendants in their individual capacities.  *Kentucky v. Graham*, 473 U.S. 159 (1985).   Further, since Dr. Jensen has sued Defendants in their official capacities, he can also obtain prospective relief.  *Ex Parte Young*, 209 U.S. 123 (1908).  Defendants make a blanket assertion that "all causes of action are subject to potential dismissal on an immunity theory."  (MSD at 4.) However, the Ninth Circuit Court of Appeals in *Demers* stated that "[q]ualified immunity does not preclude injunctive relief."  *Demers v. Austin*, 746 F.3d 402, 417 (9th Cir. 2014).

Second, in the Ninth Circuit Court of Appeals, the standard to determine whether qualified immunity exists is whether: (1) the person suing has plausibly alleged a violation of a constitutional right, and (2) the constitutional right was clearly established at the time. *Orn v. City of Tacoma*, 949 F.3d 1167 (9th Cir. 2020)  Dr. Jensen has clearly plead allegations of a plausible violations of his First Amendment rights in his FAC.  Moreover, the precedent from the U.S. Supreme Court and the Ninth Circuit Court of Appeals have clearly established that retaliating against Dr. Jensen for constitutionally protected speech is unconstitutional.  *See Demers,* 746 F.3d at 409-418; *Garcetti v. Caballos*, 547 U.S. 410 (2008); *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Board of Education*, 391 U.S. 563 (1968). Dr. Jensen meets both prongs of this test and this Court should deny the MSD.

Further, even if the defendants are correct in asserting their defenses, this case will continue in Nevada state court.  This U.S. District Court has denied similar motions to stay discovery when state claims would proceed.  *Martinez v. Las Vegas Metropolitan Police Department*, No. 20-cv-00618-JCM-NJK, 2020 WL 3166611, at *1 (D. Nev. June 9, 2020); *Anoruo v. Valley Health System*, LLC, No, 18-cv-00105-MMD-NJK, 2018 WL 1785866 at *3 (D. Nev. April 12, 2018).

### B. Plaintiff needs additional discovery

Here, Plaintiff is alleging multiple serious constitutional violations against Defendants and written discovery would be very helpful to better ascertain the events and facts giving rise to this dispute.  Defendants request this Court to grant an order essentially exempting them from their ongoing state law requirements.  *See generally* NRS 239 et seq.  The public has an interest in better understanding the factual disputes in this matter and in a fair and timely adjudication of this litigation.  Finally, additional discovery is pertinent to the causes of action at issue in the MTD.

### C. Preliminary Peek

Plaintiff, Dr. Lars Jensen, has a very high likelihood of success on at least one, if not every claim against Defendants.  Dr. Jensen alleges seven claims.  There are four claims relating to violation of constitutional rights by Defendants, and two claims that are related to violation of rights secured by the Nevada Constitution.  Dr. Jensen also requests declaratory relief from this Court that: (1) the Defendants' interpretation of insubordination is incorrect, (2) the Defendants' custom or practice of retaliating against and terminating professors for speaking on matters of public concern are unconstitutional abridgments of the freedom of speech, and (3) the

Defendants' custom or practice of ignoring due process rights of faculty in disciplinary hearings are unconstitutional and violate due process rights guaranteed in the Constitution.

### i. The First and Second Causes of Action – First Amendment Retaliation

Dr. Jensen has alleged facts that make out a constitutional violation of his First Amendment rights. The decision in *Demers* was issued by the Ninth Circuit Court of Appeals in 2014 and the U.S. Supreme Court issued the decision in *Garcetti* in 2006. Defendants may not be excused from ignoring these precedents since the case law in this area is well settled. Defendants further claim that "[t]his is a dispute between the Plaintiff and his supervising dean over how Plaintiff's written hand out should be distributed at a college workshop." (MSD at 4) However, this assertion by Defendants raises a factual issue about what the classification of the event in question was and requires additional discovery. Further, Dr. Jensen alleges at least five separate incidents of constitutionally protected expression in his FAC: (1) an email on February 18, 2018, (2) an email on December 18, 2019, (3) his attempt to ask a question at the Math Summit, (4) distribution of a handout at the Math Summit, and (5) a February 2020 email. These are more than sufficient alleged facts to make out a First Amendment violation by Defendants. Finally, additional discovery would help better understand the underlying events for each incident of protected expression listed above.

### ii. Fourth Cause of Action – Procedural Due Process

Defendants argue that Dr. Jensen failed to plausibly allege the prima facie elements of a procedural due process claim. However, Defendants' policy of applying incorrect standards of insubordination based on distributing handouts failed to give Dr. Jensen adequate notice of what is "insubordination" at TMCC. Further, Dr. Jensen has a property interest in TMCC following

policy and NSHE Code.  These alleged facts are more than sufficient to make out a claim of a violation of procedural due process.

### iii. Sixth Cause of Action – Equal Protection

Defendants argue in their MSD and their MTD that Dr. Jensen's Sixth Cause of Action fails because he did not adequately plead a "class-of-one" theory.  However, Dr. Jensen's complaint is not based on a "class-of-one" theory but on the principle that "all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  As alleged in the FAC, Defendants punished Dr. Jensen for attempting to exercise his First Amendment rights, but they took no action against others who spoke at the Math Summit.  Further, discovery may reveal more instances of Defendants retaliating or punishing other faculty for having similar views as Dr. Jensen.

### iv. Third and Fifth Causes of Action – State Law Claims

Dr. Jensen has alleged state law claims based on the Nevada Constitution for infringements on his speech and due process rights.  Defendants claim in their MTD that the Court should decline supplemental jurisdiction over these claims, but even if that happens Dr. Jensen will continue this litigation in state court.  As mentioned above, in similar situations this U.S. District Court has denied stays of discovery when it is likely that state law claims would proceed if federal claims were dismissed. *See Martinez,* 2020 WL 3166611, at *1; *see also Anoruo*, 2018 WL 1785866 at *3.

### v. Seventh Cause of Action – Declaratory Relief

This Court has authority under federal statute to issue declaratory relief.  Even if the other claims are dismissed this Court still has the authority to make a declaratory judgment regarding the Defendants interpretation of insubordination being incorrect based on prior Nevada Supreme

Court precedent.  *See generally State ex rel. Richardson v. Board of Regents*, 70 Nev. 144 (1981).

### D. Burden of Discovery

"The fact that discovery may involve inconvenience and expense is not sufficient, standing alone, to support a stay of discovery." *See Kor Media Grp., LLC,* 294 F.R.D. at 579, 583.  Dr. Jensen has attempted in good faith to limit costs associated with discovery and agreed to stay depositions.  As already mentioned above, both TMCC and NSHE already are subject to the Nevada Public Records Act and much of the production of documents needed in this litigation would not create unnecessary inconvenience or expense for Defendants since they already have a legal requirement to produce the materials to the public if requested.

### V.    <u>CONCLUSION</u>

While Defendants may not want to disclose damaging facts, they fail to articulate a legitimate necessity for such an overly broad stay of discovery by this Court.  Given their failure to promptly respond to Plaintiff's previous public records requests this strongly suggests that this MSD was filed for an improper purpose and is part of a bad faith strategy to further harm Dr. Jensen by preventing him from gathering needed discovery.   Moreover, both the defense of qualified immunity and Eleventh Amendment sovereign immunity fail as a matter of law.  Their defenses do not cover the remaining state law claims or declaratory relief requested by Plaintiff and therefore they fail to show that the pending MTD is dispositive.  As such, the MSD should be denied by this Court.

Even if this Court is so moved to grant the stay, Plaintiff would request that this Court limit the stay to only depositions and allow written discovery to continue.  Further, if a stay is granted by this Court Plaintiff requests that the Court leave open the option for a motion to lift

the stay immediately pending the District Court's ruling on the MTD. Allowing the stay until

the filing of an Answer is unnecessarily long and against the spirit of Federal Rule of Civil

Procedure 1's requirement of a "…just, speedy, and inexpensive determination of every action."

Fed. R. Civ. P. 1.

For the reasons stated above, Plaintiff Lars Jensen respectfully requests this Court to deny

the MSD.

DATED: March 30, 2022

Respectfully submitted,

By:  /s/ John M. Nolan
John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

/s/ Michael Langton
Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

/s/ Mark Mausert
Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff*

ER255

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 255 of 298
Case 3:22-cv-00045-MMD-CLB   Document 28   Filed 04/06/22   Page 1 of 9

Kiah D. Beverly-Graham,
NV Bar No. 11916
Deputy General Counsel
John Albrecht, NV Bar No. 4505
General Counsel
Truckee Meadows Community College
2215 Raggio Parkway
Reno, Nevada 89512-1095
(775) 673-7396
(775) 673-7135 fax
john.albrecht@dri.edu
kiah.beverly@dri.edu
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LARS JENSEN,

        Plaintiff,

v.

NATALIE BROWN, et al.

        Defendants.

Case No. 3:22-cv-00045-MMD-CLB

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO STAY DISCOVERY

In their Motion to Stay Discovery (ECF No. 24) ("Motion"), Defendants established that entry of an order staying discovery in this action is appropriate due to the pendency of their Motion to Dismiss (ECF No. 21) ("MTD"), which is likely dispositive of this case. In the MTD, all Defendants raised defenses of Eleventh Amendment sovereign immunity and qualified immunity. The case law supports entry of a stay until resolution of the immunity defenses. *See* Motion, ECF No. 24 at 3:23-4:17. The MTD puts forth several additional arguments that are independently dispositive of the entire action, further warranting entry of the requested stay. MTD, ECF No. 21, 9-24.

The material issues raised by Plaintiff's Response in Opposition to Defendant's Motion (ECF No. 27) ("Opposition" or "Opp.") are addressed below.

-1-

# ARGUMENT

**I.    Defendants Have Raised Viable Eleventh Amendment and Qualified Immunity Defenses and Such Defenses Warrant A Stay of Discovery**

As Plaintiff correctly points out, a discovery stay is not automatic, even if a potentially dispositive motion is pending. However, there are certain issues which, when raised in a motion to dismiss, tend to warrant a stay of discovery. The immunity arguments raised in the MTD are such issues.

As this Court has held, "a pending Motion to Dismiss is not ordinarily a situation that in and of itself would warrant a stay of discovery. **Common examples of such situations, however, occur when jurisdiction, venue, or immunity are preliminary issues**." *Twin City Fire Ins. Co. v. Emps. Ins. of Wausau*, 124 F.R.D. 652, 653 (D. Nev. 1989) (Reed, J.) (emphasis added) (citing ref's omitted). Judge Reed went on to note that "the United States Supreme Court has stated that in suits against government officials, which raise issues of immunity, discovery should not be allowed until the resolution of certain threshold questions through motions to dismiss or motions for summary judgment." *Id.* (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817, (1982)).

Numerous decisions from the Ninth Circuit and this Court confirm that "stay[ing] discovery until the issue of immunity [is] decided . . . furthers the goal of efficiency for the court and litigants." *See Little v. Seattle*, 863 F.2d 681, 685 (9th Cir. 1988) (affirming discovery stay while immunity issue was decided); *see also Pina v. Lewis*, 717 F. App'x 739, 740 (9th Cir. 2018) ("district court did not abuse its discretion by granting defendants' motion to stay discovery because the question of defendants' immunity had not been resolved"); *Hinkley v. Vail*, 616 F. App'x 274, 275 (9th Cir. 2015) (same); *Ministerio Roca Solida v. Dep't of Fish & Wildlife*, 288 F.R.D. 500, 507 (D. Nev. 2013) (granting stay of discovery where motion to

ER257

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 257 of 298
Case 3:22-cv-00045-MMD-CLB   Document 28   Filed 04/06/22   Page 3 of 9

dismiss raised immunity issues and finding "that the interest of a just, speedy and inexpensive resolution of the matter justifies temporarily staying discovery in this matter"); *Slocum v. Fowler*, 16-cv-02169-JAD-CWH, 2018 WL 4468998, at *3 (D. Nev. Sept. 18, 2018); *Pilger v. Mosley*, No. 18-cv-00854-JAD-PAL, 2018 WL 5268605, at *2 (D. Nev. Oct. 23, 2018).

The Opposition makes various arguments about why the immunity defenses cannot result in complete dismissal of this action. None of these arguments warrant denial of the Motion.

<u>First</u>, Plaintiff argues that Eleventh Amendment immunity does not prevent him from obtaining damages against Defendants in their individual capacities. Opp. 5:8-9. But qualified immunity, which is also raised in the MTD as grounds to dismiss the individual capacity defendants, does. *See*, *e.g.*, *J. K. J. v. San Diego*, 17 F.4th 1247, 1258 (9th Cir. 2021) (dismissing individual defendants on grounds of qualified immunity); *see also* MTD, ECF No. 21 at 21:20-22:9. Thus, the MTD presents a viable basis to dismiss the claims against the official and individual defendants. And the case law provides that staying discovery pending resolution of questions of qualified immunity is appropriate. *See Little*, 863 F.2d at 685 (affirming discovery stay while qualified immunity issue was decided).

<u>Second</u>, the Opposition suggests a stay is not warranted because qualified immunity purportedly does not preclude injunctive relief and, accordingly, some sliver of a claim will survive the MTD. Opp. 5:14-15. But many courts have stayed discovery based on the pendency of a qualified immunity defense, even when injunctive relief is sought. *E.g.*, *McComb v. Crehan*, No. 06-cv-00852-RCJ-PAL, 2007 WL 9728904, at *2 (D. Nev. Sept. 10, 2007) (staying discovery until qualified immunity defense resolved, notwithstanding claims for injunctive relief); *Self v. Horel*, No. 07-cv-5347-MMC, 2008 WL 4774457, at *2 (N.D. Cal. Oct. 30, 2008)

(same). And the MTD asserts numerous arguments other than immunity that are likely to dispose of the entire action. *See* MTD, ECF No. 21, at 9-24.

<u>Third</u>, Plaintiff argues that Eleventh Amendment immunity does not protect the official capacity Defendants from his claims for "prospective relief." Opp. 5:9-12. But, as explained in the MTD, the pleading does not actually allege facts that amount to a claim for prospective relief. *See* MTD, ECF No. 21 at 21:8-18. With respect to one claim – the First Amendment cause of action against official capacity defendants – the First Amended Complaint ("FAC") attempts to assert an entitlement for "prospective relief." *See* FAC (ECF No. 8) ¶¶ 105-06. But prospective relief is a "narrow exception" to immunity, which exists where there is a request for injunctive relief to compel future compliance with the law. *See Krainski v. Nev*, 616 F.3d 963, 967-68 (9th Cir. 2010). The FAC's "prospective relief" allegations do not meet this standard. They allege either monetary harm or seek retroactive changes to Plaintiff's personnel file, not future compliance with the law. *See* FAC (ECF No. 8) ¶¶ 105-06. Thus, this "narrow exception" to Eleventh Amendment immunity is not available to Plaintiff.

<u>Fourth</u>, Plaintiff appears to argue that even if the immunity defenses preclude this action in federal court, he will refile in state court. *See* Opp. 6:2-4. But the presence of state law claims that might theoretically be refiled in the future is not an automatic bar to a stay. *See, e.g., Pina* 717 F. App'x at 740 (affirming stay of discovery where immunity questions were unresolved, notwithstanding presence of plaintiff's state law claims).

In support of this argument, Plaintiff relies on *Martinez v. Las Vegas Metro. Police Dep't*, No. 20-cv-00618-JCM-NJK, 2020 WL 3166611 (D. Nev. June 9, 2020) and *Anoruo v. Valley Health System*, LLC, No. 18-cv-00105-MMD-NJK, 2018 WL 1785866 (D. Nev. Apr. 13, 2018). Both cases are inapposite.

In *Martinez* the Court declined to stay discovery because, unlike here, the underlying motion was not potentially dispositive of all of Plaintiff's claims. 2020 WL 3166611, at *1. In part, this holding was based on Defendant's concession that the *partial* motion to dismiss would not be dispositive of the entire case because it did not challenge a state law claim. *Id.* Here, the MTD challenges every cause of action in the pleading and, if granted, would dispose of the entire case. *See* MTD, ECF No. 21 at 9-24. And, as just discussed, courts can, and do, grant stays even in light of the theoretical possibility that similar claims may be filed in state court.

*Anoruo* is even further afield. There, plaintiff sought to stay discovery pending his motion to remand, amend, and extend time to respond to defendant's motion to dismiss. The Court denied the stay, principally because "a motion to remand is not sufficient grounds to grant a stay of discovery." *Id.* at *3. Here, the underlying MTD is the sort of motion that regularly warrants a stay of discovery, as discussed above.

And, Defendants have raised several other viable arguments in the MTD that support wholesale dismissal of the action. With respect to these arguments, Defendants stand on their summary contained in the moving papers and the arguments in the MTD itself. Motion, ECF No. 24 at 4:17-5:19; MTD, ECF No. 21, at 9-24.

In sum, between the immunity defenses and the other viable arguments raised in the MTD, Defendants are likely to prevail on their dispositive motion and obtain complete dismissal of all causes of action. Accordingly, a stay of discovery is warranted.

**II.**   **Plaintiff Effectively Concedes No Discovery Is Needed to Resolve the MTD**

To obtain the requested stay, Defendants must also establish that no discovery is needed for the purpose of resolving the pending MTD. *See Tradebay, LLC, v. eBay, Inc.*, 278 F.R.D. 597, 602 (D. Nev. 2011). Defendants did so in the opening brief. Motion, ECF No. 24, at 5:19-

24. The Opposition does not present any argument to the contrary, arguing instead that Plaintiff

needs discovery in the action generally and with respect to the "causes of action at issue in the

MTD." Opp. 6:10-18. But all causes of action are at issue in the MTD, and the Opposition fails

to explain what discovery is needed now to resolve that motion or why. Plaintiff does not truly

respond to this point, effectively conceding that no discovery is needed to resolve the MTD.

**III.    Plaintiff's Statements Regarding Litigation Misconduct Are Irrelevant and May Be Disregarded and These Statements Are Demonstrably Incorrect and Misleading**

According to the Opposition, Defendants' Motion is "improper" and "part of a bad faith

strategy to further harm Dr. Jensen by preventing him from gathering needed discovery" by

"delay[ing] adjudication of this case on the merits." Opp. 2:20-22; 9:14-19. Seemingly in support

of this serious charge of misconduct, the Opposition also asserts that Defendants are responsible

for purported "delay" in TMCC's response to various public record requests submitted by

Plaintiff. This delay supposedly "caused severe harm to Plaintiff by limiting his ability to defend

himself . . . before this Court" and in an administrative disciplinary proceeding that TMCC

conducted with respect to Plaintiff in October 2021 (the "Termination Proceeding"). Opp. 3:4-

12.  These assertions of wrongdoing are demonstrably inaccurate and misleading and, in any

case, irrelevant to the disposition of this Motion.

Most importantly, the Opposition fails to point to any authority that provides that alleged

extra-litigation misconduct is relevant to resolving an application for a discovery stay. It is not,

and the Court can disregard these assertions. If the Court is inclined to put these allegations

aside, Defendants will let the issue rest.

However, if the Court finds these claims are relevant to the disposition of the Motion,

then Defendants' position in response is also relevant. That position is as follows.

First, the claims of improper conduct are untrue. Defendants have engaged in no bad faith conduct in connection with discovery in this action or in connection with Plaintiff's public record requests or the disclosure obligations in the Termination Proceeding.

Second, Plaintiff's assertions of prejudice fall apart upon close analysis. Plaintiff claims to have suffered "severe harm" in this action due to a perceived delay in TMCC's response to his pre-litigation, state law public record requests. But Plaintiff's claims of harm are belied by the fact that he is no worse off than any other plaintiff would be at the outset of a litigation. In fact, he is in a far better position in terms of discovery than the average litigant would be at this early stage. This is because in the Termination Proceeding, in which Plaintiff raised many of the same issues now asserted in the FAC, Plaintiff received hundreds of pages of documents in the form of prehearing disclosures and his personnel file. Plaintiff already has a substantial portion of the documentary discovery needed in this case.

Third, any delay in TMCC's (*not Defendants*') response to Plaintiff's record requests are for good-faith and normal-course reasons.[1] TMCC has worked diligently to respond to Plaintiff's multiple, unfocused records requests. Among other things, these requests seek years of emails – from five different custodians who work largely through email – which contain Plaintiff's first or last name. Some of the requests go as far back as January 2017; others are without limitation in time. Plaintiff declined TMCC's request to focus these searches on some particular issue. As a result, the searches requested have yielded a substantial number of documents that are not actually responsive to the requests. Nevertheless, TMCC personnel must review all of the results

---

[1]     If directed, Defendants stand ready to submit sworn statements and documentary evidence that substantiate the factual assertions in this argument.

ER262

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 262 of 298
Case 3:22-cv-00045-MMD-CLB   Document 28   Filed 04/06/22   Page 8 of 9

to locate the documents that are actually responsive and for privilege and third-party

confidentiality issues.

TMCC's ability to quickly respond to the requests is also affected by functional

limitations associated with TMCC's low-cost email system; competing public record requests;

and the fact that TMCC does not have the resources to dedicate a full-time employee to public

record requests. Importantly, TMCC has not denied any of Plaintiff's requests and continues to

work diligently on completing them.

<u>Fourth</u>, Plaintiff is incorrect in claiming that TMCC's conduct with respect to document

disclosures prejudiced him in the Termination Proceeding. Nothing demonstrates this more

clearly than the fact that the hearing did not result in Plaintiff's termination or any other sanction.

Clearly Plaintiff was not materially prejudiced.

In advance of the hearing, TMCC produced all documents upon which it intended to rely

and issued subpoenas to Plaintiff for documents and testimony at his request. This is all the

Nevada System of Higher Education ("NSHE") governing regulations require. *See* NSHE Code,

Title 2, Ch. 6, §§ 6.9.4 and 6.9.11 (available at https://nshe.nevada.edu/leadership-policy/board-

of-regents/handbook/).

Plaintiff's real complaint is that the subpoenas were quashed by the hearing officer. But

TMCC obtained that order on motion, with notice, and Plaintiff had the chance to fully brief the

issue. The hearing officer simply did not agree that Plaintiff was entitled to the documents.

Finally, Defendants would clarify the relief requested. Defendants have requested a stay

through the date on which they file an answer. That is merely a suggested efficiency in the event

the Court grants the MTD without prejudice. It is not a material component of the relief

ER263

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 263 of 298
Case 3:22-cv-00045-MMD-CLB   Document 28   Filed 04/06/22   Page 9 of 9

1    requested, and Defendants have no objection to entry of a stay which lifts automatically upon

2    disposition of the pending MTD.

3                                        **CONCLUSION**

4            For the reasons stated herein, as well as those stated in their moving papers, Defendants

5    respectfully request that the Court grant their Motion to Stay Discovery.

6    DATED April 6, 2022

7

8                                        */s/ Kiah Beverly-Graham*____
                                         Kiah D. Beverly-Graham, NV Bar No. 11916
9                                        Deputy General Counsel
                                         John Albrecht, NV Bar No. 4505
10                                       General Counsel
                                         Truckee Meadows Community College 2215
11                                       Raggio Parkway
                                         Reno, Nevada 89512-1095
12                                       (775) 673-7396
                                         (775) 673-7135 fax
13                                       john.albrecht@dri.edu
                                         kiah.beverly@dri.edu
14
                                         *Attorneys for Defendants*
15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                         -9-

John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff Lars Jensen*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LARS JENSEN, an individual,

        *Plaintiff,*

    v.

NATALIE BROWN, in her individual and
official capacities as Administrative Officer at
Truckee Meadows Community College; JULIE
ELLSWORTH, in her individual and official
capacities as Dean of Sciences at Truckee
Meadows Community College; ANNE
FLESHER, in her individual and official
capacities as Dean of Math and Physical
Sciences at Truckee Meadows Community
College; KARIN HILGERSOM, in her
individual and official capacities as President of
Truckee Meadows Community College;
MARIE MURGOLO, in her individual and
official capacities as Vice President of
Academic Affairs at Truckee Meadows
Community College; MELODY ROSE, in her

Case No. 3:22-cv-00045-ART-CLB

**PLAINTIFF'S MOTION TO AMEND
RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
THE FIRST AMENDED VERIFIED
COMPLAINT**

**ORAL ARGUMENT REQUESTED**

individual and official capacities as Chancellor of the Nevada System of Higher Education,

*Defendants.*

Plaintiff Lars Jensen, by and through his undersigned counsel, move this Court for leave to Amend his Response in Opposition to Defendants' Brown, et al., Motion to Dismiss the First Amended Complaint filed on April 13, 2022, (ECF No. 33)(the "OMTD" ) in light of new evidence that was turned over to Plaintiff on September 7, 2022, as a result of a public records request made on September 16, 2021.  This Motion to Amend Plaintiff's OMTD  is made and based upon the following Memorandum of Points and Authorities, the Verified Complaint (ECF No.1)(the "complaint" ) and exhibits thereto, the First Amended Verified Complaint (ECF No. 8)(the "FAC" ) and exhibits thereto, Defendants' Brown, et al., Motion to Dismiss (ECF No. 21)(the "MTD" ), the exhibits and declarations filed in support of the OMTD, the Declaration of David Demers (ECF No. 31)( "Demers Decl." ) and exhibits thereto, the Declaration of Lars Jensen (ECF No. 32)( "Jensen Decl." )and exhibits thereto, Defendants' Brown, et al, Reply to the Opposition to the Motion to Dismiss, (ECF No. 34)(the "Reply" ), the pleadings and papers on file herein including documents attached to or incorporated into the pleadings, and such other evidence and argument as the Court may allow.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    BACKGROUND

Plaintiff, Dr. Lars Jensen, filed his Verified Complaint on January 26, 2022.  Two days later, on January 28, 2022, Plaintiff filed his FAC.  Defendants filed their MTD on March 15, 2022, Plaintiff filed his OMTD on April 13, 2022, and Defendants filed their reply on May 4,

2022.  Prior to this matter being before this Court, Plaintiff was subject to a termination hearing that took place on October 1 and October 22, 2021.  In preparation for that hearing, Plaintiff made various public records requests for information on September 16, 2021.  Part of the request, which is still not completely responded to, was released to Plaintiff on September 7, 2022, and contained additional "new facts" that clearly show Defendants' intent to retaliate against Plaintiff for his constitutionally protected speech.

Plaintiff respectfully requests this Court to allow leave to Amend his OMTD by including the proposed Exhibit H.

## II.    <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 15(a)(2), "…a party may amend its pleading only with the opposing party's written consent or the court's leave."  The rule goes on to state that Courts "should freely give leave when justice so requires."  *Id.*  When deciding whether to grant a motion for leave to amend the Court should assess the following five factors: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) whether plaintiff had previously amended his complaint." *Madrid v. Hutchings*, 2022 WL 4110368 at 27 (D. Nev Sept. 6, 2022)(quoting *In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 738 (9th Cir. 2013)).  The Ninth Circuit has held that the presentation of "new facts" combined with "satisfactory explanation for his failure to fully develop his contentions originally" as sufficient grounds for a District Court to grant leave to amend.  *See Bonin v. Calderon*, 59 F. 3d 815, 845 (9th Cir. 1995)(citing *Allen v. City of Beverly Hills*, 911 F. 2d 367, 374 (9th Cir. 1990)).

///

///

### III.   <u>ANALYSIS</u>

Dr. Jensen's Motion for Leave to Amend his OMTD is based on new facts discovered in the delivery of emails from a public records request.  The pertinent email chain disclosed through the records request reveals that Defendant Julie Ellsworth and Defendant Anne Flesher coordinated with others at TMCC prior to the Math Summit on January 21, 2020, to retaliate against Plaintiff's constitutionally protected speech.

First, this email chain demonstrates that Defendants' empty claim of Plaintiff creating a "conspiracy theory" is wrong and that in fact at least two of the named Defendants did in fact specifically target Plaintiff prior to the Math Summit on January 21, 2020. *See* MTD 3:6-10  This email thread also reveals why only Plaintiff was targeted at the Math Summit to use the "Parking Lot."

Second, the email chain also shows that at one-point Defendants were seriously considering having police present to arrest Dr. Jensen because they felt his professionally articulated concerns were "bullying."  Prior planning to have the police present would provide support for Plaintiff's claim that the Math Summit was a public event.

Third, the overall email thread demonstrates intent by Defendants Julie Ellsworth and Anne Flesher to discriminate against Plaintiff because Defendants did not approve of the content of his speech regarding policy implementation for math curriculum at Truckee Meadows Community College that dealt with matters of public concern.  In Defendants' MTD they state that Plaintiff's prior emails "…do not support the First Amendment claims and can be put aside for this analysis." *See* MTD 9:22-23  This newly discovered email thread reveals that Plaintiff was targeted specifically for disciplinary action for his prior speech in emails.  Plaintiff originally requested these emails through a public records request on September 16, 2021, with a request

for delivery before October 1, 2021, so they could be used in his termination hearing. Defendants' delivery of the emails occurred on September 7, 2022 – almost one year later. This delay severely hurt Plaintiff's ability to defend himself at the termination hearing and pleadings before this Court.

Fourth, this email thread clearly demonstrates that Plaintiff was speaking on matters of public concern, raises important questions as to whether the speech was as a private citizen or public employee, shows that the adverse employment action was based on the Plaintiff's protected speech, reveals that Defendants' lacked justification for treating Plaintiff differently, and shows that the basis for the adverse employment action was the protected speech. Under the clearly established case law in the Ninth Circuit, these newly discovered facts meet the tests set out for First Amendment Retaliation. *See Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009); *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014).

Finally, this email thread also shows that Defendant Ellsworth and Defendant Flesher considered Dr. Jensen's prior constitutionally protected speech as an "attack" on them as administrators, which further supports Plaintiff's state law claims made under the precedent from the *Richardson* case from the Nevada Supreme Court. *See Richardson v. Bd. of Regents*, 70 Nev. 347, 366-67 (1954); *See also* Reply 4:13-22.

**IV.** **CONCLUSION**

Plaintiff respectfully requests that this honorable Court grant leave to amend his OMTD by inclusion of proposed Exhibit H. This exhibit contains an email thread which demonstrates Plaintiff was targeted prior to the Math Summit on January 21, 2020, for retaliation based on his constitutionally protected speech.

For the foregoing reasons, Plaintiff Dr. Lars Jensen respectfully requests this Court to grant the Motion for Leave to Amend his OMTD by including Exhibit H.

DATED: September 22, 2022                         Respectfully submitted,

                                    By:   /s/ John M. Nolan
                                          John M. Nolan, Esq. (NSBN 15790)
                                          2750 Peavine Creek Road
                                          Reno, Nevada 89523
                                          jmnolan84@gmail.com

                                          /s/ Michael Langton
                                          Michael Langton, Esq. (NSBN 290)
                                          801 Riverside Drive
                                          Reno, NV 89503
                                          Telephone: (775) 329-3612
                                          mlangton@sbcglobal.net

                                          /s/ Mark Mausert
                                          Mark Mausert, Esq. (NSBN 2398)
                                          Sean McDowell, Esq. (NSBN 15962)
                                          729 Evans Avenue
                                          Reno, Nevada 89512
                                          Telephone: (775) 786-5477
                                          mark@markmausertlaw.com

                                          *Attorneys for Plaintiff Lars Jensen*

John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff Lars Jensen*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LARS JENSEN, an individual, | Case No. 3:22-cv-00045-ART-CLB |
| *Plaintiff,* | **JOHN M. NOLAN DECLARATION** |
| v. | |
| NATALIE BROWN, et al | |
| *Defendants.* | |

I, John M. Nolan, declare under penalty of perjury as follows:

1.  I am co-counsel for Plaintiff Dr. Lars Jensen.

2.  This declaration is in support of Plaintiff's Motion to Amend his Response in

Opposition to Defendants' Brown, et al., Motion to Dismiss the First Amended

Verified Complaint.

3.  In connection with my duties as co-counsel, I have obtained personal knowledge of the facts stated herein.

4.  On September 7, 2022, Plaintiff Lars Jensen forwarded to me an email with two attachments from Elena Bubnova.

5.  The two attachments contained approximately 289 pages of emails and other documents that were part of a public records request that Plaintiff Lars Jensen had originally requested on September 16, 2021.

6.  Attached to the accompanying Motion to Amend are true and correct copies of 3 pages of relevant documents from the public records disclosure from Elena Bubnova on September 7, 2022 listed as Exhibit H.

DATED: September 22, 2022

By:  /s/ John M. Nolan
John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

# EXHIBIT H

**Email thread dated January 18, 2020-January 21, 2020**

# EXHIBIT H

**From:** Julie Ellsworth <jellsworth@tmcc.edu>
**Sent on:** Tuesday, January 21, 2020 12:00:14 PM
**To:** Kim Studebaker <kstudebaker@tmcc.edu>
**Subject:** Re: Pathways - Some Observations

He disobeyed my request of process in the meeting and I will be writing him up.

Sent from my iPhone

> On Jan 21, 2020, at 8:14 AM, Kim Studebaker <kstudebaker@tmcc.edu> wrote:

> Here's my cell # if needed:

> ▄▄▄▄▄▄

>> On Tue, Jan 21, 2020 at 7:24 AM Julie Ellsworth <jellsworth@tmcc.edu> wrote:
>> He bullies all the time
>>
>> I will play today as we go. Do not need anyone on hand. But will call if needed. Thanks!
>>
>> Sent from my iPhone
>>
>>> On Jan 20, 2020, at 10:16 AM, Kim Studebaker <kstudebaker@tmcc.edu> wrote:
>>>
>>> Ok, thanks. It sounds like from your response to AnnE that Lars has been disruptive and bullying in your recent Math Dept meetings-is that correct ? Do you want the police nearby during your summit and breakout sessions?or do you prefer to take a "wait and see" approach?
>>>
>>>> On Sun, Jan 19, 2020 at 7:24 AM Julie Ellsworth <jellsworth@tmcc.edu> wrote:
>>>> The Summit is on Tuesday from 9am-1:30pm, primarily in Rdmt 256...but there are two breakout rooms from 10:30-12:30 in 252 and 253. I do not know if Anne sent or if the message was received.
>>>>
>>>> Sent from my iPhone
>>>>
>>>>> On Jan 19, 2020, at 7:08 AM, Kim Studebaker <kstudebaker@tmcc.edu> wrote:
>>>>>
>>>>> Confirming that I received this email. What time and where is the Math Summit being held on Tuesday?
>>>>>
>>>>> Kim
>>>>>
>>>>> On Sat, Jan 18, 2020 at 11:47 AM Julie Ellsworth <jellsworth@tmcc.edu> wrote:
>>>>>> You may inform Lars that I consider 13B the final version, based on the department vote, and it is time to move forward.
>>>>>>
>>>>>> If he is unable to move forward he may be excused from the Math Summit on Tuesday and future math meetings.
>>>>>>
>>>>>> I will not tolerate disruption toward moving forward, and I will have the police on hand to remove him from the Summit or future math meetings if it becomes necessary. I will not tolerate his bullying and harassing behavior.
>>>>>>
>>>>>> I have cc-ed HR so they are aware of the situation.
>>>>>>
>>>>>> You may forward him this email, if that is easiest.
>>>>>>
>>>>>> Thanks,
>>>>>> Julie
>>>>>>
>>>>>> On Sat, Jan 18, 2020 at 11:20 AM Anne Flesher <aflesher@tmcc.edu> wrote:
>>>>>>> Where the conversation is today. Using 105 is in conflict with the policy. They need help!
>>>>>>>
>>>>>>> Sent from my iPhone
>>>>>>>
>>>>>>> Begin forwarded message:
>>>>>>>
>>>>>>>> **From:** Lars <ljensen@tmcc.edu>
>>>>>>>> **Date:** January 18, 2020 at 10:05:40 AM PST

ER274

**To:** Anne Flesher <aflesher@tmcc.edu>, Bill Gallegos <bgallegos@tmcc.edu>, Bill Newhall <bnewhall@tmcc.edu>, Blisin Hestiyas <bhestiyas@tmcc.edu>, Casey Machen <cmachen@tmcc.edu>, Damien Ennis <dennis@tmcc.edu>, Dan Hooper <dhooper@tmcc.edu>, Gail Ferrell <gsmall@tmcc.edu>, Hieu Do <hdo@tmcc.edu>, Jeffrey Olsen <jolsen@tmcc.edu>, Jim Cotter <jcotter@tmcc.edu>, Jim Winston <jwinston@tmcc.edu>, Jonathan Lam <jlam@tmcc.edu>, Kurt Ehlers <kehlers@tmcc.edu>, Lars Jensen <ljensen@tmcc.edu>, Paula Farrenkopf <pfarrenkopf@tmcc.edu>, Rebecca McCleary <rmccleary@tmcc.edu>, Rebecca Porter <rporter@tmcc.edu>, Shannon McCool <smccool@tmcc.edu>, Shehara Snow <ssnow@tmcc.edu>, Theodore Lambert <tlambert@tmcc.edu>
**Subject: Pathways - Some Observations**


Dear Colleagues,

Here are some of my observations and proposals (attached) on the
co-req paths, and related issues. (Yes, I will keep fighting this
until everything is written in rock.)

(1) There no agreement in the Department on what Math 124 is going to
be. Some, including Jeff, believe we need to basically change it into
a Math 95+96. Others, including Anne and myself believe it should be
taught in accord with the course description, i.e. basically as a
second precalc course. While Paula, Kurt, Jeff, and I were discussing
this last Wednesday, the following idea came up for the STEM sequence:
Start the STEM pathway with an open Math 105, and allow students who
pass this course to register for a co-req Math 126+26. This makes Math
124 unnecessary, but does not prevent us from teaching it (according
to course description, of course) if nursing or others really need us
to. The obvious advantage with this setup is that we are taking full
advantage of the fact that we are a community college, and STEM
students who find that Math 126+3 is too much for them can fall back
on Math 105, and go change into a vocational direction (see attached).

(2) What we're doing to Math 120 is unconscionable. there is no reason
why we cannot keep teaching regular Math 120 exactly the way we do
now, and complement it with a Math 120+20 coreq (3+3) course, where
the Math 20 part covers Math 95+96. This would align us with UNR as
well. Teaching the 120 part of a Math 120+20 coreq course exactly as
we do now would not change retention- or graduation rates at all
because the grade in a 120+20 is determined by the grade in the 120
part. If we did it this way, we could allow a student passing any 120
to register for 126, and we would be aligned with UNR.  (see
attached).

(3) I assume we shall have a final vote of approval for whatever
version we com up with. I don't consider the current voting procedure
sufficient. For example when we get a choice between version 13a and
13b, I see it as a choice between which of these version I prefer, and
not a question of whether I approve of any of these. For example, I
prefer 13b over 13a, but I would vote against on an up/down vote on
either one. Therefore I cannot consider Version 13b as final before an
up/down vote on it has been taken.\\

Lars.

--


--

*Public Records Notice:* In accordance with Nevada Revised Statutes
(NRS) Chapter 239, this email and responses, unless otherwise made
confidential by law, may be subject to the Nevada Public Records laws and
may be disclosed to the public upon request.

--
**Public Records Notice:** In accordance with Nevada Revised Statutes (NRS) Chapter 239, this email and responses, unless otherwise made
confidential by law, may be subject to the Nevada Public Records laws and may be disclosed to the public upon request.

--
Julie Ellsworth, Ph.D.
Dean of Sciences

ER274

Truckee Meadows Community College
775.674.7552 (Dandini office)

--
**Public Records Notice:** In accordance with Nevada Revised Statutes (NRS) Chapter 239, this email and responses, unless otherwise made confidential by law, may be subject to the Nevada Public Records laws and may be disclosed to the public upon request.

--
**Kim Studebaker, SPHR, SHRM-SCP**
**Assistant Director, Human Resources**
Truckee Meadows Community College
7000 Dandini Blvd./RDMT 211
Reno, NV 89512
(775) 674-7502 Phone
(775) 674-7560 Fax
kstudebaker@tmcc.edu

--
**Public Records Notice:** In accordance with Nevada Revised Statutes (NRS) Chapter 239, this email and responses, unless otherwise made confidential by law, may be subject to the Nevada Public Records laws and may be disclosed to the public upon request.

--
**Public Records Notice:** In accordance with Nevada Revised Statutes (NRS) Chapter 239, this email and responses, unless otherwise made confidential by law, may be subject to the Nevada Public Records laws and may be disclosed to the public upon request.

--
**Kim Studebaker, SPHR, SHRM-SCP**
**Assistant Director, Human Resources**
Truckee Meadows Community College
7000 Dandini Blvd./RDMT 211
Reno, NV 89512
(775) 674-7502 Phone
(775) 674-7560 Fax
kstudebaker@tmcc.edu

--
**Public Records Notice:** In accordance with Nevada Revised Statutes (NRS) Chapter 239, this email and responses, unless otherwise made confidential by law, may be subject to the Nevada Public Records laws and may be disclosed to the public upon request.

--
**Public Records Notice:** In accordance with Nevada Revised Statutes (NRS) Chapter 239, this email and responses, unless otherwise made confidential by law, may be subject to the Nevada Public Records laws and may be disclosed to the public upon request.

--
**Kim Studebaker, SPHR, SHRM-SCP**
**Assistant Director, Human Resources**
Truckee Meadows Community College
7000 Dandini Blvd./RDMT 211
Reno, NV 89512
(775) 674-7502 Phone
(775) 674-7560 Fax
kstudebaker@tmcc.edu

--
**Public Records Notice:** In accordance with Nevada Revised Statutes (NRS) Chapter 239, this email and responses, unless otherwise made confidential by law, may be subject to the Nevada Public Records laws and may be disclosed to the public upon request.

ER276

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 276 of 298
Case 3:22-cv-00045-ART-CLB   Document 45   Filed 10/06/22   Page 1 of 4

1    Kiah D. Beverly-Graham
     NV Bar No. 11916
2    General Counsel
     Truckee Meadows Community College
3    2215 Raggio Parkway
     Reno, Nevada 89512-1095
4    (775) 673-7300
     (775) 673-7135 fax
5    kiah.beverly@dri.edu

6    *Attorney for Defendant*

7                    **UNITED STATES DISTRICT COURT**
                           **DISTRICT OF NEVADA**
8

9    LARS JENSEN,

10            Plaintiff,

11        v.                                    Case No. 3:22-cv-00045-ART-CLB

12   NATALIE BROWN, et al.

             Defendants.
13

14   <u>**OPPOSITION TO PLAINTIFF'S MOTION TO AMEND MOTION PAPERS**</u>

15           All Defendants submit this Opposition to Plaintiff's Opposition in

16   Opposition to Defendants' Motion to Dismiss the First Amended Verified Complaint (ECF No.

17   44) (the "Motion").

18   **I.    THE MOTION SHOULD BE DENIED BECAUSE THE RELIEF REQUESTED
             WOULD RESULT IN NEW ALLEGATIONS BEING INTRODUCED THROUGH**
19           <u>**BRIEFING, WHICH IS NOT PERMITTED ON A MOTION TO DISMISS**</u>

20           Plaintiff's Motion seeks to add new, unpled factual matter and arguments to Plaintiff's

21   opposition papers previously submitted in response to Defendants' pending Motion to Dismiss

22   (ECF No. 21). The new factual material is contained in a document recently produced to Plaintiff

23   in response to a public records request to Truckee Meadows Community College.

24           "[N]ew allegations contained in [a party's] opposition motion . . . are irrelevant for Rule

25   12(b)(6) purposes. In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not*

26

27

28                                           -1-

ER277

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 277 of 298
Case 3:22-cv-00045-ART-CLB   Document 45   Filed 10/06/22   Page 2 of 4

look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 n. 1 (9th Cir. 1998) (emphasis in original) (citing, *inter alia*, 2 Moore's Federal Practice, § 12.34[2] (Matthew Bender 3d ed.) for the proposition that "The court may not ... take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a)"); *see also Rio Properties, Inc. v. Wong Shun Yuen*, No. 205-cv-00961-RCJ-LRL, 2006 WL 8442466, at *3 (D. Nev. July 20, 2006) ("it is inappropriate for the Court to consider additional facts set forth in an opposition or reply brief when considering a Motion to Dismiss").

The prohibition against adding unpled factual material through the motion papers is critical to the purpose of a motion to dismiss. Such a motion is meant to "test[] the sufficiency of the pleadings" through consideration of whether the complaint (not other papers) states a claim. *See, e.g., DeNigris v. Las Vegas Police Managers & Supervisors Ass'n, Inc*., No. 2:11-cv-119, 2012 WL 1964027, at *2 (D. Nev. May 31, 2012). This task becomes impossible if new, unpled factual allegations can be introduced through briefing, making the facts at issue in the dispositive motion an ever-moving target.

Plaintiff's Motion seeks to interject new facts and arguments on a fully submitted motion to dismiss, based on material that is not alleged or referred to anywhere in the operative pleading. *See* Motion at 2:8-10, 3:5, 4:2 (describing document at issue as "new facts" first obtained by Plaintiff on September 7, 2022, a date long after the date the operative complaint was filed). The relief requested is directly at odds with the above-referenced authorities, and the Motion should accordingly be denied.

///

ER278

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 278 of 298
Case 3:22-cv-00045-ART-CLB   Document 45   Filed 10/06/22   Page 3 of 4

## II.    THE MOTION SHOULD ALSO BE DENIED BECAUSE IT IS NOT PERMITTED BY THE FEDERAL RULES OF CIVIL PROCEDURE

The Motion should also be denied because Plaintiff has not identified any appropriate basis in the Federal Rules of Civil Procedure for the relief requested.

Plaintiff's motion is premised on Fed. R. Civ. P. 15(a)(2). *See* Motion at 3:10-25 (arguing the legal standard for the Motion is Rule 15(a)(2)). That rule permits a party to move to "amend its *pleading[.]*" *Id.* (emphasis added). The problem with the relief requested is that the motion papers Plaintiff seeks to amend are not pleadings.

Fed. R. Civ. P. 7(a)(1)-(7) describes a "pleading" as one of a limited number of specific documents, such as an answer or complaint, that set forth the parties' allegations or response to the same. *See also* Black's Law Dictionary (11th ed. 2019) (defining pleading as "[a] formal document in which a party to a legal proceeding (esp. a civil lawsuit) sets forth or responds to allegations, claims, denials, or defenses. In federal civil procedure, the main pleadings are the plaintiff's complaint and the defendant's answer"). Motion papers are not pleadings.

This is no mere technicality: as discussed above, the purpose of a motion to dismiss is undermined if new facts can be interjected through amended briefing.

## III.    PLAINTIFF'S CHARACTERIZATION OF THE DOCUMENT IS IRRELEVANT AND SHOULD BE DISREGARDED

Because there is no procedural basis for the Motion at issue, there is no standard or test against which the content of the proposed new material should be measured. Rather, the dispositive issues on this Motion are addressed above. Accordingly, Plaintiff's arguments and characterizations of the new factual material (*see* Motion at 4-5) are not relevant to the disposition of the Motion. In any event, because Plaintiff seeks to add new briefing, but does not

Case: 23-2545, 02/19/2024, DktEntry: 12.1, Page 279 of 298
Case 3:22-cv-00045-ART-CLB   Document 45   Filed 10/06/22   Page 4 of 4

ER279

attach the proposed new papers, Defendants are not able to meaningfully respond to the proposed new arguments.

However, because Plaintiff's interpretation of the new email contains serious allegations, Defendants are compelled to note that they do not agree with Plaintiff's characterization of the document and generally dispute the accuracy of that characterization.

If the Court determines that Plaintiff is entitled to amend his opposition papers, Defendants respectfully request that the Court grant them a reasonable time after the amended opposition is filed to amend their reply to address these new issues.

## **CONCLUSION**

Not only is there no rule basis for Plaintiff's motion, granting it would be directly contrary to the principle that papers submitted in connection with a motion to dismiss cannot be used to add to, or amend, the pleadings. For that reason, and as further stated herein, Defendants respectfully request that the Court deny Plaintiff's Motion to add new, unpled factual material to the existing Motion to Dismiss briefing.

DATED October 6, 2022

        _/s/ Kiah Beverly-Graham_
Kiah D. Beverly-Graham
NV Bar No. 11916
General Counsel
Truckee Meadows Community College
2215 Raggio Parkway
Reno, Nevada 89512-1095
(775) 673-7300
(775) 673-7135 fax
kiah.beverly@dri.edu

_Attorney for Defendants_

-4-

ER279

John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff Lars Jensen*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LARS JENSEN, an individual,<br><br>   *Plaintiff,*<br><br>  v.<br><br>NATALIE BROWN, in her individual and official capacities as Administrative Officer at Truckee Meadows Community College; JULIE ELLSWORTH, in her individual and official capacities as Dean of Sciences at Truckee Meadows Community College; ANNE FLESHER, in her individual and official capacities as Dean of Math and Physical Sciences at Truckee Meadows Community College; KARIN HILGERSOM, in her individual and official capacities as President of Truckee Meadows Community College; MARIE MURGOLO, in her individual and official capacities as Vice President of Academic Affairs at Truckee Meadows Community College; MELODY ROSE, in her | Case No. 3:22-cv-00045-ART-CLB<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF HIS MOTION TO AMEND RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED VERIFIED COMPLAINT**<br><br>**ORAL ARGUMENT REQUESTED** |

–1–
Plaintiff's Reply in Support of His Motion to Amend Response in Opposition to Defendants' Motion to Dismiss
3:22-cv-00045-ART-CLB

ER280

individual and official capacities as Chancellor
of the Nevada System of Higher Education,

*Defendants.*

Plaintiff Lars Jensen, by and through his undersigned counsel, submits this Reply in support of his Motion to Amend his Response in Opposition to Defendants' Brown, et al., Motion to Dismiss the First Amended Complaint filed on September 22, 2022, (ECF No. 44)(the "Motion" ). The defined terms used herein are given the same meaning as in the Motion.

I.  **ARGUMENT**

Plaintiff withdraws his argument that Fed. R. Civ. P. 15(a)(2) applies, but still requests that the Motion be granted since this Court has the inherit authority to allow amendment to the Plaintiff's OMTD. Fed. R. of Civ. P. 1 states that the rules "…should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." The proposed exhibit containing the email thread was received on September 6, 2022, after both the FAC and the OMTD had been filed. The material in the proposed exhibit is highly relevant for the reasons listed in the Motion and is germane to the determination of allegations and the causes of action listed in the FAC.

First, in Plaintiff's Motion there was no change to any arguments in the OMTD. Plaintiff stands behind all previously made arguments in the OMTD and awaits this Court's ruling. The Motion filed simply requests leave of the Court to add one additional exhibit that supports the arguments Plaintiff has already made to this Court in his OMTD and the allegations already made in the FAC.

–2–
Plaintiff's Reply in Support of His Motion to Amend Response in Opposition to Defendants' Motion to Dismiss
3:22-cv-00045-ART-CLB

ER281

Second, in the Opposition to the Motion Defendants argue through a series of case citations that the Court may not "consider additional facts set forth in an opposition or reply brief when considering a Motion to Dismiss." *See* Opp. 1:6-10  However, these arguments fail to account for the facts and allegations as set forth in the FAC.  Plaintiff did in fact plead First Amendment retaliation by Defendants.  *See* FAC ¶ 2, 3, 4, 5, 22, 23, 25, 26-45, 47-49, 60, 61-67, 84-86, 91-94, 97-98, 101-109.  Plaintiff specifically plead in his FAC that Defendants "sought to silence" and "punish him." *Id.* ¶ 2  Plaintiff did plead that he attempted "…on multiple occasions to professionally communicate his concerns." *Id.* ¶ 2  The FAC stated that "Dr. Jensen has consistently voiced his concerns regarding the lowering of math standards and deterioration of shared governance at TMCC since at least 2017." ¶ 22  The proposed exhibit containing the email thread which further substantiates the allegations as listed in the FAC as it demonstrates that at least two of the named Defendants did make attempts to silence and punish Plaintiff.  The Ninth Circuit has held that "[a]s it makes sense and comports with existing practice, we hold that documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).

## II.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Dr. Lars Jensen respectfully requests this honorable Court to grant the Motion for Leave to Amend his OMTD by including Exhibit H.  This exhibit contains an email thread which demonstrates Plaintiff was targeted prior to the Math Summit on January 21, 2020, for retaliation based on his constitutionally protected speech.

///

///

–3–
Plaintiff's Reply in Support of His Motion to Amend Response in Opposition to Defendants' Motion to Dismiss
3:22-cv-00045-ART-CLB

ER282

DATED: October 13, 2022                    Respectfully submitted,

                                    By:   /s/ John M. Nolan
                                          John M. Nolan, Esq. (NSBN 15790)
                                          2750 Peavine Creek Road
                                          Reno, Nevada 89523
                                          jmnolan84@gmail.com

                                          /s/ Michael Langton
                                          Michael Langton, Esq. (NSBN 290)
                                          801 Riverside Drive
                                          Reno, NV 89503
                                          Telephone: (775) 329-3612
                                          mlangton@sbcglobal.net

                                          /s/ Mark Mausert
                                          Mark Mausert, Esq. (NSBN 2398)
                                          Sean McDowell, Esq. (NSBN 15962)
                                          729 Evans Avenue
                                          Reno, Nevada 89512
                                          Telephone: (775) 786-5477
                                          mark@markmausertlaw.com

                                          *Attorneys for Plaintiff Lars Jensen*

−4−
Plaintiff's Reply in Support of His Motion to Amend Response in Opposition to Defendants' Motion to Dismiss
3:22-cv-00045-ART-CLB

ER283

ER284

John M. Nolan, Esq. (NSBN 15790)
2750 Peavine Creek Road
Reno, Nevada 89523
jmnolan84@gmail.com

Michael Langton, Esq. (NSBN 290)
801 Riverside Drive
Reno, NV 89503
Telephone: (775) 329-3612
mlangton@sbcglobal.net

Mark Mausert, Esq. (NSBN 2398)
Sean McDowell, Esq. (NSBN 15962)
729 Evans Avenue
Reno, Nevada 89512
Telephone: (775) 786-5477
mark@markmausertlaw.com

*Attorneys for Plaintiff Lars Jensen*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LARS JENSEN, an individual,<br><br>     *Plaintiff,*<br><br>    v.<br><br>NATALIE BROWN, in her individual and official capacities as Administrative Officer at Truckee Meadows Community College; JULIE ELLSWORTH, in her individual and official capacities as Dean of Sciences at Truckee Meadows Community College; ANNE FLESHER, in her individual and official capacities as Dean of Math and Physical Sciences at Truckee Meadows Community College; KARIN HILGERSOM, in her individual and official capacities as President of Truckee Meadows Community College; MARIE MURGOLO, in her individual and official capacities as Vice President of Academic Affairs at Truckee Meadows Community College; MELODY ROSE, in her | Case No. 3:22-cv-00045-LRH-CLB<br><br>**NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**<br><br>District Judge: Larry R. Hicks |

ER284

individual and official capacities as Chancellor
of the Nevada System of Higher Education,

*Defendants.*

Notice is hereby given through this Notice of Appeal to the United States Court of

Appeals for the Ninth Circuit that Lars Jensen the appellant in the above-named case, by and

through his undersigned counsel, hereby appeals to the United States Court of Appeals for the

Ninth Circuit from the Order of United States District Court Judge Larry R. Hicks (ECF No. 58)

dated September 27, 2023.  A copy of the Order (ECF No. 58) is attached hereto as Exhibit A.

The Representation Statement required by FRAP 12(b) is attached as Exhibit B.

DATED: October 2, 2023                    Respectfully submitted,

By:  /s/ John M. Nolan
     John M. Nolan, Esq. (NSBN 15790)
     2750 Peavine Creek Road
     Reno, Nevada 89523
     jmnolan84@gmail.com

     /s/ Michael Langton
     Michael Langton, Esq. (NSBN 290)
     801 Riverside Drive
     Reno, NV 89503
     Telephone: (775) 329-3612
     mlangton@sbcglobal.net

     /s/ Mark Mausert
     Mark Mausert, Esq. (NSBN 2398)
     Sean McDowell, Esq. (NSBN 15962)
     729 Evans Avenue
     Reno, Nevada 89512
     Telephone: (775) 786-5477
     mark@markmausertlaw.com

     *Attorneys for Plaintiff Lars Jensen*

**CERTIFICATE OF SERVICE**

I hereby certify, under penalty of perjury that I am a citizen of the United States, over eighteen (18) years of age, and not a party to, nor interested in, the within action; and on the date set below, I sent a true and correct copy, **NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**, via the electronic filing system maintained by the above mentioned Court and the United States Postal Service mail, to the addressee listed below:

Kiah D. Beverly-Graham
NV Bar No. 11916
General Counsel
Truckee Meadows Community College
2215 Raggio Parkway
Reno, Nevada 89512-1095
(775) 673-7300
(775) 673-7135 fax
kiah.beverly@dri.edu

DATED: October 2, 2023

/s/ John M. Nolan
*Attorney for Lars Jensen*

## INDEX OF EXHIBITS

| Exhibit # | Description | Number of Pages |
|---|---|---|
| A | District Judge Larry R. Hicks September 27, 2023 Order | 20 |
| B | Representation Statement Required by FRAP 12(b) | 2 |

# United States District Court
## District of Nevada (Reno)
## CIVIL DOCKET FOR CASE #: 3:22-cv-00045-LRH-CLB

Jensen v. Brown et al
Assigned to: Judge Larry R. Hicks
Referred to: Magistrate Judge Carla Baldwin
Case in other court: 9th Circuit, 23-02545
Cause: 42:1983 Civil Rights Act

Date Filed: 01/25/2022
Date Terminated: 09/27/2023
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Dr. Lars Jensen**                      represented by    **Mark L. Mausert**
Law Office Of Mark Mausert
729 Evans Avenue
Reno, NV 89512
775-786-5477
Fax: 775-786-9658
Email: mark@markmausertlaw.com
*ATTORNEY TO BE NOTICED*

**Michael E. Langton**
Law Office of Michael E. Langton
801 Riverside Dr
Reno, NV 89503
775-329-7557
Fax: 775-329-7447
Email: mlangton@sbcglobal.net
*ATTORNEY TO BE NOTICED*

**Sean McDowell**
Law Office Of Mark Mausert
729 Evans Avenue
Reno, NV 89512
775-786-5477
Fax: 775-786-9658
Email: sean@markmausertlaw.com
*ATTORNEY TO BE NOTICED*

**John M. Nolan**
2750 Peavine Creek Road
Reno, NV 89523
775-682-9166
Email: jmnolan84@gmail.com
*ATTORNEY TO BE NOTICED*

ER289

V.

**Defendant**

**Dr. Natalie Brown**                    represented by   **John Albrecht**
                                                         Desert Research Institute
                                                         GENERAL COUNSEL
                                                         2215 Raggio Parkway
                                                         Reno, NV 89512
                                                         775-673-7396
                                                         Fax: 775-673-7315
                                                         Email: john.albrecht@dri.edu
                                                         *TERMINATED: 11/14/2022*

                                                         **Kiah D. Beverly-Graham**
                                                         Snell & Wilmer L.L.P.
                                                         50 W. Liberty St., Ste. 510
                                                         Reno, NV 89501-1961
                                                         775-785-5440
                                                         Fax: 775-785-5441
                                                         Email: Kiah.Beverly@dri.edu
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Dr. Julie Ellsworth**                  represented by   **John Albrecht**
                                                         (See above for address)
                                                         *TERMINATED: 11/14/2022*

                                                         **Kiah D. Beverly-Graham**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Anne Flesher**                         represented by   **John Albrecht**
                                                         (See above for address)
                                                         *TERMINATED: 11/14/2022*

                                                         **Kiah D. Beverly-Graham**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Dr. Karin Hilgersom**                  represented by   **John Albrecht**
                                                         (See above for address)
                                                         *TERMINATED: 11/14/2022*

ER290

Kiah D. Beverly-Graham
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Marie Murgolo**                    represented by **John Albrecht**
(See above for address)
*TERMINATED: 11/14/2022*

Kiah D. Beverly-Graham
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dr. Melody Rose**                    represented by **John Albrecht**
(See above for address)
*TERMINATED: 11/14/2022*

Kiah D. Beverly-Graham
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/26/2022 | | Case randomly assigned to Chief Judge Miranda M. Du and Magistrate Judge Carla Baldwin. (WJ) (Entered: 01/26/2022) |
| 01/26/2022 | 1 | COMPLAINT against All Defendants (Filing fee $402 receipt number 0978-6774014) by Lars Jensen. Proof of service due by 4/26/2022. (Attachments: # 1 Exhibit Exhibit A Plaintiff's Verified Complaint, # 2 Civil Cover Sheet Civil Cover Sheet and Attorney Contact Information Attachment, # 3 Summons Natalie Brown Summons, # 4 Summons Julie Ellsworth Summons, # 5 Summons Anne Flesher Summons, # 6 Summons Karin Hilgersom Summons, # 7 Summons Marie Murgolo Summons, # 8 Summons Melody Rose Summons) (Nolan, John) NOTICE of Certificate of Interested Parties requirement: Under Local Rule 7.1-1, a party must immediately file its disclosure statement with its first appearance, pleading, petition, motion, response, or other request addressed to the court. (Entered: 01/26/2022) |
| 01/26/2022 | 2 | STANDING ORDER. This case has been assigned to the Honorable Miranda M. Du. Chief Judge Du's Civil Standing Order is posted on the U.S. District Court, District of Nevada public website and may be accessed directly via this hyperlink: www.nvd.uscourts.gov. (Copies have been distributed pursuant to the NEF - PAV) (Entered: 01/26/2022) |

| 01/26/2022 | 3 | NOTICE of Appearance by attorney Mark L. Mausert on behalf of Plaintiff Lars Jensen. (Mausert, Mark) (Entered: 01/26/2022) |
|---|---|---|
| 01/26/2022 | 4 | NOTICE of Appearance by attorney Mark L. Mausert on behalf of Plaintiff Lars Jensen. *Sean McDowell* (Mausert, Mark) (Entered: 01/26/2022) |
| 01/27/2022 | 5 | SUMMONS ISSUED as to All Defendants (re ECF No. 1 ). (Attachments: # 1 Summons as to Julie Ellsworth, # 2 Summons as to Anne Flesher, # 3 Summons as to Karin Hilgersom, # 4 Summons as to Marie Murgalo, # 5 Summons as to Melody Rose) (HKL) (Entered: 01/27/2022) |
| 01/27/2022 | 6 | CERTIFICATE of Interested Parties by Lars Jensen. There are no known interested parties other than those participating in the case (Nolan, John) (Entered: 01/27/2022) |
| 01/27/2022 | 7 | NOTICE of Appearance by attorney Michael E. Langton on behalf of Plaintiff Lars Jensen. (Langton, Michael) (Entered: 01/27/2022) |
| 01/28/2022 | 8 | First AMENDED COMPLAINT with Jury Demand against All Defendants by Lars Jensen. No changes to parties. (Attachments: # 1 Exhibit A, # 2 Summons Natalie Brown, # 3 Summons Julie Ellsworth, # 4 Summons Anne Flesher, # 5 Summons Karin Hilgersom, # 6 Summons Marie Murgolo, # 7 Summons Melody Rose) (Nolan, John) (Entered: 01/28/2022) |
| 01/31/2022 | 9 | SUMMONS ISSUED as to All Defendants re ECF No. 8 Amended Complaint. (Attachments: # 1 Julie Ellsworth, # 2 Anne Flesher, # 3 Karin Hilgersom, # 4 Marie Murgolo, # 5 Melody Rose) (DRM) (Entered: 01/31/2022) |
| 01/31/2022 | 10 | SUMMONS Re-ISSUED as to Marie Murgolo (correcting spelling) re ECF No. 9 Summons issued. (DRM) (Entered: 01/31/2022) |
| 02/07/2022 | 11 | SUMMONS Returned Executed by Lars Jensen re 9 Summons Issued, 8 Amended Complaint,. Melody Rose served on 2/3/2022. (Mausert, Mark) (Entered: 02/07/2022) |
| 02/08/2022 | 12 | SUMMONS Returned Executed by Lars Jensen re 9 Summons Issued, 8 Amended Complaint,. Anne Flesher served on 2/7/2022. (Mausert, Mark) (Entered: 02/08/2022) |
| 02/08/2022 | 13 | CLERK'S NOTICE. Attorney Action Required to ECF No. 12 . Counsel is advised to file a *Notice of Corrected Image/Document* and link to 12 . Summons returned executed is missing process server's signature. **(no image attached)** (LE) (Entered: 02/08/2022) |

| 02/08/2022 | 14 | NOTICE of Corrected Image/Document re 12 Summons Returned Executed by Plaintiff Lars Jensen. (Service of corrected image is attached.) (Mausert, Mark) (Entered: 02/08/2022) |
|---|---|---|
| 02/16/2022 | 15 | NOTICE of Appearance by attorney Kiah D. Beverly-Graham on behalf of Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. (Beverly-Graham, Kiah) (Entered: 02/16/2022) |
| 02/16/2022 | 16 | CERTIFICATE of Interested Parties by Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. There are no known interested parties other than those participating in the case (Beverly-Graham, Kiah) (Entered: 02/16/2022) |
| 02/16/2022 | 17 | First STIPULATION *REGARDING SERVICE OF FIRST AMENDED COMPLAINT AND DATE FOR DEFENDANTS TO FILE RESPONSIVE PLEADING* by Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. (Beverly-Graham, Kiah) (Entered: 02/16/2022) |
| 02/16/2022 | 18 | NOTICE of Appearance by attorney John Albrecht on behalf of Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. (Albrecht, John) (Entered: 02/16/2022) |
| 02/16/2022 | 19 | ORDER **granting** ECF No. 17 Stipulation : Responsive pleading to First Amended Complaint (ECF No. 8 ) due by 3/15/2022. Signed by Magistrate Judge Carla Baldwin on 2/16/2022. (Copies have been distributed pursuant to the NEF - DRM) (Entered: 02/17/2022) |
| 02/17/2022 | 20 | NOTICE of Change of Address by Kiah D. Beverly-Graham. (Beverly-Graham, Kiah) (Entered: 02/17/2022) |
| 03/15/2022 | 21 | First MOTION to Dismiss by Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. Responses due by 3/29/2022. (Attachments: # 1 Declaration Declaration of Kiah Beverly-Graham, # 2 Exhibit 1, # 3 Exhibit 2) (Albrecht, John) (Entered: 03/15/2022) |
| 03/15/2022 | 22 | REQUEST for Judicial Notice re 21 Motion to Dismiss, by Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. (Attachments: # 1 Exhibit 4) (Albrecht, John) (Entered: 03/15/2022) |
| 03/15/2022 | 23 | EXHIBIT *3* to 21 Motion to Dismiss, by Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. (Albrecht, John) (Entered: 03/15/2022) |

| 03/16/2022 | 24 | First MOTION to Stay Discovery by Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. Responses due by 3/30/2022. (Attachments: # 1 Declaration) (Albrecht, John) (Entered: 03/16/2022) |
|---|---|---|
| 03/16/2022 | 25 | MOTION to Extend Time (First Request) re 21 Motion to Dismiss, by Plaintiff Lars Jensen. (Langton, Michael) (Entered: 03/16/2022) |
| 03/21/2022 | 26 | ORDER **granting** ECF No. 25 Motion to Extend Time : Response to ECF No. 21 Motion to Dismiss due by 5/4/2022. Signed by Chief Judge Miranda M. Du on 3/21/2022. (Copies have been distributed pursuant to the NEF - DRM) (Entered: 03/22/2022) |
| 03/30/2022 | 27 | RESPONSE to 24 Motion to Stay Discovery by Plaintiff Lars Jensen. Replies due by 4/6/2022. (Nolan, John) (Entered: 03/30/2022) |
| 04/06/2022 | 28 | REPLY to Response to 24 Motion to Stay Discovery by Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. (Beverly-Graham, Kiah) (Entered: 04/06/2022) |
| 04/13/2022 | 29 | CLERK'S NOTICE that in order to create a caseload for U.S. District Judge Anne R. Traum, this case is reassigned to Judge Anne R. Traum for all further proceedings. All further documents must bear the correct case number **3:22-cv-00045-ART-CLB**. **(no image attached)** (DRM) (Entered: 04/13/2022) |
| 04/13/2022 | 30 | REQUEST for Judicial Notice re 26 Order on Motion to Extend/Shorten Time, 21 Motion to Dismiss, 25 Motion to Extend/Shorten Time by Plaintiff Lars Jensen. (Attachments: # 1 Exhibit Exhibit A - 7-Step Plan, # 2 Exhibit Exhibit B - Aimlessness in Education Article, # 3 Exhibit Exhibit C - Mark Criley Letter, # 4 Exhibit Exhibit D - Joshua Bleisch Letter, # 5 Exhibit Exhibit E - Keith Whittington Letter) (Nolan, John) (Entered: 04/13/2022) |
| 04/13/2022 | 31 | DECLARATION re 21 Motion to Dismiss, 25 Motion to Extend/Shorten Time by Plaintiff Lars Jensen. (Attachments: # 1 Exhibit Exhibit A 7 Step Plan) (Nolan, John) (Entered: 04/13/2022) |
| 04/13/2022 | 32 | DECLARATION re 21 Motion to Dismiss, 25 Motion to Extend/Shorten Time by Plaintiff Lars Jensen. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C) (Nolan, John) (Entered: 04/13/2022) |
| 04/13/2022 | 33 | RESPONSE to 21 Motion to Dismiss, by Plaintiff Lars Jensen. Replies due by 4/20/2022. (Attachments: # 1 Exhibit Exhibit A - Email from February 13, 2018, # 2 Exhibit Exhibit B - Email from December 18, 2019, # 3 Exhibit Exhibit C - Math Summit Agenda, # 4 Exhibit Exhibit D - Declaration of Keith Hooper, # 5 Exhibit Exhibit E - Declaration of Julia Hammett, # 6 Exhibit Exhibit F - Declaration of Damien Ennis, # 7 |

ER294

| | | |
|---|---|---|
| | | Exhibit Exhibit G - Declaration of Jeff Olsen) (Nolan, John) (Entered: 04/13/2022) |
| 05/04/2022 | <u>34</u> | REPLY to Response to <u>21</u> Motion to Dismiss, by Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. (Albrecht, John) (Entered: 05/04/2022) |
| 05/26/2022 | 35 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Carla Baldwin on 5/26/2022. By Deputy Clerk: LGM. A Virtual Motion Hearing regarding the Defendants' Motion to Stay Discovery <u>24</u> is set for **6/8/2022** at **09:00 AM** in Reno Courtroom 1 before Magistrate Judge Carla Baldwin. The court will send to lead counsel an email containing information required to join the Zoom video conference prior to the hearing date. Counsel appearing telephonically shall dial **877-336-1829**. The **access code** is **2809752** and the **security code** is **2245**. IT IS SO ORDERED. **(no image attached)** (Copies have been distributed pursuant to the NEF - LGM) (Entered: 05/26/2022) |
| 06/08/2022 | <u>36</u> | ORDER TO FILE CASE MANAGEMENT REPORT: The parties shall meet and confer on items required to be included in the Joint Case Management Report and file such report by no later than **Wednesday, June 29, 2022**. See the attached order for specifications. Signed by Magistrate Judge Carla Baldwin on 6/8/2022. (Copies have been distributed pursuant to the NEF - LGM) (Entered: 06/08/2022) |
| 06/08/2022 | <u>37</u> | MINUTES OF PROCEEDINGS - Virtual Motion Hearing held on 6/8/2022 before Magistrate Judge Carla Baldwin. Crtrm Administrator: *LGM*; Pla Counsel: *John Nolan, Mark Mausert, and Michael Langton*; Def Counsel: *Kiah Beverly-Graham and John Albrecht*; Recording start and end times: *9:03:06 - 9:26:56*; Courtroom: *1*; Having heard from counsel and good cause appearing, the Court finds that counsel shall meet and confer to determine a plan to delineate discovery narrowing what discovery shall proceed first in this case. Therefore, Defendant's Motion to Stay Discovery <u>24</u> is DENIED. The Court advises that it will issue an Order to File Case Management Report and schedule a Virtual Case Management Conference. See the attached order for specifications. (Copies have been distributed pursuant to the NEF - LGM) (Entered: 06/08/2022) |
| 06/10/2022 | 38 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Carla Baldwin on 6/10/2022. By Deputy Clerk: LGM. A Virtual Case Management Conference is set for **7/13/2022** at **09:00 AM** in Reno Courtroom 1 before Magistrate Judge Carla Baldwin. The court will send to lead counsel an email containing information required to join the Zoom video conference prior to the hearing date. Counsel appearing telephonically shall dial **877-336-1829**. The **access code** is **2809752** and the **security code** is **2245**. IT IS SO ORDERED. **(no image attached)** |

ER294

| | | |
|---|---|---|
| | | (Copies have been distributed pursuant to the NEF - LGM) (Entered: 06/10/2022) |
| 06/22/2022 | 39 | Joint CASE MANAGEMENT REPORT by Plaintiff Lars Jensen (Nolan, John) (Entered: 06/22/2022) |
| 07/13/2022 | 40 | CIVIL STANDING ORDER - Magistrate Judge Carla Baldwin. (Copies have been distributed pursuant to the NEF - CJD) (Entered: 07/13/2022) |
| 07/13/2022 | 41 | MINUTES OF PROCEEDINGS - Virtual Case Management Conference held on 7/13/2022 before Magistrate Judge Carla Baldwin. Crtrm Administrator: *LGM*; Pla Counsel: *John Nolan and Michael Langton*; Def Counsel: *Kiah Beverly-Graham*; Recording start and end times: *9:05:55 - 9:23:59*; Courtroom: *1*; The Court hears from counsel regarding ESI. The Court advises counsel that the Court will issue its Standing Order in this case. A further Virtual Case Management Conference is set for **1/17/2023 at 11:00 AM** in Reno Courtroom 1 before Magistrate Judge Carla Baldwin. The parties shall file a Joint Case Management Report by no later than **January 10, 2023**. See the attached order for specifications. (Copies have been distributed pursuant to the NEF - LGM) (Entered: 07/18/2022) |
| 07/18/2022 | 42 | SCHEDULING ORDER re ECF No. 39 Case Management Report : Discovery due by **6/5/2023**. Motions due by **7/5/2023**. Proposed Joint Pretrial Order due by **8/4/2023**. Signed by Magistrate Judge Carla Baldwin on 7/18/2022. (Copies have been distributed pursuant to the NEF - DRM) (Entered: 07/18/2022) |
| 07/18/2022 | 43 | NOTICE PURSUANT TO LOCAL RULE IB 2-2: In accordance with 28 USC § 636(c) and FRCP 73, the parties in this action are provided with a link to the "AO 85 Notice of Availability, Consent, and Order of Reference - Exercise of Jurisdiction by a U.S. Magistrate Judge" form on the Court's website - www.nvd.uscourts.gov. **AO 85 Consent forms should NOT be electronically filed.** Upon consent of all parties, counsel are advised to manually file the form with the Clerk's Office. (A copy of form AO 85 has been mailed to parties not receiving electronic service.) (DRM) (Entered: 07/18/2022) |
| 09/22/2022 | 44 | MOTION to Amend 33 Response,, by Plaintiff Lars Jensen. Responses due by 10/6/2022. (Attachments: # 1 Declaration Declaration of John M. Nolan, # 2 Exhibit Proposed Exhibit H)(Nolan, John) (dispositive) (Entered: 09/22/2022) |
| 10/06/2022 | 45 | RESPONSE to 44 Motion to Amend/Correct by Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. Replies due by 10/13/2022. (Beverly-Graham, Kiah) (Entered: 10/06/2022) |

ER296

| 10/13/2022 | 46 | REPLY to Response to 44 Motion to Amend/Correct by Plaintiff Lars Jensen. (Nolan, John) (Entered: 10/13/2022) |
|---|---|---|
| 11/14/2022 | 47 | First STIPULATION *for Withdrawal of John Albrecht* by Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. (Albrecht, John) (other) (referral) (Entered: 11/14/2022) |
| 11/14/2022 | 48 | ORDER **granting** ECF No. 47 Stipulation for withdrawal of John Albrecht as attorney for all defendants, individually and officially. Signed by Magistrate Judge Carla Baldwin on 11/14/2022. (Copies have been distributed pursuant to the NEF - HKL) (Entered: 11/14/2022) |
| 11/23/2022 | 49 | STIPULATION *FOR PROTECTIVE ORDER* by Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. (Beverly-Graham, Kiah) (other) (protective) (Entered: 11/23/2022) |
| 11/28/2022 | 50 | PROTECTIVE ORDER **granting** ECF No. 49 Stipulated Protective Order regarding confidentiality of discovery material. The Court's jurisdiction with respect to this protective order will terminate upon the conclusion of this case. Signed by Magistrate Judge Carla Baldwin on 11/28/2022. (Copies have been distributed pursuant to the NEF - HKL) (Entered: 11/28/2022) |
| 01/10/2023 | 51 | Joint CASE MANAGEMENT REPORT by Plaintiff Lars Jensen. (Nolan, John) (Entered: 01/10/2023) |
| 01/11/2023 | 52 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Carla Baldwin on 1/11/2023. By Deputy Clerk: LGM. Having reviewed the parties' Second Joint Case Management Report 51 , the Court finds that the Virtual Case Management Conference currently set for 1/17/2023 at 11:00 AM is VACATED. IT IS SO ORDERED. **(no image attached)** (Copies have been distributed pursuant to the NEF - LGM) (Entered: 01/11/2023) |
| 02/06/2023 | 53 | MINUTE ORDER IN CHAMBERS of the Honorable District Judge Anne R. Traum on 2/6/2023. By Deputy Clerk: Katie Lynn Sutherland.<br><br>With good cause appearing, the Honorable District Judge Anne R. Traum recuses herself in this action. IT IS ORDERED that this action is referred to the Clerk for random reassignment of this case for all further proceedings.<br><br>**(no image attached)** (Copies have been distributed pursuant to the NEF - KLS) (Entered: 02/06/2023) |

ER297

| | | |
|---|---|---|
| 02/09/2023 | 54 | CLERK'S NOTICE that this case is randomly reassigned to Judge Larry R. Hicks for all further proceedings. All further documents must bear the correct case number **3:22-cv-00045-LRH-CLB**. **(no image attached)** (EDS) (Entered: 02/09/2023) |
| 05/15/2023 | 55 | First STIPULATION FOR EXTENSION OF TIME (First Request) *of Discovery Cutoff* by Defendants Natalie Brown, Julie Ellsworth, Anne Flesher, Karin Hilgersom, Marie Murgolo, Melody Rose. (Beverly-Graham, Kiah) (extend) (discovery) (Entered: 05/15/2023) |
| 05/15/2023 | 56 | ORDER **granting** ECF No. 55 Stipulation for Extension of Time (first request). Discovery due by **12/4/2023**. Motions due by **1/1/2024**. Proposed Joint Pretrial Order due by **1/31/2024**. Signed by Magistrate Judge Carla Baldwin on 5/15/2023. (Copies have been distributed pursuant to the NEF - HKL) (Entered: 05/15/2023) |
| 05/15/2023 | 57 | NOTICE PURSUANT TO LOCAL RULE IB 2-2: In accordance with 28 USC § 636(c) and FRCP 73, the parties in this action are provided with a link to the "AO 85 Notice of Availability, Consent, and Order of Reference - Exercise of Jurisdiction by a U.S. Magistrate Judge" form on the Court's website - www.nvd.uscourts.gov. **AO 85 Consent forms should NOT be electronically filed.** Upon consent of all parties, counsel are advised to manually file the form with the Clerk's Office. (A copy of form AO 85 has been mailed to parties not receiving electronic service.) (HKL) (Entered: 05/15/2023) |
| 09/27/2023 | 58 | ORDER - IT IS THEREFORE ORDERED that the Administrators' motion to dismiss is (ECF No. 21 ) is **GRANTED**. IT IS FURTHER ORDERED that Dr. Jensen's motion to amend (ECF No. 44 ) is **DENIED** as moot. IT IS FURTHER ORDERED that the Clerk of the court shall enter judgment accordingly and close this case. Signed by Judge Larry R. Hicks on 9/27/2023. (Copies have been distributed pursuant to the NEF - DLS) (Entered: 09/27/2023) |
| 09/27/2023 | 59 | JUDGMENT entered pursuant to ECF No. 58 Order. Signed by Clerk of Court Debra K. Kempi on 9/27/2023. (Copies have been distributed pursuant to the NEF - DLS) (Entered: 09/27/2023) |
| 10/02/2023 | 60 | NOTICE OF APPEAL as to 58 Order on Motion to Amend/Correct,, Order on Motion to Dismiss,,, by Plaintiff Lars Jensen. Filing fee $ 505, receipt number ANVDC-7444957. E-mail notice (NEF) sent to the US Court of Appeals, Ninth Circuit. (Attachments: # 1 Exhibit Order ECF No.58, # 2 Exhibit Representation Statement) (Nolan, John) (Entered: 10/02/2023) |
| 10/03/2023 | 61 | FORMS - Designation of Transcripts and Transcript Order forms and instructions for ECF No. 60 Notice of Appeal. The forms may also be |

ER297

ER298

|  |  | obtained on the Court's website at www.nvd.uscourts.gov. (Attachments: # 1 Transcript Order Form) (DRM) (Entered: 10/03/2023) |
|---|---|---|
| 10/04/2023 | 62 | USCA TIME SCHEDULE ORDER and Docketing Notice as to ECF No. 60 Notice of Appeal. USCA Case Number **23-2545** assigned. (Copies have been distributed pursuant to the NEF - DRM) (Entered: 10/04/2023) |
| 11/02/2023 | 63 | DESIGNATION of Record on Appeal by Plaintiff Lars Jensen re 60 Notice of Appeal,. (Nolan, John) (Entered: 11/02/2023) |