**FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| LARS JENSEN, Doctor, | No. 23-2545 |
| *Plaintiff - Appellant*, | D.C. No. 3:22-cv-00045-LRH-CLB |
| v. | |
| NATALIE BROWN, Doctor; ANNE FLESHER; KARIN HILGERSOM, Doctor; MARIE MURGOLO; MELODY ROSE, Doctor, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted November 4, 2024
Phoenix, Arizona

Filed March 10, 2025

Before: Richard A. Paez, Marsha S. Berzon, and John B. Owens, Circuit Judges.

Opinion by Judge Berzon

# SUMMARY[*]

## First Amendment Retaliation

The panel reversed the district court's dismissal of an action brought by Lars Jensen, a math professor at Truckee Meadows Community College, alleging that Truckee Meadows Community College and Nevada System of Higher Education administrators (the "Administrators") retaliated against him and violated his due process and equal protection rights after he voiced concerns about a policy change to the math curriculum standards.

The panel held that the district court erroneously dismissed Jensen's First Amendment retaliation claim for damages against the Administrators in their personal capacities. Jensen pleaded a First Amendment violation because (1) Jensen's criticism of the changes in the college mathematics curriculum addressed a matter of public concern; (2) the speech, related to scholarship or teaching, was not barred from First Amendment protection even if Jensen spoke pursuant to his official duties; (3) Jensen sufficiently alleged that the adverse employment actions were motivated, at least in part, by his speech; and (4) the Administrators had not made a showing of an "actual, material and substantial disruption" or "reasonable predictions of disruption" to support their claim that the state's interest outweighed Jensen's. The Administrators were not entitled to qualified immunity because it was clearly established at the time that a professor has a right to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

speak about a school's curriculum without being reprimanded, given negative performance reviews, and put through an investigation and termination hearing.

The panel held that Jensen's First Amendment claim against the Administrators in their official capacities was not barred by Eleventh Amendment sovereign immunity because Jensen sought prospective relief in the form of (1) an injunction to expunge negative records from his file and to end the Administrators' custom and practice of retaliatory actions, and (2) a declaratory judgment that such retaliation violates the First Amendment.

The panel held that Jensen did not identify an interest that could form the basis of a procedural due process claim and that his equal protection claim failed because he had not alleged he belonged to a discrete class. Nevertheless, the district court abused its discretion in denying Jensen leave to amend these claims without explanation. The panel therefore reversed and remanded so that Jensen may have the opportunity again to seek leave to amend these claims.

## COUNSEL

Daniel Ortner (argued), Becket Fund for Religious Liberty, Washington, D.C.; Joshua Bleisch and Joshua House, Foundation for Individual Rights and Expression, Washington, D.C.; Michael E. Langton, Law Office of Michael E. Langton, Reno, Nevada; John M. Nolan, University of Nevada Reno, Management Department College of Business, Reno, Nevada; Mark Mausert and Sean McDowell, Law Offices of Mark Mausert, Reno, Nevada; for Plaintiff-Appellant.

4                        JENSEN V. BROWN

Kiah D. Beverly-Graham (argued), Truckee Meadows Community College, Reno, Nevada, for Defendants-Appellees.

Luke A. Busby, Luke Andrew Busby Ltd, Reno, Nevada; Risa Lieberwitz, Aaron Nisenson, and Edward Swidriski, American Association of University Professors, Washington, D.C.; for Amici Curiae American Association of University Professors and Nevada Faculty Alliance.

---

**OPINION**

BERZON, Circuit Judge:

Plaintiff Lars Jensen, a math professor at a Nevada community college, voiced concerns about a policy change that he argues caused the math department to lower its curriculum standards. He alleges that soon after, Jensen was reprimanded, pressured to resign from another faculty member's tenure committee, given two consecutive negative performance reviews, and required to undergo an investigation and termination hearing. Our question is whether Jensen has pleaded plausible First Amendment, due process, and equal protection violations arising from these events.

We conclude that the district court erroneously dismissed Jensen's First Amendment retaliation claims. We further conclude that Jensen did not adequately plead due process and equal protection claims, but the district court abused its discretion in denying Jensen leave to amend. Accordingly, we reverse and remand.

# I. Background

## A. Factual Background[1]

Plaintiff Lars Jensen is a mathematics professor at Truckee Meadows Community College ("TMCC"). TMCC is part of the Nevada System of Higher Education ("NSHE").

In June of 2019, the Board of Regents for the NSHE adopted a new "co-requisite policy." Under the co-requisite policy, students would be placed in college level math classes even if they needed remedial math instruction. Students who needed remedial math instruction would be required to take remedial classes as "co-requisites" alongside college level classes, instead of as "pre-requisites" before taking college level math courses. To maintain course completion rates under this policy, TMCC's math department decided to lower the academic level of certain math classes. On December 18, 2019, Jensen sent an email to the math department faculty in which he expressed concerns about the department's new standards for coursework.

On January 21, 2020, Julie Ellsworth, the Dean of Sciences at TMCC, facilitated a "Math Summit" to discuss the co-requisite policy's implementation "with the community." During a question-and-answer session following a presentation from Ellsworth, Jensen attempted

---

[1] Because this appeal arises from the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we accept as true the allegations of Jensen's first amended complaint. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). Our review "is limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Id.*

6        JENSEN V. BROWN

to comment on the co-requisite policy. Ellsworth cut him off and announced that the question-and-answer session had ended. After Jensen again attempted to speak, Ellsworth directed him to the "parking lot," a whiteboard that was provided for Math Summit participants to post comments.

Jensen then went to his office and created a handout, titled "On the Math Pathways – Looking Under the Hood," which discussed his concerns with the new co-requisite policy.[2] The one-page document criticized the fact that the math department, in response to the policy, decided to "lower the academic level of Math 120 so students will be able to complete the course at current rates." Jensen argued that this curriculum change would impact "31% of [TMCC's] degree[] and certificate programs by lowering the math[] and technical skills of graduates in these programs." He concluded by discussing the impact on the community, noting that local employers subsidize TMCC through tax revenue and expect in return to be able to hire qualified graduates.

Jensen returned to the Math Summit with copies of the handout. During a break in the Summit's programming, he went room to room distributing his handout to the participants. When he began passing out his handout in Ellsworth's room, she picked up the copies he had distributed and motioned for the participants in the room to pass their handout copies to her. Jensen reminded Ellsworth that it was break time and that he was not being disruptive or disturbing anyone, but Ellsworth again instructed Jensen

---

[2] The handout's contents are properly before us because the handout was attached as an exhibit to Jensen's complaint. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

not to distribute the handout. Jensen then distributed his handout to two other rooms of Summit participants. When he returned to Ellsworth's room and attempted to disseminate his handout again, she directed him to stop. The pair went into the hallway to talk, and Ellsworth again told Jensen that he could not circulate his handout. During this conversation, she accused him of "disobeying her" and being a "bully," stated that his conduct was "disruptive," and warned him that he had "made an error by defying her."

True to her word, one week after the Math Summit Ellsworth sent Jensen a letter of notice of reprimand along with a proposed letter of reprimand addressing Jensen's "insubordination" at the event. An official letter of reprimand was sent and placed in Jensen's personnel file on March 30, 2020.

Shortly after receiving the notice of reprimand, Jensen sent an email to the entire TMCC faculty related to the co-requisite policy. The email, titled "Lowering Standards is Criminal – Literally," argued that the faculty was failing to maintain certain instructional standards required by the NSHE Handbook.

About a week after sending this email, Jensen, after pressure from Ellsworth, resigned as chair and member of another professor's tenure committee. Ellsworth then began to raise issues with Jensen's syllabus policies, which she characterized as "punitive." These course policies mirrored those that had been used for years by other professors in the math department, none of whom Ellsworth similarly reprimanded.

During the 2019-2020 annual performance evaluations conducted in May 2020, the department chair recommended that Jensen be rated "excellent 2." Ellsworth scored Jensen's

performance as "unsatisfactory," the lowest possible rating. In the evaluation, Ellsworth wrote, "Professor Jensen exhibited insubordination in two instances, one which is documented in relationship to the Math Summit and is on record in HR, and the other one in regard to the requested alteration of a course syllabus."

During the following year's annual performance evaluation, the department chair recommended that Jensen be scored "excellent." Anne Flesher, the Dean of Math and Physical Sciences at TMCC, rated Jensen "unsatisfactory." Flesher had attended the Math Summit and had criticized Jensen during the event. To justify the "unsatisfactory" rating, Flesher identified minor issues with Jensen's performance, based on criteria that Jensen asserts were not equally applied to other faculty.

Following that evaluation, Flesher informed TMCC President Karin Hilgersom that Jensen had received two consecutive "unsatisfactory" annual performance evaluations. Under the NSHE Handbook, receiving two consecutive "unsatisfactory" rankings automatically triggers a disciplinary hearing to determine if the faculty member should be terminated. Hilgersom appointed Natalie Brown, a TMCC administrator, to investigate Jensen before the hearing. A termination hearing was then held. Jensen takes issue with numerous aspects of the investigation and hearing, which he contends did not conform to the procedures set out in the NSHE Handbook.[3] Jensen does not

---

[3] The allegations include that TMCC lacked the authority to investigate Jensen, that the individual initially appointed to preside over the hearing was biased, that one of the hearing committee members was biased, and that Jensen was denied subpoenas to obtain certain records and witnesses.

allege that he was terminated or that any other discipline resulted from the hearing.

## B. Procedural History

Jensen then instigated the present action against various TMCC and NSHE administrators ("the Administrators"), alleging (1) First Amendment retaliation, (2) procedural due process violations, and (3) equal protection violations.**⁴** His First Amendment retaliation claim was brought against the Administrators in their personal and official capacities. The due process and equal protection claims were brought against the Administrators in their personal capacities only.**⁵**

The Administrators moved to dismiss Jensen's first amended complaint, arguing that his official capacity claim was barred by sovereign immunity and his personal capacity claims by qualified immunity. The district court granted the motion and dismissed Jensen's claims with prejudice, denying Jensen leave to amend. Jensen now appeals the district court's dismissal.

## II. Discussion

### A. Personal Capacity First Amendment Claim

We turn first to Jensen's First Amendment retaliation claim for damages against the Administrators in their personal capacities. A public official sued for damages in

---

⁴ Jensen also brought claims under the Nevada Constitution. The district court did not consider the merits of the state law claims but dismissed them without prejudice on sovereign immunity and pendant jurisdiction grounds. Jensen has not appealed the dismissal of the state claims.

⁵ Jensen's due process claim was brought only against Brown, Hilgersom, and Flesher. His other claims were brought against all of the Administrators.

their individual capacity is entitled to qualified immunity unless (1) "the facts alleged, taken in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right" and (2) the right at issue "was clearly established 'in light of the specific context of the case'" at the time of the alleged misconduct. *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1100 (9th Cir. 2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Ordinarily, courts may decide these issues sequentially or not, depending on the circumstances. *See Pearson v. Callahan*, 555 U.S. 223, 236-39 (2009); *Olson v. County of Grant*, 127 F.4th 1193, 1203 (9th Cir. 2025); *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 599-602 (9th Cir. 2019). But in this instance, the merits of the First Amendment claim need to be decided for purposes of the official capacity prospective relief sought. *See infra* pp. 30-35. And as we ultimately conclude that the Administrators did violate clearly established law, *see infra* pp. 25-30, we must address the merits of the constitutional issue for that reason as well. So we assess first whether Jensen has pleaded a First Amendment violation.

### i. Underlying Constitutional Violation

"The First Amendment shields public employees from employment retaliation for their protected speech activities." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012). Where a public employer retaliates against an employee for workplace-related speech, the First Amendment requires "balanc[ing] . . . the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services

it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). We have distilled *Pickering* and its progeny into a five-part inquiry:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). Only the first four prongs are at issue here.[6]

### a. Matter of Public Concern

To be covered under the *Pickering* doctrine, Jensen's speech must have been on a matter of public concern. *See Eng*, 552 F.3d at 1070. "Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Johnson v. Multnomah Cnty.*, 48 F.3d 420,

---

[6] On appeal the Administrators briefly touch on the fifth prong by asserting that Jensen did not plausibly allege that the Administrators would not have taken disciplinary action but for his speech. The Administrators, not Jensen, had the burden on that prong. *See Eng*, 552 F.3d at 1072. Additionally, the Administrators did not raise this argument before the district court and so forfeited it. *See Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1053 (9th Cir. 2007).

12                          JENSEN V. BROWN

422 (9th Cir. 1995) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). "Even if only 'a relatively small segment of the general public' might have been interested in the subject of [the speech], that is sufficient." *Hernandez v. City of Phoenix*, 43 F.4th 966, 978 (9th Cir. 2022) (citation omitted). In contrast, "individual personnel disputes and grievances . . . of no relevance to the public's evaluation of the performance of governmental agencies" are not matters of public concern. *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. "Of these, content is the most important factor." *Demers v. Austin*, 746 F.3d 402, 415 (9th Cir. 2014). "We adhere to a liberal construction of what an issue 'of public concern' is under the First Amendment." *Roe v. City of San Francisco*, 109 F.3d 578, 586 (9th Cir. 1997).

Jensen's criticism of the changes in TMCC's mathematics curriculum addressed a matter of public concern. "[T]he preferable manner of operating [a] school system . . . clearly concerns an issue of general public interest." *Pickering*, 391 U.S. at 571. The handout Jensen distributed at the Math Summit spoke to the preferable manner of operating TMCC, specifically its math department. Jensen described how the math department's lowered standards would impact almost a third of TMCC's degree and certificate programs and how graduates would consequently have inadequate math and technical skills when entering the job market. Jensen also grounded his criticism in the effect these lower standards would have on the community, noting that employers in the surrounding

area subsidize TMCC through their taxes and expect competent graduates in return. The decline of TMCC's educational standards and the resulting impact on the community is a matter of public concern.

Any doubt in this regard is resolved by the similarities between Jensen's handout and the speech at issue in *Demers*. David Demers, a professor at the Edward R. Murrow College of Communication at Washington State University, distributed a pamphlet opining on an ongoing controversy over whether to separate the school's Mass Communications faculty, "which had a professional and practical orientation," from the Communications Studies faculty, "which had a more traditional academic orientation." *Demers*, 746 F.3d at 407. Demers's pamphlet contained a plan for separating the two faculties and recommended other changes that would strengthen the Mass Communications department and its practical focus. *Id.* We concluded that the pamphlet spoke on a matter of public concern, as it addressed "broad proposals to change the direction and focus of the School." *Id.* at 416.

In criticizing the recent curriculum changes, Jensen similarly addressed the "the direction and focus" of TMCC. *Id.* Moreover, like the *Demers* pamphlet, Jensen's handout "did not focus on a personnel issue or internal dispute of no interest to anyone outside a narrow 'bureaucratic niche.'" *Id.* (quoting *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996)). "Nor did the [handout] address the role of particular individuals in [TMCC], or voice personal complaints." *Id.* Instead, it focused on the effect that the math curriculum changes would have on students and on the broader community.

The Administrators contend that Jensen's handout was distributed less widely than the pamphlet in *Demers*. Demers posted his pamphlet to his website and sent it to alumni, friends, and newspapers, as well as other faculty members, *id.*; Jensen circulated his handout at the Math Summit, which was open to the "community." The parties dispute whether the "community" included members of the public or was limited to individuals affiliated with TMCC. Either way, the same result follows.

"If an employee expresses a grievance to a limited audience, such circulation can suggest a lack of public concern." *Id.* "But limited circulation is not, in itself, determinative." *Id.* "The form of the speech—complaints to staff and superiors rather than to the general public—does not remove it from the realm of public concern." *Chateaubriand v. Gaspard*, 97 F.3d 1218, 1223 (9th Cir. 1996). In *Rankin v. McPherson*, for example, a public employee's remark about a presidential assassination attempt made to only the employee's co-worker addressed a matter of public concern. 483 U.S. 378, 381-82, 385-87 (1987). Similarly, *Anthoine v. North Central Counties Consortium* held that speech made only to the chairman of the governing board of the plaintiff's employer addressed a matter of public concern. 605 F.3d 740, 749 (9th Cir. 2010). Although the audience to whom a public employee's speech is addressed may be instructive "[i]n a close case, when the subject matter of a statement is only marginally related to issues of public concern," *Johnson*, 48 F.3d at 425, the nature of Jensen's speech does not present a close question. As a result, the scope of Jensen's handout distribution does not affect our conclusion that Jensen has plausibly alleged that he spoke on a matter of public concern.

### b. Speaking as a Private Citizen

Next we must ask "whether the plaintiff spoke as a private citizen or public employee." *Eng*, 552 F.3d at 1070. The premise of this requirement, derived from *Garcetti v. Ceballos*, is that generally, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 421 (2006). But *Garcetti* noted that it was not "decid[ing] whether the analysis [the Court] conduct[ed] . . . would apply in the same manner to a case involving speech related to scholarship or teaching." *Id*. at 425.

Addressing that open question in *Demers*, we held that "*Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor." 746 F.3d at 412. Rather, speech "related to scholarship or teaching" is covered by the *Pickering* doctrine even if it was made pursuant to a public employee's official duties. *Id.*

Not all speech made by a higher education employee relates to scholarship or teaching. For example, proposals "to allocate one additional teaching credit for teaching a large class instead of a seminar, to adopt a dress code that would require male teachers to wear neckties, or to provide a wider range of choices in the student cafeteria" are likely too attenuated from academic topics to be classified as relating to scholarship or teaching. *Id.* at 415. Conversely, the scholarship or teaching exception does not require that the speech be published in an academic journal or uttered while instructing a class. The pamphlet in *Demers*, for example,

was speech related to scholarship or teaching because, "if implemented, [the pamphlet's proposals] would have substantially altered the nature of what was taught at the school." *Id.*

As *Demers* exemplifies, speech about a school's curriculum is "related to scholarship or teaching" and so falls outside *Garcetti*'s purview, even if that speech is not made while teaching a class or producing scholarship. We noted in *Demers* that although "[i]t may in some cases be difficult to distinguish between what qualifies as speech 'related to scholarship or teaching' . . . this is not such a case," indicating that speech about a school's curriculum fits comfortably within the scholarship or teaching exception. *Id.*; *see also id.* at 413 (recognizing in a separate example that speech about a "department's curriculum" is related to scholarship or teaching).

Like the pamphlet in *Demers*, Jensen's speech concerned "what was taught at the school." *Id.* It denounced the co-requisite policy and the resulting effect on standards for students' completion of math courses. Further, like the plaintiff in *Demers*, Jensen rooted his criticism of the curriculum change in concerns over the quality of education students would receive. *Id.* Because Jensen's speech was focused on the contents of TMCC's math curriculum, it relates to scholarship or teaching and does not come within *Garcetti*'s bar on First Amendment protection for speech made pursuant to a public employee's official duties.

### c. Motivating Factor

The next inquiry is "whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action." *Eng*, 552 F.3d at 1070. "To constitute an adverse employment action, a government act of

retaliation need not be severe and it need not be of a certain kind." *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003). "Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights." *Id.* "The goal is to prevent, or redress, actions by a government employer that 'chill the exercise of protected' First Amendment rights." *Id.* at 974-75 (quoting *Rutan v. Republican Party*, 497 U.S. 62, 73 (1990)).

Jensen avers that he experienced several adverse employment actions. Specifically, he alleges that he was (1) issued a letter of notice of reprimand and a letter of reprimand; (2) pressured to resign from another faculty member's tenure committee; (3) given two "unsatisfactory" performance evaluations even though the department head had recommended that he be evaluated as "excellent 2" or "excellent"; (4) subjected to an investigation into his performance; and (5) required to undergo a termination hearing. These actions, especially when considered collectively, were "reasonably likely to deter" employees from "engaging in speech protected under the First Amendment." *Id.* at 976-77.

Jensen has also alleged facts that plausibly support the inference that his speech at the Math Summit was a substantial or motivating factor for the adverse employment actions. "A plaintiff may establish motive using direct or circumstantial evidence." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 870 (9th Cir. 2016). "At the pleading stage, a plaintiff adequately asserts First Amendment retaliation if the complaint alleges plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct." *Id.*

18          JENSEN V. BROWN

Jensen's complaint plausibly links the allegedly retaliatory acts to his speech. At the Math Summit, Ellsworth vocally opposed Jensen's distribution of his handout and informed Jensen that he had "made an error by defying her." The notice of reprimand, sent one week after the Summit, was explicitly a response to Jensen's alleged insubordination at the Math Summit. Just a few weeks later, Ellsworth pressured Jensen to resign from the tenure committee of another faculty member. The following month, Ellsworth gave Jensen an official letter of reprimand expressly based on the conduct identified in the notice of reprimand. The temporal proximity of these events, as well as the fact that some were explicitly premised on Jensen's handout distribution, plausibly demonstrates that Jensen's speech motivated the adverse employment actions. *See Anthoine*, 605 F.3d at 751.

As for Jensen's 2019-2020 performance review, Ellsworth wrote that Jensen's "unsatisfactory" rating was due in part to his conduct at the Math Summit. Drawing all reasonable inferences in Jensen's favor, the other reason given for the "unsatisfactory" rating—that Jensen had punitive course policies—may have been pretextual, given that other faculty members enforced similar policies without criticism or any adverse evaluation impact, and the math department chair recommended that Jensen be given a rating of "Excellent 2." Even if this additional reason was not pretextual, the presence of a legitimate basis for the adverse employment action does not immunize the employer from liability unless it can show that "it would have made the same employment decisions even absent the questioned speech." *Eng*, 552 F.3d at 1072. As explained, *supra* note 6, the Administrators have not at this juncture made any such showing.

This negative performance review, in combination with the negative review Jensen received the following year,[7] triggered the subsequent termination proceedings under the mandatory provision in Section 5.13.2 of the NSHE Handbook. These allegations sufficiently indicate that the adverse employment actions were motivated, at least in part, by Jensen's speech.

### d. Balancing the State's Interest

A public employee's right to speak is not absolute and may be outweighed by the state's interest "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. "Once a plaintiff shows that his statements were of public concern and that the statements were a substantial motivating factor for the disciplinary action taken against him, the burden shifts to the defendant to show that its legitimate administrative interests outweigh the plaintiff's First Amendment rights." *Bauer v. Sampson*, 261 F.3d 775, 784 (9th Cir. 2001). In assessing the strength of the state's interest, pertinent considerations include "whether the statement impairs discipline by superiors or harmony among

---

[7] Jensen contends that his 2020-2021 "unsatisfactory" performance review, although not explicitly premised on the events of the Math Summit, was also retaliatory and "based on criteria that was not equally applied to other faculty." He alleges that Flesher, the administrator responsible for that review, had attended the Math Summit, where she criticized Jensen. And the individual administrator who knew Jensen's work best, the math department chair, recommended Jensen be scored "excellent." In any event, because the termination proceedings would not have occurred without the "unsatisfactory" 2019-2020 performance review—which was explicitly based on Jensen's Math Summit conduct—we need not determine whether Jensen has pleaded facts plausibly demonstrating that the subsequent performance evaluation was also retaliatory.

20 JENSEN V. BROWN

co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388.

"In many cases, factual development is necessary, so the balancing cannot be performed on a 12(b)(6) motion." *Weisbuch v. County of L.A.*, 119 F.3d 778, 783 (9th Cir. 1997). Where the facts alleged do not decisively indicate that the state's interest outweighs the plaintiff's, the *Pickering* balancing is generally deferred at least to the summary judgment stage.[8]

The rules governing affirmative defenses support this practice. "Ordinarily, affirmative defenses . . . may not be raised on a motion to dismiss except when the defense raises no disputed issues of fact." *Lusnak v. Bank of Am., N.A.*, 883

---

[8] *See, e.g.*, *Hernandez*, 43 F.4th at 979 (reversing the district court's dismissal and "remand[ing] for further development of the factual record" because "[a]lthough it seems likely that Hernandez's posts could impede the performance of his job duties and interfere with the Phoenix Police Department's ability to effectively carry out its mission, no evidence of the actual or potential disruptive impact caused by Hernandez's posts is properly before us at this stage"); *Hyland v. Wonder*, 972 F.2d 1129, 1140 (9th Cir. 1992) ("Determining to what extent Hyland's memorandum disrupted office operations . . . involves a factual investigation into the nature of Hyland's tasks, the character of his relationship with co-workers . . . , and the impact of the memorandum on office relations. . . . [T]his balancing inquiry cannot be resolved by this court at such an early stage in the proceedings."); *Thomas v. Carpenter*, 881 F.2d 828, 831 (9th Cir. 1989) (holding that although the defendant might be able to prove at trial or on summary judgment that the state requires political loyalty from plaintiff for "the effective implementation of general departmental policy," it could not do so on the facts alleged in the complaint).

F.3d 1185, 1194 n.6 (9th Cir. 2018). "In other words, dismissal based on an affirmative defense is permitted when *the complaint* establishes the defense." *U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 973 (9th Cir. 2019). "Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 603 n.8 (9th Cir. 2018) (quoting *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)). This rule reflects that affirmative defenses require the defendant to prove facts beyond those necessary to support the plaintiff's *prima facie* case, making it difficult to assess the defense's merit on a 12(b)(6) motion where review is limited to the allegations in the complaint.

Evaluating the state's interest in conducting the *Pickering* balancing presents the same challenge. The state interest prong is not part of the *prima facie* case for First Amendment retaliation. *See Thomas v. City of Beaverton*, 379 F.3d 802, 807-08 (9th Cir. 2004); *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022). As a result, a plaintiff's complaint is unlikely to include facts related to the state's interest, making it difficult to conduct the *Pickering* balancing on a motion to dismiss.

Only in the rare cases where "the balance can only come out one way on the averments pleaded" do we dismiss on that basis. *Weisbuch*, 119 F.3d at 783. For example, in *Weisbuch* the plaintiff worked in a high-level position at the Los Angeles Department of Health Services. *Id.* at 781. Because of the nature of his position, his vocal disagreement with the department head's policy decisions "necessarily" threatened the department's ability to efficiently carry out

those policies. *Id.* at 783-84. Given that the department's functioning required employees "in a high level supervisory position[] or a confidential advisory position" to agree with their supervisor's general policy views, it was evident from the pleadings that the state's interest outweighed the employee's. *Id.* at 784.

Unlike in *Weisbuch*, the pleadings in this case do not reveal any state interest that clearly outweighs Jensen's. The Administrators' only clearly asserted state interest grounded in the pleadings is their assertion that Jensen distributed his handout in violation of Ellsworth's "express or implied directions." They maintain that, in doing so, Jensen engaged in "insubordination," which the state has a legitimate interest in preventing.

The complaint does indicate that Jensen's handout distribution was at odds with Ellsworth's instructions. When Jensen passed out his handout in Ellsworth's room, she "began to physically pick up copies that were distributed and motioned for the participants to return their copies to her." After Jensen reminded Ellsworth that it was break time and that he was not being disruptive or disturbing anyone, Ellsworth "again denied Dr. Jensen the opportunity to distribute his handout." In spite of this directive, Jensen disseminated his handout in other rooms and eventually returned to Ellsworth's room to again attempt to distribute the handout there.[9]

---

[9] The Administrators also argue that Jensen's handout distribution violated Ellsworth's instruction to use the "parking lot" to express his concerns regarding the co-requisite policy. But Ellsworth stated that she did so to prevent him from verbally commenting during a session that had run out of time. She did not order him to use the parking lot to express his views during the breaks in the Summit programming.

But the state's interest in punishing a disobedient employee for speaking in violation of their supervisor's orders cannot automatically trump the employee's interest in speaking. To be sure, one factor in assessing the extent of the state's interest in preventing disruption is whether the employee's speech "impairs discipline by superiors." *Rankin*, 483 U.S. at 388. But, as *Rankin* makes clear, the focus of this inquiry is whether there has been a disruption in the office's ability to operate: "[T]he very nature of the balancing test[] make[s] apparent that the state interest element of the test focuses on the effective functioning of the public employer's enterprise," not on whether the employee has been directed to cease speaking. *Id.* Accordingly, for a court "to find that the government's interest as an employer in a smoothly-running office outweighs an employee's first amendment right, defendants must demonstrate actual, material and substantial disruption, or reasonable predictions of disruption in the workplace." *Robinson v. York*, 566 F.3d 817, 824 (9th Cir.2009) (internal quotation marks and alteration omitted). Applying this standard, we have often held that the *Pickering* balancing does not favor the state in situations where the employee's speech or expressive conduct violated orders from their supervisor.

In *Nunez v. Davis*, for example, Nunez's conduct violated her supervisor's direct orders, but we concluded that this disobedience was not sufficient to show that her expressive conduct "impaired discipline." 169 F.3d 1222, 1226-29 (9th Cir. 1999). Similarly, in *Robinson*, we concluded that "the *Pickering* balancing test can favor protected speech even where the speech violates the employer's written policy requiring speech to occur through specified channels." 566 F.3d at 825. And in *Dahlia v. Rodriguez*, we held that an employee stated a claim for First

Amendment retaliation even though his speech ran counter to his supervisor's direct orders. 735 F.3d 1060, 1075, 1080 (9th Cir. 2013).

In assessing the state interest, there is good reason for focusing on the disruptive impact of the employee's speech, rather than simply disobedience to an order to stop speaking. If we were instead to allow an employer to prevail solely on the basis that the employee disobeyed the employer's order not to speak, employers would have carte blanche to "stifl[e] legitimate speech or penalize[e] public employees for expressing unpopular views." *McKinley*, 705 F.2d at 1115. Under such a regime, an employer seeking to prevent an employee from engaging in protected speech could do so simply by ordering the employee to cease. The employee would have to either obey or face retaliation from which there is no recourse. In either case, the employer would succeed in quashing protected speech. This type of suppression is to the detriment of both the speaker and the listener, as it undermines "[t]he public interest in having free and unhindered debate on matters of public importance," which is a "core value of the Free Speech Clause." *Pickering*, 391 U.S. at 573. The First Amendment cannot abide such a result.

Nor do the pleadings suggest any other state interest that might justify the Administrators' actions, much less outweigh Jensen's interest in free expression on matters of public concern. Nothing in the complaint suggests that Jensen served in a "confidential, policymaking, or public contact role" where the "government's interest in avoiding disruption is magnified." *Pool v. VanRheen*, 297 F.3d 899, 908 (9th Cir. 2002) (citation omitted). Nor is it evident that Jensen's position was one where "personal loyalty and confidence are necessary." *Id.* at 909. Jensen also was not

employed in a police department or military agency where "[d]iscipline and esprit de corps are vital to its functioning." *Cochran v. City of L.A.*, 222 F.3d 1195, 1201 (9th Cir. 2000); *see also Pool*, 297 F.3d at 909.[10] To the contrary, there is no indication in Jensen's pleadings that his speech impaired TMCC's functioning. Jensen alleges that he distributed the handouts in a non-disruptive manner, waiting until there was a break in the Math Summit's programming to pass them out. And several witnesses testified during Jensen's disciplinary hearing that he behaved professionally while distributing the handouts.

The upshot is that at this stage there has been no showing of an "actual, material and substantial disruption" or "reasonable predictions of disruption" to support the Administrators' claim that the state's interest outweighs Jensen's. *Robinson*, 566 F.3d at 824 (citations omitted). Consequently, we conclude that Jensen has pleaded a constitutional violation.[11]

### ii. Clearly Established Right

We now turn to "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232. To satisfy this test, "the contours of the right must be sufficiently clear that a reasonable

---

[10] We do not hold that Jensen could not have plausibly alleged a First Amendment retaliation claim if he were in such a role. We only note that the absence of such circumstances supports our conclusion that there is no apparent state interest clearly outweighing Jensen's interests.

[11] Some of the Administrators may turn out not to be individually liable based on their own actions. Because no such argument has been made on appeal of the dismissal on the pleadings, we do not decide whether Jensen has plausibly alleged that each individual Administrator's actions violated the First Amendment.

official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 635 (1987). There does not need to be "a case directly on point for a right to be clearly established," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

Additionally, it is insufficient simply to show that "the generic First Amendment right to free speech" or "the right to be free from speech-based retaliatory discharge" was clearly established. *Moran v. Washington*, 147 F.3d 839, 845 (9th Cir. 1998); *Brewster v. Bd. of Educ.*, 149 F.3d 971, 980 (9th Cir. 1998). "Instead, we must define the rights implicated . . . at a level commensurate with the specific factual and legal context of the case." *Dodge*, 56 F.4th at 784.

Here, by the time of the alleged retaliation, *Pickering* had established that "the preferable manner of operating the school system . . . clearly concerns an issue of general public interest." 391 U.S. at 571. More recently, *Demers* held that speech opining on "the nature of what [is] taught at [a] school" addresses a matter of public concern, putting a reasonable official on notice that Jensen's speech regarding TMCC's math curriculum met this criterion. 746 F.3d at 415-16. In addition, it was clearly established at the time of the alleged retaliation that speech need not be aired to the general public to involve a matter of public concern. *See Anthoine*, 605 F.3d at 749; *Rankin*, 483 U.S. at 381-82, 385-87. Further, *Demers* pronounced that if a public employee's speech is "related to scholarship or teaching," it does not fall outside the ambit of the First Amendment simply because it is made pursuant to the employee's official duties. 746 F.3d at 412. As *Demers* illustrated, speech about a department's

curriculum, like that at issue here, falls squarely within the scholarship or teaching exception. *Id.* at 414-15. And it was clearly established that retaliatory actions like those taken by the Administrators constitute adverse employment actions. *See Coszalter*, 320 F.3d at 976. So at the time of the Math Summit incident, it was clearly established that a professor has a right to speak about a school's curriculum without being reprimanded, given negative performance reviews, and put through an investigation and termination hearing.

We note, as the district court concluded otherwise, that *Demers*' substantive holdings as to the reach of the *Pickering* doctrine are now clearly established law. *Demers* ultimately held that qualified immunity applied in that case, but that was because "[u]ntil the decision in [*Demers*], our circuit ha[d] not addressed the application of *Garcetti* to teaching and academic writing." 746 F.3d at 417. Once *Demers* clarified that *Garcetti* does not apply to speech related to scholarship or teaching, the doctrinal ambiguity was eliminated and does not bar Jensen's claim.

Ordinarily, the next *Pickering* step is evaluating whether it was clearly established that TMCC's interest in maintaining an orderly workplace did not outweigh Jensen's right to speak. *See, e.g.*, *Hufford v. McEnaney*, 249 F.3d 1142, 1148-49 (9th Cir. 2001); *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 747 (9th Cir. 2001). But "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making," *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018). One such problem arises when the boundaries of the right at issue are delineated by a balancing test in which the defendant bears the burden of substantiating its interest, as is the case here. Determining whether it was clearly established that the *Pickering* balancing would tilt in Jensen's favor

turns on the strength of the state's interests, which, as discussed above, must appear from the complaint itself, if at all.

We have firmly recognized "that only a 'real, not imagined, disruption' might outweigh the expressive interests of the employee." *Robinson*, 566 F.3d at 826 (quoting *McKinley*, 705 F.2d at 1115); *see also Clairmont*, 632 F.3d at 1107. Again, the requirement that an employer substantiate their concerns of disruption applies even if the employer characterizes the employee's speech as "an act of insubordination," *Clairmont*, 632 F.3d at 1107, or the speech involves some degree of disobedience, *Robinson*, 566 F.3d at 825. Although the Administrators assert a state interest in preventing and punishing what they deem to be insubordination, they have not shown that there was "actual, material and substantial disruption" or "reasonable predictions of disruption" based on the facts in the complaint. *Robinson*, 566 F.3d at 824 (citations omitted).

Faced with similar circumstances, the D.C. Circuit declined to grant state officials qualified immunity where the strength of the state's interest could not be established from the pleadings. *See Navab-Safavi v. Glassman*, 637 F.3d 311, 318 (D.C. Cir. 2011).[12] As was the case in *Navab-Safavi*,

---

[12] Although the Ninth Circuit does not appear to have confronted this issue on a motion to dismiss, we have faced a comparable lack of evidentiary development regarding the weight of the state's interest on summary judgment and reached a similar result. *See Allen v. Scribner*, 812 F.2d 426, 436 (9th Cir. 1987), *amended by* 828 F.2d 1445 (9th Cir. 1987) ("Inasmuch as the defendants' interest in preventing the substantial disruption of the eradication program *may* have been served by restrictions on the free speech rights of Project employees . . . , we are not in a position to determine whether the above named defendants violated 'clearly established constitutional rights.'").

"all we have of record is the [state's] assertion that its interest in performing its governmental functions . . . was sufficiently implicated by plaintiff's conduct to warrant the protection of qualified immunity." *Id.* There is not yet any "evidence in the record that [Jensen's] conduct interfered with the performance of the governmental function," and "we are unable to determine without an evidentiary record whether any act [the state] committed in defense of [its interests] constituted a violation of clearly established rights, or even in general terms, where the *Pickering* balancing tips." *Id.* Because "it is not possible to determine at this stage as a matter of law that [Jensen] has not alleged a violation of clearly established law," the Administrators are not entitled to qualified immunity at the pleading stage. *Id.*

In reaching the opposite outcome, the district court concluded that Jensen had not shown that his right was clearly established. The complaint described his anti-retaliation right too generally, the district court said, and contained "only three citations—*Demers*, 746 F.3d 402, the First Amendment, and 42 U.S.C. § 1983," which "do not clearly establish the specific right at issue in this particular case."

We cannot agree with this truncated analysis. "[A]ppellate review of qualified immunity dispositions is to be conducted in light of all relevant precedents, not simply those cited to, or discovered by, the district court." *Elder v. Holloway*, 510 U.S. 510, 512 (1994). "A court engaging in review of a qualified immunity judgment should therefore use its 'full knowledge of its own and other relevant precedents.'" *Id.* at 516 (alteration omitted) (quoting *Davis v. Scherer*, 468 U.S. 183, 192 n.9 (1984)). As described above, our review of the full range of relevant precedents

indicates that the Administrators are not entitled to qualified immunity at this stage.

## B. Official Capacity First Amendment Claim

The district court dismissed Jensen's official capacity claim, maintaining that it was barred by sovereign immunity. "The Eleventh Amendment bars suits against the State or its agencies for all types of relief, absent unequivocal consent by the state." *Romano v. Bible*, 169 F.3d 1182, 1185 (9th Cir. 1999). Ordinarily, this protection "extends to state instrumentalities and agencies," as well as "state officials" sued in their "official capacity." *Krainski v. Nevada ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 967 (9th Cir. 2010). But over a century ago, *Ex parte Young* held that Eleventh Amendment-linked sovereign immunity is not a barrier to suits against state officers "where the relief sought is prospective in nature and is based on an ongoing violation of the plaintiff's federal constitutional or statutory rights." *Cent. Rsrv. Life of N. Am. Ins. Co. v. Struve*, 852 F.2d 1158, 1161 (9th Cir. 1988) (emphasis omitted) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Under this principle, a plaintiff may seek "prospective injunctive relief that governs the official's future conduct," but not "retroactive relief that requires the payment of funds from the state treasury." *Nat'l Res. Def. Council v. Cal. Dep't of Transp.*, 96 F.3d 420, 422 (9th Cir. 1996). Jensen's ability to proceed with his official capacity claim turns on whether he sought prospective relief.

### i. Injunctive Relief: Expungement

Jensen sought injunctive relief mandating "full expungement of all negative personal [sic] files, return of his 2019-2020 annual performance evaluation to 'excellent', and return of his 2020-2021 annual performance evaluation to 'excellent.'" The district court held that such an injunction

would be "retroactive" because it "more closely resemble[d] recovery of lost wages than true prospective relief addressing ongoing violations." Jensen challenges this conclusion on appeal.[13]

Ninth Circuit case law establishes that expungement of records constitutes prospective relief and so is not barred by sovereign immunity. *See Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007). In *Flint*, a former college student brought suit against school administrators alleging that the spending limits imposed in student government elections violated his First Amendment right to freedom of speech. *Id.* at 820. In connection with this claim, Flint sought injunctive relief expunging any reference to his campaign spending violations from his disciplinary record. *Id.* at 824. We held that the expungement relief sought was not barred by sovereign immunity, reasoning that "the injunctions sought [were] not limited merely to past violations: they serve[d] the purpose of preventing present and future harm to [the plaintiff]." *Id.* at 825. We reached a similar conclusion in *R.W. v. Columbia Basin College*, holding that the *Ex parte Young* doctrine applied where the student plaintiff sought, among other things, expungement of negative records. 77 F.4th 1214, 1226 (9th Cir. 2023); s*ee also Elliott v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986) ("The injunctive relief requested here, reinstatement and expungement of personnel records, is clearly prospective in effect and thus falls outside the prohibitions of the Eleventh Amendment."). Most recently, in *K.J. v. Jackson*, we confirmed that expungement

---

[13] Jensen does not contest the district court's determination that his request for "compensation from the date of judgment for salary adjustments he would have received had he not received the unlawful performance reviews" was impermissible retroactive monetary relief. We therefore do not address whether that is the case.

of information from school records is a form of prospective relief a student plaintiff can seek under the *Ex parte Young* doctrine. 127 F.4th 1239, 1251 (9th Cir. 2025).

As was the case in *Flint*, *R.W.*, and *K.J.*, the expungement sought here is prospective in nature and so is not barred by sovereign immunity. Although the negative performance evaluations and letters of reprimand arose from the Administrators' alleged past constitutional violations, *Ex parte Young* does not demand that the relief sought be unrelated to past violations. Rather, a plaintiff may pursue relief that "would relate to [a] past violation," so long as it "would not amount to relief *solely for the past violation*." *Doe v. Lawrence Livermore Nat'l Lab'y*, 131 F.3d 836, 841 (9th Cir. 1997). Expungement of negative work records does not amount solely to relief for a past violation, because "[t]he goal of . . . the removal of damaging information from the plaintiff[']s work record is not compensatory; rather, it is to compel the state official to cease her actions in violation of federal law and to comply with constitutional requirements." *Elliott*, 786 F.2d at 302.

The Administrators contend otherwise, arguing that cases involving student plaintiffs are not controlling. A student seeking expungement experiences a "self-evident educational or career harm inherent in the existence of the records at issue," they maintain, whereas an individual already employed is less likely to seek future employment or educational opportunities that require disclosing one's disciplinary record as an employee. As a result, the Administrators assert, for us to determine that his requested relief would remedy an "ongoing violation," Jensen must plead with specificity what ongoing harm he will endure related to the existence of the negative records.

Putting aside the fact that Jensen *has* alleged specific ongoing harm due to the negative documents in his personnel file, [14] holding Jensen to a higher pleading standard because he is an employee rather than a student makes no sense. Just as a student's negative disciplinary records "may jeopardize the student's future employment or college career," *Flint*, 488 F.3d at 824, the presence of negative performance evaluations or letters of reprimand in an employee's personnel file poses an obvious threat to career advancement. Such documents, or information derived from them, may stymie efforts to obtain a job elsewhere or prevent accessing certain benefits, opportunities, or promotions at their current job. One might ask, indeed, why the Administrators are so insistent on retaining the disciplinary records if they do not expect to rely on them for anything.

In sum, the alleged violation—First Amendment retaliation—is ongoing insofar as the retaliatory records continue to exist in Jensen's personnel file. Because expungement would constitute prospective relief from this ongoing violation, Jensen's First Amendment official capacity claim is not barred by the Eleventh Amendment.

---

[14] Jensen alleges that the negative performance reviews "negatively impacted . . . future merit pay" and prevent him "from receiving employment benefits and other opportunities at TMCC." He alleges that "Defendants' unlawful actions," which allegedly include the creation and retention of the records at issue, have caused ongoing "damage to his personal and professional reputation, denial of future employment opportunities and earning capacity, mental and emotional distress, and humiliation and embarrassment."

## ii. Declaratory Relief and Non-Expungement Injunctive Relief

Even if that were not the case, Jensen sought, in addition to expungement, prospective relief in the form of an order "[e]njoining Defendants . . . to end their custom and practice of taking adverse employment actions against faculty who speak on matters of public concern" and a declaratory judgment that "Defendants' adverse employment actions against Dr. Jensen, and Defendants' custom or practice of retaliating against and terminating professors for speaking on matters of public concern, are unconstitutional abridgments of the freedom of speech."

Unlike its treatment of the requested expungement, the district court correctly recognized that this prospective declaratory and injunctive relief was "not barred by the Eleventh Amendment." But its analysis of the injunctive relief stopped there. At the conclusion of its order, the District Court again addressed the non-expungement relief sought, stating that "[w]hile Eleventh Amendment immunity and qualified immunity do not bar Dr. Jensen's claims for declaratory and injunctive relief, the Court dismisses Dr. Jensen's claim for declaratory relief because all other substantive causes of action are dismissed." The district court then proceeded to dismiss Jensen's official capacity claim entirely, without identifying any reason why Jensen could not seek an injunction for indisputably prospective relief.

The district court provided a more robust, although no more correct, explanation for why Jensen could not pursue declaratory relief. After disposing of Jensen's substantive claims, the district court concluded that declaratory relief

JENSEN V. BROWN 35

was unavailable because "[d]eclaratory relief is not a standalone claim."

It is true that "[t]he Declaratory Judgment Act does not provide an independent *jurisdictional* basis for suits in federal court," and so "only permits the district court to adopt a specific remedy when jurisdiction exists." *Fiedler v. Clark*, 714 F.2d 77, 79 (9th Cir. 1983) (emphasis added). But, as the district court recognized, Jensen's request for declaratory relief is prospective and can proceed under *Ex parte Young.* There is no principle precluding declaratory relief from being the only relief awarded, and it is quite usual for declaratory relief to be permitted as a "standalone claim." *See, e.g.*, *Redd v. Guerrero*, 84 F.4th 874, 888 (9th Cir. 2023); *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 700 (9th Cir. 1992); *Standard Ins. Co. v. Saklad*, 127 F.3d 1179, 1181 (9th Cir. 1997); *Doc's Dream, LLC v. Dolores Press, Inc.*, 959 F.3d 357, 359 (9th Cir. 2020). The district court erred in holding that Jensen could not maintain an official capacity First Amendment claim for declaratory relief alone.

In sum, because Jensen sought prospective relief in the form of (1) an injunction to expunge various negative records from his personnel file, (2) an injunction to "end [the Administrators] custom and practice of taking adverse employment actions against faculty who speak on matters of public concern," and (3) a "declaratory judgment that Defendants' custom and practice of retaliating against faculty who speak on matters of public concern, including Dr. Jensen, violate the First Amendment," the Eleventh Amendment does not bar his official capacity First Amendment retaliation claim.

## C. Procedural Due Process Claim

The district court held that the Administrators were entitled to qualified immunity with respect to Jensen's procedural due process claim because Jensen failed to plead a constitutional violation. "A section 1983 claim based upon procedural due process . . . has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).

In the portion of his complaint addressing his due process claim, Jensen identified the following interests: (1) "a protected liberty interest in his good name, reputation, honor, and integrity," (2) "a protected liberty interest in his future employment opportunities," and (3) "a significant interest in avoiding termination for cause or being subjected to a biased hearing panel." The district court concluded that none of these interests supported a due process claim.

On appeal, Jensen does not challenge the district court's conclusion that his asserted interests in his reputation, his future employment, and avoiding termination do not provide a basis for a due process claim. Instead, Jensen contends that he was denied due process related to the deprivation of (1) his "liberty interests in ensuring that his First Amendment rights were protected . . . , his rights under state law were protected, and his rights in the NSHE Handbook were protected," and (2) his "property interests in his right to academic freedom, right to maintain standards of curriculum, right to have processes for faculty terminations followed, and right to not be charged with insubordination for distributing handouts."

As to Jensen's asserted "liberty interests" in ensuring his rights under the First Amendment and state law were protected, he did not plead a due process claim premised on either theory. Nor did he raise either argument in his briefing before the district court. He is foreclosed from asserting these theories for the first time on appeal. *See One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1158 (9th Cir. 2009); *Steam Press Holdings, Inc. v. Haw. Teamsters, Allied Workers Union, Loc. 996*, 302 F.3d 998, 1005 (9th Cir. 2002).

As to his "property interest in his right to academic freedom, right to maintain standards of curriculum, . . . and right to not be charged with insubordination for distributing handouts," Jensen *did* raise a due process argument on these grounds before the district court. But, as the district court correctly determined, Jensen's complaint did not assert a due process violation grounded in the deprivation of any of these interests. Jensen's failure to plead a due process claim based on these interests is dispositive at this point.[15]

That leaves Jensen's asserted interest in compliance with the processes for faculty terminations outlined in the NSHE Handbook.[16] Jensen pleads that he was deprived of due process when (1) he was denied subpoenas that he was

---

[15] Jensen may seek to amend his complaint to add additional due process claims on remand. *See infra* p. 40-41.

[16] Although Jensen's briefing—which addresses his due process claim only briefly—is not clear on this point, we understand Jensen's "liberty interest" in ensuring that "his rights in the NSHE Handbook were protected" and his "property interest" in his "right to have processes for faculty terminations followed" as describing the same set of procedural protections for faculty termination proceedings contained in the NSHE Handbook.

entitled to under NSHE Handbook Section 6.9.11, (2) Hilgersom, in violation of NSHE Handbook Section 6.11.6(b), refused to remove one of the presiding committee members who had previously submitted a complaint of discrimination against Jensen, and (3) Brown exceeded her authority under NSHE Handbook Section 5.13.2(a)-(b) by investigating him and listing additional charges in Jensen's charging documents.

State law establishing certain procedures can, under some circumstances, create a property interest in accessing those procedures. *See, e.g.*, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 431-32 (1982) (holding that employee had a property interest in accessing state agency's adjudicatory procedures); *Redd v. Guerrero*, 84 F.4th 874, 893 (9th Cir. 2023) (holding that capital habeas petitioner had a property interest in obtaining appointed counsel). But, unlike in *Logan* or *Redd*, Jensen has not argued that the relevant procedural rights in the NSHE Handbook "can be surrendered for value," *Logan*, 455 U.S. at 431, or "resemble[] more traditional conceptions of property in that [they] ha[ve] an 'ascertainable monetary value.'" *Redd*, 84 F.4th at 893-94. Nor has he argued that these procedures share any other relevant characteristics with the sort of "individual entitlement[s]" that are generally considered to be property under the Due Process Clause. *Logan*, 455 U.S. at 430-31.

Alternatively, procedures created by state law may give rise to a property right if the procedures present a "significant substantive restriction" on the decisionmaker's discretion such that it transforms "what otherwise would be 'an abstract need or desire' or 'a unilateral expectation'" as to the outcome of those procedures into "a legitimate claim of entitlement." *Parks v. Watson*, 716 F.2d 646, 656-57 (9th

Cir. 1983) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)); *see also Goodisman v. Lytle*, 724 F.2d 818, 820 (9th Cir. 1984); *Clemente v. United States*, 766 F.2d 1358, 1364-65 (9th Cir. 1985); *Nunez v. City of Los Angeles*, 147 F.3d 867, 873 n.8 (9th Cir. 1998). But here Jensen does not contend that he has any interest in obtaining a different *outcome* from the termination proceedings. He would be hard pressed to do so, given that he was not terminated or otherwise disciplined following the proceedings. "Absent a substantive property interest in the outcome of procedure, [Jensen] is not constitutionally entitled to insist on compliance with the procedure itself." *Shanks v. Dressel*, 540 F.3d 1082, 1092 (9th Cir. 2008). Thus, Jensen did not identify an interest that can form the basis of his procedural due process claim.

## D. Equal Protection Claim

The district court determined that the Administrators were entitled to qualified immunity with respect to Jensen's equal protection claim because Jensen failed to plead a constitutional violation. "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (quoting *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998)). "The first step in equal protection analysis is to identify the state's classification of groups." *Country Classic Dairies, Inc. v. Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988). "An equal protection claim will not lie by 'conflating all persons not injured into a preferred class receiving better treatment' than the plaintiff." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005)

(quoting *Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir. 1986)).

Jensen's equal protection claim fails because he has not alleged that he belongs to a discrete class. He claims only that he was "treated . . . differently than similarly situated Professors" and "evaluated differently from other faculty." These allegations do not establish membership in a class singled out for discriminatory treatment, nor can Jensen state an equal protection claim by grouping everyone besides himself into a "preferred class." *Thornton*, 425 F.3d at 1167.

"[A]n equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.'" *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 601 (2008). But, unlike in the legislative and regulatory context where the class-of-one theory of equal protection has traditionally been applied, the state's role as an employer often "involve[s] discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Id.* at 603. "To treat employees differently . . . is simply to exercise the broad discretion that typically characterizes the employer-employee relationship." *Id*. at 605. Accordingly, "the class-of-one theory of equal protection has no application in the public employment context," and this avenue is unavailable to Jensen. *Id.* at 607; *see also Okwu v. McKim*, 682 F.3d 841, 846 (9th Cir. 2012). The district court did not err in concluding that Jensen failed to plead an equal protection violation.

## E. Leave to Amend

Finally, Jensen argues that the district court abused its discretion in dismissing his claims with prejudice and

without leave to amend. Generally, a "court should freely give leave [to amend the pleadings] when justice so requires." Fed. R. Civ. P. 15(a). "[T]his policy is to be applied with extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)).

Denial of leave to amend a complaint is generally reviewed for abuse of discretion. *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004). "[O]utright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Consequently, "[a] simple denial of leave to amend without any explanation by the district court is subject to reversal." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003); *see also DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987).

Here, the district court gave no reason for its denial of leave to amend, and in doing so, abused its discretion. We reverse and remand so that Jensen may have the opportunity again to seek leave to amend his due process and equal protection claims.

## III. Conclusion

Jensen's First Amendment retaliation claims are barred by neither qualified immunity nor sovereign immunity. They may therefore progress past the pleading stage. Although Jensen's due process and equal protection claims do not state a claim as pleaded, the district court abused its discretion in denying Jensen leave to amend without explanation. The district court's dismissal order is **REVERSED and**

**REMANDED for further proceedings consistent with this opinion.**